# EXHIBIT A

**FILED**

APR 3 0 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

KAROLINA OBRYCKA, MARTIN
KOLODZIEJ, and EVA CEPIASZUK,

Plaintiffs,

v.

CITY OF CHICAGO, a Municipal
Corporation, ANTHONY ABBATE, Jr.,
GARY ORTIZ, PATTI CHIRIBOGA,
and JOHN DOE,

Defendants.

07cv2372
JUDGE ST. EVE
MAG. JUDGE NOLAN

## COMPLAINT AT LAW

NOW COME the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, by and through their attorneys, EklWilliams PLLC and Law Offices of Gustavo Munoz & Associates, and complaining of the Defendants, City of Chicago, Anthony Abbate, Jr., Gary Ortiz, Patti Chiriboga and John Doe, state as follows:

### INTRODUCTION

This is an action brought pursuant to the First and Fourteenth Amendments to the United States Constitution and under Illinois State Law. Specifically, the Defendant, Anthony Abbate, Jr., violated the rights of Karolina Obrycka, by savagely beating her without any justification, and that the Defendant, City of Chicago, violated the rights of Karolina Obrycka because the savage beating that Karolina Obrycka suffered at the hands of Anthony Abbate, Jr. was the direct and proximate result of the pervasive and unconstitutional custom, practice and policy of the City of Chicago in failing to investigate, discipline or otherwise hold accountable its police officers, whether on duty

or off duty, which custom, practice and policy has engendered the firm understanding among Chicago Police Officers, including Anthony Abbate, Jr., that they may commit crimes against and violate the rights of the citizens of the City of Chicago and the State of Illinois with impunity, and without fear of official consequence. Furthermore, the Defendants, Anthony Abbate, Gary Ortiz, Patti Chiriboga and John Doe, while acting under color of law and in conspiracy with one another, violated the rights of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, by threatening and intimidating the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, with the threat of false arrest, planting of evidence and other criminal acts, in order to coerce and deter the Plaintiffs from engaging in protected speech on a matter of public concern, namely pursuing criminal charges against Anthony Abbate, Jr., offering witness accounts of the beating and subsequent acts in furtherance of the conspiracy, and disseminating a video tape recording of Anthony Abbate, Jr.'s savage beating of Karolina Obrycka.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(1) and 28 U.S.C. §1367(a). Venue is proper in this District under 28 U.S.C. §1391(b), as all or most of the parties reside in this Judicial District, and the events giving rise to the claims asserted herein occurred in this Judicial District.

### BACKGROUND

3. The Plaintiff, Karolina Obrycka, is a resident of this Judicial District. On, before and for some time after February 19, 2007, she was employed as a waitress / bartender at Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois.

Case 1:07-cv-02372 Document Filed 04/30/07 Page 3 of 16

4.    The Plaintiff, Martin Kolodziej, is a resident of this Judicial District. On, before and since February 19, 2007, he was employed as the manager of Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois.

5.    The Plaintiff, Eva Cepiaszuk, is a resident of this Judicial District. On, before and since February 19, 2007, she was the owner of Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois.

6.    The Defendant, City of Chicago (hereinafter "CITY"), at all relevant times, was an Illinois Municipal Corporation, duly chartered and organized under the Laws of the State of Illinois, located entirely within this Judicial District.

7.    The Defendant, Anthony Abbate, Jr. (hereinafter "ABBATE"), at all relevant times, was a sworn Chicago Police Officer residing in this Judicial District, who possessed the authority under law to carry out the police powers invested in him by the Defendant, CITY and the State of Illinois, including the power to arrest.

8.    The Defendant, Gary Ortiz (hereinafter "ORTIZ"), at all relevant times was a resident of this Judicial District and an employee of the Defendant, CITY, within the Department of Streets & Sanitation, and was a personal friend of the Defendant, ABBATE.

9.    The Defendant, Patti Chiriboga (hereinafter "CHIRIBOGA"), at all relevant times was a resident of this Judicial District employed as a waitress / bartender at Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois, and was a personal friend of the Defendant, ABBATE.

10.    The Defendant, John Doe (hereinafter "OFFICER DOE"), at all relevant times is believed to have been a resident of this Judicial District and a sworn Chicago Police Officer who

possessed the authority under law to carry out the police powers invested in him by the Defendant, CITY and the State of Illinois, including the power to arrest.

### THE SAVAGE BEATING OF KAROLINA OBRYCKA

11.     On February 19, 2007, the Plaintiff, Karolina Obrycka, was working at Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois, as a waitress / bartender. While tending bar, she was serving several patrons who had been drinking in the bar for some time. One of the patrons was the Defendant, ABBATE, a person known by many in the bar to be a Chicago Police Officer, off-duty at the time.

12.     Late in the evening of February, 19, 2007, the Defendant, ABBATE, began to act in a violent, abusive and combative manner; earlier in the evening, he used abusive and profane language toward the Plaintiff, Karolina Obrycka, and others, and was otherwise extremely unruly and abusive. After these circumstances had occurred and it was apparent that ABBATE was intoxicated, the Plaintiff, Karolin Obrycka, refused to serve ABBATE any further alcoholic beverages.

13.     At some time soon after this, ABBATE walked to the area behind the bar, his intentions unclear. The Plaintiff directed him to go back to the customer area. Shortly thereafter, ABBATE again entered the service area behind the bar, this time carrying a bar stool in a menacing manner. The Plaintiff, Karolina Obrycka, attempted to prevent ABBATE from remaining behind the bar by pushing him back towards the customer area. However, Karolina Obrycka is less than half the size of ABBATE.

14.     In response to her efforts to move him out from behind the bar area, ABBATE erupted into a violent fit, and began to savagely toss, beat, kick and punch the diminutive Plaintiff,

Karolina Obrycka, about her whole body, including her head, arms legs, torso and back.

15.     Eventually, ABBATE stopped beating the Plaintiff, Karolina Obrycka, and abruptly left the bar. Around that time, the Chicago Police were called via 9-1-1. Some time thereafter, several uniformed Chicago Police Officers arrived. At the time the police arrived, the Plaintiff, Karolina Obrycka, was unaware of ABBATE's last name and that he was a Chicago Police Officer.

### THE IMMEDIATE AFTERMATH

16.     When several Chicago Police Officers arrived to investigate the 9-1-1 call, Karolina Obrycka reported to them what had happened, and gave a physical description of the Defendant, ABBATE, and his first name, "Tony." Furthermore, the Plaintiff, Martin Kolodziej, who arrived in the bar shortly after the aforementioned events occurred, reported to the responding officers that "Tony" was a Chicago Police Officer, and that he believed that the bar's video system should have recorded the whole incident.

17.     However, upon hearing that the offender was a Chicago Police Officer, the responding officers did not direct the Plaintiff, Martin Kolodziej, to preserve the recording or turn it over to them, did not even view it, and simply gave the Plaintiff, Karolina Obrycka, a complaint form and directed her to go to the station at Belmont & Western to file the complaint if she wanted. The responding officers then left the bar without any further investigation. It is not known if these officers ever generated an investigatory report in connection with their response to the scene of the report, but they did not engage in any further investigation to locate ABBATE, question him or record the statement of any other witness in the bar.

18.     Before she had the opportunity to go to the police station, the Plaintiff, Karolina Obrycka, was approached by another patron in the bar by the name of "Gary" (the Defendant, ORTIZ) and another employee of the bar, the Defendant, CHIRIBOGA. Both ORTIZ and CHIRIBOGA began to talk with the Plaintiff, Karolina Obrycka, about what the Defendant, ABBATE, had done.

19.     Prior to speaking with the Plaintiff, Karolina Obrycka, the Defendants, ORTIZ and CHIRIBOGA, had been in contact with ABBATE on their cell phones, and the Defendant, CHIRIBOGA, an employee of the bar, asked the Plaintiff, Martin Kolodjiez, if she could see the video, which she then viewed. After relaying to ABBATE that his savage beating of the Plaintiff, Karolina Obrycka, was caught on tape, ABBATE, ORTIZ and CHIRIBOGA agreed to communicate to the Plaintiff, Karolina Obrycka, that if she would not file the complaint against ABBATE, that ABBATE would pay for her medical bills, lost wages and other financial loss she suffered as a result of the beating.

20.     Thereafter, in furtherance of this agreement and in concert with each other, the Defendants, ORTIZ and CHIRIBOGA, while acting under color of law, told Plaintiff, Karolina Obrycka, that if she would refrain from filing the charge against ABBATE, he would pay her for her trouble. The Plaintiff, Karolina Obrycka, refused, and both Defendants, ORTIZ and CHIRIBOGA, communicated back to ABBATE that the Plaintiff's, Karolina Obrycka, silence could not be bought.

### THREATS AND INTIMIDATION TO SILENCE THE PLAINTIFFS

21.     At some point later, while acting under color of law, the Defendant, CHIRIBOGA, and the Defendants, ABBATE and OFFICER DOE, spoke and/or met and through joint and

concerted action, entered into an agreement to threaten and intimidate the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, to coerce and deter them from testifying or otherwise presenting evidence against ABBATE in connection with the complaint filed by the Plaintiff, Karolina Obrycka.

22.     Specifically, the Defendants, ABBATE, CHIRIBOGA and OFFICER DOE, spoke and/or met and agreed to communicate to the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, that the Defendants were aware of the Plaintiffs' vehicle identification tags and descriptions, and that if the Plaintiffs did not turn over to the Defendants (or destroy) the video tape recording of ABBATE savagely beating the Plaintiff, Karolina Obrycka, that the Plaintiffs and patrons of Jesse's Shortstop Inn would be falsely arrested for Driving Under the Influence of Alcohol and/or possession and/or trafficking of cocaine. The Defendants also agreed to threaten the Plaintiffs not to show the video to anyone.

23.     In furtherance of the agreement made between and among the Defendants, and other as yet unknown-co-conspirators, the Defendant, CHIRIBOGA, met with the Plaintiff, Martin Kolodziej, and threatened him that if he did not turn over the tape to ABBATE or destroy it in two days, and refrain from showing it to anyone, that the lives of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, and patrons and employees of Jesse's Shortstop Inn would be in danger, and that these Plaintiffs and patrons and employees of Jesse's Shortstop Inn would be indiscriminately and falsely arrested on trumped up charges of driving under the influence and/or possession and/or trafficking of cocaine through the planting of drugs.

## THE CHICAGO POLICE "SHAM" INVESTIGATION

24.    After being threatened by the Defendant, CHIRIBOGA, the Plaintiffs, Karolina Obrycka and Martin Kolodziej, met with investigators of the Office of Professional Standards (hereinafter "OPS") within the Chicago Police Department (hereinafter "CPD"), and shared with them the videotape that showed ABBATE savagely beating the Plaintiff, Karolina Obrycka, the responding officers showing up at the scene and then leaving without conducting any investigation and the Defendants, ORTIZ and CHIRIBOGA, talking with the Plaintiff, Karolina Obrycka, trying to bribe her.

25.    When he met with the OPS investigators, the Plaintiff, Martin Kolodziej, also advised the investigators that a friend of ABBATE's, the Defendant, CHIRIBOGA, had conveyed to the Plaintiffs a threat and intimidation of false arrest for driving under the influence and/or planting of evidence, namely cocaine. The Plaintiff, Martin Kolodziej, also advised the investigators that he was in possession of an audio recording of the threats from ABBATE and OFFICER DOE relayed to Plaintiff, Martin Kolodziej, by the Defendant, CHIRIBOGA. Despite being advised of further physical evidence of an ongoing conspiracy to intimidate and coerce the Plaintiffs from sharing the evidence and information in their possession, the OPS investigators did not even ask for the audio tape of the threats.

26.    Rather, in response to the complaint filed by the Plaintiff, Karolina Obrycka, and the videotape and information furnished by the Plaintiff, Martin Kolodziej, the OPS investigators set about a concerted and deliberate effort to minimize and conceal from public scrutiny the details and facts of the case. Specifically, the OPS investigators conducted a bad faith investigation, including but not limited to the following:

a. did not follow-up on the bribery allegations involving the Defendants, ABBATE, ORTIZ and CHIRIBOGA;

b. did not follow-up on the intimidation, conspiracy and official misconduct allegations involving Defendants, ABBATE, OFFICER DOE and CHIRIBOGA;

c. did not conduct a meaningful interview of ABBATE designed to establish the truth of what occurred both during the beating and after;

d. did not recommend, or otherwise cause, the immediate administrative suspension of ABBATE pending formal disciplinary proceeding; and

e. submitted incomplete facts and evidence of the case to the Office of the Cook County State's Attorney.

27. As a result of the bad faith investigation of the criminal conduct by the OPS investigators as described above, the complaints and evidence related to the beating and bribery of Plaintiff, Karolina Obrycka, and the intimidation of Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, were improperly and insufficiently addressed and/or allowed to occur without consequence. The initial charge of simple battery was filed by the CPD without consultation with the Office of the Cook County State's Attorney, despite the brutal and savage nature of the attack and despite the subsequent conspiracy to silence the witnesses; no further charges or investigation was left open regarding the remaining allegations of bribery and intimidation.

28. In short, the investigators carried out the pervasive custom, practice and policy of the CPD of failing to investigate, discipline or otherwise hold accountable its police officers, whether on duty or off duty.

## THE PUBLIC FALLOUT AND OFFICIAL SCRUTINY

29. On March 20, 2007, after it became apparent to the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, that the proper course of legal and official action would not

be taken by the CPD, and after having lived under the threat against life and limb, including the threat of being falsely arrested, legal representatives of the Plaintiffs disclosed the video tape recording of ABBATE beating the Plaintiff, Karolina Obrycka, to the media. The brutal, vicious and savage nature of the beating immediately brought about national and worldwide condemnation of the event, including grave suspicion on CPD for the decision to allow only a charge of simple battery and its failure to engage in any immediate disciplinary action against ABBATE.

30.     On March 19 or 20, 2007, the Office of the Cook County State's Attorney initiated a felony charge of Aggravated Battery against ABBATE. Even on the approval of this charge and the issuance of an arrest warrant, members of the CPD violated their own policies in placing ABBATE under arrest, in that they allowed him into custody and in the back of a squad car without handcuffs. Even after public condemnation of that preferential treatment, ABBATE was again protected by the CPD, when he was shielded from public view at a subsequent court appearance, where ABBATE was escorted in and out of a back door of the courthouse, around metal detectors and outside the view of the media.

31.     On or shortly before April 27, 2007, ABBATE was indicted on 14 Counts of Aggravated Battery, Official Misconduct and Conspiracy by a Grand Jury in Cook County, Illinois.

### COUNT I
### 42 U.S.C §1983
### DUE PROCESS / FIRST AMENDMENT / EQUAL PROTECTION – MONELL CLAIM

32.     Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 31, above, as if fully set forth herein.

33.     The actions of the Defendants, ABBATE, ORTIZ, CHIRIBOGA and OFFICER DOE,

were done pursuant to one or more of the following de facto policies, practices and/or customs of the CITY that are so pervasive that they carry the force of law.

34.     Specifically, the CITY has a de facto policy, practice and/or custom of concealing and/or suppressing officer misconduct (both on duty and off duty misconduct), including the use of unlawful force. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; failure to promptly record witness statements or preserve evidence; failure to promptly interview the suspected officer; failure to properly and sufficiently discipline an officer, even where the complaint is sustained; fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct is so obviously true.

35.     Likewise, the CITY has a de facto policy, practice and/or custom of investigating complaints against off duty officers differently than complaints against other citizens. This "double standard" regarding allegations of misconduct against off-duty officers includes, but is not limited to: all of the above acts and/or omissions listed in paragraph 34, above; limiting charges against off-duty officers to misdemeanors, regardless of the severity or outrageousness of the alleged misconduct; and suppressing felony review of charges against off-duty officers, regardless of the severity or outrageousness of the alleged misconduct.

36.     Likewise, the CITY has a de facto policy, practice and/or custom of failing to maintain accurate and complete records of complaints and investigations of misconduct.

37.     Likewise, the CITY has a de facto policy practice and/or custom of hiring and retaining unqualified officers, and failing to properly train, monitor and/or supervise its police

officers.

38.     Finally, the CITY, has a de facto policy, practice and/or custom of a "code of silence." This code is an implicit understanding between and among members of the CPD resulting in a refusal or failure to report instances of misconduct of which they are aware, including the use of unlawful force, despite their obligation to do so as sworn peace officers. This includes police officers who remain silent or give false or misleading information during official investigations into allegations of a fellow officer related to misconduct that occurred on duty or off duty in order to protect themselves or their fellow officers from discipline, criminal prosecution or civil liability.

39.     Individually and collectively, the above described de facto policies, practices and/or customs of the CITY proximately result in the culture and endemic attitude among members of the CPD, including the Defendants, ABBATE and OFFICER DOE, that they may engage in misconduct against the citizenry with impunity, and without fear of official consequence; they consider themselves "above the law."

40.     The aforementioned de facto policies, practices and/or customs of the CITY, individually and collectively, have been maintained and/or implemented with utter indifference by the CITY and has or have encouraged and/or motivated the Defendants, ABBATE and OFFICER DOE, to commit the aforesaid wrongful acts against the Plaintiffs, and therefore acted as the direct and proximate cause of the injuries sustained by the Plaintiffs.

41.     The above acts / omissions of the CITY violated the Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

42.     As a direct result of the facts and allegations set forth in Count I, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, have suffered, and will in the future

continue to suffer injuries of a personal and pecuniary nature, including extreme emotional distress, and damage to their business and property.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, demand judgment against the Defendant, CITY OF CHICAGO, in a sum in excess of $1,000,000.00, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## COUNT II
### 42 U.S.C. §1983
### CONSPIRACY – FIRST AMENDMENT

43.     Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 42, above, as if fully set forth herein.

44.     As alleged above, the Plaintiffs spoke out about matters of public concern, to wit, the criminal acts and conspiracy committed in the official and individual capacities of the Defendants, ABBATE, ORTIZ, CHIRIBOGA and OFFICER DOE.

45.     Defendants, acting under color of law, individually and/or in concert with each other and other as yet unknown co-conspirators, unlawfully conspired to retaliate against the Plaintiffs through concerted and deliberate action, including threats and intimidation, in order to punish Plaintiffs for the exercise of their protected speech and to keep the Plaintiffs from further exercising their right to protected speech, and to conceal and destroy evidence in Plaintiffs' possession.

46.     As the proximate result of the threats and intimidation described herein and above, the Plaintiffs have suffered and will in the future continue to suffer injuries of a personal and pecuniary nature.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk,

demand judgment against the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ, PATTI CHIRIBOGA and JOHN DOE, in a sum in excess of $1,000,000.00, including punitive damages, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

**COUNT III**
42 U.S.C. §1983
CONSPIRACY – EQUAL PROTECTION

47.     Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 46, above, as if fully set forth herein.

48.     Defendants, acting under color of law, individually and/or in concert with each other, singled out the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, with threats of investigation of criminal charges, false arrest, planting of evidence and bodily harm, all in retaliation for the acts and participation of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, of providing evidence and information related to the criminal and internal investigation of ABBATE.

49.     Defendants' conduct, as described above, violated the rights of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, to equal protection of the laws as guaranteed under the Fourteenth Amendment to the United States Constitution, and caused the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, to suffer damages, including personal and pecuniary injuries.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, demand judgment against the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ, PATTI CHIRIBOGA and JOHN DOE, jointly and severally in a sum in excess of $1,000,000.00, including

punitive damages, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## COUNT IV
### 42 U.S.C. §1985(2)
#### CONSPIRACY

50.      Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 49, above, as if fully set forth herein.

51.      The individual Defendants, acting together and under color of law, reached an understanding and agreement, engaged in a course of conduct, and otherwise conspired among and between themselves and with other unnamed and/or as yet unknown co-conspirators, to intimidate, threaten and otherwise deter the Plaintiffs from acting as witness and/or party to any potential and/or threatened action in the federal courts of the United States related to the conduct described herein and above.

52.      As the proximate result of the threats and intimidation described herein and above, the Plaintiffs have suffered and will in the future continue to suffer injuries of a personal and pecuniary nature.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, demand judgment against the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ, PATTI CHIRIBOGA and JOHN DOE, jointly and severally in a sum in excess of $1,000,000.00, including punitive damages, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## COUNT V
### INDEMNIFICATION

53.     Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 52, above, as if fully set forth herein.

54.     Defendants, ABBATE, ORTIZ and OFFICER DOE, were employees and agents of the CITY and acted within the scope of their employment in committing the misconduct described herein and the Defendant, CITY, was their principal.

55.     Defendant, CITY, is a municipal corporation required to provide indemnity within the meaning of 735 ILCS 10/9-102 for all actual damages caused by the Defendants, ABBATE, ORTIZ and OFFICER DOE, caused while acting in the scope of their employment

WHEREFORE, the Defendant, CITY OF CHICAGO, is liable to Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, for an amount which will compensate them for past and future damages, including but not limited to Plaintiffs' pain, suffering, emotional distress, and damages to their business and property proximately caused by the wrongful and unlawful acts of the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ and JOHN DOE.

### PLAINTIFFS DEMAND A JURY OF TWELVE.

Respectfully submitted by,

EklWilliams PLLC and
Law Offices of Gus Munoz and Associates

Terry A. Ekl
Patrick L. Provenzale
**EKL WILLIAMS PLLC**
**Attorneys for Plaintiff**
115 West 55th Street, Suite 400
Clarendon Hills, Illinois 60514
(630) 654-0045
(630) 654-0150 *Facsimile*
tckl@cklwilliams.com
ARDC # 00727105

Gustavo Munoz
**Law Office of Gus Munoz**
**Attorneys for Plaintiff**
7557 West 63rd Street
Summit, IL 60501
(708) 924-9000
(708) 924-9004 *Facsimile*
lawofficeofgusmunoz@yahoo.com

# EXHIBIT B

KAROLINA OBRYCKA, ET AL. V. CITY OF CHICAGO, ET AL.
FEDERAL COURT NUMBER: 07 C 2372

**Group Exhibit D**
**Peter K. Manning, Ph.D.**
**(Reports and Supporting Documents)**



EW 00543

EW 00543

Expert Report of Peter K. Manning

8/31/2009 4:22 PM

I am Peter K. Manning, a professional sociologist (PhD, Duke University Sociology, 1966, MA [hons.] Oxford, 1981). Since 2001, I have held the Elmer V.H. and Eileen M. Brooks Chair in Criminal Justice at Northeastern University, Boston. My work is frequently cited and I am included in Who's Who in America and Who's Who in the World. I have written some 20 books, five of them research-based monographs on policing, and over forty publications, chapters and refereed publications in policing (see my vitae attached). As a result of my 37 years of experience observing police in London, England, Birmingham, England, Toronto, Canada, and ten American cities, including Chicago, Boston and Washington DC, I have developed a methodology for interviewing, observing and police work and analyzing the dynamics of the police organization. My focus is ethnographic, studying the social and cultural patterns that produce police behavior. This enables me to infer within an organizational and occupational context general patterns of behavior from observations, interviews and records. I consider my area of expertise the occupational culture and how it determines choices and behavior; police corruption; specialized policing such as narcotics law enforcement, and police technology and communications systems. I have published extensively in all of these areas (see vitae).

In what follows, I draw on the materials listed below, my own work, and the work of other scholars of policing, many of whom have served as police officers. The scholars I refer to are Moskos, Niederhoffer, Skolnick, Reuss-Ianni, who describe the ways that the values and norms of the occupational culture pattern discretion on and off the job. I have had the advice of Michael Raphael, my student at Northeastern, in preparing this report. I believe the general points I make below apply to the patterns of work of officers in the Chicago Police Department, and I point out also where they are illustrated vividly by the supervision and administration of the Chicago Police Department. All my opinions herein reflect a reasonable degree of scientific certainty within my own field of expertise, criminal justice and police studies.

In preparing this expert report requested by EklWilliams, PLLC I have viewed the following exhibits:

1. Exhibits 1, 1a, 2-14, 14a, 14b,14c,14d, 15, 15a, 16, 16a, 17-20 assembled by EklWilliams
2. Unpublished paper by Christopher Cooper "Yes Virginia, there is a police code of silence: prosecuting police officers and the police subculture."
3. Preliminary expert report by Lou Reiter in Arias and Sorokosz, plaintiffs, v. City of Chicago.
4. Analysis of off-duty CR files for allegations of off-duty misconduct conducted by OPS/IAD
5. Data analysis memo for Obrycka vs. City of Chicago et al (07 C 2372). By Steven Whitman, PhD 31 July 2009.
6. Patrick Provenzale author- Attorney's outline of facts and record in support of outline of facts letter dated May 29th, 2009. Includes "outline of issues and record citations" in Karolina Obrycka V. City of Chicago and "supplemental Outline of Issues and record citations" in re Karolina Obrycka v. City of Chicago. I refer to these as follows:

EW 00544

EW 00544

- Attorney's Outline of Facts
- Protective Order
- Record in Support of Outline Facts
    - One CD (City 00777) of 9-1-1 call;
    - One DVD (City 0780) of Bar Video Footage
    - One CD with various documents, including:
        - Unified Chronological Summary of Phone Records;
        - Answers to Court Authorized Interrogatories;
        - 07 C 2372 – Deposition Transcripts and Select Exhibits;
        - Miscellaneous Items
        - CR 1004416
        - OPS and IAD Internal Investigative Procedures;
    - One DVD (EW 272) with News Footage of Abbate Felony Arrest;
    - *Gilfand v. Planey, et al.*, 07 C 2566 – Amended Complaint, Video Footage and Deposition Transcripts related to Jefferson Tap case of 12/15/2006.

I have been paid for 7.5 days at $800 a day by Ekl Williams for preparation of this report.

In my opinion, the Chicago police organization displays features which are conducive to supporting a "closed culture" that is insulated from outside penetration by the administration, and a "code of silence," which means that officers will withhold information, refuse to gather it, or fail to implicate fellow officers in wrong doing. This culture also facilitates very loose discipline and supervision as supervisors share this culture and code. Because of these general patterns, there are systematic failures in discipline in all police departments periodically. This means an examination of police routine procedures and forms of accountability are critical to maintaining vigilance. Absent supervision, discipline and evaluation, police work tends to be shaped by unwritten polices and practices. These in turn produce corruption. I will define these features, give examples found in the Chicago police department and connect these to its administration, occupational culture and evaluation procedures.

Policing is set in a political context of regulation and administration, and is an extension of the executive branch. In the United States, policing is locally funded, locally directed and strongly influenced by local electoral politics. Police in Chicago, based on detailed studies by Wilson, Banfield, Gosnell, Skogan and Harnett among others, is a city with a highly organized democratic party with strong control over patronage, hiring and firing, disciplining and transferring employees in city government. Chicago, like Boston, has an extraordinary number of jobs whose appointment is under the control of the Mayor. The top command of the department is hired with the advice of the police board and the mayor. The change in local government away from local ward heads has given more control over appointments to Mayor Daley. The police are the largest city government agency and a source of political allies if they are loyal to the Mayor. The control of appointments to these jobs gives the mayor considerable influence in promotion, transfer and the perks of office in city agencies.

The Chicago police organization is very large, employing about 13,000 officers and several thousand civilians, and covers an extensive territory divided in districts to which officers are assigned. In fact, it is a network of independent officers with little direct guidance who are the face of the city to its citizens. The police must be trusted; there is no alternative given

2

EW 00545

EW 00545

their weapons, skills, force, presence and numbers. The police organization is loosely coupled within – divisions, units and investigations are guided loosely. This looseness is to the advantage of individual officer but to the disadvantage of top command and the politicians and the citizens of the city to whom they are accountable. While politicians claim they control, discipline and supervise employees closely, even while claiming the officers are doing a good job and do not need close supervision, the job is not easily supervised and the primary concern is to avoid the "explosive" media incident by an officer which reflects on the entire department.

There is a long history of lax supervision in policing (Van Maanen, 1981, Manning, 2003) and reticence to evaluate systematically and closely (Manning, 2008). This laxness results because of the occupational culture discussed below as well as the fact that police work is constituted of many kinds of interpersonal skills that are not easily measured or evaluated by standard tests. Thus, the closely knit occupational culture, a product of the job and its vicissitudes, the loosely organized patrol division and the secretive investigative units, combine to support unwillingness on the part of administrators and politicians to act decisively to punish, discipline, and terminate officers. This means that discipline is reactive, *ad hoc* and seen as arbitrary within the organization by police officers. The larger the police department, the less direct supervision exists, and the higher probability of misconduct. Chicago is among the largest police departments in this country and has a long history of corruption (Banfield and Wilson, 1965).

### General Features of the Organization, the Occupational Culture, and Police Work

1. The Chicago police organization is a "flat organization" that is, the majority of the officers are set out in cars or on foot to randomly patrol; about 60% of the force is allocated to patrol. Top command is small in percentage terms, around 1-2 %, relative to the size of the organization. Special units are even more autonomous in defining their mission, targets and activities. The patrol officers are essentially the eyes and ears of the force and are given wide discretion and freedom to act. The vast majority of patrol officers' time is uncommitted and unaccounted for because they are expected to carry out random patrol. They are on the radio/computer but because they are alone, spread out in large areas, and known only by their own reports as to how they spend their time and action, they are rarely closely supervised, are expected to be independent and decisive, and viewed as the original source of authority within the organization. In many respects, police organizations are reactive and grant great latitude to officers to make low visibility decisions on the street. Unlike other organizations, the police are based on the assumption that the officer on the ground makes the best decisions, not the top command or management. Top command, from the officers' point of view, is "out of touch" and is a group of "politicians" who know little of the reality of the streets. This has powerful ramifications as it means that written policy is vague and general and that day to day decisions accumulate to produce "working rules" (Manning and Redlinger, 1977) that make constraints and patterns. The everyday decisions thus take in the character of a *de facto* policy. Police departments, with long histories of what is acceptable (or not) over time tend to develop a "character" that shapes discipline, internal investigations, and how much and what information is reported to top command. In Chicago, it is very difficult for a citizen to file a complaint because of cumbersome procedures (Outline of facts, II.B.1-7 II.B.1,2,3). These complaints are rarely sustained (expert witness document on complaints and their resolution by Steven Whitman, PhD).

3

EW 00546

EW 00546

2. The police occupational culture, meaning the taken-for-granted values and beliefs that guide practitioners, has deep and wide-ranging consequences. Police work is viewed legally, morally, and traditionally by officers as a "calling," something that one feels suited for from an early age and has a higher purpose. As an kind of "elect," police are always seen as superior to others by the public even though this may be difficult to sustain: police are distrusted by some groups. Because police are powerful and have wide legal authority, they are viewed ambivalently even by the "respectable" population; thus, respect or disrespect is always an issue on or off-duty. Loyalty on the job to fellow officers is based on the team-work notion in doing "risky" business, but is also reinforced by other bonds such as neighborhood of residence, religion, ethnicity, kinship, union membership and joint leisure activities. Like many professions, policing is seen by officers as a 24 hour occupation. This is indicated by the obligation to carry a weapon at all times and to identify oneself as a police officer in the case of an off-duty intervention. There is really no "off duty" for a police officer. (Outline of Issues and record citations III.A,B. Abbate asserting he is a Chicago officer and stating "No body tells me what to do"). In addition, police work is isolating. Because police work is shift work, and most uniformed officers rotate through a sequence of 8 hour shifts, officers associate more with other police officers and their families than with non-police. Police officers think of each other as a kind of loosely associated "family" and these familial bonds cross cities, states and even nations. Loyalty is thus often determined by many ties - religious, neighborhood, actual kinship (family members in the police), cohort experience and past partnerships. This idea of loyalty always applies. This loyalty is sometimes called a "code of silence" and can be seen in extreme cases of lying and perjury as in the Boston case of Officer Conley and the beating of an African American officer, Michael Cox (See Lehr, 2009).

Uniformed police work, because it is risky and deals with failures, the "dark side" of citizens' behavior, often requires quick and subtle judgment in complex situations. It is thus characterized by uncertainty. Police assume that you can't "police by the book," that formal rules and procedures can only be guidelines, not instructions, that "experience is the best teacher," "CYA" or "cover your ass"- is a general rule in any bureaucracy. It is closely adhered to in policing because of the complexity of the work; the gap between the detailed reality of the incident and the formatted paperwork required; the view that supervision is capricious and the citizens untrustworthy. Written records are a refracted and composite, stylized view of the complex events described. That is, they are written to extract what the officer feels is necessary to convey the necessity of his/her decision-making. Paperwork is viewed as a nuisance- an after the fact of "real police work" on the street- and thus is avoided if possible including failing to report incidents.

As is the case in all occupations, police practitioners believe they are more of an expert in contrast to the general public. They believe that intervention is required else things might escalate and value rapid decisive action over cogitation and pondering. The public is often perceived as ignorant and wrong. They believe that the job puts you in "harm's way" –good police work always generates complaints. It comes with the territory and the job. Police feel under siege from time to time. While they expect that their supervisors will "back them up," they are generally disappointed. Because of the complexity of the work and its often lonely and demanding character, police worry that they will not or are not being backed up, especially by fellow officers. This belief in support, mutual protection and even lying for

4

EW 00547

EW 00547

each other when faced with public criticism, is a foundational belief. The range of loyalty of one officer to another varies, and at the extreme it may include overlooking or failing to report illegal activities, failing to intervene in abuse of authority, or knowingly falsifying reports. Saving face is highly valued.

Police work is authoritative decisive team work and this is indicated by the belief that the public will not back you up, and only your fellow officers will. Team work relies on dramatizing the connection between officers- working groups share secrets that bind them together against outsiders. This is the strongest possible bases for mutual obligation. Backing up one's partner and other officers is essential; it is expected that you cover for others and back them up informally during incidents that are potentially difficult or dangerous. Maintaining the officer's authority is the core of successful policing. The authority given in the law, by tradition and custom, shades over into personalized authority- the elision of the badge and the person. Authority on or off duty is always a mixture of the personal and socio-legal, so that getting personal gain, e.g. sex, money, influence, on or off the job is easily confused with getting compliance generally for requests directed to others.

This mutual support and loyalty is especially true of special squads or units that work together repeatedly in dangerous and risky situations. The incident, the here and now work of the officer is the central focus of the job. Paperwork and reports are secondary and or a rendition of the events necessary but avoided if possible. There is never a "complete picture" of an event, only a partial, written, adequate, description. The writing up of a report is called "creative writing" not lying. A former Baltimore police officer, Peter Moskos, uses this term (Moskos, 2008: 50-51). Formal, written rules and regulations are seen as constraining, negative and largely irrelevant to policing- the informal rules really make it work. Analogously, police officers are expected to violate everyday conventions, break laws, and bend the rules to do the right thing. They can easily conclude as a result that "the ends justify the means" and that support from colleagues essential.

Data from Chicago analyzed by Whitman and associates (refer to # 5 above) shows convincingly that few complaints are sustained, that the number sustained have declined from 1999-2004 (figure 5), and that a key feature in sustaining a complaint is whether an officer is involved as a witness, complainant, or provides corroborating evidence. Use of excessive force against citizens is the most commonly used indicator of police misconduct. Table 1 of the Whitman report shows that the percentage of excessive force complaints sustained against police department in the United States in 2006 according to the Justice Department in 20006 was 8% while in Chicago it ranged from 2.7% to .5% These data suggest three things: 1). that the investigative process is faulty and ritualized negligence which assumes officer innocence 2). That the higher administration of the department has a turned a blind eye to the flawed investigation process 3) police officers have little to fear from internal affairs investigations and citizen complaints 4) sustained excessive force complaints are far rarer in Chicago Police Department than the national standard. Since there are over 22,000 police departments in the United States with size ranging from 1 officer to approximately 42,000, and Chicago in one of the largest, this is a markedly low figure of sustained complaints of excessive force.

3. Supervision and discipline in policing. Other than internal affairs (IAD) investigations, much supervision and discipline in patrol work falls to sgts. On the ground, supervision

5

tends to be loose because at best no sgt. can supervise closely 8-10 officers over the course of a shift given time and space limitations. Much supervision is after the fact- review of paperwork and giving advice. The face to face world of the sergeant-officer is negotiated and complex because it is the "face" of the organization to the officer. The sergeant, middle management, top command is dependent on the officer not to make serious errors that cause public criticism, provide information "up the line." The officer, on the other hand, feels his/her job is to keep the sergeant honest (since officers know of the many errors of the sergeant that have not been revealed). All authority above the sergeant is seen as capricious and unpredictable- you never know when you will be disciplined or called on the carpet - a belief implied by the "you can't police by the book maxim." Related to this is the core notion of the uniformed officer- job control. Job control- controlling the conditions of work both the written contract and the unwritten or implicit aspects of the contract- is second only to maintaining one's personal safety. These are the tacit, non-contractual aspects of the contract. Routine evaluation in Chicago is constrained by union contracts and tends to be a ritual in which all officers get very similar numerical ratings within a district (Manning, 2008). On the other hand, promotion is and advancement in the department is a way that city administration rewards loyalty.

4. Policy and Practice. Much of what passes for "policy" is not formal or written nor directed to the future. It is difficult to understand what is done by officers by reading written policies. In Chicago, conventions, understandings, and the oral culture that contains stories about what is acceptable or not on the job produce *de facto* policies. These constitute a *de facto* policy because they guide the actions and choices of police officers. Related to this maxim is "You had to be there." This is the rule of thumb shared by sgts as well as officers on the street. It is unwise and unprofessional to second guess officers' decisions. It is also an indication of untrustworthiness if one informs on another officer's actions, on or off the job. There is also a reticence to pass judgment on other officers. As a result, officers (are expected to) hear the words (direct statements and orders) and the music (implications, and context of remarks) when advised by supervisors. This conflates what is said and what is implied because officers are on their own and must make many unreviewed decisions in complex situations.

Management is by negative example, not reward. Effective sanctions are seen as negative rather than positive. Professional standards units or internal affairs units are seen as "political" weapons of the top command, and not an everyday threat. It is widely believed that these investigators are out of touch with the realities of the job. This view is shared to some degree by members of such units. Evaluation processes are ritualized and paperwork does not reveal the actual assessment of performance. This is handled almost entirely by word of mouth unless the officer is known within the department as "bad cop," the incident is egregious and information such as a video or audio imagery or other firm evidence, is brought forth. Claims made by involved citizens are discounted, and the officers' word and or his colleagues' reports are generally trusted within the organization and in court.

In fact informal job control on the ground by officers is very tight. Firing is rare; reassignment is the most common punishment (not defined legally as such) and suspension with or without pay used frequently for founded complaints. Emphasis in evaluation is on the absence of negative information rather than on performance competence. Competence, good police work, as well as major errors in judgment are known in the oral culture, but not

6

EW 00549

EW 00549

always written down. More generally, in any large police department, much that is important is not written down; is secret and shared within a segment, i.e., the patrol officers, detectives, sgts and top command, of the organization. Much is understood rather than stated or written. The control of the job extends to failing to take reports on colleagues and overlooking their miscues.

## Further Comment on the Chicago Police Department

1. In re: investigation of excessive force. The attitude of officers is a mixture of contempt and ambivalent concern with regard to IAD. This is amplified in Chicago by the lawsuits against the officers (exhibit one) settled by the city, adding to their feeling of insulation and protection against further remedies. The special squads in Chicago police are given even more latitude as a result of failure to investigate and failure to punish special unit officers (Exhibits 2, 3, and 4, Manning, 1979). (Exhibits 10,11). The working rules of special units reflect the organization of the criminals they monitor- secrecy, lying, use of informants, surveillance, and situational actions later justified due to circumstances. Since typically the IAD reports directly to the Superintendent, it is relatively easy to "sit on" or quash an investigation or to draw it out. The effects of the media, as noted above, make some cases "axial media events" or single events that turn around public opinion (Manning 2003) e.g., the Jefferson Tap case and the Abbate case. In effect, this tells officers that low-visibility decisions by the police are covered by loyalty and lack of close supervision and it is only the media that make the actions wrong- these are "…only wrong if you get caught." Administrators, in turn, as shown by Mayor Daley/Couric interview (exhibits 15, 16) defend officers in public. The cover-up by officers in the Abbate case and their unwillingness to take detailed reports, inform witnesses of court dates, and wiliness to suppress information are characteristic of officers' loyalty (see anecdotal evidence- failure of police to follow up on Abbate's being named in 911 call; named "Tony" to police officer; failing to sign off on report until 4 days later I.A. vii; officers did not review tape when told it was available 1.A.bi; officers failed to report video tape system; name of suspect Tony Abbate; failure to report that the suspect was a police officer 1.A.bii). After the investigation, efforts were made to conceal the video and prevent further investigation (anecdotal evidence 1.A.2a, efforts to then minimize damage 1.A.2b). The depositions (Supplemental Outline of Issues....II.A.2.a shows that regardless of information about intimidation, threats to plant evidence on witnesses, or falsely arrest people in the bar, no action was taken to locate Abbate). The city also protects officers from misconduct in my judgment as witness anecdotal evidence II.A. and B concealing the video, inadequate efforts to locate a sworn officer whose residence and workplace is known to the city, and inadequate investigation of complaints procedure. Deposition testimony (supplemental Outline of Issues and Record Citations II.A.2a i-vii) bears on officers loyalty and unwillingness to investigate, find and arrest Abbate.

This "music" or context of loose discipline is reflected also in the Garcia case showing inadequate investigation (Exhibits 18, 19). In summary, the organizational structure of policing makes officers active, out "on their own" and reliant on citizen compliance and back –up from others. "You had to be there" to understand the actions taken. The ideology that you had to be there and always get your partner's back extends into the highest reaches of the police since all top command except the commissioner have come up through the ranks from the bottom and share this belief system.

7

EW 00550

EW 00550

2. The code of silence is the result of several forces noted above. First, the negative risks of the job and the danger that is present although exaggerated by the media in the perception of officers, makes police officers defensive and active to protect themselves and their colleagues. Second, police work in dangerous situations is "team work" and dramatized as such on the job. They rely on each other in difficult situations especially and resist "second guessing" each other because they could be in trouble as a result of making a risky decision. Third, mistakes at work are typically defined by the occupation without review if they control the conditions of work. In general, police control the official records that are not reviewed (see anecdotal evidence I.A.1,2). That is why the known public events are often so shocking- routine, everyday violence and violations of procedures are generally handled informally without pubic knowledge or internal discipline. The code is powerful such that usually in corruption scandals a few individual officers are punished or one or two top people, such as the Chief of Commissioner, are fired leaving the patterns unchanged. The active involvement of officers extends to silencing others who might participate in the justice process (Outline of Facts I.A. 1. a, b, c, d, e. This includes failing to properly investigate the complaints, influencing the investigation, failure to notify Obrycka of her court date and intimidating the media. This also show administrative conclusion as the Captain was later fired for not restraining the officers at the court). Officers engaged in the investigation showed inadequate efforts to locate and arrest Abbate Oultine of Issues II.A.2.a. ). Fourth, police work supports an "us against them" mentality and sees investigation as capricious and arbitrary since you can't police by the book, many violations are routinely overlooked (Weiss statement, exhibit 17 Weiss on "60 minutes"), and complaints' come with the territory- a good police officer will have some complaints.

3. Administrative tolerance. The police administrator (the top officers in a department — some 30 or so in a large department plus Captains in Districts) has three main audiences: the politicians, especially the Mayor; the media and the troops or officers. Each one can destroy the ability of the top command to govern. In general, if the administrator's concern is the media, he/she may lose the loyalty of the officers; if the administrator defends officers whatever their behavior, he/she will lose the confidence of the media and the politicians. Officers can easily sabotage a chief's goals by "over recording crime," upgrading incidents from misdemeanors to felonies, adding counts or charges to arrests, making more arrests, or on the other hand by not pursuing investigations, writing fewer traffic tickets (which are a source of city revenue) and failing to make modest arrest totals. Because the discipline is lax, investigation of complaints uneven, and much is overlooked, only the most visible incidents reach the media. They are but the tip of an iceberg of low-visibility incidents.

## Conclusion

The Chicago Police Department permits wide discretion on the job to officers. Their mode of coping with uncertainty is to back each other up, maintain a code of silence, avoid paperwork that is revealing of errors, and emphasize loyalty rather than "rule-following." The paperwork required is seen as a minimal and a means to justify the officer's decision(s). Supervision is difficult at best, but the level and kinds of complaints sustained, the ritual of evaluation, job control, and the low visibility of deciding means a high degree of tolerance of officers' misconduct as well as a hesitance to investigate complaints and misconduct. These unwritten rules about backing up each other, the code of silence that protects officers from revelations concerning their conduct and administrative laxity are directly a cause of acting with impunity against citizens, as seen in the beating and level of violence seen in the Abbate

EW 00551

EW 00551

case. The history of not sustaining complaints also encourages a context of disregard for citizens' rights on and off duty. Finally, the long standing tolerance of misconduct by the top administration of the police department and city also encourages police misconduct. I can state with a reasonable degree of scientific certainty in my field of expertise that the context of the Chicago Police Department and the occupational culture of the patrol officer, contributed directly to the pattern of misconduct in the Abbate case.


Signed,

*Peter K. Manning*

Peter K. Manning,
Brooks Professor of Criminal Justice,
Northeastern University, Boston. 8/31/2009 3:25 PM


## References Cited

Banfield, Edward and James Q. Wilson 1966. City Politics Cambridge: Harvard University Press.

Lehr, Richard 2009. The Fence: A Police Cover-up Along Boston's Racial Divide. New York: HarperCollins.

Manning, Peter K. 1979. The Narcs' Game. Cambridge: Massachusetts Institute of Technology Press.

Manning, Peter K. 2003. Policing Contingencies. Chicago: University of Chicago Press.

Manning, Peter K. 2008 "Performance Rituals" Policing 2 (3): 284-293

Manning, Peter K. and Lawrence J. Redlinger "Working Bases for Corruption" in Manning and Van Maanen editors Policing: A View from the Streets. New York: Random House.

Moskos, Peter 2008. Cop in the Hood. Princeton: Princeton University Press.

Van Maanen, John 1983 "The Boss: first line supervision in an American police agency" in M. Punch editor Control in the Police Organization. Cambridge: Massachusetts Institute of Technology Press.

EW 00552

EW 00552

# EXHIBIT C

# **Ekl**Williams PLLC
Attorneys and Counselors at Law



KAROLINA OBRYCKA v. CITY OF CHICAGO

Expert Discovery
Outline of Issues and Record Citations

I.    The City of Chicago Police Department has a de facto municipal policy so widespread as to have the force of law that amounts to a Code of Silence

     A.    Anecdotal Evidence

         1.    The night of 2-19-07:

             a.    Physical Evidence

                 i.    9-1-1 call and bar video – identifying Abbate by name and that he's a police officer: (Videos) City 00777, at 01:27 – 01:37 and (Videos) City 00780, 112608 / 0702201215 – 0702201245, Camera 2, at 19:50 to 19:58:

                       **OEMC:** OK, and who is this man, was this a boyfriend?

                       **KO:** What's his last name?

                       **Passera:** Abbott; Tony Abbate, they'll know him. He's a policeman.

                       **KO:** I don't care if he's a police officer, the police will be here . . .

                       **OEMC:** Ma'am . . .;

                 ii.    Video inside the bar showing Karolina greet the officers as they enter the bar – all 4 present: (Videos) City 00780, 112608 / 0702201215 – 070221245, Camera 1 at 26:40 – 28:00:

                       **KO:** Hi, I called. I have three witnesses. Um, he's a policeman, this is actually what I just found out. And then he went behind the

CONFIDENTIAL EW003636

bar, he, he was following this guy [indicating Passera], he went behind the bar and at the, the first time I told him to get out, I didn't touch him. The second time when he went behind the bar I started to push him away because he's not allowed behind the bar, and then he started to hit me; he throw me on the floor, he started to hit me. Everything is in the camera [pointing at the camera above the officer's head]; tomorrow, tomorrow the owner will be here. He won't give me the copy, what exactly happened, but I want to press charges.

PM:  OK, how did he hit you, ma'am?

KO:  Well, he tried to hit me behind my head, I covered my face . . .

PM:  Well did he punch you?

KO:  He punch me, he kick me, he throw me on the floor, like this [indicating a downward punching motion].

PM:  Where did he go now?

KO:  He just went away. This guy [indicating Passera] . . .

PM:  [inaudible]

KO:  Excuse me?

PM:  What was he wearing?

KO:  He's got a hat, a checkered shirt, he had a jacket . . . [inaudible]

Passera:  [inaudible]

KO:  You know his last name [to Passera] . . .

Passera:  [inaudible]

KO:  His name is Tony, I don't know his last name the owner for sure knows, he's the police.

CONFIDENTIAL EW003637

PM: [inaudible]

KO: OK. I want to press charges, I don't care. He cannot do his job and beat people up.
[See also, (Miscellaneous) C.R. transcript at City 00963-00965.]

iii. (VIDEOS) CITY 00780, 112608 / 0702201215 – 0702201245, Camera 1 at 28:30 to 28:50:
[Passera walks over to Knickrehm and leans into his ear apparently saying something that sounds like "he's a cop."]

iv. Video inside the bar showing Karolina answering a phone call and it's Patti and then spelling Abbate's name:
(Videos) City 00780, 113608 / 0702201245 – 0702201315, Camera 2 at 10:30 – 11:52

[Phone rings and Karolina answers]
KO: . . . big belly, big belly. Hello, Shortstop. Yeah, hi Patti. Yeah, I'm OK – I'm gonna have [inaudible] . . . can you tell me his last name? A-b [on camera 1, she writes down the name then shows the officer the paper and says] [inaudible] A-b-a-t-t-e. They gonna find him. [inaudible]. You know what, maybe I'll let you talk to him. OK? Yes. Yeah, they know that already. Yeah. I'll let you talk to them. Thank you, Patti.

PM: [Masheimer gets on the phone with Patti Chiriboga]. Hello?

v. Video inside the bar of Masheimer talking to Karolina and Karolina motioning toward the cameras while officers present:
(Videos) City 00780, 113608 / 0702201245 – 0702201315, Camera 2 at 14:35 - 14:52

KO: Well the owner will be probably here in 10 or 15 minutes and he's gonna copy the tape if you guys would like to wait . . .

PM: He's gonna have what?
KO: Pick-up the tape.

CONFIDENTIAL EW003638

PM: Well, where's the cameras?

KO: One's here, second is there and a third's there. (indicating)

vi. Karolina and Masheimer conversation in the bar: (Videos) City 00780 113608 / 0702201245 – 0702201315, Camera 2 at 15:22

PM: OK, now, now, I, I just have another question for you . . .

KO: Yes.

PM: You said earlier, or you mentioned that he was the police or might be the police?

KO: He was the police.

PM: How do you know that?

KO: I don't know, but for Chicago . . .

PM: But how do you know he was a policeman?

KO: Patti does, you know when she called . . .

PM: Who?

KO: Patti, she's a bartender also here, she called and told me he's a cop. That's how I know and . . .

vii. Masheimer not submitting or Clancy not signing off on report until 2/23/07, 4 days later – See (Miscellaneous) City 00849 – 00850; (Transcripts) Halpern dep. pp. 1-20 and Exh. #1.

b.   Deposition Testimony (Police Response)

i.   Martin Kolodziej

a.   Told the officers that the tape was inside and he could play it for them while they were parked out front – pp. 125-127.

b.   Officers did not stay to review the tape despite being told about it, they took off – Id.

CONFIDENTIAL EW003639

    ii.    Peter Masheimer / Knickrehm / Alioto / Pfeiffer

        a.    Failed to record in report that the bar had a camera security / surveillance system. See (Transcripts) Masheimer dep, pp. 50-75 and Dep. Exhibits 1 and 2; see also deps of Knickrehm, Alioto and Pfeiffer.

        b.    Failed to record in his report that the suspects name was Tony Abbate or Abbott – (Transcripts) PM dep, pp. 80-81 and Dep. Exhibits 1 and 2; see also deps of Knickrehm, Alioto and Pfeiffer.

        c.    Failed to record in his report that suspect was a police officer – (Transcripts) PM dep, pp.81 and Exhibits 1 and 2;

    iii.    Karolina Obrycka

        a.    Told all 4 officers the name Tony, that he was a cop and that there was video. (Transcripts) KO dep, pp. 233-246; see also I.A.1.a.ii., supra.

        b.    Officers did not stay to review the tape despite being told about it, they took off – Id; (Transcripts) Martin Kolodziej dep., pp. 125-127.

  c.    Pleadings

    i.    (Miscellaneous) City's response to Request to Admit (10/10/08) re: C.R. 1004248 – Sustained vs. PM and JK, not vs. RA and MP;

2.    Events after 2-19-07

  a.    Immediate decision to conceal video from public view;

    i.    Deposition / sworn Testimony

        a.    (Transcripts) Deb Kirby, dep pp. 60-72 (no testimony as to direction to make press release);

        b.    (Transcripts) Mike Duffy, dep. pp 150-152 (Cline wanted to know who had copies of

CONFIDENTIAL EW003640

tape, no testimony as to making press releases);

    c.    Interrogatory Answers (Answers to Interrogatories) (Grau, Bond, Mecklenberg, Starks, Gross, Cline).

b.    Efforts to minimize the conduct and consequence with misdemeanor charge.

    i.    Interference with Charging process:

        a.    IAD contacting SAO without OPS direction regarding felony review and downplaying it: (Transcripts) Mike Duffy dep. pp. 158-166 (Deb Kirby did not have authority to go to SAO on her own, it was his review referral to make); (Transcripts) Deb Kirby dep. pp. 86-91 (she talked to Bilek at some point about charging, does not recall whether she did before or after "presentation" meeting with Bilek, Calloway, Boyd, etc.); Dave Naleway dep. (Kirby calling Bilek on 2/22 not on speaker phone with Bilek, not expressing her opinions about proper charge); (Transcripts) Joe Stehlik dep. pp. 28-43 (Kirby calling Bilek on 2/22 and telling Bilek it appears it's a simply battery).

        b.    IAD officers obtaining KO's signature on misdemeanor (or blank) complaint form before case submitted for felony review: (Transcripts) Boyd dep. pp. 51-60 (on 2/22, had KO sign a complaint, told her it was so AA could be arrested); (Transcripts) Stehlik dep. pp. 53-66 (on 2/22, had KO sign a blank complaint form, or maybe one that was filled out for misdemeanor battery, does not recall).

        c.    IAD officers contradicting each other as to positions taken during SAO review conference on 2/23: (Transcripts) Calloway dep. pp. 45-48 (on 2/23, arguing with Bilek and Freeman to charge a felony); (Transcripts) Boyd dep. 61-68 (on 2/23, everyone in the conference agreed it should be a misdemeanor, Bilek refuse a felony and

CONFIDENTIAL EW003641

directed a charge of misdemeanor battery).

    d.    ASAs dispute that they denied a felony at the 2/23 conference: (Transcripts) Bilyk dep. pp. 14-22; Freeman dep. pp. 16-26.

    e.    ASAs not aware of AA's charge and arrest on misdemeanor until approx. 3/15 or 3/19: (Transcripts) Bilyk dep. pp. 36-42; Freeman dep., pp. 29 – 30.

c.    Boroff, Colucci, Dahlstrom, et al., concealing AA's efforts to influence investigation.

    i.    See attached telephone records summary (Phone Records)

d.    No notice to KO of AA's first court date

    i.    Sgt. Stehlik claims that he called KO on her cell phone and advised her of the court location, date and time for AA's case. (Transcripts) Stehlik dep., pp. 80-82.

    ii.    Karolina denies that she was ever told the court information.

    iii.    Karolina's cell phone records show that no call was placed to her cell from the City of Chicago on 3/14/07. See (Miscellaneous) EW00257.

e.    25th District Efforts to Conceal AA from Public Scrutiny.

    i.    CR 1004416.

3.    Jefferson Tap; 12-15-06:

    a.    Physical Evidence

        i.    (Miscellaneous) Second Amended Complaint

        ii.    Video (See (Videos) EW00269) at 03:40:40 – 03:45:42 and  03:45:42 – 03:50:42

        iii.    Deposition Testimony (See (Transcripts) EW00270) Barry Gilfand dep., pp. 182 – 229; Aaron Gilfand dep., 159 – 174;

CONFIDENTIAL EW003642

B. 25th District and City-wide Off-Duty CR Evidence

    1. No example in CR's of on-duty officer contradicting another on-duty officer;

    2. No Example of 25th District officer accused where multiple officers present, and entry or logging of charges of failure to report officer misconduct as to other officers present;

    3. CR's where off-duty officer who criticizes responding on-duty officers is disciplined for insubordination;

II. The City of Chicago has a de facto municipal policy so widespread as to have the force of law of protection of officer misconduct from scrutiny or consequence through inadequate investigation and discipline of officer misconduct.

A. Anecdotal Evidence in this case:

    1. Efforts to conceal video – if this was not a police officer, City would have had a press conference / APB for violent offender. (See I.A.2.a., above)

    2. Intentionally Inadequate efforts to locate, question and arrest AA, despite allegations that he was intimidating and threatening witnesses:

        a. Deposition Testimony (to be supplemented)
            i. Dave Naleway
            ii. Dion Boyd
            iii. Joseph Stehlik
            iv. Joseph Skala
            v. Kenneth Bigg

    3. Violations of Department Policy regarding felony arrest – Abbate not searched or handcuffed when taken into custody on the felony warrant – taped by Fox News. See (Videos) EW 0272 at 03:49 – 04:02

    4. CR 1004416 (25th District writing the media parking tickets and threatening arrest for trespass on AA's first court appearance)

B. Improper / Inadequate Investigatory Rules and Restrictions

    1. Officer may only be questioned if complainant signs an affidavit;

    2. Officer only to be questioned after investigation and all witness statements completed;

CONFIDENTIAL EW003643

3. Officer given written notice as to complainant's name and substance of investigation and allegations before having to answer questions;

4. In many cases, officer's asked questions via "To – From" memos and no prohibitions against accused officers collaborating in preparing responses;

5. No recording of oral interviews. only "non-verbatim question – answer formats" that interfere with effective questioning techniques.

6. "Moving target" of standard of proof;

7. Multiple levels of disciplinary review that reduce initial disciplinary recommendations.

C. Statistical Evidence

1. Dr. Whitman's report;

2. No Example of Excessive Force or False Arrest sustained CR where citizen vs. officer in 25th District; also, where multiple officers accused, no charges of failure to report officer misconduct logged;

3. 25th District and Off-Duty Sustained CR's only involve the following;

   a. technical rules violations;
   b. where one officer cites another for a rules violations;

   c. where independent witness is a police officer corroborating complainant;

   d. where officer is arrested by another municipal PD for criminal offense.

III. Direct evidence of Abbate's Subjective Belief of Impunity for his Conduct:

A. (Videos) City 00780, 0702201115 - 0702201145 Camera 2 at 17:26: Abbate raising his arms with flexed biceps and stating "Chicago Police Department"

B. During beating incident, Abbate tells Karolina "nobody tells me what to do."

CONFIDENTIAL EW003644

# EXHIBIT D



KAROLINA OBRYCKA, ET AL. V. CITY OF CHICAGO, ET AL.
FEDERAL COURT NUMBER: 07 C 2372

**Group Exhibit C**
**Steven Whitman, Ph.D.**
**(Reports and Supporting Documents)**

EW 00484

Draft date: 8-4-09

**Data Analysis Memo for Obrycka v. City of Chicago, et al., (07 C 2372)**

**Prepared by Steven Whitman, Ph.D.**

**July 31, 2009**

**Introduction**

The law firm of Ekl/Williams retained me to analyze data for the above-mentioned case. I, in turn, hired Kristi Allgood, M.P.H., to assist me. In Part 1 of this report I describe what data were provided to us, how we structured the data for analysis and what the resulting databases were. In Part 2 I present our data analyses that respond to the questions posed to me by Ekl/Williams. In each of these analyses, whenever possible I provide a comparative context for my findings in this case by using data from another case in Chicago (*Bond v. Utreras*, et al. 04 C 2617) and/or data from other geographies. In Part 3, I reproduce basic findings that I developed in the Bond case. I do this because the data set there was comprehensive and again provides an important context. Finally, in Part 4, I offer some concluding observations.

1

EW 00485

### Part 1. Methodology

I was provided data for Chicago Police Department for the 11th, 20th and 25th

Districts as well as off-duty complaints for the entire Chicago Police Department.

These contained Complaint Registers (CRs) for various types of complaints that

were filed against police officers. For the 11th and 20th Chicago Police

Department District Complaint lists we received data on sheets that were in PDF

format. We (Allgood and I) then imported the data into Microsoft Excel

spreadsheets by using a commercial program that I purchased for this purpose.

The program is called "Able to Extract-Professional Edition" by Investintech, Inc

(http://www.investintech.com/prod_a2e_pro.htm).


Each file was converted from the PDF provided and verified by hand by a clerk

we retained who compared the imported data with what was contained in the

original PDF. Most of the information converted properly, but occasionally

numbers were converted as letters and vice versa. These conversion errors

were checked and corrected by the clerk in Microsoft Excel. The verified Excel

file was then converted into a CSV file (comma separated values file) and then

imported into SAS statistical software package (Version 9.1 for Windows) for

statistical analysis. In SAS, data can be printed and viewed in summaries

(frequencies) so that data errors can be seen easily. SAS will also not convert a

database properly if it is not formatted properly. For example, every date was

verified using SAS to ensure that the dates were read properly and that they

were "real" dates. Also, even though data is formatted properly there can still be

2

errors.  Thus, summary analyses were done to check for outliers or miscoded data.

Each complaint formed a row that contained several variables.  The variables that are relevant to our analyses include a unique identifier for a police officer, the CR number, the CPD code of the accusation (including a written description), the date of the incident, filing, and resolution of the complaint, and the final finding (e.g., sustained, unfounded, exonerated).  A complaint was considered "Sustained" if the final finding was labeled as "SU" on the PDF.

- The 11th District:  There were n=3,093 complaints for the 11th District from February 19, 2002 to May 26, 2005 and all were included in the analysis.

- The 20th District:  There were n=762 complaints for the 20th District from May 26, 2005 to March 20, 2007 and all were included in the analysis.

In addition to the 11th and 20th District data, Ekl/Williams were given PDF pages that described complaints against on-duty Chicago Police officers working in the 25th District as well as complaints for all force and DUI[1] related complaints against off-duty officers for the City of Chicago.  These data were provided to Ekl/Williams in a different format than those for the 11th and 20th Districts.  For the 25th District and DUI related complaints the actual investigation documents were provided by the Office of Professional Standards (OPS) and/or Internal

---

[1] DUI complaints have been requested by Ekl/Williams and will be included as data becomes available, however there were 2 DUI complaints included in our off-duty files which are described later in this report.

EW 00487

Affairs Division (IAD). These include the history of a particular complaint against an officer from the date of complaint through the closing of the investigation. Some of the documents in these files were descriptions of the complaint by a citizen or another officer, letters provided by the CPD officers named as the accused/witnesses, affidavits signed by the complainant, letters attempting to contact the complainant for an interview, CPD required reports regarding an arrest made or a call to service, a letter stating the final finding, and the case log/description from OPS regarding the complaint history. Typically these documents were available, but there may be additional documents not listed above that were also included such as interviews with the complainant or civil suit documents. These case documents varied from a few pages to up to 200 pages in some cases.

These data were summarized by Ekl/Williams on a one-page form which the lawyers created and used to pull the needed information for the sometimes long complaint investigation file. The lawyers coded and collected the following information: whether the incident occurred on or off duty, the date of the incident, the written complaint against the officer, whether or not the complainant signed the affidavit required to initiate an investigation, whether or not a statement was provided by the accused officer, whether or not a police witness was present and was not charges with failure to report the incident he/she witnessed, and the final finding of the investigation which included disciplinary action for sustained findings (Appendix A). These summary pages were then entered into a Microsoft Access database created by Allgood.

4

EW 00488

The Access database included strict formats to prevent data entry errors. Our clerks entered these data into the database. Allgood verified these data in a similar manner to the 11th and 20th District files using SAS (described above). If any discrepancies were discovered then Allgood reconciled the form with the database. Thus 2 additional databases were formed from the investigation files:

- The complaints made against on-duty officers working in the 25th District of the CPD (January, 2005 – February, 2007).

- The force and DUI complaints against off-duty officers in the CPD, regardless of the district in which the officers worked between 2002-2007.

5

EW 00489

Because the 25th district data and the off-duty data were hand collected by the attorneys working on this case, we conducted independent review of the complaint files to ensure that bias (intentional or unintentional) did not influence the collection of the data and thus our findings. Allgood, using SAS, selected a systematic sample of every 10th entered complaint for both the off-duty (for CDP) and the on-duty (for the 25th District only) CRs. This amounted to 87 cases (because there were 868 cases in this group). These were verified by Allgood's coding being "blinded" to the coding by the attorneys. Only the data used for this analysis were verified. These included: the written charge/accusation, whether or not the complaint was terminated for complainant non-participation, whether or not other officers were witness to the accusation and not charged themselves with failure to report, and the final finding. The remaining items are considered subjective and are not used in our objective analysis of these data. After the audit was completed ambiguous discrepancies were resolved in conversations with the attorneys.

6

EW 00490

It should be noted that because the off duty files are organized in a way that does not include the CPD coded charge, the attorneys at Ekl/Williams created a coding system that would suit the needs of the data analysis. The attorneys were interested in the specific on-duty charges of excessive force, false arrest, planting evidence, failure to report the misconduct of another officer and "other" complaints. Because the first 4 charges typically occur on-duty, the "Other" category was used to capture off-duty complaints for which the official complaints do not include an official CPD charge code that fits into the categories for the on-duty complaints. For example, if an off-duty officer is arrested for a DUI, the complaint will state the officer was Driving while Under the Influence, rather than using the official CPD designated code of 02D-Driving While Intoxicated-Off-Duty (a sub-category of the 02-Alcohol/Narcotics complaint category). Thus, the "Other" complaint category includes charges of all different types of complaints ranging from verbal abuse to murder. This unusual coding procedure employed by both OPS and CPD required our strenuous recoding efforts.

In total, these summaries (for the 25th District and off-duty CRs) contained n= 892 complaints but 24 of these did not designate whether they occurred on or off duty and were excluded. Thus, the final number of complains used for these analyses included n = 868. Of these, 697 occurred on-duty (thus for the 25th District) and 171 occurred off-duty (for the entire Chicago Police Department).

Due to this unusual coding by OPS and CPD we created a DUI measure based on the summary files provided to us by EKL/Williams:

7

EW 00491

- DUI:  The key words used for DUI complaints initiated by the arresting the officer included all complaints that included DUI in the text of the charge. For DUI complaints there were 3 charges for off-duty driving under influence.  One charge was excluded because the complaint was for a minor traffic violation and not a DUI.  The CPD later administratively investigated the traffic complaint as a DUI, thus it was excluded, leaving 2 DUI complaints.

In addition to these data, all sustained findings include the discipline for charge. There were 20 on-duty sustained complaints for the 25th District and 52 sustained complaints for the off-duty complaints against the CPD.

Any comparison data included in this report was found though an extensive internet search, publicly available reports and reports which use aggregate data (cannot identify any police officer).  All comparison data are cited in the sections where they are used.

Statistical Tests of Significance

In some of the analyses that follow I employ statistical tests of significance. Allow me to just state a few words of introduction about these.  It is possible using statistical tests of significance to determine whether the differences in varying proportions (for example) are likely due to chance or are likely due to some real causes.  Most usually we employ a level of significance of 95% in such analyses, so that when we say "likely," we mean with a probability of 95%.  That

8

EW 00492

is the significance level I employ in this report. The statistical term we use for "due to real causes" is "statistically significant." For data arrayed like much in this report, it is appropriate to use the chi-square test of statistical significance and sometimes a variant of that known as "Fisher's exact test." When I refer to a difference being statistically significant I mean that such a test has declared the difference meaningful. If a difference is not statistically significantly, then an observed difference is likely (with 95% probability) due to chance or random error.

## Part 2. Data Analyses

*Question 1: Present all evidence that speaks to the question of whether Officer Anthony Abbate had reason to believe that he could act with impunity, that is, that he had reason to believe that he would not be punished regardless of what he did to Karolina Obrycka.*

The first part of my response to this question is contained in Table 1. To analyze this question I employed the data described above using two "excessive force" categories, as defined in footnote a in the table. After a great deal of data analysis, I found the following:

9

EW 00493

In the 3 districts described above and using 2 definitions of "excessive force" we can see that the proportion of sustained complaints ranged from 0.0% to 2.3%. I tested these 2 proportions (the ones with the largest difference) and they were not statistically significantly different from each other. As I noted above when describing statistical tests of significance, this means that they vary simply because of chance, not because of any real cause.

An important number in Table 1 is the finding from the Department of Justice Report[2] which demonstrates that the sustained rate for the use of force in the United States for "large" police departments (like Chicago's) in 2002 was 8.0%, much higher than any of the other 7 proportions in Table 1. This 8% is very statistically significantly higher than any other number in Table 1.

**Table 1. Excessive Force Complaints for Various Jurisdictions and Dates**

| Location | Dates | # of Excessive Force Complaints | % (#) Sustained |
|---|---|---|---|
| 11th District | 2/02-5/05 | 836 | 1.0% (8) |
| 11th District (a) | 2/02-5/05 | 679 | 0.4% (3) |
| 20th District | 5/05-3/07 | 172 | 2.3% (4) |
| 20th District (a) | 5/05-3/07 | 138 | 1.4% (2) |
| 25th District | 1/05-2/07 | 147 | 0.0% (0) |
| City of Chi (b) | 1/99-12/04 | 10,646 | 2.7% (292) |
| City of Chi (b) | 2004 | 1,884 | 0.5% (9) |
| US Justice Dept[1] | 2002 | 26,556 | 8.0% (2,124) |

(a) subcategory of Excessive Force cited as being of interest by Ekl et al. This includes Excessive Force during arrest, after arrest, at lock-up and no arrest, unnecessary contact (on/off duty), off duty, and use of weapon unnecessarily. This are represented by codes 05A-D, 05L-N, and 05 P.

(b) from Bond, op cit

---

[2] Citizens Complaints about Police Use of Force; Department of Justice Special Report, June, 2006, NCJ 210296).

10

EW 00494

Thus, with respect to this set of data, we can see that over the years, and consistent with other Chicago data, the probability of an excessive force complaint being sustained in the city is very low, ranging from 0% to 2.3% for the districts and definitions given to us for this analysis. My previous analysis of data from the Bond case showed that the 6-year average rate between 1999 and 2004 was 2.7%. This overall figure however masked the fact that this proportion dropped every year in this interval, from a high of 4.8% in 1999 to a low of 0.5% (that is, one-half of one percent) in 2004.

A comparison with some other cities will suggest just how low these proportions are. A quote here from a recent publication will help establish this context:

We then attempted a comparison of CPD excessive force and sustained rate data with that of law enforcement agencies that the U.S. Department of Justice found, pursuant to 42 U.S.C, 14141, to have engaged in a pattern and practice of excessive force and had deficient disciplinary systems for addressing brutality complaints. These agencies include Detroit, Los Angeles, Washington, D.C., Miami, Cleveland and Pittsburgh. We obtained 2002 force and sustained rate data for each of these agencies, as reported to the Bureau of Justice Statistics. Some of the agencies listed above had begun to remediate their systems under federal consent decrees by 2002, complicating our attempts to make good comparisons. Albeit imperfect, our preliminary review showed that Chicago's internal brutality and disciplinary data were substantially worse than cities where the Department of Justice had already concluded that there were serious problems.[3]

Thus, the 11th, 20th and 25th Districts are generally worse than Chicago, are much worse than the United States, and are worse than these other large cities noted by Futterman and his colleagues, above. However, the situation is even gloomier than these data would suggest.

---

[3] Craig B. Futterman, H. Melissa Mather and Melanie Miles, "The Use of Statistical Evidence to Address Police Supervisory and Disciplinary Practices: The Chicago Police Department's Broken System," Volume 1, DePaul Journal for Social Justice 251 (Spring, 2008)

11

EW 00495

I offer three additional observations on these proportions, each of which suggest the actual sustained complaint proportions are even much lower than what the data in Table 1 indicate and the implications are much more severe than even the implications suggested above.

*First*, as I pointed out in my Bond report, it is of course the case that citizens do not file complaints for every incident that occurs. What proportion of the time might such an incident report be filed? This is very difficult to know but the above-cited DoJ report presents an estimate: "Force complaints represent a subset of all force events. That is, not all force events result in citizens filing formal complaints. How often do citizens actually complain? Estimates from the 2002 Police-Public Contact Survey indicated that although 75% of citizens experiencing force thought the level of force used was excessive, about 10% filed a complaint with the agency employing the officer(s). About 1% filed a complaint with a Civilian Complaint Review Board."

It would be reasonable to apply this estimate of 10% to our data. This would imply that in each category in Table 1, the number of sustained complaints would remain as they are in the table but the number of complaints underestimates the number of force events by a factor of 10. This has the effect of dividing the proportions of sustained complaints by 10 in order to come up with the more meaningful "proportion of force events in which a complaint was sustained." Thus, for example, instead of the proportion of sustained events for the 11th

12

EW 00496

District being 1%, the proportion of force events in which a complaint was sustained was actually 0.1% (that is, one-tenth of one percent).

*Second*, as described by Futterman et al,[4] after a sustained finding, there are multiple layers of review by various CPD efforts. As a result, "the Police Board reversed sustained findings or reduced discipline in nearly 50% of the cases that it reviewed. Thus, the real sustained and disciplinary rates appear to be far lower than reported [by police data]."

*Third*, we are only citing data here that describe sustained complaints. Sustaining such complaints is only the first step having to do with effective deterrence. For example, we must next ask whether disciplinary actions were taken and whether, if they were, the actions were effective. If the answers to these questions are not both "yes," then what is the purpose of pursuing a complaint system? Extensive analysis that I performed in my Bond report, attached as the third section in this report, suggests that the answers to both of these questions is "no."

---

[4] Craig B. Futterman, H. Melissa Mather and Melanie Miles, "The Use of Statistical Evidence to Address Police Supervisory and Disciplinary Practices: The Chicago Police Department's Broken System," Volume 1, DePaul Journal for Social Justice 251 (Spring, 2008)

13

EW 00497

As a second part of my response to this first question I looked at the number of officers who had multiple excessive force complaints against them. We pursued this in the following manner. For the 11th District we eliminated all complaints that were not for excessive force. This reduced the original list from 3,093 complaints of all types (page 3) to 836 complaints (page 10, Table 1) for excessive force. We then sorted these 836 complaints according to the Unique Identification Number and then counted the number of reappearances of IDs on this list. This number would represent police officers who were complained against more than once. Since the interval of time for the data from the 11th District was just over 3 years, I though it would be interesting to see how many officers were complained against more than 3 times (that is, 4 or more times or *more than once a year for excessive force*). These counts are presented in Table 2.

**Table 2. Officers Complained Against 4 or More Times for Excessive Force in the 11th District, from February 19, 2002 to May 26, 2005.**

| # of Excessive Force Complaints | # of Officers |
| --- | --- |
| 4 times | 24 officers |
| 5 times | 12 officers |
| 6 times | 9 officers |
| 7 times | 4 officers |
| 8 times | 7 officers |
| 9 times | 3 officers |
| 10 times | 0 officers |
| 11 times | 3 officers |
| 12 times | 1 officer |
| 366 complaints | 63 officers |

14

EW 00498

A couple of noteworthy observations emerge from this list. First, from among all of these 63 "repeaters," there are only 5 sustained complaints out of a total of 366. Second, not one of these 63 repeaters had more than 1 complaint against them sustained. Third, no complaints were sustained against 2 officers with 11 complaints, 2 officers with 9 complaints and all 7 officers with 8 complaints. Recall that having 8 complaints means more than 2 excessive force complaints per year.

We repeated the same analysis for the 20th District. Here we had data for 23 months or just under 2 years. The number of officers with 2 or more excessive force complaints (i.e., more than 1 per 12-month period) against them is presented in Table 3.

**Table 3. Officers Complained Against 2 or More Times for Excessive Force in the 11th District, from May, 2005 to March, 2007**

| # of Excessive Force Complaints | # of Officers |
| --- | --- |
| 2 times | 23 officers |
| 3 times | 10 officers |
| 4 times | 4 officers |
| 5 times | 2 officers |
| 6 times | 1 officer |
| 108 complaints | 40 officers |

There thus were 40 officers who had repeated excessive force complaints against them for a total of 108 complaints. Only 2 complaints were sustained and not one of the officers complained against 3, 4, 5, or 6 times had a sustained complaint.

15

EW 00499

*By way of conclusion to my response to this first question I come back to the originally stated concern of Ekl/Williams about impunity. Again, this is a subjective term that has no statistical meaning but one can reflect on the implications of all of these officers being complained against time and time again for excessive force with the result being virtually no sustained complaints. Every one of these very low proportions of sustained complaints are also susceptible to the three mitigating factors I discussed on pages 11 and 12 above, and are thus even far gloomier than they appear. All of this information together suggests that there is only the tiniest probability that an officer will have a complaint against him/her sustained. My findings from the Bond case (see Part 3, below) indicate that even when such complaints are sustained that the officers are rarely punished and that even when they are punished they are rarely punished in a meaningful or effective manner. All of this suggests that there is indeed a pervasive environment of impunity.*

EW 00500

*Question 2: Do any of the data speak to whether a "code of silence" exists in the CPD?*

The existence of a "code of silence" can be examined by using data which describe "failure to report" CRs. This occurs when an officer is a witness to a CR accusation, but violates the CPD policy by not filing a report as a witness to police misconduct. A failure to report CR can be initiated by any officer or investigator of police misconduct. Using the only data available for this analysis, which is the on-duty CRs against the CPD 25th District described above, we have summarized the "failure to report" in the following way:

- Ekl/Williams performed an assessment of CR's for the 25th District to determine if any of the CRs included non-reporting officer witnesses who where not charged with "failure to report." Each CR for the 25th District was reviewed by attorneys at EKL/Williams who determined: 1) if there were officers who witnessed the misconduct of another officer; and 2) if that officer witness was not charged with failure to report. One would know if an officer was charged with failure to report because such a charge would be documented in the CR file along with all of the other investigation materials and evidence. To ensure accurate data collection we performed an independent review of 10% of the CR's to eliminate the potential for bias introduced by the attorney's handling this case.

17

EW 00501

The data that reflect on the issue of OPS to file a CR against an officer who did not file a complaint when witness to an accusation of another officer can be found in Table 4. This table shows that over 1/3 of the CR's included officer witnesses that not only did not file a report of police misconduct but also were not charged with failure to report. This means that 36% of the CR's should have included a complaint and investigation of failure to report and did not.

**Table 4. Other officers witness to accusation and not charged themselves with failure to report (FTR) for the 25th District.**

|                                          | #      | %   |
|------------------------------------------|--------|-----|
| Should have been charged with FTR        | 246    | 36% |
| Should not have been charged with FTR*   | 430    | 64% |
| Total Cases                              | 676**  |     |

*Note: Most of those not requiring a charge for FTR were due to only 1 officer responding to the call, or only 1 officer involved in the incident

**Note: The original number of CRs in this category was, as noted above, 697. However, 21 had missing information and thus could not be included in this table.

18

EW 00502

In addition, the remaining approximately two-thirds of CRs that did not include failure to report charges primarily included incidents where all officers who witnessed the accusation were also accused, and thus could not be classified as witness to the event. This means that since there were no police witnesses, there would not be a charge against an officer for failure to report. Thus it can be assumed that the actual percent of failure to report should be much higher, if one excludes those CRs where there were no police witnesses. Unfortunately, the data was not collected in a way to tease out this actual figure. Thus we report the conservative estimate that suggests not only inadequate tracking of failure to report by the CPD but inadequate investigations by Internal Affairs or the Office of Professional Standards.[5]

---

[5] To the extent that a police procedures or police culture expert opines that a 'Code of Silence' exists and has existed within the Chicago Police Department from 2005 to March 2007 (the dates of this 25th District On-Duty Data), this data supports such an opinion in two ways. First, the data suggests that the internal investigatory mechanism of the Chicago Police Department conceals instances of an officer failing to report the misconduct of another officer by failing to investigate such allegations. Second, the data suggests that the Chicago Police Department is complicit in the "Code of Silence" of its members by not properly recording the number of instances in which an officer is accused of failing to report the misconduct of another officer, which results in the CPD having no data identifying the problem at all.

EW 00503

*Question 3: We were able to obtain some data about driving while intoxicated by police officers. What does this data describe?*

As noted above (page 3) CPD provided Ekl/Williams with a listing of use of force complaints against all off-duty officers for the City of Chicago from 2002 – 2007. There were n = 171 listed. Two of these complaints were for DUI (Driving Under the Influence)[6]. Both of these DUI complaints involved violent outcomes (one resulted in a double reckless homicide and the other a 6-car pile up) and both were sustained.

I tried to find some data to compare with these 2 DUI complaints in this 5-year period. There are 2 sources that are worth noting. The first is data from the 2009 Illinois DUI Factbook.[7] This report presents 2007 data (in a graph on its page 6) suggesting that the arrest rate per 1,000 licensed drivers aged 20 – 44 was roughly (and conservatively) 10 per thousand licensed drivers, or 1%. If we apply these estimates to the CPD we come up with the following. Since there are about 13,000 Chicago police officers, we would expect about 130 DUI arrests per year (1% of 13,000) or 650 over a 5-year period such as the one covered by this report. Using these estimates we wind up comparing this 650 to the 2 that are contained in the CR data base provided to Ekl/Williams by the CPD. Thus, we would expect to find 325 times more CRs for DUI than we did. Needless to say these Illinois data do not generate an ideal comparison but they do result in a

---

[6] Note that Ekl/Williams did not specifically request DUI data, yet 2 DUI CRs were included. Ekl/Williams have made a Freedom of Information Act request to secure all DUI CRs against Off-Duty Officers.

[7] 2009 Illinois DUI Fact Book, (available at: http://www.cyberdriveillinois.com/publications/pdf_publications/dsd_a118.pdf )

20

EW 00504

factor of magnitude difference of 325, thus suggesting that modifications of the Illinois data would not in any way invalidate the concept at hand here.

The second resource for comparing DUI's among off duty police officers appears in a Chicago Tribune investigation which was reported on April 16, 2009 after a Drunk Driving crash that left 2 young civilians dead when an off-duty officer crashed his car into theirs on the Dan Ryan Expressway. The Tribune found that there were 13 DUI incidents involving off-duty CPD officers in 2008.[8] With 13,000 officers in the Chicago Police Department this equates to a rate of 1 DUI arrest involving an off-duty police officer per 1000 police officers. This figure can be compared to the general public DUI figure (cited above) of 10 DUI arrests per 1000 licensed drivers. This means that CPD off-duty officers are only 10% as likely as someone in the general public to be arrested for a DUI.

We further examined the 2 DUI CRs and found that both DUI complaints resulted in horrific accidents, thus implying that the traffic officers had no choice but to file a complaint. The ratio of 325 to 1, noted in the previous paragraph, suggests that had these off-duty officers been pulled over for a DUI and had no accidents occurred, no complaint would have been filed. In addition the Tribune article further notes that 5 of the 13 DUI arrests in 2008 involved crashes. In addition, only 4 of these DUI arrests were made by CPD, 3 arrests were made by

---

[8] Chicago Tribune, 4/16/2009, available at: http://archives.chicagotribune.com/2009/apr/16/local/chi-police-duisapr16

21

EW 00505

suburban officers and the remaining 6 occurred out of state. The article further states that none of the 13 CDP members lost their job in 2008 for the DUIs.

**Part 3. Findings from the Bond Case: A Context for Analyses in this Report**

<u>Introduction</u>

In *Bond*, I was asked to analyze several collections of data and to answer particular statistical questions. I proceeded to answer a list of relevant questions. In this report, I have excluded the analyses that related to the specific facts of the *Bond* case. The last paragraph of each section (question) is my conclusion to the posed question. Tables and figures (graphs) that I have generated are numbered consecutively and appear, 1 per page, at the end of this report. The tables come first and then the figures.

**Sources Used**

Virtually all of the data used in my *Bond* analyses came from the Chicago Police Department. Most often they were put into Microsoft Excel spreadsheets or Word tables. Some of the relevant sources are as follows:

**CPD Internal Affairs Division Analytical Section Statistical Report, 9/7/06**
   1) Select Received CR Allegations 1999-2004 (sustained rates)

**CPD Internal Affairs Division Analytical Section Statistical Report, 5/9/06**
   ☐ Select received CR allegations 1999-2004
   ☐ *Closed* Complaint Register Cases: Disciplinary Count by Involved Members 1999-2004. Category: 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05H, 05P
   ☐ *Closed* Complaint Register Cases: Disciplinary Count by Involved Members 1999-2004. Category: 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05H, 05P

22

EW 00506

    ☐ *Closed* Complaint Register Cases: Disciplinary Count by Involved
        Members 1999-2004. Category: 03B, 03C
    ☐ *Closed* Complaint Register Cases: Disciplinary Count by Involved
        Members 1999-2004. Category: 08C, 09F, 10S
    ☐ *Closed* Complaint Register Cases: Disciplinary Count by Involved
        Members 1999-2004. Category: 01B
    ☐ *Closed* Complaint Register Cases: Disciplinary Count by Involved
        Members 1999-2004. Category: 03D
    ☐ Complaint Category Tables, CPD Internal Affairs Division

List of Sustained Penalty Codes, CPD Internal Affairs, Analytical Section

**Defendant City of Chicago's Response to Plaintiff's Second Set of Requests to Produce Documents**

**Defendant City of Chicago's Response to Plaintiff's Fifth Set of Requests to Produce Documents**

**US Department of Justice materials**
    Bureau of Justice Statistics Special Report: "Citizen Complaints about Police
    Use of Force," June 2006.

Question # 1

*Did Defendant Chicago Police Officers have reason to believe in 2003 and 2004 that*

*they could abuse with impunity or without any fear of meaningful punishment? Does*

*CPD's data suggest that it has an effective system for disciplining officers who*

*abuse civilians?*

The data that I analyzed that best respond to these questions are contained in two

collections of tables that may be identified as Internal Affairs Division, Analytical

Section, Statistical Report, 09 May 2006 and 07 Sep 2006. Both are titled "Select

Received CR Allegations, 1999 to 2004." I grouped the data into two time intervals,

from 2002 - 2004 and the entire interval 1999 - 2004.

23

EW 00507

I first produced Tables 1 and 2 and accompanying Figures 1 and 2 for 2002 – 2004.
As can be seen in Table 1 and Figure 1, there were 10,149 total complaints in this
interval and a total of 124 of these were sustained, for a rate of 0.0122 with a very
narrow confidence interval of (0.0101, 0.0144). This means that just over 1% of all
complaints were sustained. This rate varied among categories, ranging from
"Planting False Evidence" (0.0061) to "Sexual Harassment, Abuse, Rape" (0.1982).

In an analogous manner I computed similar rates for what I called "meaningfully
sustained complaints" or suspensions that were for more than 7 days (or a
discharge). This information is contained in Table 2 and Figure 2. Note that among
the 10,149 complaints, only 19 received "meaningful suspensions" for a rate of
0.0019, or just less than 2 per 1000 complaints. The confidence interval, which
again is very narrow, may be found below Table 2.

I repeated these calculations for 1999 - 2004. These results are contained in Tables
3 and 4 and Figures 3 and 4. The results for sustained complaints and meaningfully
sustained complaints are very similar to the above rates. There is a tendency for the
rates from 1999 – 2001 to be slightly higher than the rates for 2002 – 2004. The
order of magnitude is not noteworthy. For example, the meaningfully sustained rate
declined from roughly 5 per 1000 complaints in 1999 – 2004 (which of course
contains 1999 – 2001) to roughly 2 per 1000 complaints in 2002 – 2004.

Since I was given data for the years 1999 – 2004, I thought it would be instructive to
generate time trends for these 5 years for the brutality complaints and the total

24

complaints (Figures 5 and 6). The results are dramatic. Note that the proportion of complaints that were sustained decreases every year for both categories and that both the proportions are much lower in 2004 than they were in 1999. For the "Total" category, 3.7% of the complaints were sustained in 1999 compared to only 0.6% in 2006, a decline of 84%. Sustained brutality complaints fell from 4.8% to .5%, a decline of 90%.

All of these data indicate that, in either of these two time intervals, the probability that a complaint would be sustained was tiny and that the probability that it would be meaningfully sustained was even tinier, being smaller by a factor of about 10. Furthermore, the sustained proportions declined dramatically over this interval.

This question (#1) involves words like "impunity" and "effective system." These are not, of course, statistical words. However, it is fair to say that it was very, very unlikely for a Chicago Police Officer in the years considered above to be disciplined as a result of a complaint in general, or a Force complaint in particular. It was essentially impossible for an officer to be meaningfully disciplined. As noted above, according to a federal government report (Bureau of Justice Statistics Special Report, June 2006, NCJ 210296, entitled "Citizen Complaints about Police Use of Force"), only 10% of all brutality incidents are reported and the data I analyzed in *Bond* indicate that meaningful discipline occurs in Chicago in 2 out of every 1,000 complaints. Putting these two numbers together suggests that 2 out of every 10,000 brutality incidents result in meaningful discipline in Chicago. This is pretty close to never.

25

EW 00509

Question # 2

*What was the likelihood that meaningful discipline would result from an official misconduct complaint against a "repeater" (an officer who had amassed more than 10 official misconduct complaints between 2001- May 2006)?  In other words, what level of certainty did a "repeater" have that an official misconduct charge against him or her would not lead to any meaningful discipline?*

The CPD produced a list of officers with more than 10 complaints from May 2001 – May 2006 and the complaints lodged against them.  This list is 208 pages long.  This information was summarized and entered into a Microsoft Excel spread sheet that I analyzed.  The spreadsheet required 54 pages to print out.  We should note in passing that more than 10 complaints in this 5-year interval imply an average of more than 2 complaints per year.

There were 662 "repeaters" on the list.  Between May 2001 – May 2006 10,733 complaints were listed against these officers, and 236 or 2.2% were sustained.  Between 2002 – 2004 there were 7,864 complaints and 161 or 2.0% were sustained.  Saying this another way, 98% of the complaints against these repeaters were not sustained.

Among the 236 sustained complaints, 35% were for a reprimand, 5% for a violation notice, and 23% for 1 a day suspension.  Thus, between May 2001 and May 2006 10,733 complaints were filed.  These resulted in 236 sustained complaints.  Of

26

EW 00510

these, 63% were for a reprimand, violation or a suspension of 1 day. Only 22 of the 10,733 complaints (two tenths of one percent) were for suspensions longer than 7 days.

There is more that should be considered in this context. Among the 662 officers with more than 10 complaints issued against them, only 167 (25%) were ever disciplined for anything; 75% were never disciplined.

I thought it might be interesting to look at those officers who had 30 or more complaints (an average of 6 or more per year) against them. I list them separately with the number of complaints and the number that were sustained. Although I have omitted the names of the officers these pairs of data are listed according to the alphabetical order of the involved officers from among the list of the 662 who had more than 10 complaints.

(Complaints, Sustained)
(30,0)
(33,0)
(30,0)
(31,0)
(36,1)
(33,1)
(50,2)
(30,0)
(52,0)
(30,0)
(31,0)
(32,0)
(53,1)
(31,0)
(34,0)
(30,0)
(30,0)
(30,0)

27

(30,0)
(36,1)
(34,0)
(55,0)
(33,0)
(30,1)
(31,0)
(40,0)
(38,0)
(35,0)
(30,0)
(35,0)
(33,0)
(31,0)
(33,0)

Thus, 33 officers were complained against 30 times or more during this interval. Six

of them had sustained complaints. Only 1 of these was disciplined more than once

(twice in this case). Only one of the disciplines was "meaningful," i.e., suspension

for more than 7 days. Four officers were complained against 50 or more times. One

was disciplined once, one was disciplined twice, and two were never disciplined.

Thus, the answer to this question is that it there has been virtually no discipline of

"repeaters" and even less "meaningful" discipline for repeaters.

Question # 3

*How does the Chicago Police Department's brutality complaint data and the rate that*

*the CPD sustains brutality charges compare to national law enforcement data?*

There is a relevant publication from the Bureau of Justice Statistics on this topic. It

is a Special Report, June 2006, NCJ 210296, entitled "Citizen Complaints about

28

EW 00512

Police Use of Force." All of the data cited in the report is for 2002. Some of the main findings follow, with Chicago comparisons.

1) Among "large municipal police departments" there were 9.5 complaints per 100 full-time sworn officers. If Chicago has 13,500 police officers (as suggested by the CPD web site), then this would imply we could expect 1283 complaints in a year. In fact, as seen in Table 4, in Chicago between 1999 – 2004 (6 years) there were 10,646 "Brutality" complaints (Force) or 1,774/year, much higher than the national average.

2) 8% of all force complaints were sustained. For forces with more than 1,000 officers (like Chicago) the rate was 6%.

In fact, as seen in Table 4, only 0.74% (less than 1 percent) of Brutality complaints in Chicago were sustained during this interval. Thus, Force complaints are more than 8.1 times as likely to be sustained in the rest of large municipal police departments in the country as a whole than in Chicago. Saying this another way, a Brutality complaint in Chicago is 88% less likely to be sustained than it is for the country as a whole.

Thus, Chicago Force complaint data seem out of line with the national profile with sustained rates being far lower than for the country as a whole.

29

EW 00513

Question # 4

*Does the CPD have an effective system to identify and address individual patterns of police abuse?*

Using the above-cited data, we can see that 662 police officers had more than 10 complaints against them from 2001 – 2006. If we take 13,500 as the number of officers in the CPD, this implies that 4.9% of the CPD fell into this category of 11 or more complaints. According to data provided by the CPD (in "Defendant City's Response to Plaintiff's Fifth Request to Produce, No. 2") 10,387 officers had 3 or fewer complaints. By simple subtraction this implies that another 2,451 or 18.2% had 4 – 10 complaints. Figure 7 presents this distribution.

What actions were required of these officers with repeat complaints against them? Of the 662, only 89 (13.4%) were ever enrolled in the Behavioral Intervention System (BIS) and Personnel Concerns Program (PCP). Also, 48 (7.3%) of these took a class only. Thus, 137 (less than one quarter - 21%) of the 662 "repeaters" were ever placed in an improvement program.

Above I listed 33 officers who had 30 or more complaints against them. Only 14 of these were ever enrolled in the BIS (6) or PCP (4) or took a class (4). Notably, there were four officers with 50 or more complaints and only two of them were ever in the BIS, PCP or took a class.

30

EW 00514

I also sought to understand whether the programs or classes were effective. I proceeded in the following manner. First, I placed the data for all 137 officers in an Excel spreadsheet. Then I calculated the number of months since the last program ended (through May, 2006). Then I divided the number of complaints against the officer since that date (this number was contained in the spreadsheet) by the number of months since the last program and then divided by 12. This gave me the number of complaints against the officer per 12-month (yearly) period. Recall that these officers were flagged because they had an average of more than 2 complaints per year and that there were 137 officers in this category. I eliminated the 7 that were still in programs and the 1 that had missing information. For the remaining 129 officers I calculated the average annual complaint rates. These officers averaged 2.6 complaints per year, a higher rate than the flagging cut-off (2 per year). Among these 129, only 9 had no complaints lodged against them after participating in the program or class. An additional 9 averaged less than 1 complaint per year. The remaining 111 averaged more. 14 of them averaged more than 5 complaints a year; four of these averaged more than 7 and one averaged 9.3 complaints per year.

From all appearances these programs not only appear to be ineffective but also appear not to produce results better than having no programs.

Question # 5

*Does the CPD have an effective system to identify and address patterns of police abuse committed by groups of police officers, such as police units?*

31

EW 00515

In the City of Chicago's Responses to document requests, the CPD stated that it does not maintain information about the number of "Complaint Registers" (police abuse complaints), sustained rates, or disciplinary rates by CPD police unit. The CPD also indicated that searches for Complaint Registers cannot be conducted by CPD unit. It is therefore clear that the CPD does not use complaint data to identify patterns of misconduct by groups of officers.

EW 00516

## Table 1. Sustained Rates of C.R. Investigations from 2002 to 2004, by Type of Offense

| 2002-2004 | Sustained | Total | SU Rate |
|---|---|---|---|
| Brutality | 82 | 5,357 | 0.0153 |
| Illegal Search | 13 | 3,837 | 0.0034 |
| Sexual Harassment, Abuse, Rape | 22 | 111 | 0.1982 |
| Racial Abuse | 3 | 183 | 0.0164 |
| Planting Evidence, False Arrest | 4 | 661 | 0.0061 |
| Total | 124 | 10,149 | 0.0122 |

Source: Data for "Total Complaints" column comes from Internal Affairs Division, 09 May 2006 Memo, POL00825. Sustained data comes from Internal Affairs Division, 07 Sep 2006 Memo, POL02020-02021.

95% CI for Sustained Total Rate (0.0122) = (0.0101, 0.0144)

EW 00517

### Table 2.  Meaningfully Sustained Rates of C.R. Investigations from 2002 to 2004, by Type of Offense

| 2002-2004 | Meaningfully Sustained | Total | MS Rate |
|---|---|---|---|
| Brutality | 15 | 5,357 | 0.0028 |
| Illegal Search | 1 | 3,837 | 0.0003 |
| Sexual Harassment, Abuse, Rape | 2 | 111 | 0.0180 |
| Racial Abuse | 1 | 183 | 0.0055 |
| Planting Evidence, False Arrest | 0 | 661 | 0 |
| Total | 19 | 10,149 | 0.0019 |

Source: Data for "Total Complaints" column comes from Internal Affairs Division, 09 May 2006 Memo, POL00825.  Sustained data come from same memo, pages POL00826-000831.

95% CI for Meaningful Sustained Total Rate (0.0019) = (0.001031, 0.002713)

34

EW 00518

## Table 3.  Sustained Rates of C.R. Investigations from 1999 to 2004, by Type of Offense

| 1999-2004 | Sustained | Total | SU Rate |
|---|---|---|---|
| Brutality | 292 | 10,646 | 0.0274 |
| Illegal Search | 27 | 6,504 | 0.0042 |
| Sexual Harassment, Abuse, Rape | 53 | 281 | 0.1886 |
| Racial Abuse | 12 | 539 | 0.0223 |
| Planting Evidence, False Arrest | 6 | 749 | 0.0080 |
| Total | 390 | 18,719 | 0.0208 |

Source: Data for "Total Complaints" column comes from Internal Affairs Division, 09 May 2006 Memo, POL00825.  Sustained data comes from Internal Affairs Division, 07 Sep 2006 Memo, POL02020-02021.

95% CI for Sustained Total Rate (0.0208) = (0.0188, 0.0229)

35

EW 00519

### Table 4.  Meaningfully Sustained Rates of C.R. Investigations from 1999 to 2004, by Type of Offense

| 2002-2004 | Meaningfully Sustained | Total | MS Rate |
|---|---|---|---|
| Brutality | 79 | 10,646 | 0.0074 |
| Illegal Search | 1 | 6,504 | 0.0002 |
| Sexual Harassment, Abuse, Rape | 7 | 281 | 0.0249 |
| Racial Abuse | 2 | 539 | 0.0037 |
| Planting Evidence, False Arrest | 0 | 749 | 0 |
| Total | 89 | 18,719 | 0.0048 |

Source: Data for "Total Complaints" column comes from Internal Affairs Division, 09 May 2006 Memo, POL00825.  Sustained data come from same memo, pages POL00826-000831.

95% CI for Meaningful Sustained Total Rate (0.0048) = (0.0038, 0.0057)

EW 00520



Figure 1. Sustained Rates of C.R. Investigations, 2002- 2004, by Type of Offense

EW 00521



EW 00522



Figure 3. Sustained Rates of C.R. Investigations, 1999- 2004, by Type of Offense

EW 00523



40

EW 00524



Figure 5. Percent Sustained Complaints by Year: Total

EW 00525



Figure 6. Percent Sustained Complaints by Year: Brutality

EW 00526



Figure 7. Complaints Against
Chicago Police Officers, 2001-2006

**Note: Median is 1.5 complaints per officer**
Source: CPD Internal Affairs, Analytical Section List of 662 officers with more than 10
complaints from May 2001-May 2006, POL00834-POL01043; Defendant City of
Chicago's Response to Plaintiff's Fifth Set of Requests to Produce Documents.

43

EW 00527

# EXHIBIT E

# **Ekl**Williams PLLC
Attorneys and Counselors at Law



KAROLINA OBRYCKA V. CITY OF CHICAGO

Expert Discovery
Supplemental Outline of Issues and Record Citations

II.     The City of Chicago has a de facto municipal policy so widespread as to
        have the force of law of protection of officer misconduct from scrutiny or
        consequence through inadequate investigation and discipline of officer
        misconduct.

    A.     Anecdotal Evidence in this case:

        1.     Efforts to conceal video – if this was not a police officer, City
        would have had a press conference / APB for violent offender.
        (See I.A.2.a., above)

        2.     Intentionally Inadequate efforts to locate, question and arrest
        AA, despite allegations that he was intimidating and
        threatening witnesses:

            a.     Deposition Testimony (supplemented)

                i.     Deb Kirby dep., pp. 64-71, 77-79 (Supt. Cline directed IAD
                to assist OPS and locate Abbate to relieve his police
                powers, she delegated the job of locating Abbate to Lt.
                Naleway – "Dave is an expert at locating people."), 73-75
                (during the week of the event, Kirby was aware of threats
                from Abbate to falsely arrest people associated with the
                bar), pp. 108-119 (She was aware of Abbate's threats to
                falsely arrest and plant drugs on people in the bar, but
                considered efforts to locate Abbate limited to the
                restrictions of an administrative investigation; generally in
                efforts to locate people, they will reach out to family, they
                will run vehicles, they will attemot to identify and locate
                the vehicle).

                ii.     Dave Naleway dep., pp. 82-83 (Naleway was never aware
                of allegations that Abbate had threatened the bar owner,
                bartender and bar patrons with false arrest and planting of
                drugs), 98-135 (Naleway directed Sgts. Maraffino and
                Martin to locate Abbate, and he was aware they went out to
                Abbate's precinct, house and his father's house on the 22nd

CONFIDENTIAL EW003633

and probably on the 23rd. They reported back to Naleway that Abbate had left his shift abruptly on the 22nd and that there was no response at his house or his father's house on the 22nd. By that Monday, Naleway assumed that Abbate had checked himself into a treatment facility so Naleway called EAP. Naleway only received confirmation that Abbate had contacted EAP, but Naleway never got confirmation that Abbate had in fact done so, or where he was at. Naleway directed Maraffino and Martin to stop looking and informed Deb Kirby. Deb Kirby never told Naleway to keep looking because Abbate was threatening the bar owner, bartender and patrons with retaliatory police action).

iii.    Sgt. Maraffino reports that on February 22nd, he and Martin went to the 20th District, Abbate's house and Abbate's father's house – no contact. See City 03105-3106. There is no other record of any effort by either Sgt. to locate Abbate, and no record of Naleway's claim that either Sgt. told Naleway that they talked to Abbate's partner. Boyd's report states that Maraffino and Martin went to the wrong district (17th) and then only to Abbate's house, and that Boyd had called the 20th and learned that Abbate used compensatory time for his shift on the 22nd and had checked himself into a rehab center. See City 00815-816, 838-839.

iv.    Dion Boyd dep., pp. 74-85 (to effect the arrest of Abbate on the misdemeanor battery charge, he called the 20th district and was told Abbate had taken emergency compensatory time for his shift on the 22nd, and then he learned from a supervisor, he believes Lt. Calloway, on the 23rd that Abbate had checked himself into a rehab facility. Boyd understood that he could not contact Abbate at that point because of union rules, so he made no other efforts to locate or contact Abbate).

v.    Keith Calloway dep., pp. 50-63 (Calloway directed Boyd to locate and arrest Abbate after the meeting with the State's Attorneys (Feb. 23), and Calloway had learned in that meeting from Mike Duffy (head of OPS) that Abbate had checked into a rehab or treatment facility).

vi.    Mike Duffy dep., pp. 182-189 (During meeting with the State's Attorney on 2/23 that there was information that Duffy learned from Calloway, either after the meeting with the State's Attorneys (on 2/23) or the next day, that when attempts were made to locate and arrest Abbate on the misdemeanor battery, he could not be located and it was learned that he checked into a hospital. Deb Kirby (or

CONFIDENTIAL EW003634

perhaps Naleway) told Duffy on the phone on Monday (2/26) that it was confirmed that Abbate was in a hospital and they would wait to arrest until he got out.)

vii.    OPS was aware of threats of retaliation against the bar by Abbate by 2320hrs on 2/21 (See City 00253), OPS was told specifics of the retaliatory threats by 1200hrs on 2/22 (See City 00254) and were aware of the existence of the tape by the bar owner of Chirboga conveying Abbate's threats of false arrest and planting drugs by 1700hrs on 2/22 (See City 00256 – 00257).

CONFIDENTIAL EW003635

# EXHIBIT F

**Original Transcript**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

KAROLINA OBRYCKA, MARTIN KOLODZIEJ and
EVA CEPIAZUK,

     Plaintiffs,

    V.                               CASE NO. 07 C 2372

CITY OF CHICAGO, a Municipal Corporation, ANTHONY
ABBATE, JR., GARY ORTIZ, PATTI CHIRIBOGA, and
JOHN DOE,

     Defendants.

---

**VIDEOTAPED DEPOSITION OF**

**PETER K. MANNING, PH.D.**

November 17, 2009
10:25 a.m.

Northeastern University, College of Criminal Justice
431 Churchill Hall, 360 Huntington Avenue
Boston, Massachusetts

Rosemary F. Grogan, RPR



ESQUIRE
an Alexander Gallo Company

Telephone: 312.782.8087
Toll Free: 800.708.8087
Facsimile: 312.704.4950

311 Monroe Street
Suite 1200
Chicago, IL 60606

PETER K. MANNING, PH.D.                    NOVEMBER 17, 2009

214

1   officers' loyalty and unwillingness to investigate, find

2   and arrest Abbate."

3       Q.   Sir, everything you've added to this fourth

4   draft of your report, that was not there in the third

5   draft of your report, comes from the outline of issues

6   and supplemental outline of issues prepared by

7   Mr. Provenzale and provided to you, correct?

8       A.   Correct.  Those are my words, and those --

9   that is my judgment of the question that was being

10  asked, "does the officer loyalty exist, and is there a

11  blue code of silence?"

12              And I was addressing that question in

13  reference to this case.

14      Q.   And every single one of your citations is back

15  to the document created by Mr. Provenzale --

16      A.   But the evidence he provided --

17      Q.   Sir --

18      A.   -- went along with that.

19      Q.   Sir, every single one of your citations goes

20  back to the document that Mr. Provenzale prepared for

21  you summarizing the evidence, correct?

22      A.   Correct.

23      Q.   All right.  If you turn to your draft on page

24  three, the draft that you did at 9:51 morning -- I'm



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com