# EXHIBIT A

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

APR 3 0 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

KAROLINA OBRYCKA,  MARTIN
KOLODZIEJ, and EVA CEPIASZUK,

Plaintiffs,

v.

CITY OF CHICAGO, a Municipal
Corporation, ANTHONY ABBATE, Jr.,
GARY ORTIZ, PATTI CHIRIBOGA,
and JOHN DOE,

Defendants.

07cv2372
JUDGE ST. EVE
MAG. JUDGE NOLAN

## COMPLAINT AT LAW

NOW COME the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, by and

through their attorneys, EklWilliams PLLC and Law Offices of Gustavo Munoz & Associates, and

complaining of the Defendants, City of Chicago, Anthony Abbate, Jr., Gary Ortiz, Patti Chiriboga

and John Doe, state as follows:

### INTRODUCTION

This is an action brought pursuant to the First and Fourteenth Amendments to the United

States Constitution and under Illinois State Law.  Specifically, the Defendant, Anthony Abbate, Jr.,

violated the rights of Karolina Obrycka, by savagely beating her without any justification, and that

the Defendant, City of Chicago, violated the rights of Karolina Obrycka because the savage beating

that Karolina Obrycka suffered at the hands of Anthony Abbate, Jr. was the direct and proximate

result of the pervasive and unconstitutional custom, practice and policy of the City of Chicago in

failing to investigate, discipline or otherwise hold accountable its police officers, whether on duty

or off duty, which custom, practice and policy has engendered the firm understanding among Chicago Police Officers, including Anthony Abbate, Jr., that they may commit crimes against and violate the rights of the citizens of the City of Chicago and the State of Illinois with impunity, and without fear of official consequence. Furthermore, the Defendants, Anthony Abbate, Gary Ortiz, Patti Chiriboga and John Doe, while acting under color of law and in conspiracy with one another, violated the rights of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, by threatening and intimidating the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, with the threat of false arrest, planting of evidence and other criminal acts, in order to coerce and deter the Plaintiffs from engaging in protected speech on a matter of public concern, namely pursuing criminal charges against Anthony Abbate, Jr., offering witness accounts of the beating and subsequent acts in furtherance of the conspiracy, and disseminating a video tape recording of Anthony Abbate, Jr.'s savage beating of Karolina Obrycka.

### JURISDICTION AND VENUE

2.  This Court has jurisdiction over the action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(1) and 28 U.S.C. §1367(a). Venue is proper in this District under 28 U.S.C. §1391(b), as all or most of the parties reside in this Judicial District, and the events giving rise to the claims asserted herein occurred in this Judicial District.

### BACKGROUND

3.  The Plaintiff, Karolina Obrycka, is a resident of this Judicial District. On, before and for some time after February 19, 2007, she was employed as a waitress / bartender at Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois.

4.      The Plaintiff, Martin Kolodziej, is a resident of this Judicial District. On, before and since February 19, 2007, he was employed as the manager of Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois.

5.      The Plaintiff, Eva Cepiaszuk, is a resident of this Judicial District. On, before and since February 19, 2007, she was the owner of Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois.

6.      The Defendant, City of Chicago (hereinafter "CITY"), at all relevant times, was an Illinois Municipal Corporation, duly chartered and organized under the Laws of the State of Illinois, located entirely within this Judicial District.

7.      The Defendant, Anthony Abbate, Jr. (hereinafter "ABBATE"), at all relevant times, was a sworn Chicago Police Officer residing in this Judicial District, who possessed the authority under law to carry out the police powers invested in him by the Defendant, CITY and the State of Illinois, including the power to arrest.

8.      The Defendant, Gary Ortiz (hereinafter "ORTIZ"), at all relevant times was a resident of this Judicial District and an employee of the Defendant, CITY, within the Department of Streets & Sanitation, and was a personal friend of the Defendant, ABBATE.

9.      The Defendant, Patti Chiriboga (hereinafter "CHIRIBOGA"), at all relevant times was a resident of this Judicial District employed as a waitress / bartender at Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois, and was a personal friend of the Defendant, ABBATE.

10.     The Defendant, John Doe (hereinafter "OFFICER DOE"), at all relevant times is believed to have been a resident of this Judicial District and a sworn Chicago Police Officer who

possessed the authority under law to carry out the police powers invested in him by the Defendant, CITY and the State of Illinois, including the power to arrest.

### THE SAVAGE BEATING OF KAROLINA OBRYCKA

11.    On February 19, 2007, the Plaintiff, Karolina Obrycka, was working at Jesse's Shortstop Inn, 5425 W. Belmont Avenue, Chicago, Illinois, as a waitress / bartender. While tending bar, she was serving several patrons who had been drinking in the bar for some time. One of the patrons was the Defendant, ABBATE, a person known by many in the bar to be a Chicago Police Officer, off-duty at the time.

12.    Late in the evening of February, 19, 2007, the Defendant, ABBATE, began to act in a violent, abusive and combative manner; earlier in the evening, he used abusive and profane language toward the Plaintiff, Karolina Obrycka, and others, and was otherwise extremely unruly and abusive. After these circumstances had occurred and it was apparent that ABBATE was intoxicated, the Plaintiff, Karolin Obrycka, refused to serve ABBATE any further alcoholic beverages.

13.    At some time soon after this, ABBATE walked to the area behind the bar, his intentions unclear. The Plaintiff directed him to go back to the customer area. Shortly thereafter, ABBATE again entered the service area behind the bar, this time carrying a bar stool in a menacing manner. The Plaintiff, Karolina Obrycka, attempted to prevent ABBATE from remaining behind the bar by pushing him back towards the customer area. However, Karolina Obrycka is less than half the size of ABBATE.

14.    In response to her efforts to move him out from behind the bar area, ABBATE erupted into a violent fit, and began to savagely toss, beat, kick and punch the diminutive Plaintiff,

Karolina Obrycka, about her whole body, including her head, arms legs, torso and back.

15.    Eventually, ABBATE stopped beating the Plaintiff, Karolina Obrycka, and abruptly left the bar.  Around that time, the Chicago Police were called via 9-1-1.  Some time thereafter, several uniformed Chicago Police Officers arrived.  At the time the police arrived, the Plaintiff, Karolina Obrycka, was unaware of ABBATE's last name and that he was a Chicago Police Officer.

### THE IMMEDIATE AFTERMATH

16.    When several Chicago Police Officers arrived to investigate the 9-1-1 call, Karolina Obrycka reported to them what had happened, and gave a physical description of the Defendant, ABBATE, and his first name, "Tony."  Furthermore, the Plaintiff, Martin Kolodziej, who arrived in the bar shortly after the aforementioned events occurred, reported to the responding officers that "Tony" was a Chicago Police Officer, and that he believed that the bar's video system should have recorded the whole incident.

17.    However, upon hearing that the offender was a Chicago Police Officer, the responding officers did not direct the Plaintiff, Martin Kolodziej, to preserve the recording or turn it over to them, did not even view it, and simply gave the Plaintiff, Karolina Obrycka, a complaint form and directed her to go to the station at Belmont & Western to file the complaint if she wanted. The responding officers then left the bar without any further investigation.  It is not known if these officers ever generated an investigatory report in connection with their response to the scene of the report, but they did not engage in any further investigation to locate ABBATE, question him or record the statement of any other witness in the bar.

18.     Before she had the opportunity to go to the police station, the Plaintiff, Karolina Obrycka, was approached by another patron in the bar by the name of "Gary" (the Defendant, ORTIZ) and another employee of the bar, the Defendant, CHIRIBOGA. Both ORTIZ and CHIRIBOGA began to talk with the Plaintiff, Karolina Obrycka, about what the Defendant, ABBATE, had done.

19.     Prior to speaking with the Plaintiff, Karolina Obrycka, the Defendants, ORTIZ and CHIRIBOGA, had been in contact with ABBATE on their cell phones, and the Defendant, CHIRIBOGA, an employee of the bar, asked the Plaintiff, Martin Kolodjiez, if she could see the video, which she then viewed. After relaying to ABBATE that his savage beating of the Plaintiff, Karolina Obrycka, was caught on tape, ABBATE, ORTIZ and CHIRIBOGA agreed to communicate to the Plaintiff, Karolina Obrycka, that if she would not file the complaint against ABBATE, that ABBATE would pay for her medical bills, lost wages and other financial loss she suffered as a result of the beating.

20.     Thereafter, in furtherance of this agreement and in concert with each other, the Defendants, ORTIZ and CHIRIBOGA, while acting under color of law, told Plaintiff, Karolina Obrycka, that if she would refrain from filing the charge against ABBATE, he would pay her for her trouble. The Plaintiff, Karolina Obrycka, refused, and both Defendants, ORTIZ and CHIRIBOGA, communicated back to ABBATE that the Plaintiff's, Karolina Obrycka, silence could not be bought.

### THREATS AND INTIMIDATION TO SILENCE THE PLAINTIFFS

21.     At some point later, while acting under color of law, the Defendant, CHIRIBOGA, and the Defendants, ABBATE and OFFICER DOE, spoke and/or met and through joint and

concerted action, entered into an agreement to threaten and intimidate the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, to coerce and deter them from testifying or otherwise presenting evidence against ABBATE in connection with the complaint filed by the Plaintiff, Karolina Obrycka.

22.    Specifically, the Defendants, ABBATE, CHIRIBOGA and OFFICER DOE, spoke and/or met and agreed to communicate to the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, that the Defendants were aware of the Plaintiffs' vehicle identification tags and descriptions, and that if the Plaintiffs did not turn over to the Defendants (or destroy) the video tape recording of ABBATE savagely beating the Plaintiff, Karolina Obrycka, that the Plaintiffs and patrons of Jesse's Shortstop Inn would be falsely arrested for Driving Under the Influence of Alcohol and/or possession and/or trafficking of cocaine. The Defendants also agreed to threaten the Plaintiffs not to show the video to anyone.

23.    In furtherance of the agreement made between and among the Defendants, and other as yet unknown-co-conspirators, the Defendant, CHIRIBOGA, met with the Plaintiff, Martin Kolodziej, and threatened him that if he did not turn over the tape to ABBATE or destroy it in two days, and refrain from showing it to anyone, that the lives of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, and patrons and employees of Jesse's Shortstop Inn would be in danger, and that these Plaintiffs and patrons and employees of Jesse's Shortstop Inn would be indiscriminately and falsely arrested on trumped up charges of driving under the influence and/or possession and/or trafficking of cocaine through the planting of drugs.

### THE CHICAGO POLICE "SHAM" INVESTIGATION

24.     After being threatened by the Defendant, CHIRIBOGA, the Plaintiffs, Karolina Obrycka and Martin Kolodziej, met with investigators of the Office of Professional Standards (hereinafter "OPS") within the Chicago Police Department (hereinafter "CPD"), and shared with them the videotape that showed ABBATE savagely beating the Plaintiff, Karolina Obrycka, the responding officers showing up at the scene and then leaving without conducting any investigation and the Defendants, ORTIZ and CHIRIBOGA, talking with the Plaintiff, Karolina Obrycka, trying to bribe her.

25.     When he met with the OPS investigators, the Plaintiff, Martin Kolodziej, also advised the investigators that a friend of ABBATE's, the Defendant, CHIRIBOGA, had conveyed to the Plaintiffs a threat and intimidation of false arrest for driving under the influence and/or planting of evidence, namely cocaine. The Plaintiff, Martin Kolodziej, also advised the investigators that he was in possession of an audio recording of the threats from ABBATE and OFFICER DOE relayed to Plaintiff, Martin Kolodziej, by the Defendant, CHIRIBOGA. Despite being advised of further physical evidence of an ongoing conspiracy to intimidate and coerce the Plaintiffs from sharing the evidence and information in their possession, the OPS investigators did not even ask for the audio tape of the threats.

26.     Rather, in response to the complaint filed by the Plaintiff, Karolina Obrycka, and the videotape and information furnished by the Plaintiff, Martin Kolodziej, the OPS investigators set about a concerted and deliberate effort to minimize and conceal from public scrutiny the details and facts of the case. Specifically, the OPS investigators conducted a bad faith investigation, including but not limited to the following:

a.    did not follow-up on the bribery allegations involving the Defendants, ABBATE, ORTIZ and CHIRIBOGA;

b.    did not follow-up on the intimidation, conspiracy and official misconduct allegations involving Defendants, ABBATE, OFFICER DOE and CHIRIBOGA;

c.    did not conduct a meaningful interview of ABBATE designed to establish the truth of what occurred both during the beating and after;

d.    did not recommend, or otherwise cause, the immediate administrative suspension of ABBATE pending formal disciplinary proceeding; and

e.    submitted incomplete facts and evidence of the case to the Office of the Cook County State's Attorney.

27.    As a result of the bad faith investigation of the criminal conduct by the OPS investigators as described above, the complaints and evidence related to the beating and bribery of Plaintiff, Karolina Obrycka, and the intimidation of Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, were improperly and insufficiently addressed and/or allowed to occur without consequence. The initial charge of simple battery was filed by the CPD without consultation with the Office of the Cook County State's Attorney, despite the brutal and savage nature of the attack and despite the subsequent conspiracy to silence the witnesses; no further charges or investigation was left open regarding the remaining allegations of bribery and intimidation.

28.    In short, the investigators carried out the pervasive custom, practice and policy of the CPD of failing to investigate, discipline or otherwise hold accountable its police officers, whether on duty or off duty.

## THE PUBLIC FALLOUT AND OFFICIAL SCRUTINY

29.    On March 20, 2007, after it became apparent to the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, that the proper course of legal and official action would not

be taken by the CPD, and after having lived under the threat against life and limb, including the threat of being falsely arrested, legal representatives of the Plaintiffs disclosed the video tape recording of ABBATE beating the Plaintiff, Karolina Obrycka, to the media. The brutal, vicious and savage nature of the beating immediately brought about national and worldwide condemnation of the event, including grave suspicion on CPD for the decision to allow only a charge of simple battery and its failure to engage in any immediate disciplinary action against ABBATE.

30. On March 19 or 20, 2007, the Office of the Cook County State's Attorney initiated a felony charge of Aggravated Battery against ABBATE. Even on the approval of this charge and the issuance of an arrest warrant, members of the CPD violated their own policies in placing ABBATE under arrest, in that they allowed him into custody and in the back of a squad car without handcuffs. Even after public condemnation of that preferential treatment, ABBATE was again protected by the CPD, when he was shielded from public view at a subsequent court appearance, where ABBATE was escorted in and out of a back door of the courthouse, around metal detectors and outside the view of the media.

31. On or shortly before April 27, 2007, ABBATE was indicted on 14 Counts of Aggravated Battery, Official Misconduct and Conspiracy by a Grand Jury in Cook County, Illinois.

### COUNT I
42 U.S.C §1983
DUE PROCESS / FIRST AMENDMENT / EQUAL PROTECTION – MONELL CLAIM

32. Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 31, above, as if fully set forth herein.

33. The actions of the Defendants, ABBATE, ORTIZ, CHIRIBOGA and OFFICER DOE,

were done pursuant to one or more of the following de facto policies, practices and/or customs of the CITY that are so pervasive that they carry the force of law.

34.     Specifically, the CITY has a de facto policy, practice and/or custom of concealing and/or suppressing officer misconduct (both on duty and off duty misconduct), including the use of unlawful force. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; failure to promptly record witness statements or preserve evidence; failure to promptly interview the suspected officer; failure to properly and sufficiently discipline an officer, even where the complaint is sustained; fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct is so obviously true.

35.     Likewise, the CITY has a de facto policy, practice and/or custom of investigating complaints against off duty officers differently than complaints against other citizens. This "double standard" regarding allegations of misconduct against off-duty officers includes, but is not limited to: all of the above acts and/or omissions listed in paragraph 34, above; limiting charges against off-duty officers to misdemeanors, regardless of the severity or outrageousness of the alleged misconduct; and suppressing felony review of charges against off-duty officers, regardless of the severity or outrageousness of the alleged misconduct.

36.     Likewise, the CITY has a de facto policy, practice and/or custom of failing to maintain accurate and complete records of complaints and investigations of misconduct.

37.     Likewise, the CITY has a de facto policy practice and/or custom of hiring and retaining unqualified officers, and failing to properly train, monitor and/or supervise its police

officers.

38.     Finally, the CITY, has a <u>de facto</u> policy, practice and/or custom of a "code of silence." This code is an implicit understanding between and among members of the CPD resulting in a refusal or failure to report instances of misconduct of which they are aware, including the use of unlawful force, despite their obligation to do so as sworn peace officers.  This includes police officers who remain silent or give false or misleading information during official investigations into allegations of a fellow officer related to misconduct that occurred on duty or off duty in order to protect themselves or their fellow officers from discipline, criminal prosecution or civil liability.

39.     Individually and collectively, the above described <u>de facto</u> policies, practices and/or customs of the CITY proximately result in the culture and endemic attitude among members of the CPD, including the Defendants, ABBATE and OFFICER DOE, that they may engage in misconduct against the citizenry with impunity, and without fear of official consequence; they consider themselves "above the law."

40.     The aforementioned <u>de facto</u> policies, practices and/or customs of the CITY, individually and collectively, have been maintained and/or implemented with utter indifference by the CITY and has or have encouraged and/or motivated the Defendants, ABBATE and OFFICER DOE, to commit the aforesaid wrongful acts against the Plaintiffs, and therefore acted as the direct and proximate cause of the injuries sustained by the Plaintiffs.

41.     The above acts / omissions of the CITY violated the Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

42.     As a direct result of the facts and allegations set forth in Count I, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, have suffered, and will in the future

continue to suffer injuries of a personal and pecuniary nature, including extreme emotional distress, and damage to their business and property.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, demand judgment against the Defendant, CITY OF CHICAGO, in a sum in excess of $1,000,000.00, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## COUNT II
### 42 U.S.C. §1983
### CONSPIRACY – FIRST AMENDMENT

43.     Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 42, above, as if fully set forth herein.

44.     As alleged above, the Plaintiffs spoke out about matters of public concern, to wit, the criminal acts and conspiracy committed in the official and individual capacities of the Defendants, ABBATE, ORTIZ, CHIRIBOGA and OFFICER DOE.

45.     Defendants, acting under color of law, individually and/or in concert with each other and other as yet unknown co-conspirators, unlawfully conspired to retaliate against the Plaintiffs through concerted and deliberate action, including threats and intimidation, in order to punish Plaintiffs for the exercise of their protected speech and to keep the Plaintiffs from further exercising their right to protected speech, and to conceal and destroy evidence in Plaintiffs' possession.

46.     As the proximate result of the threats and intimidation described herein and above, the Plaintiffs have suffered and will in the future continue to suffer injuries of a personal and pecuniary nature.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk,

demand judgment against the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ, PATTI CHIRIBOGA and JOHN DOE, in a sum in excess of $1,000,000.00, including punitive damages, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

### COUNT III
42 U.S.C. §1983
CONSPIRACY – EQUAL PROTECTION

47.     Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 46, above, as if fully set forth herein.

48.     Defendants, acting under color of law, individually and/or in concert with each other, singled out the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, with threats of investigation of criminal charges, false arrest, planting of evidence and bodily harm, all in retaliation for the acts and participation of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, of providing evidence and information related to the criminal and internal investigation of ABBATE.

49.     Defendants' conduct, as described above, violated the rights of the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, to equal protection of the laws as guaranteed under the Fourteenth Amendment to the United States Constitution, and caused the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, to suffer damages, including personal and pecuniary injuries.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, demand judgment against the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ, PATTI CHIRIBOGA and JOHN DOE, jointly and severally in a sum in excess of $1,000,000.00, including

punitive damages, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## COUNT IV
42 U.S.C. §1985(2)
CONSPIRACY

50.    Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 49, above, as if fully set forth herein.

51.    The individual Defendants, acting together and under color of law, reached an understanding and agreement, engaged in a course of conduct, and otherwise conspired among and between themselves and with other unnamed and/or as yet unknown co-conspirators, to intimidate, threaten and otherwise deter the Plaintiffs from acting as witness and/or party to any potential and/or threatened action in the federal courts of the United States related to the conduct described herein and above.

52.    As the proximate result of the threats and intimidation described herein and above, the Plaintiffs have suffered and will in the future continue to suffer injuries of a personal and pecuniary nature.

WHEREFORE, the Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, demand judgment against the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ, PATTI CHIRIBOGA and JOHN DOE, jointly and severally in a sum in excess of $1,000,000.00, including punitive damages, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## COUNT V
### INDEMNIFICATION

53.    Plaintiffs reallege and incorporate herein by reference the foregoing allegations contained in paragraphs 1 through 52, above, as if fully set forth herein.

54.    Defendants, ABBATE, ORTIZ and OFFICER DOE, were employees and agents of the CITY and acted within the scope of their employment in committing the misconduct described herein and the Defendant, CITY, was their principal.

55.    Defendant, CITY, is a municipal corporation required to provide indemnity within the meaning of 735 ILCS 10/9-102 for all actual damages caused by the Defendants, ABBATE, ORTIZ and OFFICER DOE, caused while acting in the scope of their employment

WHEREFORE, the Defendant, CITY OF CHICAGO, is liable to Plaintiffs, Karolina Obrycka, Martin Kolodziej and Eva Cepiaszuk, for an amount which will compensate them for past and future damages, including but not limited to Plaintiffs' pain, suffering, emotional distress, and damages to their business and property proximately caused by the wrongful and unlawful acts of the Defendants, ANTHONY ABBATE, JR., GARY ORTIZ and JOHN DOE.

### PLAINTIFFS DEMAND A JURY OF TWELVE.

Respectfully submitted by,

EklWilliams PLLC and
Law Offices of Gus Munoz and Associates

Terry A. Ekl
Patrick L. Provenzale
**EKL WILLIAMS PLLC**
**Attorneys for Plaintiff**
115 West 55th Street, Suite 400
Clarendon Hills, Illinois 60514
(630) 654-0045
(630) 654-0150 *Facsimile*
tckl@eklwilliams.com
ARDC # 00727105

Gustavo Munoz
**Law Office of Gus Munoz**
**Attorneys for Plaintiff**
7557 West 63rd Street
Summit, IL 60501
(708) 924-9000
(708) 924-9004 *Facsimile*
lawofficeofgusmunoz@yahoo.com

# EXHIBIT B

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

OBRYCKA,

     Plaintiff,

V.                        Case No. 07 C 2372

CITY OF CHICAGO, et al.,

     Defendants.

_____/

**PRELIMINARY EXPERT REPORT OF LOU REITER**

1.    My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2.    Since 1983 I have been providing law enforcement consultation in police training and management. I provide law enforcement training in the following areas:

- Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures
- Personnel practices.
- Supervisory techniques
- Crowd control procedures.
- Liability management.
- Policy and procedure development.
- Management effectiveness.

1

EW 00411

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization. My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3.    Since 1983, I have been retained in over 1000 police related cases. This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes case analysis and development and expert witness testimony. I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico, to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

4.    I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and

2

EW 00412

traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide Law Enforcement Administrative Investigations; the Second Edition in 1998, and the current Third Edition in 2006.

5.     My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6.     I have reviewed the following materials to date regarding this case:

- Complaint
- Answers
- Response to Request for Admissions
- Fraternal Order of Police Collective Bargaining Agreement 2003-2007
- Various news media articles and video clips regarding administrative investigations and City and Police responses, Chicago officials' comments regarding the Code of Silence, Jefferson Tap incident, and other officer involved incidents of misconduct
- Court and agency documents regarding other recent officer convictions
- Depositions in this litigation
  - Sgt. Kenneth Bigg
  - Thomas Bilyk
  - Dion Boyd
  - Commander Keith Calloway
  - Michael Duffy
  - Lauren Freeman
  - Charles Halpern
  - Officer Jerry Knickrehm
  - Officer Peter Masheimer
  - David Naleway
  - AS Debra Kirby
  - Marcin Kolodziej

EW 00413

- Karolina Obrycka
- Joseph Skala
- Joseph Stehlik
- Depositions from Gilfand case Aaron and Barry Gilfands and Scott Lowrance
- Chicago Police Department reports
- OPS reports of videotape review including transcript of conversation between Plaintiff and Officer Mashiemer and retaliation incident
- IAD report reference arrest of Officer Abbate
- CPD General Orders referencing disciplinary process
- IAD Standard Operations Procedures 1997
- OPS Standard Operations Procedures 2000
- CR 1004248 OPS investigation of responding officers: Knickrehm/Masheimer
- Officer Abbate CR history
  - Complaint History
  - C 302115, 1004337, 237004, and 258124
- Videotapes security
- Audiotapes
- Videotape of incident on Fox News
- Dr. Whitman (draft report), "Data Analysis Memo for Obrycka v. City of Chicago, July 31, 2009
- Dr. Christopher Cooper, "Yes Virginia, There is a Police Code of Silence, Prosecuting Police Officers and the Police Subculture," 2007 paper

7.  These opinions are based upon the totality of my specialized knowledge in the field of police practices. This experience is derived from my personal police experience, knowledge and training. This expertise has been developed during my 46 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant. This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices. The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies, my constant training of police supervisors, managers and executives, my continuous interaction with other police

4

EW 00414

professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards which modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal. Many of these generally accepted practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

5

EW 00415

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

8. I have been involved in over an estimated 15 civil litigation matters concerning the Chicago Police Department since the late 1980s. On four (4) occasions I was retained by the City as a police practices expert. This case involvement has allowed me to become familiar with the personnel, citizen complaint process, disciplinary system, numerous studies and commission reports, and operations of the Internal Affairs and Office of Professional Standards. I have reviewed depositions of at least four (4) prior Chicago Police Superintendents, a similar number of Directors of OPS, and many Police Department managers, supervisors and first level officers. During this period of time I have also reviewed several hundred CR investigations conducted by the Department. The last case I acted as a police practices expert was in 2007, *Arias, et al., v. City of Chicago, et al.,* 05C5940, concerning events occurring during 2004-2005. In my review of this case I reviewed approximately 300 CR files conducted by both Chicago OPS and IA.

EW 00416

9. I have been retained by the Plaintiff's attorney to evaluate this current litigation from the point of view of the police Code of Silence and administrative investigations. These are widely known in law enforcement to have a direct impact on creating an environment with a police agency which could influence police employees to conduct themselves, both on and off the job, in a manner contrary to accepted conduct little fear of sanction by the agency.

10. **In my opinion, based upon my specialized knowledge, skills and training coupled with my continuous review of documents and testimony from the Chicago Police Department over the past 20 years and the discovery in this case, the Chicago Police Department has created an organizational environment where the Code of Silence and deficient administrative investigations and disciplinary procedures are present and would allow police officers to engage in misconduct with little fear of sanction. This adverse environment, in my opinion, is the product of acts and/or omissions by the Police Department to conduct itself in a manner contrary to reasonable and generally accepted police practices.**

11. Police officers operate in the field essentially autonomously. Their daily performance is monitored and controlled by training, policies and procedures and supervisory techniques and systems, including administrative investigations. These three (3) elements establish the parameters within which field police officers perform. These systems and practices inform officers what they should or should not do particularly when dealing with citizens during enforcement encounters. The supervisory practices, techniques, systems and administrative investigations are

7

EW 00417

the most critical aspect of controlling, monitoring and guiding field officer performance.

12.  **Administrative investigations**, commonly referred to as Internal Affairs or Professional Standards, are vital to maintaining reasonable parameters of field performance by officers. These investigations can originate from a myriad of sources. A common police practice is to investigate allegations of police misconduct which come to the attention of the police agency from any source if the allegation if later proven true would amount to misconduct. This type of system protects the concerns and rights of the four (4) essential elements to such a system - the aggrieved person, the accused officer, the involved police agency, and the community served by the police agency. These systems of administrative investigations establish the environment within the involved agency for field officers to know that they will be held accountable for their actions in the field.

13.  These practices are not new in the police field. They have been delineated in frequent national studies on police practices including the 1931 Wickershim Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and Goals, and other similar studies since that time. These practices are embodied in model policies of nationally recognized police professional groups such as the International Association of Chiefs of Police and the Police Executive Research Forum. They have been continuously referenced in authoritative texts such as the O.W. Wilson Police Administration and its many

8

EW 00418

successors, the International City Management Association's texts on municipal police practices and Police Administration, Fifth Edition, Swanson, Territo and Taylor. It is extensively covered in specific training for administrative investigations by national training entities including the Institute for Police Technology and Management (FL), International Association of Chiefs of Police (VA), Americans for Effective Law Enforcement (IL), and Public Agency Training Council (IN). Since 1997, specific recommendations for this aspect of policing are embodied into the various agreements between police agencies and the Civil Rights Division, U.S. Department of Justice and the "best practices" developed by the U.S. Department of Justice from these investigations.

14. During the police seminar training I conduct on law enforcement administrative investigations and police discipline, I frequently use court case citations. These are used to illustrate the importance of following generally accepted practices when conducting these types of supervisory investigations. Some of those I have and continue to use are Beck v. City of Pittsburgh, et al., 89 F.3d 966 (3rd Circ. 1996)Cert. denied, and Clark v. City of Muskegon, 2000 U.S. Dist. LEXIS 6660 (WD MI. 2000). From Beck, I emphasize the following points:

- Policy made in 2 ways. (1) "official proclamation, policy or edict." (2) "A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law. Custom may also be established by evidence of knowledge and acquiescence."

- "The investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens."

9

EW 00419

From Clark, I point out the court's observations of the importance of the complaint acceptance and investigation systems and the result they can have on individual officer performance and behavior and agency liability:

- "...a direct link between the municipalities acts and those of the police officer can exist where there is evidence that the ineffectiveness of...citizen complaint system was widespread, because it can be inferred that every police officer was aware that excessive force could be used with near impunity."

- "A police department's primary function is to investigate reports of malfeasance. When is fails to perform that function effectively, an obvious consequence is an increase in malfeasance since perpetrators will feel that their actions will go unpunished. This is no less true when...police officer. In fact, because police departments are vested with increased power and authority over ordinary citizens, police departments must be especially vigilant when complaints of excessive force are lodged...Citizen complaint processes are designed to reduce police misconduct. When citizen complaints are discouraged, ignored and discarded, it is an obvious and predictable consequence that in an department with 77 officers, some officers will realize they can commit misconduct with impunity."

- "The existence of a policy is not enough...we cannot look to the mere existence of superficial grievance procedures as a guarantee that citizen's constitutional liberties are secured." "Muskegon's deliberate indifference to the risks that flow from an inadequate citizen complaint process is sufficient to establish causation where an officer who knows that an ineffective process exists uses excessive force."

15. I have reviewed many reports and documents in prior cases regarding the Chicago Police Department which I believe support my opinion that the Department has had historical and on-going problems in its complaint process, administrative investigations and discipline.

16. Documents from the City Council meeting of November 5, 2003, indicated that the Council was proposing the amendment of Chapter 2-84 of the Municipal Code of Chicago to include "2-84-508 During investigations into civilian complaints regarding alleged misconduct by a police officer: (a) investigators shall question

EW 00420

civilians and police officers in the same amount of detail about the alleged
misconduct; (b) in the event of conflicting statements between a civilian and a
police officer, there shall be no presumption in favor of the statement of the police
officer; and (c) investigators shall give reasons for sustaining or not sustaining all
cases." The Council further submitted a proposal to amend Ordnance 2-84-330 to
include "No complaint made against an officer shall be investigated unless the
complaint takes the form of a sworn affidavit of the complainant."

17. The first amendment identified in Paragraph 16 is consistent with generally
accepted police practices and the U.S. Department of Justice best practices and
provisions within its agreements with police agencies regarding the conduct of
police administrative investigations. However, the second proposed amendment is
diametrically opposite these same generally accepted practices and the type of
governmental action considered to be a stifling and intimidating bureaucratic
hindrance to an open and transparent system for the acceptance of complaints
alleging police misconduct from the community. Use of this form of intimidation
has been condemned by study commissions on police practices as far back as the
1968 Kerner Commission following disastrous urban riots of the later 1960s. The
Police Department continues to rely on the premise that unless they have a signed
complaint from the citizen, no investigation can proceed (note Assistant
Superintendent Kirby deposition). Yet, throughout the country including Illinois,
police agencies are faced with this same requirement and continue to investigate
the matter by simply having someone within the agency become the complaining
party. It is interesting to note that in the CR investigation involving the responding

11

officers to the Obrycka incident the initiating person was Mr. Duffy of OPS and listed himself as "third party."

18. The testimony of citizens and community leaders to the Committee on Police and Fire and the Committee on Human Relations in the transcripts of hearings for these bodies on June 24, 1999, and January 20, 2000, are replete with community concerns and objections to the complaint and disciplinary systems of the Chicago Police Department. An example is the testimony of Warren Friedman, Director of the Chicago Alliance For Neighborhood Safety (page 14-16 CC00014-16), "One result of this widespread perception of corruption and abuse is that people are fearful of reporting incidents and skeptical of the department's rule to improve things. If people read sections of the contract, they will see that it sets police officers above them, that it insulates police from accountability. It denies people protection by forbidding investigation of anonymous complaints. It requires the purging of personnel records of complaints after a year making prevented measures difficult, if not impossible...In 1996 the attorney general convened a symposium. Its topic was police integrity, public service with honor. The final report on the proceedings echoed a question that was raised again and again by participants. Why after decades of concern does the police culture continue to tolerate a code of silence in matters related to violations of integrity and law."

19. These deficiencies in the administrative investigations of complaints, employee discipline and the adverse impact of the Code of Silence, has been noted by, documented for and relied upon managers and administrators within the Chicago Police Department. The failure to modify this systemic deficiency in the process

EW 00422

by successive Police Superintendents, in my opinion, is indicative of a conscious

choice by the Police Department to continue this practice of indifference to

allegations of misconduct and police abuse including Constitutional violations.

Field officers in the Chicago Police Department, in my opinion, would be aware of

these deficiencies and the many hurdles involved in the City's disciplinary system.

Officers who would choose to violate laws and written policies in such a

Department with this level of continuous historic deficiencies in its administrative

investigation process would more likely than not feel that the system, the

investigative process, the disciplinary system and the code of silence would shield

them from ultimately being held accountable.

20.  In 1990, the Department undertook an internal investigation of its OPS practices

which has become known as the "Goldston Report." This involved the re-

investigation of allegations of torture and police abuse occurring at the 2nd District

during the 1980's. Inspector Goldston's ultimate conclusion was that this abuse

was systemic over a ten year period and that the command officers of the District

were either involved in it or were aware of it. Inspector Sanders undertook a re-

investigation of the original CR investigation of the alleged abuse which concluded

that it was not sustained. Her review involved the criminal trial transcripts of the

subsequent proceedings. She sustained the charges of abuse against three (3)

police officials. It is interesting to note that even in this investigation there were no

recommendations on issues of false and misleading statements or any analysis of

agency issues including training, policy/procedures or supervisory practices.

13

EW 00423

21. In June, 1997, the Mayor created an Anti-Corruption Task Force. That group conducted a series of meetings in its attempt to determine the scope of the problem and to create working unit for this review. In the minutes of that Task Force, members of the Police Department testified about the deficiencies of the administrative investigation and discipline process within the Department. Some of those comments were:

- Chief Risley, March 18, 1997, "...Risley stated that 'numbers' pressures can be overwhelming. He stated that shortcuts are tantamount to violations of civil rights, although officers are not called upon to answer for them. There is nothing in the organization to hold officers in check for constitutional violations...seems he is the only one who cares about constitutional violations. He offered one example of a clear violation of constitutional rights involving an illegal search, which, before it reached Risley's desk, had resulted in a "non-finding" by the deputy chief, by the district lieutenant, and by the officers' sergeant."

- Director Shines, April 9, 1997, "...Shines desired to disabuse the Task Force of notion that a truly effective cop will have many complaints lodged against him regarding excessive force and corruption."

- Letter to the Task Force from the Latin American Police Association, August 14, 1997, "...Additionally, for Tactical and Gang Units, there is the established emphasis on measuring activity via arrest statistics. This forces officers to devise methods in order to perpetuate a steady flow of arrests for each shift – and creates a situation for the unscrupulous officer to pervert the criminal justice system."

- Leroy O'Shield, former commander of the Austin District and then Superintendent of CHA, September 16, 1997, "...He highlighted a number of areas that lead to corruption: (1) turnover arrests; (2) "confidential informant" situations, in which young aggressive officers are looking for big busts; (3) questionable search warrant practices."

- Chief Risley, March 18, 1998, "...Risley stated that there is a significant lack of investigative expertise and technique at OPS, and this problem always existed at OPS."

- UIC update (study group for the Task Force), April 23, 1998, "...They have generally found a lack of investigatory experience at OPS, and the quality of OPS' work and investigation techniques are lacking."

EW 00424

- UIC update, April 27, 1998, "...the staff has some concerns with the supervision and oversight of investigators at OPS, as well as their technique and expertise. They have seen a general dissatisfaction with OPS. However, to blame only Gayle Shines is a fit unfair. The police department simply does not cooperate with OPS investigations. In addition, OPS does not have good equipment, including computer automation. They also generally have a poor relationship with IAD. However, OPS investigators just are not making cases."

22. I regularly train on this subject to police practitioners and use my publication, Law Enforcement Administrative Investigations, as a training tool. I frequently conduct internal audits of police agencies in the practice of administrative investigations. I have personally been an investigator of police misconduct allegations and have adjudicated other cases of police misconduct for 11 years as a police command officer. I am familiar with the effect these practices have within police agencies. The audit practices I used for my review of the practices of the Chicago Police Department are the same that I use in my training and auditing for other police agencies. I feel confident that these practices are consistent with the generally accepted practices within law enforcement.

23. I feel that this review is sufficient for a reasonable evaluation of the practices of the Chicago Police Department in this critical area of policing. The process I used in this audit is comparable to the studies I have done for other police agencies and the Department of Justice. That administrative audit process which I regularly employ approaches the data review from the perspective of a qualitative analysis[1], frequently done with a sampling of the investigative files I'm provided during discovery. In most cases it involves the creation of a specific form to guide and

---

[1] I conduct what I refer to as qualitative reviews of administrative investigations, rather than a quantitative or statistical review. In my qualitative reviews, I example actual administrative investigation case files and supporting documentation such as the disciplinary review.

15

EW 00425

record my review of individual cases. This review captures relevant vital data and then allows for the analysis of the specific aspects of the individual investigation. These sections include the interview process, witness search/collection, evidence collection and analysis and adjudication considerations. These audit forms are then used to develop a matrix of the administrative investigation practice. This process allows me to evaluate individual cases and then overlay those reviews to determine the agency practice and philosophy.

24.   The files I analyzed in this case, in my opinion, involve which favored the officers and precluded any meaningful investigation and, ultimately, any discipline. These observations were similar to those I've made in past cases involving the Chicago Police Department and have assisted me in creating an opinion that this is a historical, systemic deficiency. These deficiencies are contrary to the generally accepted practices for this essential aspect of police control, monitoring and accountability. The investigations appeared to be very pretextual with the apparent ultimate mission to discredit the complainant rather than conduct a reasonable search for the truth of the allegation(s). The deficiencies I observed within these files allow me to opine that any reasonable officer on the Chicago Police Department during this period of time would reasonably believe that they would not be disciplined or sanctioned in any meaningful manner for misconduct involving their actions with citizens.

25.   Officer Abbate had familiarity with the complaint and administrative investigation process in the Chicago Police Department. The disclosed CR investigations indicate that he had been personally involved in five (5) complaint investigations,

16

EW 00426

not including this current incident. These investigations are typical of those I have reviewed in the past and demonstrated excessive time delays, improper interview techniques, failure to discipline for giving false statements and lack of imposition of recommended discipline.

- C302115 This investigation was agency initiated concerning improper field activities including being out of his assigned district and failing to respond to requests from supervisors and communications. This incident occurred in November, 2004, with the investigative report concluded in January, 2005. The completed adjudication with the recommendation of a 12 day suspension was signed May, 2007. The charges included AWOL, inattentive to work and failure to follow orders of supervisors. The discipline was 4 counts of insubordination. In this case, Officer Abbate was required to simply submit to:from responses rather than be interviewed. In this response he lied, but was not charged with false statements. The documentation from the City has indicated that this "penalty not served."
- C258124 This Internal Affairs investigation concerned improper handling of a prisoner's property. It occurred in November, 1999, and was concluded in February, 2000. This investigation was Not Sustained. The report indicated that the complainant refused to cooperate. None of the officers was interviewed and the investigation consisted only of a review of their reports. None of the officers were specifically questioned about the allegations.
- C237004 This administrative investigation concerned allegations of excessive force in the arrest and transportation of a female arrestee. It occurred in May, 1997, and was concluded in May, 1999. Officer Abbate's complaint history indicates that his involvement was Unfounded. Yet, the investigation report by OPS recommended he be suspended for 2 days. The other officers received much more significant recommended penalties. This investigative report reflected only a narrative summary of the interview given to OPS.

26. The only administrative investigation produced in this litigation concerns the response by Officer Knickrehm and Masheimer to the call for service by Plaintiff Obrycka. This incident occurred on February 19, 2007. The Independent Police Review Authority reported the conclusion of the investigation on April 25, 2008, with charges reporting failures and giving false statements by the officers in their

17

EW 00427

denials. The representation of the City is that no discipline has been imposed to date.

- In this case the IPRA used the common question and answer format which is an account typed by the investigator while interviewing the subject. There was no tape recording.
- The subject, Ms. Obrycka, was interviewed twice. The second interview was by telephone.
- Both officers were questioned in May, 2007. While the investigator had the transcription of the communications/911 tape, the officers were not questioned nor challenged with the information in that tape.
- The investigation indicated that the investigator reviewed the bar videotape and audio portion in October, 2007.
- While the IPRA concluded that the officers were untruthful, they were not reinterviewed nor challenged with this new information.

27. Dr. Whitman's study of Chicago Police Department, in my opinion, further supports my observations in his statistical study. For example, Dr. Whitman found that the sustained rate of CR investigations for Chicago police officers was extremely low. For all complaints alleging excessive force between 1999-2004 the sustained rate was 2.7 percent; for 2004 it was .5 percent; and the report referenced the statistics for similar cases from the U.S. Department of Justice was 8.0 percent. His study disclosed that for CR investigations between 2002-2004 for allegations of "brutality; illegal search; sexual harassment, abuse and rape; racial abuse; and planting evidence and false arrest" the sustained rate was .0122 percent.

28. The **Code of Silence** (Blue Veil or Blue Wall) is a reluctance for persons to come forward with negative information about another person. This concept exists to varying degrees within all walks of life and employee settings. It is more sinister in law enforcement for several reasons. Police officers have powers over citizens which no one else in America has - to restrict liberty and to use force against a member of the public. Police officers are most often the only witnesses to police

18

EW 00428

abuse of citizens' rights. The paramilitary nature of most police agencies creates a closer relationship amongst police officers. Various forms of retaliation are frequent to police employees who break the Code of Silence.

29. The Code of Silence has been memorialized and documented in law enforcement historically. It can be traced back to the 1866 Civil Rights Act passed to combat "Black Codes" and the 1871 KuKluxKlan Act passed to address "customs" and unwritten codes and failures to prosecute following the American civil war and specifically directed to the law enforcement officers in the South who would not enforce and prosecute persons who violated the rights of blacks. The 1931 Wickershim Commission study under President Hoover spoke to its existence in law enforcement. In 1936, leading police administration expert August Vollmer wrote: "It's unwritten law in police departments that police officers must never testify against their brother officers."

30. The writings of Professor Neiderhoffer in the late 1950's and 1960's further documented this issue in law enforcement. It has been an integral part of all national study commissions on police practices and local commissions, such as the 1991 Christopher Commission in Los Angeles, 1992 St. Clair Commission in Boston, and 1992 Koltz Commission of the Los County Sheriff's Office. The Christopher Commission's study of the Los Angeles Police Department in 1991 found that the Code of Silence was "...perhaps the greatest single barrier to the effective investigation and adjudication of complaints." It has been documented in the continuous commissions involving the New York Police Department since the days of Serpico and, most recently in 1994, the Mollen Commission. This concept

19

EW 00429

and its negative effects has been documented in most leading and authoritative texts on police practices.

31.     The Code of Silence has been the underlying issue in countless civil litigation matters involving police employees. These generally have been in cases involving employee retaliation when they either voluntarily or reluctantly come forth with information that results in other employees being sanctioned. Most of these cases result in the employees not being able to continue to work within the agency. Some examples I use during my training of police practitioners are:

- *Blair v. City of Pomona*, 223 F.3d 1074 (9th Circ. 2000)
- *Brandon v. Allen*, 516 F. Supp. 1355 (W.D. Tenn. 1981) affirmed 469 U.S. 464 (1985)
- *Katt v. New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001)
- *Simon v. Naperville*, 88 F. Supp. 2d 872 (N.D. Ill. 2000)
- A recent case developing in 2000 in Oakland, CA., involved the misconduct of officers referred to as The Riders; the probationary officer bringing the misconduct to the attention of authorities had to be moved to another police agency by Chief Word for fear of retaliation.

32.     I have written about the Code of Silence and have made it an integral part of the regular training I conduct within law enforcement. I initially documented the tremendous negative impact of the Code of Silence in the chapter I authored on "Internal Discipline" for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals, 1973, for the U.S. Department of Justice. I have testified on the Code of Silence in civil litigation trials at both the local and Federal levels.

33.     In my law enforcement training seminar I conduct and in testimony given regarding the Code of Silence, I enumerate a methodology useful in determining

20

EW 00430

whether the Code of Silence may be present in an agency and be having an adverse affect on the performance of the agency and the identification of officers engaging in misconduct:

- Repeated acts without reporting and/or taking any remedial action
- Will officers engage in misconduct in the presence of other officers
- Have any complaints been initiated by supervisors?
- Retaliation against officers who break ranks.
- Is what other officers say they were doing at the critical moment contrary to reasonable practices?
- Is it an occurrence which should have alerted a reasonable officer and focused his/her attention to the incident?
- Was the incident so obvious officers would have had to shut their eyes and ears not to have been aware of it?
- Were officers in a position to have seen or heard what occurred but denied any knowledge?
- Are they avoiding, rather than denying?
- Development of cliques and small specialized units
- Requests not to work with specific officers or units.

34. During my audits of agencies, involvement with various litigation matters and my seminars, I have come to realize that another aspect of the Code of Silence exists in law enforcement somewhat different from the traditional view of this adverse philosophy. I have come to identify this newer view as the Blue Shield - acts or omissions by an agency which insulate and protect its employees from accountability and criticism. Examples that I regularly use during my training programs are:

- Inadequate administrative investigations
- Unreasonable delays in adjudicating administrative investigations and imposition of discipline
- Failure to discipline
- No misconduct for false and misleading statements
- Accept criminal decision in lieu of administrative decision
- No confrontation with penalized misconduct
- Hiding the discipline.
- Confidentiality of records

21

EW 00431

- Allowing employees to escape discipline by leaving "in lieu of" and "personal reasons"
- Allow/encourage inaccurate testimony in civil cases.

35. I have opined in the past about the Code of Silence specifically in the Chicago Police Department: "The Code of Silence exists to varying degrees in all police agencies in the United States. The failure of the Chicago Police Department to acknowledge its potential and take affirmative steps to eliminate or minimize the influence of the Code of Silence, in my opinion, is a conscious choice various Chicago Police managers and executive officers have taken and, in my opinion, represents a position of deliberate indifference by the Chicago Police Department to this disruptive issue within the agency. Any reasonable officer in the Chicago Police Department would be aware of the systemic deficiencies in the administrative investigative process and the discipline deliberative system coupled with the entrenched affect of the Code of Silence. Those officers who engage in misconduct and violate citizens' Constitutional rights would do so with the perception that their misconduct would go undiscovered or investigated in such a deficient manner or subjected to prolonged delay in adjudication that they would not be held accountable or sanctioned."

36. During my work on the recent case of *Klipfel/Casali v. Rubin, et al.,* 94 C 6415, I reviewed the deposition of Brian Netols, Assist U.S. Attorney, who was the lead prosecutor in the Miedzianowski criminal trial (this one the primary Chicago police officer involved in the case against the ATF Plaintiffs). Attorney Netols testified during his deposition that he believes that the Code of Silence was involved in all eighteen (18) criminal trials of Chicago police officers that he has prosecuted (31).

22

EW 00432

His definition of the Code of Silence was "...a belief by members of law

enforcement that there's a code that defines certain things you do and don't do is

report the criminal activities of other officers. And the way I understand it to work

in practice, and the way I've addressed it in court, is that code also includes not

just not, not reporting the criminal activities, but actually not interrupting or

stopping the criminal activities if you come about them." (29-30)   He has heard

that citizens involved with these types of cases have feared retaliation from the

police (32).

37.   These types of consequences of the Code of Silence occurred in this case.  The

initial indicator was the initial 911 report to Chicago dispatch.  Police dispatch

operators are trained to be alert to the totality of the call for service from a citizen.

They are trained to ensure that relevant information is passed on to the assigned

and responding police units.  The transcript of Ms. Obrycka's 911 call is specific to

information that the subject of the call might have been a police officer.  This is

very significant information for officer safety for the assigned field unit.  With the

knowledge that a police officer might be involved it would be reasonable to

assume that a firearm might be involved.  This information was not transmitted to

Officers Knickrehm and Masheimer.  In my opinion, this would not have been an

oversight for any reasonably trained police dispatcher.  More reasonable would be

that the dispatcher did not want to make a record that a police officer might be in

some form of trouble.

38.   The second indicator in this case that the Code of Silence occurred was the

conscious choices made by Officers Knickrehm and Masheimer.  The record in the

23

transcription of the bar videotape is clear that the officers were told that "Tony" was known to be a police officer. They were also told that the bar had a security videotape that may have captured the incident. The officers failed to note either of these significant evidentiary facts in their report. They filed their report as a "simple battery." Any reasonable officer would know that this would not normally result in the case being put on the front burner for detectives, if any personal follow-up even occurred. The IPRA sustained these allegations against the officers for not reporting the possible misconduct of a fellow police officer and for giving false statements to IPRA.

39. A third indicator of the Code of Silence is the documentation from OPS/IPRA that this office apparently did not conduct any investigation of the police dispatcher and why the dispatcher failed to notify the assigned officers that a police officer might be the suspect in the call for service.

40. A fourth indicator is the perfunctory attempt by Internal Affairs to locate Officer Abbate once it was established he was the subject of the assault of Ms. Obrycka. Assistant Superintendent Kirby (head of Internal Affairs) testified that the unit's ability to locate Officer Abbate would be limited as this was only an administrative investigation; in reality it was a criminal as well as an administrative investigation.

41. A fifth indicator was the allegations that Officer Abbate and others were attempting to retaliate against Ms. Obrycka and the bar in an attempt to have the charges dropped against Officer Abbate.

42. The last indicator is the hastened attempt by the Police Department to have Officer Abbate prosecuted on a misdemeanor charge, rather than wait for the complete

EW 00434

analysis of the case by the State Attorney's Office. During that misdemeanor proceeding, the local District Commander ordered that the media not be allowed to cover the proceeding.

43. My perceptions of the Code of Silence within law enforcement and, specifically, the Chicago Police Department is echoed in the detailed legal article by Dr. Christopher Cooper, "Yes Virginia, There is a Police Code of Silence, Prosecuting Police Officers and the Police Subculture," 2007. This article has specific references to issues within the Chicago Police Department.

44. The other documents, information and data that I have reviewed in regards to this case referenced earlier in this report is indicative of further systemic disciplinary deficiencies in other City units, as well as the Police Department. This information details other significant disciplinary issues within the Police Department delineating similar factors to this case with other police officers and specialized police units. Media accounts of City leaders, including the Mayor and current and past Police Superintendents, indicates that these persons were aware of the current and historical disciplinary deficiencies and the negative impact of the Code of Silence and had not implemented concerted programs to rectify this known problem.

45. It is my understanding that additional materials may be in process of being produced or may be requested later. I would request that this report be considered a preliminary report. Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

EW 00435

46. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

47. My fees for this professional service is a flat Case Development Fee of $7500 and a fee of $2000 for a deposition in the Atlanta area or $2500 per day plus expenses for services away from the Atlanta area including depositions and trial appearances.

This report is signed under penalty of perjury on this 27th day of August, 2009, in London, KY.

_____

Lou Reiter

26

EW 00436

# EXHIBIT C

**Terry Ekl**

| | |
|---|---|
| **From:** | Terry Ekl |
| **Sent:** | Thursday, May 28, 2009 11:45 AM |
| **To:** | 'lreiter583@aol.com' |
| **Subject:** | Obrycka Outline.pdf |

**Attachments:** Obrycka Outline.pdf



Obrycka
Outline.pdf (7 MB)

ear Lou;

Please disregard my most recent email.  Attached is the most recent outline which is in a
more readable formate.  Thanks.

Terry

1

131

# EXHIBIT D

<u>KAROLINA OBRYCKA V. CITY OF CHICAGO</u>

**Expert Discovery**
*Outline of Issues and Record Citations*

I.     The City of Chicago Police Department has a *de facto* municipal policy so widespread as to have the force of law that amounts to a Code of Silence

　　A.     Anecdotal Evidence

　　　　1.     The night of 2-19-07:

　　　　　　a.     Physical Evidence

　　　　　　　　i.     9-1-1 call and bar video – identifying Abbate by name and that he's a police officer:
(Videos) City 00777, at 01:27 – 01:37 and (Videos) City 00780, 112608 / 0702201215 – 0702201245, Camera 2, at 19:50 to 19:58:

> OEMC:  OK, and who is this man, was this a boyfriend?

> KO:  What's his last name?

> Passera:  Abbott; Tony Abbate, they'll know him.  He's a policeman.

> KO:  I don't care if he's a police officer, the police will be here . . .

> OEMC:  Ma'am . . .;

　　　　　　　　ii.    Video inside the bar showing Karolina greet the officers as they enter the bar – all 4 present:
(Videos) City 00780, 112608 / 0702201215 – 070221245, Camera 1 at 26:40 – 28:00:

> KO:  Hi, I called.  I have three witnesses. Um, he's a policeman, this is actually what I just found out. And then he went behind the bar, he, he was following this guy [indicating Passera], he went behind the bar and at the,

the first time I told him to get out, I didn't touch him. The second time when he went behind the bar I started to push him away because he's not allowed behind the bar, and then he started to hit me; he throw me on the floor, he started to hit me. Everything is in the camera [pointing at the camera above the officer's head]; tomorrow, tomorrow the owner will be here. He won't give me the copy, what exactly happened, but I want to press charges.

PM: OK, how did he hit you, ma'am?

KO: Well, he tried to hit me behind my head, I covered my face . . .

PM: Well did he punch you?

KO: He punch me, he kick me, he throw me on the floor, like this [indicating a downward punching motion].

PM: Where did he go now?

KO: He just went away. This guy [indicating Passera] . . .

PM: [inaudible]

KO: Excuse me?

PM: What was he wearing?

KO: He's got a hat, a checkered shirt, he had a jacket . . . [inaudible]

Passera: [inaudible]

KO: You know his last name [to Passera] . .

Passera: [inaudible]

Page 2 of 10

KO: His name is Tony, I don't know his last name the owner for sure knows, he's the police.

PM: [inaudible]

KO: OK. I want to press charges, I don't care. He cannot do his job and beat people up.
[See also, (Miscellaneous) C.R. transcript at City 00963-00965.]

iii. (VIDEOS) CITY 00780, 112608 / 0702201215 – 0702201245, Camera 1 at 28:30 to 28:50:
[Passera walks over to Knickrehm and leans into his ear apparently saying something that sounds like "he's a cop."]

iv. Video inside the bar showing Karolina answering a phone call and it's Patti and then spelling Abbate's name:
(Videos) City 00780, 113608 / 0702201245 – 0702201315, Camera 2 at 10:30 – 11:52

[Phone rings and Karolina answers]
KO: . . . big belly, big belly. Hello, Shortstop. Yeah, hi Patti. Yeah, I'm OK – I'm gonna have [inaudible] . . . can you tell me his last name? A-b [on camera 1, she writes down the name then shows the officer the paper and says] [inaudible] A-b-a-t-t-e. They gonna find him. [inaudible]. You know what, maybe I'll let you talk to him. OK? Yes. Yeah, they know that already. Yeah. I'll let you talk to them. Thank you, Patti.

PM: [Masheimer gets on the phone with Patti Chiriboga]. Hello?

v. Video inside the bar of Masheimer talking to Karolina and Karolina motioning toward the cameras while officers present:
(Videos) City 00780, 113608 / 0702201245 –

Page 3 of 10

0702201315, Camera 2 at 14:35 - 14:52

KO: Well the owner will be probably here in 10 or 15 minutes and he's gonna copy the tape if you guys would like to wait . . .

PM: He's gonna have what?
KO: Pick-up the tape.

PM: Well, where's the cameras?

KO: One's here, second is there and a third's there. (indicating)

vi.   Karolina and Masheimer conversation in the bar: (Videos) City 00780 113608 / 0702201245 – 0702201315, Camera 2 at 15:22

PM: OK, now, now, I, I just have another question for you . . .

KO: Yes.

PM: You said earlier, or you mentioned that he was the police or might be the police?

KO: He was the police.

PM: How do you know that?

KO: I don't know, but for Chicago . . .

PM: But how do you know he was a policeman?

KO: Patti does; you know when she called . . .

PM: Who?

KO: Patti, she's a bartender also here; she called and told me he's a cop. That's how I know and . . .

vii.  Masheimer not submitting or Clancy not signing off on report until 2/23/07, 4 days later – See

(Miscellaneous) City 00849 – 00850;
(Transcripts) Halpern dep. pp. 1-20 and Exh. #1.

b.    Deposition Testimony (Police Response)

    i.    Martin Kolodziej

        a.    Told the officers that the tape was inside and he could play it for them while they were parked out front – pp. 125-127.

        b.    Officers did not stay to review the tape despite being told about it, they took off – Id.

    ii.    Peter Masheimer / Knickrehm / Alioto / Pfeiffer

        a.    Failed to record in report that the bar had a camera security / surveillance system.  See (Transcripts) Masheimer dep, pp. 50-75 and Dep. Exhibits 1 and 2; see also deps of Knickrehm, Alioto and Pfeiffer.

        b.    Failed to record in his report that the suspects name was Tony Abbate or Abbott – (Transcripts) PM dep, pp. 80-81 and Dep. Exhibits 1 and 2; see also deps of Knickrehm, Alioto and Pfeiffer.

        c.    Failed to record in his report that suspect was a police officer – (Transcripts) PM dep, pp.81 and Exhibits 1 and 2;

    iii.    Karolina Obrycka

        a.    Told all 4 officers the name Tony, that he was a cop and that there was video. (Transcripts) KO dep, pp. 233-246; see also I.A.1.a.ii., supra.

        b.    Officers did not stay to review the tape despite being told about it, they took off – Id; (Transcripts) Martin Kolodziej dep., pp. 125-127.

Page 5 of 10

c.  Pleadings

    i.  (Miscellaneous) City's response to Request to Admit (10/10/08) re: C.R. 1004248 – Sustained vs. PM and JK, not vs. RA and MP;

2.  Events after 2-19-07

    a.  Immediate decision to conceal video from public view;

        i.  Deposition / sworn Testimony

            a.  (Transcripts) Deb Kirby, dep pp. 60-72 (no testimony as to direction to make press release);

            b.  (Transcripts) Mike Duffy, dep. pp 150-152 (Cline wanted to know who had copies of tape, no testimony as to making press releases);

            c.  Interrogatory Answers (Answers to Interrogatories) (Grau, Bond, Mecklenberg, Starks, Gross, Cline).

    b.  Efforts to minimize the conduct and consequence with misdemeanor charge.

        i.  Interference with Charging process:

            a.  IAD contacting SAO without OPS direction regarding felony review and downplaying it: (Transcripts) Mike Duffy dep. pp. 158-166 (Deb Kirby did not have authority to go to SAO on her own, it was his review referral to make); (Transcripts) Deb Kirby dep. pp. 86-91 (she talked to Bilek at some point about charging, does not recall whether she did before or after "presentation" meeting with Bilek, Calloway, Boyd, etc.); Dave Naleway dep. (Kirby calling Bilek on 2/22 not on speaker phone with Bilek, not expressing her

opinions about proper charge); (Transcripts)
Joe Stehlik dep. pp. 28-43 (Kirby calling
Bilek on 2/22 and telling Bilek it appears it's
a simply battery).

b.  IAD officers obtaining KO's signature on
misdemeanor (or blank) complaint form
before case submitted for felony review:
(Transcripts) Boyd dep. pp. 51-60 (on 2/22,
had KO sign a complaint, told her it was so
AA could be arrested); (Transcripts) Stehlik
dep. pp. 53-66 (on 2/22, had KO sign a blank
complaint form, or maybe one that was filled
out for misdemeanor battery, does not
recall).

c.  IAD officers contradicting each other as to
positions taken during SAO review
conference on 2/23: (Transcripts) Calloway
dep. pp. 45-48 (on 2/23, arguing with Bilek
and Freeman to charge a felony);
(Transcripts) Boyd dep. 61-68 (on 2/23,
everyone in the conference agreed it should
be a misdemeanor, Bilek refuse a felony and
directed a charge of misdemeanor battery).

d.  ASAs dispute that they denied a felony at
the 2/23 conference: (Transcripts) Bilek dep.
pp. 14-22; Freeman dep. pp. 16-26.

e.  ASAs not aware of AA's charge and arrest on
misdemeanor until approx. 3/15 or 3/19:
(Transcripts) Bilek dep. pp. 36-42;
Freeman dep., pp. 29 – 30.

c.  Boroff, Colucci, Dahlstrom, et al., concealing AA's efforts
to influence investigation.

i.  See attached telephone records summary (Phone
Records)

d.  No notice to KO of AA's first court date

Page 7 of 10

        i.     Sgt. Stehlik claims that he called KO on her cell phone and advised her of the court location, date and time for AA's case. (Transcripts) Stehlik dep., pp. 80-82.

        ii.    Karolina denies that she was ever told the court information.

        iii.   Karolina's cell phone records show that no call was placed to her cell from the City of Chicago on 3/14/07. See (Miscellaneous) EW00257.

   e.    25th District Efforts to Conceal AA from Public Scrutiny.

        i.     CR 1004416.

   3.    Jefferson Tap; 12-15-06:

      a.   Physical Evidence

        i.     Video (See (Videos) EW00269) at 03:40:40 – 03:45:42 and 03:45:42 – 03:50:42

        ii.    Deposition Testimony (See (Transcripts) EW00270)
           Barry Gilfand dep., pp. 182 – 229;
           Aaron Gilfand dep., 159 – 174;

**B.** 25th District and City-wide Off-Duty CR Evidence

   **1.**   No example in CR's of on-duty officer contradicting another on-duty officer;

   **2.**   No Example of 25th District officer accused where multiple officers present, and entry or logging of charges of failure to report officer misconduct as to other officers present;

   **3.**   CR's where off-duty officer who criticizes responding on-duty officers is disciplined for insubordination;

**II.** **The City of Chicago has a *de facto* municipal policy so widespread as to have the force of law of protection of officer misconduct from scrutiny or**

consequence through inadequate investigation and discipline of officer misconduct.

A.    Anecdotal Evidence in this case:

    1.    Efforts to conceal video – if this was not a police officer, City would have had a press conference / APB for violent offender. (See I.A.2.a., above)

    2.    Intentionally Inadequate efforts to locate, question and arrest AA, despite allegations that he was intimidating and threatening witnesses:

        a.    Deposition Testimony (to be supplemented)
            i.    Dave Naleway
            ii.   Dion Boyd
            iii.  Joseph Stehlik
            iv.   Joseph Skala
            v.    Kenneth Bigg

    3.    Violations of Department Policy regarding felony arrest – Abbate not searched or handcuffed when taken into custody on the felony warrant – taped by Fox News. See (Videos) EW 0272 at 03:49 – 04:02

    4.    CR 1004416 (25th District writing the media parking tickets and threatening arrest for trespass on AA's first court appearance)

B.    Improper / Inadequate Investigatory Rules and Restrictions

    1.    Officer may only be questioned if complainant signs an affidavit;

    2.    Officer only to be questioned after investigation and all witness statements completed;

    3.    Officer given written notice as to complainant's name and substance of investigation and allegations before having to answer questions;

    4.    In many cases, officer's asked questions via "To – From" memos and no prohibitions against accused officers collaborating in preparing responses;

5.    No recording of oral interviews. only "non-verbatim question – answer formats" that interfere with effective questioning techniques.

6.    "Moving target" of standard of proof;

7.    Multiple levels of disciplinary review that reduce initial disciplinary recommendations.

C.    Statistical Evidence

1.    Dr. Whitman's report;

2.    No Example of Excessive Force or False Arrest sustained CR where citizen-vs. officer in 25th District; also, where multiple officers accused, no charges of failure to report officer misconduct logged;

3.    25th District and Off-Duty Sustained CR's only involve the following;

    a.    technical rules violations;
    b.    where one officer cites another for a rules violations;

    c.    where independent witness is a police officer corroborating complainant;

    d.    where officer is arrested by another municipal PD for criminal offense.

III.    Direct evidence of Abbate's Subjective Belief of Impunity for his Conduct:

A.    (Videos) City 00780, 0702201115 - 0702201145 Camera 2 at 17:26; Abbate raising his arms with flexed biceps and stating "Chicago Police Department"

B.    During beating incident, Abbate tells Karolina "nobody tells me what to do."

# EXHIBIT E

**Original Transcript**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KAROLINA OBRYCKA,

      Plaintiff,

    vs.

CITY OF CHICAGO, a Municipal
Corporation; ANTHONY ABBATE,
JR.; GARY ORTIZ; PATTI
CHIRIBOGA; and JOHN DOE,

      Defendants.

Civil Action File No.
07 C 2372

**DEPOSITION OF**

**LOU REITER**

November 10, 2009
10:13 a.m.

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia

Maxyne Bursky, RPR, CRR, CCR-2547



# ESQUIRE
an Alexander Gallo Company

Telephone: 312.782.8087
Toll Free: 800.708.8087
Facsimile: 312.704.4950

311 Monroe Street
Suite 1200
Chicago, IL 60606

25

1        A.   Yes.

2        Q.   That was not anything you were going to be

3   involved in, that was just a report you were going to

4   receive, correct?

5        A.   Yes.

6        Q.   Also, on Page 10 of 10 there is laid out for

7   you in III, "direct evidence of Abbate's subjective

8   belief of impunity for his conduct."

9             Do you see that?

10       A.   I do.

11       Q.   That information was provided to you by Mr.

12  Ekl's firm before you prepared your report or had any

13  opinions in this case, correct?

14       A.   Yes.

15       Q.   As a matter of fact, all the information

16  contained in Exhibit 3 was information provided to you

17  from the Ekl law firm prior to you developing any

18  opinions in this case, correct?

19       A.   Yes.

20       Q.   Then if we can turn back to Exhibit 2, Page

21  133.

22       A.   All right.

23       Q.   So after you were supplied this outline by Mr.

24  Ekl's firm on May 28th, you wrote back to him on May

25  29, 2009, correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com