**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KAROLINA OBRYCKA,           ) | |
|           ) | |
|        Plaintiff,      ) | |
|           ) | Case No. 07 C 2372 |
|     v.         ) | |
|           ) | |
| CITY OF CHICAGO et al.,     ) | |
|           ) | |
|        Defendants.   ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant City of Chicago's motion to exclude the expert testimony of Dr. Peter Manning pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the reasons discussed below, the Court grants Defendant's motion.

## INTRODUCTION

On April 30, 2007, Plaintiff Karolina Obrycka ("Plaintiff") filed the underlying lawsuit against Defendants City of Chicago ("City"), Anthony Abbate, Jr., Gary Ortiz, and Patti Chiriboga for violating her First and Fourteenth Amendment rights.[1] Of particular import to the present motion, Plaintiff also brings a *Monell* claim against the City. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff alleges that on the night of February 19, 2007, while working as a bartender/waitress at Jesse's Shortstop Inn in Chicago, Defendant Officer Abbate – an off-duty Chicago police officer who had been

---

[1] Pursuant to the parties' stipulated agreements, Gary Ortiz and Patti Chiriboga are no longer defendants in this lawsuit. *See* R. 241, 12/2/2009 Order (dismissing Gary Ortiz without prejudice); R. 262, 9/2/2010 Order (dismissing Patti Chiriboga with prejudice).

drinking at the bar that evening – approached Plaintiff after she refused to serve him additional alcoholic beverages. With no warning, Defendant Officer Abbate proceeded to viciously beat, kick, and punch Plaintiff. Plaintiff alleges specific facts which, she contends, unequivocally demonstrate that the City conducted a sham investigation into the incident, in bad faith, and designed to protect Defendant Officer Abbate. She also alleges facts which, she argues, demonstrate that other City employees – including other Chicago police officers – conspired to prevent her from filing charges against Defendant Officer Abbate or from otherwise bringing the alleged misconduct to light. In Plaintiff's *Monell* claim, she contends, *inter alia*, that the City has *de facto* policies and practices of concealing officer misconduct and of investigating complaints against off-duty police officers differently than it investigates complaints against other citizens, and that a "code of silence" exists within the Chicago Police Department ("CPD"). Plaintiff claims that all of these things, individually and collectively, create a culture within the CPD that permits and encourages Chicago police officers to engage in misconduct with impunity and without fear of official consequences.

Plaintiff has disclosed Dr. Peter Manning as one of four expert witnesses to present testimony in support of her *Monell* claim against the City. Plaintiff is not proffering Dr. Manning to testify on policing in general. Plaintiff specifically retained Dr. Manning to "examin[e] the issue of whether a culture of impunity and a Code of Silence are endemic to the Chicago Police Department" and, if he determines that such a culture exists, to opine on the ways in which that culture "directly cause[s] violations of the constitutional rights of its citizens," including the violations Plaintiff alleges in this case. (R. 281, Pl.'s Mem. in Opposition to City's Mot. to Exclude, at 1-2, 6.) Plaintiff submits that "Dr. Manning is the

perfect man for the job of reliably delivering the important piece that the Chicago Police Culture plays in establishing this point."  (*Id*. at 2.)

Dr. Manning issued his expert report on August 31, 2009.  As the Court will discuss below, the majority of Dr. Manning's nine-page report is comprised of sweeping generalizations regarding "police organizations," "police departments," the police "organizational culture," and the attitudes and characteristics of police officers.  Dr. Manning offers CPD-specific opinions only sporadically in the report.  Nevertheless, at the conclusion of his report, Dr. Manning presents the following summary:

> The Chicago Police Department permits wide discretion on the job to officers.  Their mode of coping with uncertainty is to back each other up, maintain a code of silence, avoid paperwork that is revealing of errors, and emphasize loyalty rather than "rule-following."  The paperwork required is seen as a [*sic*] minimal and a means to justify the officer's decision(s).  Supervision is difficult at best, but the level and kinds of complaints sustained, the ritual of evaluation, job control, and the low visibility of deciding means a high degree of tolerance of officers' misconduct as well as a hesitance to investigate complaints and misconduct.  These unwritten rules about backing up each other, the code of silence that protects officers from revelations concerning their conduct and administrative laxity are directly a cause of acting with impunity against citizens, as seen in the beating and level of violence seen in the Abbate case.  The history of not sustaining complaints also encourages a context of disregard for citizens' rights on and off duty.  Finally, the long standing tolerance of misconduct by the top administration of the police department and city also encourages police misconduct.  I can state with a reasonable degree of scientific certainty in my field of expertise that the context of the Chicago Police Department and the occupational culture of the patrol officer[] contributed directly to the pattern of misconduct in the Abbate case.

(R. 270-1, Ex. A ("Manning Rept.") at 27-28.)

The City asks the Court to exclude Dr. Manning's report under Rule 702 and *Daubert* because it is "an academic mini-treatise on issues in policing in general, not a written report related to the Chicago Police Department or Chicago police officers."  (R. 270, Mot. to Bar Peter Manning, at 2.)  The City contends that (1) Dr. Manning's opinions are not relevant to Plaintiff's

*Monell* claim and do not assist the trier of fact, (2) his opinions on policing in general "have nothing to do with the City of Chicago and are pure *ipse dixit*," and (3) his opinions regarding the CPD and Chicago police officers are unreliable and inadmissible because they are based, in large part, on summaries of data prepared by Plaintiff's counsel, and also rely on the report of one of Plaintiff's other proffered experts, Dr. Steven Whitman, whose expert testimony the City is also disputing. (*Id*. at 6-7.)[2]

The Court has carefully reviewed Dr. Manning's report, as well as the parties' submissions regarding his report and the transcript of Dr. Manning's November 17, 2009 deposition. The Court also held a *Daubert* hearing on May 26, 2011, during which Dr. Manning testified for approximately six hours. Based on its comprehensive review of all of the evidence submitted in connection with the City's motion to exclude Dr. Manning's testimony, the Court grants the City's motion.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "The Federal Rules of Evidence define an 'expert' as a person who possesses 'specialized knowledge' due to his 'skill, experience, training, or education' that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Banister v. Burton,* 636 F.3d 828, 831 (7th Cir. 2011) (quoting Fed. R. Evid. 702). Rule 702 also requires that: (1) the

---

[2] The City does not contest Dr. Manning's credentials in the field of policing. (R. 303, Reply Brief, at 1 & n. 2.) The Court will discuss these credentials in greater detail below.

testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir. 2011) (quoting Fed. R. Evid. 702).

"The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). District courts must employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers v. Illinois Central R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010); *see also United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). As the Seventh Circuit instructs, "'[t]he focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate.'" *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

In *Daubert*, the Supreme Court offered the following non-exclusive factors to aid courts in determining whether a particular expert opinion is grounded in a reliable scientific methodology: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has a known or potential rate of error; and (4) whether the relevant scientific community has accepted the theory. *See Happel* v. *Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010); *Winters*, 498 F.3d at 742. Further, the 2000 Advisory Committee Notes to Rule 702 list additional factors for gauging an expert's reliability, including whether: (1) the testimony relates to matters growing naturally and directly out of research that was conducted independently from the instant litigation; (2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) the expert has adequately accounted for obvious alternative explanations; (4) the expert is being as careful as she would be in her regular professional work outside of paid litigation consulting; and (5) whether the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. *See American Honda Motor Co., Inc. v. Allen,* 600 F.3d 813, 817 (7th Cir. 2010); *Fuesting v. Zimmer, Inc.,* 421 F.3d 528, 534-35 (7th Cir. 2005), *vacated in part on other grounds,* 448 F.3d 936 (7th Cir. 2006).

An expert may be qualified to render opinions based on experience alone. *See Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data"); *Trustees of Chicago Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc*., 493 F.3d 782, 787-88 (7th Cir. 2007) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert,

Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.") (citations and quotations omitted). Indeed, "[i]n certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Committee Notes to Rule 702. As such, courts "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.* Ultimately, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis,* 561 F.3d at 705.

## ANALYSIS

### I. Dr. Manning's Report

Dr. Manning is a professional sociologist with nearly 40 years of experience observing police departments in the United States, England, and Canada. (Manning Rept., at 20.) He obtained a Ph.D. in sociology from Duke University in 1965. (R. 281-1, Curriculum Vitae ("CV"), at 3.) From 1965-1966, Dr. Manning worked as an assistant professor of sociology at Missouri University. (*Id*. at 3.) Between 1966-2000, Dr. Manning was a professor in the Departments of Sociology and Psychiatry and in the School of Criminal Justice and Sociology at Michigan State University. (*Id*.) During that time, Dr. Manning also spent time as a visiting research scholar at the University of Surrey in Guilford, England, as a visiting fellow, research fellow, and senior principal scientific officer at Oxford University, and in other visiting positions at universities nationwide. (*Id*.) Since 2001, Dr. Manning has held the Eileen and Elmer V.H. Brooks Trustees' Chair in Criminal Justice at Northeastern University in Boston, Massachusetts. (*Id*. at 4.)

Dr. Manning has authored and edited approximately eighteen books, including *Police Work: The Social Organization of Policing* (1977), *Police Work* (1997), *Encyclopedia of Police Sciences* (2007), and *Policing: A View from the Street* (2d ed. 2008).  Dr. Manning has written numerous chapters on policing and sociology, *see id.* at 7-13, and his works have been published in a litany of scholarly journals, *see id.* at 13-20.  Among those works are articles entitled *The Social Context of Police Lying*; *The Occupational Culture of Corrections and Police Officers*; and *The Study of Policing*.  Dr. Manning serves on the editorial boards of various sociology- and criminal justice-related journals, and has spoken to audiences throughout the country about issues involving, *inter alia*, policing and the police occupational culture.  *Id.* at 22-25.

Dr. Manning's focus is "ethnographic, studying the social and cultural patterns that produce police behavior."  (Manning Rept., at 20)  He describes his expertise as "the occupational culture and how it determines choices and behavior; police corruption; [and] specialized policing."  (*Id.*)  In his work, Dr. Manning has "developed a methodology for interviewing, observing [] police work and analyzing the dynamics of the police organization."  (*Id.*)  As Dr. Manning stated at the *Daubert* hearing, his methodology involves gathering as much firsthand knowledge as possible, through field work, observation, interactions with and interviews of police officers.  It also involves reviewing other scholars' research, and other relevant literature in the field.  This is the first time Dr. Manning has been retained to present expert testimony in federal court.

**A.      Materials Dr. Manning Relied Upon In Drafting His Report**

For his general observations and opinions regarding what he described at the *Daubert* hearing as the "interplay of occupational culture and organizational structure of policing," Dr.

Manning draws on his own knowledge and research in the field of policing and on the work of other scholars of policing. Those general opinions are not derived from any research studies conducted on the Chicago Police Department. Nevertheless, Dr. Manning relies on them heavily in his report, and they provide the foundation for his opinions in this case.

Dr. Manning did no independent research to familiarize himself with the CPD or the City of Chicago. All of the Chicago-specific evidence in Dr. Manning's report comes from materials that Plaintiff's counsel prepared for and/or provided to him. Plaintiff's counsel prepared a nine-page "Outline of Issues and Record Citations" (hereinafter "Outline"), which – as its title suggests – outlines Plaintiff's *Monell* argument and provides citations to, and summaries of, the evidence Plaintiff contends supports her *Monell* claim, including deposition transcript citations and summaries, pleading summaries, and Plaintiff's summary of the CPD investigation into the incident at issue in this case. (R. 270-1, at 29-38.) The Outline contains sections entitled "Deposition Testimony (Police Response)"; "Immediate decision to conceal video from public view"; "Efforts to minimize the conduct and consequence with misdemeanor charge"; "Improper/Inadequate Investigatory Rules and Restrictions"; and "Direct evidence of Abbate's Subjective Belief of Impunity for his Conduct". (*Id.*) Within each section, Plaintiff's counsel describes the evidence from the underlying incident that they contend supports Plaintiff's *Monell* claim. Plaintiff's counsel also prepared a three-page "Supplemental Outline of Issues and Record Citations" (hereinafter "Supplemental Outline") which they tendered to Dr. Manning, containing additional summaries of deposition transcripts culled from the underlying case. (*Id.* at 84-87.) Plaintiff's counsel produced the underlying deposition transcripts, pleadings, and documents to Dr. Manning separately on CDs. Plaintiff's counsel also amassed and produced

miscellaneous materials, including newspaper articles and court filings, regarding other lawsuits filed against Chicago police officers and the City of Chicago involving excessive force allegations and *Monell* claims. Finally, Plaintiff's counsel tendered to Dr. Manning a data analysis memo prepared by another expert Plaintiff is proffering in this case, Steven Whitman; a preliminary expert report prepared by another expert Plaintiff is proffering in this case, Lou Reiter[3]; Plaintiff's counsel's summary analysis of off-duty Complaint Register ("CR") files; and an unpublished paper by Christopher Cooper entitled, "Yes Virginia, There is a Police Code of Silence: Prosecuting Police Officers and the Police Subculture." (*Id.* at 20, 21.)[4] There is no evidence that Dr. Manning asked for any additional information beyond the materials that Plaintiff's counsel tendered to him.

### B. Dr. Manning's Opinions

The City notes, and the Court agrees, that Dr. Manning's expert report reads like a "mini-treatise on policing issues in general." (R. 270, Mot. to Bar Peter Manning, at 2.) Dr. Manning's general observations and opinions on "policing" comprise nearly the entirety of the report, and with rare exception, he provides no citations to the authorities upon which he bases these opinions. It is difficult to parse out exactly when he is opining on the Chicago Police Department as opposed to policing in general, and, apparently, with good reason: at the *Daubert* hearing, Dr. Manning stated that although his "general" opinions about policing do not arise out

---

[3] Although Mr. Reiter is one of Plaintiff's proffered experts in this case, the report that Dr. Manning reviewed was prepared for a separate lawsuit in which Mr. Reiter has been retained.

[4] As discussed further below, the City contends that Dr. Manning's reliance on outlines and summaries prepared by Plaintiff's counsel undermines the reliability of his opinions.

of CPD-specific research, he may nevertheless infer – and did so for the purposes of his report – that they apply equally to the Chicago Police Department. Accordingly, in the first paragraph of Dr. Manning's report, he cites a number of phenomena that, he claims, arise in "police organizations" or "police departments." (Manning Rept., at 21.) Specifically, he identifies a "closed culture," a "code of silence," and "systematic failures in discipline," which – absent supervision, discipline and evaluation – give rise to "unwritten policies and practices" that "tend[] to [] shape" police work and "produce corruption." (*Id*.) Dr. Manning opines that "the Chicago police organization displays features which are conducive to supporting" those phenomena. (*Id*.) He then states that his report "will define these features, give examples found in the Chicago police department, and connect these to its administration, occupational culture and evaluation procedures." (*Id*.)

In sum and substance, Dr. Manning opines that the Chicago Police Department displays features which are conducive to supporting a "code of silence" in which officers and supervisors protect each other, and that *de facto* policies arise out of everyday decisionmaking to "guide the actions and choices of police officers" in the CPD. Dr. Manning makes the following CPD-specific inferences and opinions:

1.   The CPD is "a network of independent officers with little direct guidance." (*Id*. at 21.)

2.   The CPD is a "flat organization" in which patrol officers are given "wide discretion and freedom to act." This loose supervision, combined other factors, results in the creation of *de facto* policies that "guide the actions and choices of police officers." (*Id*. at 22, 25.)

3.   Loyalty binds Chicago police officers together in a way that causes them to protect each other and, at times, lie about and/or cover up for each other. Similarly, administrators within and outside the CPD publicly defend officers when misconduct allegations arise, and individuals tasked with the duty of

investigating allegations of officer misconduct purposefully adjust their investigations to protect the accused officers.  (*See, generally, id*. at 23, 24, 26.)

4.  "The Chicago police organization displays features which are conducive to supporting a 'closed culture' that is insulated from outside penetration by the administration, and a 'code of silence,' which means that officers will withhold information, refuse to gather it, or fail to implicate fellow officers in wrongdoing. This culture also facilitates very loose discipline and supervision as supervisors share this culture and code."  (*Id*. at 21.)

Dr. Manning also makes the following observations regarding the Chicago Police

Department:

1.  "In Chicago, it is very difficult for a citizen to file a complaint because of cumbersome procedures."  (*Id*. at 22.)

2.  "[Citizen] complaints are rarely sustained."  (*Id*.)

3.  "Routine evaluation in Chicago is constrained by union contracts and tends to be a ritual in which all officers get very similar numerical ratings within a district." (*Id*. at 25.)

4.  Police officers' contempt for and "ambivalent concern" toward the department tasked with investigating allegations of officer misconduct are "amplified in Chicago by the lawsuits against the officers [that are] settled by the [C]ity" and "add[] to their feeling of insulation and protection against further remedies."  (*Id*. at 26.)

5.  "The special squads in Chicago police are given even more latitude as a result of failure to investigate and failure to punish special unit officers. . . . The working rules of special units reflect the organization of the criminals they monitor – secrecy, lying, use of informants, surveillance, and situational actions later justified due to circumstances."  (*Id*.)[5]

6.  "The cover-up by officers in the Abbate case and their unwillingness to take detailed reports, inform witnesses of court dates, and wiliness [*sic*] to suppress

---

[5] Plaintiff does not make any allegations regarding "special squads" or "special units" in this case.  Accordingly, the Court excludes this opinion because it is not relevant.  "*Daubert* instructs that expert testimony must be relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement."  *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007).

information are characteristic of officers' loyalty." (*Id.*)

7. "The city also protects officers from misconduct in my judgment as witness anecdotal evidence." (*Id.*)

## II.   Dr. Manning's Opinions Are Inadmissible

### A.   Dr. Manning lacks the requisite foundation to provide expert testimony on the Chicago Police Department in this case

The City does not dispute Dr. Manning's expertise in the field of policing, *see* R. 303, Reply Brief, at 1 & n. 2. That does not, however, end the Court's inquiry in this case, for "'[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). In performing its gatekeeping function, the Court must ascertain not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Id.* at 617 (internal quotation and citation omitted).

Coincidentally, Dr. Manning questioned this himself at his deposition. Without prompting, in the midst of the deposition, Dr. Manning observed, "I had a long series -- if I might comment on this? I had a long series of thoughts over the course of the month of August about the relevance of my expertise in connection with this case and how far the generalizations go." (Manning Dep. Transcript[6] at 217:9-16.) Dr. Manning resolved his concerns by

---

[6] The parties attached excerpts of Dr. Manning's deposition transcript to their filings. At the Court's request, Plaintiff's counsel tendered the complete deposition transcript to the Court. The Court references that transcript hereinafter as "Manning Dep. Transcript." The Court has ordered Plaintiff to file this transcript, as well as the deposition transcripts for Plaintiff's other experts, as part of the official record of this case. (R. 319.)

concluding, "And my view was that when it was consistent with my thinking, and the facts consistent with that, I would cite them." (*Id.*)  This resolution does not, however, satisfy the considerations the Court must make in determining Dr. Manning's expert qualification in this case.[7]

In this case, Plaintiff seeks to admit Dr. Manning's testimony to support her *Monell* claim regarding the "culture" of the Chicago Police Department.  Despite Dr. Manning's extensive academic research on policing in general, however, his knowledge about the CPD is primarily based on a three-day visit to Chicago in 1996, when he brought students and faculty to meet with members of the CPD to learn about the crime mapping approaches of the department.[8]  Crime mapping bears no relevance to the issues in this case – it involves a police department's strategy for creating partnerships and working with communities to prevent and combat crime.  Other than that three-day visit, Dr. Manning has never conducted any research on the Chicago Police Department.[9]  Beyond reviewing the materials Plaintiff's counsel sent him, Dr. Manning failed to familiarize himself with the culture, structure, and policies of the CPD – the specific subject of his expert testimony.  As a result, he was unable to defend his CPD-specific assertions during his

---

[7]  This statement, as well as others Dr. Manning made during his deposition, also raises other concerns regarding the "intellectual rigor" and methodology that Dr. Manning employed in formulating his opinions in this case.  The Court will address these concerns below.

[8]  At his deposition, Dr. Manning conceded, "I am not in any way suggesting that in this brief time, I grasped [a] deep underlining nature of policing in the City of Chicago. . . . I would not claim that that makes me an expert in the Chicago Police Department."  (R. 281-1, Pl.'s Manning Dep. Excerpts, at 50.)

[9]  Dr. Manning testified that he is familiar with Wesley Skogan's writings on Chicago policing.  (R. 303-1, City's Manning Dep. Excerpts, at 25, 28.)  Mr. Skogan's books primarily involve community policing and the Chicago Alternative Policing Strategy (CAPS), neither of which are relevant to this case.  Furthermore, Dr. Manning did not cite Mr. Skogan's works in his report.

deposition or at his *Daubert* hearing.[10]  The Court appreciates Dr. Manning's position that "I am

an expert in policing, and insofar as that is the case, I can speak to the general patterns in the

Chicago Police Department, or in the City of London," *see id*. at 37:21-24.  Plaintiff has not,

however, met her burden in demonstrating the foundation for Dr. Manning's specific testimony

in this case.  Thus, despite Dr. Manning's impressive credentials and extensive research in many

areas of policing, he lacks the requisite foundation for his CPD-specific opinions.  Accordingly,

he is not qualified to provide his proffered expert opinion in this case.  *Gayton*, 593 F.3d at 617.

## B.       Dr. Manning's opinions regarding the CPD are not reliable

As the Seventh Circuit instructs, *Daubert*'s "framework for assessing expert testimony is

applicable to social science experts, just as it applies to experts in the hard sciences."  *Tyus v.

Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (citations omitted).  Although "the test

of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor

exclusively applies to all experts or in every case," *Kumho Tire Co.*, 526 U.S. at 141 (quoting

*Daubert*, 509 U.S. at 594); *see also Mihailovich*, 359 F.3d at 919 ("[T]he *Daubert* framework is

a flexible one that must be adapted to the particular circumstances of the case and the type of

testimony being proffered."), the methodology used by social science experts to reach their

conclusions must "adhere to the same standards of intellectual rigor that are demanded in [their]

professional work" in order to be reliable.  *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th

Cir. 2002) (citation omitted); *see also Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir.

---

[10]  Matt Hurd, the former Deputy Corporation Counsel at the City of Chicago Law
Department, conducted an impressively thorough deposition of Dr. Manning on November 17,
2009, in which he exposed many of Dr. Manning's conclusions as unreliable and lacking in
foundation.  *See, e.g.*, Manning Dep Transcript, 264:24-266:12; 207:15-208:9.

2000) (stating that while the district court should not consider the "factual underpinnings" of the testimony, it should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed" when assessing whether expert testimony is reliable). "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000) (citing *Kumho Tire Co.*, 526 U.S. at 141).

Dr. Manning describes his research methodology as being comprised of "field work, observations, interviews, gathering of documents and reading of the relevant literature in the field." (R. 303-1, City's Manning Dep. Excerpts, at 13; *see also id.* at 31 ("Q: You stated you 'developed a methodology for interviewing, observing and police work and analyzing the dynamics of the police organization,' correct? A: Yes.")). When pressed about the utility of studying groups by reading about them, Dr. Manning stated that his "primary technique is observation and interviews. . . . the closer that I can get to the actual working, the practices of the job, the better." (*Id.*) Dr. Manning's work with police departments in the United States, England, and Canada adheres to that methodology.

As noted above, however, Dr. Manning did not employ that methodology in preparing his expert report. He did not interview any CPD officers or employees in preparing his report, and he neither devised nor conducted any studies of the structure or the "culture" of the CPD. Dr. Manning did not conduct any independent research on the Chicago Police Department to prepare his report, and there is no evidence that Dr. Manning investigated the veracity of the materials Plaintiff's counsel provided to him, or requested additional materials from Plaintiff's counsel to further inform his opinion.

Dr. Manning provides no foundation for his primary conclusions regarding the CPD's "code of silence" and *de facto* policies. He does not explain how he arrived at those conclusions, or cite material(s) he relied upon, other than the outlines prepared for him in this litigation by Plaintiff's counsel. Furthermore, the Court cannot simply credit Dr. Manning's testimony at his *Daubert* hearing that, as a sociologist, he may infer CPD-specific conclusions from his general knowledge of policing. That is, as the City argues, *ipse dixit* – a Latin phrase meaning, "he himself said it" – in its purest form. Dr. Manning fails to provide any basis upon which the Court may conclude that he can reliably apply his "general" knowledge of policing and "police cultures" to the Chicago Police Department.[11] *Zamecnik*, 636 F.3d at 881.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Indeed, in accordance with Seventh Circuit law, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support. . . . The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (internal citations omitted)). *See also Hayes v. Raytheon Co.*, 23 F.3d 410, 1994 WL 143000, at *4 (7th Cir. 1994) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.") (quoting *Mid-State Fertilizer Co. v. Exchange Nat'l*

---

[11] In fact, Dr. Manning's deposition testimony suggests otherwise. *See* Manning Dep. Transcript, 136:16-19 (having opined in previous scholarly works, "the police as an organization do not possess a 'common culture' when viewed from the inside").

*Bank of Chicago*, 877 F.2d 1222, 1229 (7th Cir. 1989)). Assuredly, "experts commonly extrapolate from existing data." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.2d 416, 419-20 (7th Cir. 2005) (quotation omitted). "Reliable inferences," however, "depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert." *Id.* (citation omitted). Dr. Manning's opinions are not based on reliable inferences.

The City also argues that Dr. Manning's reliance on summaries prepared by Plaintiff's counsel is impermissible under Rule 702 and *Daubert*. The City relies heavily on *Sommerfield v. City of Chicago* in arguing for the exclusion of Dr. Manning's testimony. 254 F.R.D. 317 (N.D. Ill. 2008). Although *Sommerfield* is not binding on this Court, its reasoning is persuasive. As the *Sommerfield* court observes, an attorney's "single-minded devotion to a client's interests – which 'follows from the nature of our adversarial system of justice' – is incompatible with the neutrality and evenhandedness that are necessary if a summarization of deposition testimony is to have the reliability *Daubert* demands." *Sommerfield*, 254 F.R.D. at 322 (quoting *Penson v. Ohio*, 488 U.S. 75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988)). "Acceptance of the notion that an expert can reasonably base his opinion on summaries of deposition testimony prepared by a party's lawyer would effectively eliminate *Daubert*'s insistence that an expert's opinion be grounded on reliable information." *Id.* at 321; *see also Tyus*, 102 F.3d at 263 ("the district court must ensure that it is dealing with an expert, not just a hired gun"). Although Plaintiff's counsel did produce to Dr. Manning the primary source documents that they summarize, selectively quote from, and otherwise cite in their Outlines, the manner in which Dr. Manning seems to have uncritically relied solely on Plaintiff's counsel's Outlines – which are, again, Plaintiff's roadmap of the case and the evidence her counsel has identified as supporting her claims – is not "good

18

science" or sound methodology, and it does not provide a reliable basis upon which Dr. Manning may credibly state that all of his opinions "reflect a reasonable degree of scientific certainty within [his] field of expertise, criminal justice, and police studies."  (Manning Rept., at 20.)

Furthermore, the Court harbors serious concerns about Dr. Manning's last-minute additions to his expert report – prompted, he admits, at Plaintiff's counsel's suggestion.  In Dr. Manning's deposition, the City's counsel questioned Dr. Manning at length regarding the changes he made between the third draft of his report, which he emailed to Plaintiff's counsel on the morning of August 31, 2009, and the final draft of his report, which he submitted to Plaintiff's counsel later that afternoon.  In the intervening hours, Plaintiff's counsel called Dr. Manning to discuss the report, sent Dr. Manning an email that contained the attorney-prepared Outlines and record citations, and provided Dr. Manning with information that he uncritically incorporated into his final report.  *See* Manning Dep. Transcript, 197:11-200:12 (adding an opinion on Chicago's citizen complaint system solely on the basis of Plaintiff's counsel's representations of the same during Dr. Manning's conference call with Plaintiff's counsel); 204:6-18 (adding a conclusion regarding the frequency with which citizen complaints are sustained); 208:19-209:11 (adding a quote from Defendant Officer Abbate, taken from the attorney-prepared Outline, to support a general proposition regarding policing); 209:17-210:7 (adopting Plaintiff's counsel's opinion regarding the impact of the City's settlement of lawsuits on behalf of accused Chicago police officers on the attitudes of Chicago police officers generally).  Every addition Dr. Manning made between his third draft and his final report came almost verbatim from the Outlines prepared by Plaintiff's counsel.  *Id*. at 214:3-8.

Finally, Dr. Manning's deposition demonstrates, perhaps most clearly, why his testimony

in this case fails to meet the standards required under Rule 702 and *Daubert*.  In preparing their expert analyses, experts must "adhere to the same standards of intellectual rigor that are demanded in [their] professional work" in order to be reliable.  *Chapman*, 297 F.3d at 688 (7th Cir. 2002).  Dr. Manning's deposition showcases his "standards of intellectual rigor," and poignantly highlights the disparity between his professional standards and the ones he employed in his work on this case.  Although there are many examples of these disparities, the following is perhaps most illustrative.  During Dr. Manning's deposition, the City questioned him about his conclusion that "in Chicago, it's very difficult for a citizen to file a complaint because of cumbersome procedures."  (Manning Rept., at 22.)  This was one of Dr. Manning's last-minute additions to his report, and the basis for that conclusion came from facts given to him by Plaintiff's counsel during their conference call on the morning of August 31, 2009.  During that call, Plaintiff's counsel described a set of procedures that, they contended, citizens must follow if they want to file a complaint in Chicago.  There is no evidence that they provided Dr. Manning with documentation regarding the City of Chicago's complaint procedure, or that Dr. Manning independently investigated Plaintiff's counsel's account.  Relying uncritically on Plaintiff's counsel's description, Dr. Manning concluded in his expert report that (i) it is "very difficult" for a citizen to file a complaint, and (ii) the difficulty is a direct result of the City's "cumbersome procedures."  *See* Manning Dep. Transcript at 200:2-202:10.  At his deposition, counsel for the City pressed Dr. Manning on his conclusion:

> Q:    Okay.  Sir, would it surprise you to know that Chicago has an open complaint system, and a citizen can make a complaint in many different ways, including just picking up the phone and making an anonymous call?
>
> A:    I -- no, I would not be surprised.

Q:     Okay.

A:     My -- my -- I would not be surprised.  The question is "how frequently it's done?  Under what conditions?  Where?  How it's handled, the process?  What are the procedures are to handle it?"  That's the direction that one would want to go.

*Id*. at 203:4-21.  In a span of seconds, Dr. Manning demonstrated the analytical approach he should have employed in preparing his expert report for this case – he considered the City's proposition, and immediately began describing the tests he would need to conduct in order to determine the meaning and potential impact of that "new" information.  This stands in stark contrast to the way he evaluated (or failed to evaluate) the information he received from Plaintiff's counsel.  Dr. Manning seems to have considered the evidence submitted to him by Plaintiff's counsel as definitively illustrative the "phenomena" he sees in policing, generally, without questioning its reliability, applicability, whether it may have any other meaning, or reflect any other dynamics.  Dr. Manning then seized upon the evidence as "proof" that the general phenomena he has studied elsewhere exist within the CPD.[12]  It contorts the scientific method to turn one data point – cherrypicked by Plaintiff's counsel, no less, and uncritically adopted – into a general conclusion.  *See Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (finding expert's opinion inadmissible where he "presented nothing but conclusions . . . no discussion of hypotheses considered and rejected," and noting that the expert "would not accept from his students or those who submit papers to his journal an essay containing neither facts nor reasons; why should a court rely on the sort of

---

[12]  Perhaps the most egregious example of this is Dr. Manning's reliance on a "60 Minutes" television show in which a news anchor interviewed Chicago police officers and then-Superintendent Jody Weis about a CPD unit not relevant to this case.  Plaintiff's counsel played this segment during Dr. Manning's *Daubert* hearing to demonstrate the foundation for Dr. Manning's broad conclusions regarding the existence of a "code of silence" within the CPD.

exposition the scholar would not tolerate in his professional life?").

Although this is but one example, having reviewed the lengthy record on this matter, and having listened to Dr. Manning's testimony firsthand, the Court concludes that Dr. Manning employed this approach throughout his assessment of and work on Plaintiff's case. By Dr. Manning's own admission, the foundation for his expert report heavily relied on his general knowledge of policing, culled from research conducted in other police departments. When the evidence Plaintiff's counsel presented him supported his theories, he cited those pieces of evidence and concluded that they reflected the existence of phenomena that are "endemic" to the CPD. This methodology does not meet the standards required under Rule 702 and *Daubert*.[13]

---

[13] Indeed, Dr. Manning has specifically disavowed this approach as unsound – albeit in reference to another scholar's work. During his deposition, the City asked Dr. Manning questions regarding an article by Christopher Cooper, which Dr. Manning cited in the list of materials he reviewed while preparing his report. The City explored several conclusions in Mr. Cooper's article that contradicted Dr. Manning's conclusions regarding, among other things, the existence of a "code of silence" in police departments. Dr. Manning rejected Mr. Cooper's conclusions because, he asserted, "What he's taking are a few cases that he uses to infer this. This is not based on ethnographic work." *See* Manning Dep. Transcript, 273:9-11.

**CONCLUSION**

Dr. Manning's opinions about the Chicago Police are inferences that lack foundation and, when tested, do not withstand scrutiny.  Moreover, Dr. Manning employs an unreliable methodology, and fails to adhere to the same "intellectual rigor" that he would ordinarily use in his work.  For all the reasons discussed above, the Court grants the City's motion to exclude Dr. Peter Manning as an expert witness.

**Date:** June 2, 2011

**ENTERED**

_____
**AMY J. ST EVE**
**United States District Court Judge**