# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KAROLINA OBRYCKA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07 C 2372 |
| v. ) | |
| ) | |
| CITY OF CHICAGO et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant City of Chicago's motion to exclude the expert testimony of Thomas D. Smith pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the reasons discussed below, the Court denies in large part, denies in part as moot, and grants in part Defendant's motion.

## INTRODUCTION

On April 30, 2007, Plaintiff Karolina Obrycka ("Plaintiff") filed the underlying lawsuit against Defendants City of Chicago ("City"), Anthony Abbate, Jr., Gary Ortiz, and Patti Chiriboga for violating her First and Fourteenth Amendment rights.[1] Plaintiff also brings a *Monell* claim against the City. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff alleges that on the night of February 19, 2007, while working as a bartender/waitress at Jesse's Shortstop Inn in Chicago, Defendant Officer

---

[1] Pursuant to the parties' stipulated agreements, Gary Ortiz and Patti Chiriboga are no longer defendants in this lawsuit. *See* R. 241, 12/2/2009 Order (dismissing Gary Ortiz without prejudice); R. 262, 9/2/2010 Order (dismissing Patti Chiriboga with prejudice).

Abbate – an off-duty Chicago police officer who had been drinking at the bar that evening – approached Plaintiff after she refused to serve him additional alcoholic beverages. With no warning, Defendant Officer Abbate proceeded to viciously beat, kick, and punch Plaintiff. Plaintiff alleges specific facts which, she contends, unequivocally demonstrate that the City conducted a sham investigation into the incident, in bad faith, and designed to protect Defendant Officer Abbate. She also alleges facts which, she argues, demonstrate that other City employees – including other Chicago police officers – conspired to prevent her from filing charges against Defendant Officer Abbate or from otherwise bringing the alleged misconduct to light. In Plaintiff's *Monell* claim, she contends, *inter alia*, that the City has *de facto* policies and practices of concealing officer misconduct, of failing to sufficiently investigate allegations of officer misconduct, and of investigating complaints against off-duty police officers differently than it investigates complaints against other citizens. In her *Monell* claim, Plaintiff also alleges that a "code of silence" exists within the Chicago Police Department ("CPD") whereby officers conceal each others' misconduct, in contravention of their sworn duties. Plaintiff claims that all of these policies, practices and customs, individually and collectively, encourage Chicago police officers – and, specifically in this case, Defendant Officer Abbate – to engage in misconduct with impunity and without fear of official consequences.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "The Federal Rules of Evidence define an 'expert' as a person who possesses

'specialized knowledge' due to his 'skill, experience, training, or education' that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Banister v. Burton,* 636 F.3d 828, 831 (7th Cir. 2011) (quoting Fed. R. Evid. 702). Rule 702 also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir. 2011) (quoting Fed. R. Evid. 702).

"The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). District courts must employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers v. Illinois Central R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010); *see also United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). As the Seventh Circuit instructs, "'[t]he focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate.'" *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert*

3

is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

"Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education. . . . An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (emphasis in original) (quoting Fed. R. Evid. 702). Indeed, "[i]n certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Committee's Notes to Rule 702. To be sure, district courts must still "ensure that the expert testimony at issue both rests on a reliable foundation and is relevant to the task at hand." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (quoting *United States v. Cruz-Velasco*, 224 F.3d 664, 660 (7th Cir. 2000) (internal quotation and citation omitted)). As the Seventh Circuit has repeatedly recognized, however, "while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Id*. at 787-88 (citations and quotations omitted); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Ultimately, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis,* 561 F.3d at 705.

## ANALYSIS

The City has moved to exclude the opinions of Thomas D. Smith, one of four experts

4

Plaintiff has proffered to provide testimony to support her *Monell* claim against the City. Plaintiff specifically retained Smith to opine on the process by which the City investigates complaints of police officer misconduct.[2] The City argues that Smith's opinions are not relevant or reliable under Rule 702. The City specifically contends that (1) Smith's qualifications are insufficient to qualify him as an expert, (2) his opinions "merely parrot the opinions of plaintiff's attorney" and are thus unreliable (R. 264, Mot. to Exclude Thomas Smith, at 10), and (3) his opinions fail to assist the jury in determining any fact at issue (*id*. at 15).

The Court has carefully reviewed Smith's report, as well as the parties' submissions regarding his report and the transcript of Smith's November 5, 2009 deposition. The Court also held a *Daubert* hearing on June 10, 2011, during which Smith testified for approximately 4.5 hours. Based on its comprehensive review of all of the evidence submitted in connection with the City's motion to exclude Smith's testimony, the Court denies in large part, denies in part as moot, and grants in part the City's motion.[3]

**I.    Thomas Smith's Background and Opinions**

Plaintiff disclosed Smith as an expert witness on OPS procedures and excessive force investigations of CPD officers. In his report, Smith opines on the factors which negatively

---

[2] At the time of the incident underlying this lawsuit, the CPD Office of Professional Standards ("OPS") was responsible for investigating, *inter alia*, excessive force complaints against Chicago police officers. In September 2007, the City removed OPS from the Chicago Police Department and reorganized it as separate department – the Independent Police Review Authority ("IPRA") – reporting directly to the Mayor of the City of Chicago.

[3] At the June 10, 2011 *Daubert* hearing, the Court granted Plaintiff's oral motion to withdraw Smith's opinion regarding "professional courtesy" (Smith Rept., at 12-14, under subheading "Professional Courtesy or to tolerate and condone criminal conduct"). Defendants' motion is thus denied as moot as to that opinion.

5

impacted OPS's ability to investigate excessive force complaints against Chicago police officers. (R. 264-1, Smith Rept., at 21.)

### A. Background

Mr. Smith was the Chief Investigator of the CPD's Office of Professional Standards ("OPS") from July 1998 to January 2002. As Chief Investigator, Smith was "responsible for monitoring the most serious and complex investigations," managed the OPS Major Incident Response Team that responded to, *inter alia*, all serious excessive force incidents involving Chicago police officers, and served as the liaison to other CPD units, outside law enforcement agencies, the Corporation Counsel of the City of Chicago, and the Cook County State's Attorney's Office. (R. 264-1, Thomas D. Smith Curriculum Vitae ("CV"), at 36.) Smith's responsibilities also included reviewing OPS investigations and providing feedback as to whether further investigation was required; reviewing decisions of the Command Channel Review ("CCR") when they conflicted with OPS conclusions; and, at the request of the OPS Chief Administrator, making recommendations regarding OPS operations and excessive force issues. (*Id.*) During his tenure at OPS, Smith "was present at the scene of over 100 CPD shootings, deaths in custody and serious excessive force cases." (*Id.*)

Smith came to OPS after spending three years conducting compliance and fraud investigations at a private insurance company. Then-CPD Superintendent Terry Hilliard, a former colleague of Smith's, recruited Smith for the position at OPS. Prior to that, Smith had a twenty-six year career with the U.S. Federal Bureau of Investigation ("FBI"). During his career in the FBI, Smith became a specialist in domestic and international terrorism. He investigated both "reactive" crimes and acts of terrorism, and as he became increasingly experienced, he

6

assumed supervisory responsibilities, taught classes, and conducted trainings on security-related matters. (*Id.*; *see also* Smith Dep. Transcript, 9:9-13:2.)

Smith is currently the vice president of The Thomas Group, Inc., a firm that manages special event security staff. He started the firm with a partner in 1995. (Smith Dep. Transcript, 39:8-10.) Smith has worked full-time at The Thomas Group since leaving OPS in January 2002. (CV, at 36.) In 2007, Smith expanded his work at The Thomas Group to include litigation consulting. (*Id.*) Plaintiff retained Smith in connection with this matter in 2008.

B.      **Smith's Opinions**

In his expert report, Smith identifies a number of factors that impeded OPS investigations and negatively impacted OPS's ability to adequately investigate excessive force complaints. Smith bases his opinions on his significant personal experience and observations as the Chief Investigator at OPS – in particular, his experience investigating allegations of police misconduct, which included following and applying CPD's policies and practices for such investigations – and on his personal experience and training as a law enforcement officer with the FBI. Smith also reviewed documents and materials the City produced to Plaintiff during fact discovery, including the CPD Incident Reporting Guide, CPD Internal Affairs Division ("IAD") Standard Operating Procedures, OPS Standard Operating Procedures Manual, and CPD General Orders. (*See* R. 266-1, Ex. D-City's Supp. Resps. To Pl.'s Requests for Production, at 76-77.) Finally, Smith reviewed a collection of documents furnished to him by Plaintiff's counsel related to the underlying incident (pleadings, deposition transcripts, an outline of facts prepared by Plaintiff's counsel, and other materials), the Collective Bargaining Agreement between the Fraternal Order of Police and the City, and the Arbitration Agreement between the City and CPD. (R. 282-1, Ex.

7

F-Documents Reviewed in Rendering Opinion, at 69-70.)

In his report, Smith opines that the following factors negatively impacted OPS's ability to investigate excessive force complaints against Chicago police officers:

1. OPS's inability to interview police officers at the time of the incident. (Smith Rept., at 22.)

Smith explains that CPD General Orders ("GO"), including GO 93-3-1, and the Fraternal Order of Police ("FOP") contract with the City of Chicago, "created a practice where the CPD officers were the last to be interviewed by OPS investigators." (*Id*.) This practice "evolved to eliminate OPS investigators from interviewing officers even in the initial stage of an investigation," and became codified in the OPS Standard Operating Procedures Manual for OPS investigators, which "describes the investigation process and has the interview of the CPD officers as the last step[] to be accomplished in the investigation prior to writing the report." (*Id*.) The only opportunity OPS investigators had to interview a police officer accused of misconduct during the initial stage of an investigation was during the "Roundtable" – a session convened after the CPD Detective Division had conducted a preliminary investigation into the incident, where the accused officer would make an oral statement regarding his involvement in the alleged incident. (*Id*.) Even then, OPS investigators were only permitted to ask the accused officer "clarifying" questions. This process resulted in an OPS policy of interviewing all complainants, witnesses and victims, and compiling all of the physical evidence relevant to the allegations, before interviewing the accused police officer(s) or any officers who witnessed the alleged incident. (*Id*.) Smith opines that these policies permitted accused officers, as well as any officers who may have witnessed the incident, to collaborate and provide "consistent statements." (*Id*. at 23.)

8

2. OPS's inability to tape record the interviews with the police officers. (*Id.*)

Smith asserts that OPS failed to audiotape statements from involved (i.e. accused or witness) police officers, despite the absence of any General Order, FOP contract provision, or other rule prohibiting the same. (*Id.*) Smith opines that "[a] simple system of recorded interviews would have streamlined the interrogation process and been fairer to the officers being interviewed and been much easier to implement." (*Id.*)

3. The standard use of TO/FROM statements which permitted the officers to provide written statements to written questions. (*Id.* at 24.)

Although the OPS Standard Operating Procedures Manual permitted OPS investigators to use written TO/FROM statements in "some ... investigations," Smith contends that "convenience, pressure to complete a[n] investigation or an excessive caseload" caused investigators to over-rely on this tool as part of their investigation. (*Id.*) Smith contends that TO/FROM statements provided officers with the opportunity to "discuss their answers with other officers and to attempt to have consistency with other officers in their answers," leading to inadequate investigations. (*Id.*)

4. In cases of officer-involved shootings, the investigators from OPS are not permitted to conduct the investigation, and must rely on the work of non-OPS CPD investigators. (*Id.*)

CPD detectives, not OPS, took the lead in investigating officer-involved shootings. (*Id.*) Accordingly, OPS investigations were in large part dependent on the work of the detectives and others within CPD. (*Id.*)

5. OPS was not an independent investigative body. (*Id.*)

Smith opines that OPS's position within the organizational structure of the Chicago Police Department meant that the CPD formulated OPS's protocol for investigations. It also

9

meant that OPS was subject to the rules, regulations, orders, and directives of the CPD. (*Id*.) Smith opines, "[t]he problem with the investigation process at OPS was that any investigation had a minimum amount of formal investigative requirements that had to be completed." (*Id*.) Those burdensome administrative requirements, Smith proffers, were the result of CPD rules and the FOP contract, and resulted in increased caseloads. (*Id*.) The increased caseloads were a problem because, as Smith describes, "[t]he more cases, the more deadlines, the less detailed an investigation the greater effort to just close the case." (*Id*.)

> 6. The review process for OPS disciplinary recommendations was a "gauntlet" that subjected OPS investigations to a litany of reviewing bodies that employed a heightened standard of scrutiny in their reviews. (*Id*. at 25, 29.) As a result, OPS's penalty recommendations would often be modified downward as they proceeded through the review process. (*Id*. at 29.)

In the event an OPS investigator sustained a complaint against a police officer and recommended disciplinary action, Smith states, the recommendation did not take effect until it was approved by several bodies. As Smith opines, this review system "makes it extremely difficult to not only investigate excessive force matters[, but] it slows the process and generates an ever higher standard of proof, which exhibits itself in a low sustained rate for investigations." (*Id*. at 26.) Smith further contends, "[t]he majority of the CPD excessive force cases ... are reviewed by the CCR[,] slowing down the process and picking apart the OPS investigations with an ever-increasing standard of proof." (*Id*.) Smith also opines that "there would be numerous attempts during the review process to lower the penalty." (*Id*. at 29.) "The reality of any sustained finding," according to Smith, "is that the moment it leaves the investigator's desk there is an ongoing effort to reduce the penalty at the [Chief Administrator], the CCR, the Superintendent's Office, the Complaint Review Panel, the Police Board, the arbitrator, the Cook

County Courts or the State Supreme Court." (*Id.*)

      7.    CPD officers had to be provided with the specific allegations made by the complainant before OPS investigators could interview them. (*Id.* at 26) After the interview, OPS had to provide the officers' statements to them within twenty-four hours. (*Id.* at 26, 28.)

Smith attributes this requirement to the FOP contract, which stated that CPD officers were to be provided "the specific allegations made by the complainant as well as the name or names of the complainants." (*Id.* at 26) Smith contends that "[b]y providing the specific allegations in writing made by the complainant[,] this not only allows the officer to develop his version of events, it allows other officers involved in the investigation[] to show consistency in their statements." (*Id.* at 27.) The FOP contract requirement that OPS provide the officers with a copy of their statements within twenty-four hours of the interview also permitted officers to "shar[e] with fellow officers their statements, as an attempt to have consistent statements," thus creating the opportunity to influence other officers' testimony and taint the investigation. (*Id.* at 28.) Smith also contends that the FOP contract dictated the process by which OPS investigators may interview officers – i.e., when and where the officer may be interviewed, the mechanics of the interview process, and the officer's right to legal counsel in the interview.

      8.    As a direct result of the FOP contract with the City, since 2004, OPS has required complainants to submit an affidavit under oath in order for OPS to continue the investigation into their complaint. Without this affidavit, OPS closes the investigation. (*Id.*)

Smith opines that this requirement makes it difficult to ascertain the true extent of officer misconduct because it "not only reduces the number of investigations for IPRA it also reduces the number of verified complaints against CPD officers." (*Id.*) Smith cites official public data released by IPRA which states that it closed approximately 40% of its investigations between

11

September 2007 and August 2008 because the affidavit requirement was not met. (*Id.*)

> 9. In cases where the accused officer and the victim and/or witnesses gave conflicting accounts of the incident, and there was no convincing physical evidence, the officer's version was usually accepted and the OPS investigator closed the complaint as "Not Sustained." (*Id.* at 31.)

Smith attributes this inadequacy, in part, to OPS's (and, subsequently, IPRA's) definition of "Not Sustained." (*Id.*) Smith also variously opines that "the officer's statement would always be taken with much greater credibility than the victim or citizen's statement," and "[a]n officer's statement in conflict with a victim's will usually be given the greater credibility," *id.* at 31, 32.

> 10. The FOP contract with the City prohibited OPS investigators from reviewing an accused officer's past history of Complaint Registers ("CR") unless the investigator found the pending complaint to have merit (i.e., "sustained" the complaint). (*Id.*)

Smith opines that this prevented OPS from conducting fully informed investigations into complaints against Chicago police officers. (*Id.*)

## II. Smith's Opinions Are Relevant and Will Be Helpful to the Jury

The City challenges both the relevance and the helpfulness of Smith's testimony. "*Daubert* instructs that expert testimony must be relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement." *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007). Expert testimony is inadmissible if it covers irrelevant issues. *See United States v. Fuller*, 387 F.3d 643, 648 (7th Cir. 2004).

Plaintiff offers Smith's opinions in this case to support her *Monell* claim against the City, in which she specifically alleges that the City failed to adequately investigate and discipline allegations of police misconduct. Under Section 1983, a "municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691 (emphasis in original). "A

12

person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government – by the city council, for example, rather than by the police officer who made an illegal arrest." *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011). In other words, "units of local government are responsible only for their policies rather than misconduct by their workers." *Fairley v. Fermaint*, 482 F.3d 897 (7th Cir. 2007). Thus, to establish liability against the City, Plaintiff must show that (1) she suffered a deprivation of a federal right, (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that (3) proximately caused her constitutional injury. *Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005); *see also Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009) ("A municipality . . . may be liable for a section 1983 violation if, among other things: (1) it has a permanent and well-settled municipal customer or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury"). Unconstitutional policies or customs include: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that a person with final policymaking authority caused the constitutional injury. *See Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008); *see also Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002) ("One way or another, the policy must be shown to be that of the municipality itself."). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of*

*Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (citation omitted)).

The City argues that because Smith "reviewed only two complaint register files in formulating his opinions in this case," he cannot testify to the "widespread practice of deficient investigations" that Plaintiff must establish in order to succeed on her *Monell* claim. (R. 264, Mot. to Exclude Smith, at 15-16.) As an initial matter, the City mischaracterizes the foundation for Smith's opinions. Contrary to the City's contention, Smith's opinions are not simply based on two, or three, or four CR files.[4] As the Court discusses below, Smith's opinions are grounded in his significant experience and training as the former Chief Investigator at OPS. More to the point, however, the City's suggestion that Smith's opinions are only admissible if they meet the burden of proving Plaintiff's *Monell* claim has no support in the law. The Seventh Circuit has clearly stated that "in order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case." *Smith*, 215 F.3d at 720 (emphasis added). "No one piece of evidence has to prove every element of plaintiff's case; it need only make the existence of 'any fact that is of consequence' more or less probable." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000) (citing Fed. R. Evid. 401). The City's argument thus fails.

With two exceptions, Smith's opinions about the inadequacies of the City's investigative and disciplinary processes are clearly relevant to Plaintiff's *Monell* claim and will be helpful to the triers of fact. The first exception is opinion #4, *supra* at 9, in which Smith opines on the

---

[4] Because the number of CR files Smith reviewed is not relevant to the Court's ruling on this motion, it need not resolve the parties' dispute over the "actual" number of relevant CR files Smith reviewed.

inadequacies of OPS investigations into officer-involved shootings. This case does not involve an officer-involved shooting, and Plaintiff makes no allegations in that regard. District courts may exclude portions of an expert's opinion that it finds "irrelevant or unreliable . . . without striking the proposed evidence in its entirety." *Smith*, 215 F.3d at 721 n. 3. Accordingly, the Court excludes opinion #4 because it is not relevant. *Id*.; *Gallardo*, 497 F.3d at 733. The Court also excludes Smith's opinions to the extent they implicate IPRA. IPRA did not exist at the time of the incident in the underlying case and any opinions regarding IPRA investigations are thus outside the scope of this matter. *Id*.

### III. Smith's Experience Qualifies Him As An Expert In This Case

The City argues that Smith "lacks any credentials" to offer opinions on the quality of the City's investigations into allegations of police misconduct. (R. 264, Mot. to Exclude Smith, at 3.) The City contends that Smith is "neither educated nor trained in conducting or assessing such investigations." (*Id*.) This is incorrect. Smith not only helped draft the OPS Standard Operating Procedures Manual that set forth the process by which OPS investigated allegations of misconduct, but he conducted and reviewed these very types of investigations at OPS during his tenure as Chief Investigator of OPS. The City also argues that Smith "has no publishing record on this (or any) subject, and has not reviewed any professional literature or conducted any empirical studies with regard to it. In short, Smith possesses no formal qualifications to justify the designation of 'expert' in this field." (*Id*.) This argument does not prevail.

The Seventh Circuit has recognized that "while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on

experience." *Trustees of Chicago Painters*, 493 F.3d at 787-88 (internal quotation and citation omitted). "Accordingly, we 'consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.* at 788 (quoting *Smith*, 215 F.3d at 718). "The fact of publication (or lack thereof) in a peer reviewed journal . . . will be a relevant, though not dispositive, consideration." *Daubert*, 509 U.S. at 594. Indeed, "[i]n *Kumho*, the Court made clear that the reliability test under Rule 702 is an individualized test whose relevant factors will depend on the type of expertise at issue in a given case." *Smith*, 215 F.3d at 720 (citing *Kumho*, 526 U.S. at 150 (stating that in some cases "the relevant reliability concerns may focus upon personal knowledge or experience.... [T]here are many different kinds of experts, and many different kinds of expertise.") (citations omitted)). It is well-settled law that "experience in the field can be the predominant, if not the sole, basis for expert testimony in some cases." *United States v. Ceballos*, 302 F.3d 679, 686 (7th Cir. 2002) (citations omitted)).

Smith has nearly four years of firsthand experience as OPS's Chief Investigator, during which he monitored "the most serious and complex investigations" (Smith Dep. Transcript, 27:4-9), liaised with the OPS supervisor of training "regarding pre- and in-service training programs for investigative staff" (i*d*. at 30:7-10), reviewed older investigations to provide guidance and recommendations for further action (*id*. at 31:22-33:9), and reviewed the progress of disciplinary recommendations (*id*. at 32:22-38:7). Indeed, Smith helped write the OPS Standard Operating Procedures Manual in 2000, which set forth the specific procedures and methods by which OPS investigated misconduct allegations. (*Id*. at 236:17-237:13.) As Smith stated at his *Daubert* hearing, he reviewed OPS Standard Operating Procedures Manuals for the

years 2002 through 2007, as well as General Orders, CPD policies, and other relevant documents the City produced to Plaintiff during fact discovery, in order to prepare for his work on this case and ensure that his knowledge base was current. In so doing, Smith found that there were no material changes in OPS policies or procedures between his departure in 2002 and the date of the incident in this case. *See also id*. at 358:7-24 (testifying that the procedures for investigating cases were "basically the same" as when he left OPS in 2002). The City does not present evidence to dispute this contention. For all these reasons, Smith is qualified to provide expert testimony in this case.

## IV.    Smith's Opinions Are Reliable

The City makes two final arguments in its request that the Court exclude Smith's expert opinions in this case. First, the City contends that Smith's opinions "are the expression of the opinions of plaintiff's counsel, and are not his own." (R. 264, Mot. to Exclude Smith, at 5.) Second, the City argues that Smith's opinions are unreliable "because they are not based upon sufficient facts or data, or the product of reliable methods." (*Id*. at 13-14.) As the Court establishes *supra*, Smith's extensive personal knowledge, experience and training, as well as the work he undertook to prepare his expert report for this case, provides "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert*, 509 U.S. at 592. Based on a review of Smith's lengthy deposition transcript, and the testimony he provided at his *Daubert* hearing, the Court comfortably concludes that his opinions are more than just "subjective belief or unsupported speculation." *Id*. at 590. The jury will make the ultimate decision of whether Smith is "credible or whether his . . . theories are correct" "after opposing counsel has been provided the opportunity to cross-examine [Smith] regarding his conclusions and the facts on

17

which they are based." *Smith*, 215 F.3d at 719; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful jury instruction . . . are the traditional and appropriate means of attacking shaky but admissible evidence."); *Metavante Corp.*, 619 F.3d at 762.

The Court makes one exception to this assessment. In Smith's discussion of OPS's requirement that claimants submit an affidavit in order to facilitate an investigation into the alleged misconduct, *see* opinion #8 *supra* at 11-12, Smith opines that "Illinois law is not that restrictive and an investigation can continue despite the lack of an affidavit." (Smith Rept., at 27.) Smith has not established a foundation for his knowledge of Illinois law, and his opinion regarding Illinois law is thus barred.

As to the City's first contention, that Smith is "serving as a mouthpiece for plaintiff's attorney" (R. 264, Mot. to Exclude Smith, at 13), it also fails. Smith's expert report, his deposition testimony, and his *Daubert* hearing testimony all demonstrate that his opinions are grounded in his significant personal experience and knowledge as the former Chief Investigator at OPS.[5] Having reviewed the relevant documents, and having assessed Smith's credibility and demeanor during the approximately 4.5 hour *Daubert* hearing on June 10, 2011, the Court finds

---

[5] The City raised an identical objection in connection with its motion to exclude another of Plaintiff's proffered experts, Dr. Peter Manning. Unlike Smith, Dr. Manning had no relevant personal knowledge or experience with the CPD, conducted no independent research on the CPD prior to rendering his expert opinion, cited directly to the attorney-prepared outlines in his expert report, quoted nearly verbatim the evidence summarized in the attorney-prepared outlines, and made no efforts to either verify Plaintiff's counsel's assertions or independently inform his understanding of the context in which Plaintiff arrived at her conclusions. (R. 325, 6/2/2011 Order.)

the City's argument meritless.[6]

## CONCLUSION

For the foregoing reasons, the Court denies in large part, denies in part as moot, and grants in part the City's motion. In accordance with this ruling, the Court excludes Thomas Smith's testimony regarding officer-involved shootings and IPRA as not relevant, and bars Smith from offering an opinion on Illinois law.

**Date:** June 16, 2011

                                      **ENTERED**

                                      _____
                                      **AMY J. ST. EVE**
                                      **United States District Court Judge**

---

[6] Indeed, Smith testified at his deposition that during an early meeting with Plaintiff's counsel to discuss this case, he provided Plaintiff's counsel with a non-exhaustive list of "issues" that he thought Plaintiff could consider in connection with her *Monell* claim. That meeting preceded the creation of the attorney outline. (Smith Dep. Transcript, 356:17-358:6.)