# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KAROLINA OBRYCKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 07 C 2372 |
| v. | ) |
| | ) |
| CITY OF CHICAGO et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant City of Chicago's motion to exclude the expert testimony of Dr. Steven Whitman pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the reasons discussed below, the Court grants in part and denies in part Defendant's motion.

## INTRODUCTION

On April 30, 2007, Plaintiff Karolina Obrycka ("Plaintiff") filed the underlying lawsuit against Defendants City of Chicago ("City"), Anthony Abbate, Jr., Gary Ortiz, and Patti Chiriboga for violating her First and Fourteenth Amendment rights.[1] Plaintiff also brings a *Monell* claim against the City. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff alleges that on the night of February 19, 2007, while working as a bartender/waitress at Jesse's Shortstop Inn in Chicago, Defendant Officer Abbate – an off-duty Chicago police officer who had been drinking at the bar that evening –

---

[1] Pursuant to the parties' stipulated agreements, Gary Ortiz and Patti Chiriboga are no longer defendants in this lawsuit. *See* R. 241, 12/2/2009 Order (dismissing Gary Ortiz without prejudice); R. 262, 9/2/2010 Order (dismissing Patti Chiriboga with prejudice).

approached Plaintiff after she refused to serve him additional alcoholic beverages. With no warning, Defendant Officer Abbate proceeded to viciously beat, kick, and punch Plaintiff. Plaintiff alleges specific facts which, she contends, unequivocally demonstrate that the City conducted a sham investigation into the incident, in bad faith, and designed to protect Defendant Officer Abbate. She also alleges facts which, she argues, demonstrate that other City employees – including other Chicago police officers – conspired to prevent her from filing charges against Defendant Officer Abbate or from otherwise bringing the alleged misconduct to light.

In Plaintiff's *Monell* claim, she contends, *inter alia*, that the City has *de facto* policies and practices of concealing officer misconduct, of failing to sufficiently investigate allegations of officer misconduct, and of investigating complaints against off-duty police officers differently than it investigates complaints against other citizens. In her *Monell* claim, Plaintiff also alleges that a "code of silence" exists within the Chicago Police Department ("CPD") whereby officers conceal each others' misconduct, in contravention of their sworn duties. Plaintiff claims that all of these policies, practices and customs, individually and collectively, encourage Chicago police officers – and, specifically in this case, Defendant Officer Abbate – to engage in misconduct with impunity and without fear of official consequences.

Plaintiff has proffered Dr. Steven Whitman to provide expert testimony in support of her *Monell* claim against the City. Dr. Whitman is a statistician and epidemiologist. As discussed below, Plaintiff provided Dr. Whitman with data the City produced during fact discovery concerning excessive force complaints filed against Chicago police officers. Plaintiff asked Dr. Whitman to analyze the data and (1) "[p]resent all evidence that speaks to the question of whether Officer Anthony Abbate had reason to believe that he could act with impunity, that is,

that he had reason to believe that he would not be punished regardless of what he did to Karolina Obrycka"; (2) address whether "any of the data speak to whether a 'code of silence' exists in the CPD"; and (3) analyze a small data set of complaints filed against Chicago police officers for driving under the influence of alcohol. (R. 266-1, Whitman Rept., at 8, 16, 19[2].)  In his expert report, Dr. Whitman calculates the "sustained" rates for investigations into allegations of police misconduct in the relevant Districts in this case.[3]  He then compares his findings to analyses that he and others have performed on the "sustained" rates of the CPD citywide, and of other large metropolitan police departments in the United States.  Dr. Whitman draws conclusions from those comparisons to answer Plaintiff's questions.

In its motion, the City challenges the reliability of Dr. Whitman's opinions under Rule 702.[4]  Specifically, the City argues that (1) Dr. Whitman is not qualified to offer expert testimony on police matters, (2) some of his opinions are based on misrepresentations of data and are thus unreliable, (3) some of his opinions are unreliable because he relied on Plaintiff's attorneys' summaries of facts, and (4) his conclusions about the "conduct of police officers" are pure *ipse dixit*.  (R. 255, City Mot. to Exclude Steven Whitman.)  Having carefully reviewed Dr. Whitman's report, the parties' briefs, and the transcript of Dr. Whitman's February 5, 2010 deposition, the Court grants in part and denies in part the City's motion.

---

[2] For ease of reference for the remainder of this litigation, the Court will cite to the page numbers in Dr. Whitman's expert report rather than to the page numbers on the Docket.

[3] In order to determine the "sustained" rates, Dr. Whitman counted the number of excessive force complaints filed against Chicago police officers in the relevant Districts at the relevant times, and determined how many of those complaints resulted in a finding of "sustained" – i.e., the investigators found the complaint meritorious.

[4] The City does not dispute the relevance of Dr. Whitman's analysis to the issues in this case.

**LEGAL STANDARD**

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "The Federal Rules of Evidence define an 'expert' as a person who possesses 'specialized knowledge' due to his 'skill, experience, training, or education' that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Banister v. Burton,* 636 F.3d 828, 831 (7th Cir. 2011) (quoting Fed. R. Evid. 702). Rule 702 also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir. 2011) (quoting Fed. R. Evid. 702).

"The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). District courts must employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers v. Illinois Central R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010); *see also United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should

consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). As the Seventh Circuit instructs, "'[t]he focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate.'" *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

"Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education. . . . An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (emphasis in original) (quoting Fed. R. Evid. 702). Nevertheless, district courts must still "ensure that the expert testimony at issue both rests on a reliable foundation and is relevant to the task at hand." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (quoting *United States v. Cruz-Velasco*, 224 F.3d 664, 660 (7th Cir. 2000) (internal quotation and citation omitted)). Ultimately, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis,* 561 F.3d at 705.

ANALYSIS

I.  **Dr. Whitman's Qualifications, Methodology & Opinions**

   A.  **Qualifications**

Dr. Whitman is a statistician and epidemiologist.[5] He received a masters degree in biostatistics from the University of Pittsburgh, and a Ph.D. in biostatistics from Yale University. (R. 280-1, Pl.'s Resp. to Mot. to Bar Whitman, Ex. A-Whitman Curriculum Vitae ("CV"), at 2.) For the past thirty-three years, Dr. Whitman has worked as an epidemiologist, studying public health patterns in Chicago communities. He is currently the Director of the Sinai Urban Health Institute, a research institute whose mission is "[t]o develop and implement effective approaches that improve the health of urban communities through data-driven research, evaluation, and community engagement." *See* Sinai Urban Health Institute Vision & Mission, http://www.suhichicago.org/about-suhi/vision-and-mission (last visited June 22, 2011). Dr. Whitman created the Sinai Urban Health Institute in March 2000. Prior to that, he was the Director of the Epidemiology Program at the Chicago Department of Public Health. He began his career as an epidemiologist in March 1978 at the Center for Urban Affairs and Police Research at Northwestern University, where he worked on a multi-disciplinary research study on "Epilepsy in the Urban Environment" and conducted studies of other public health issues affecting Chicago's poorest communities. Dr. Whitman began his career in academia, as a college level mathematics professor. (*Id*. at 3-5.)

---

[5] As Dr. Whitman succinctly stated at his deposition, he is "a statistician who analyzes data about health." (R. 331, Whitman Dep., 6:1-2.)

Dr. Whitman has no education, training, or professional experience[6] in criminology, or in matters involving policing, the CPD, the ways in which citizens file complaints against Chicago police officers, the process by which the CPD investigates allegations of police officer misconduct, or the CPD's disciplinary process. (Whitman Dep., 27:10-31:1.) Indeed, at his deposition, Dr. Whitman admitted that he had never reviewed a Complaint Register ("CR") file, *id*. at 30:5-7, and that he does not know – and has not attempted to ascertain – what constitutes a "proper" or "improper" method of conducting a CR investigation, *id*. at 30:12-16.

B.     **Data & Methodology**

During fact discovery, the City produced the following data sets to Plaintiff, who in turn tendered them to Dr. Whitman for use in his analysis: (i) City-created data sheets summarizing the contents of all CR files involving excessive force complaints against Chicago police officers assigned to the 20th District between May 2005 and March 2007 (Defendant Officer Abbate's assignment at the time of the incident); (ii) City-created data sheets summarizing the contents of all CR files involving excessive force complaints against Chicago police officers assigned to the

---

[6] Dr. Whitman has been retained twice before to submit expert testimony in federal civil rights cases. Both prior engagements required him to conduct statistical analyses of complaints against Chicago police officers. The last section of his expert report in this case draws on work he did for one of those cases, *Bond v. Utreras et al.* (04 C 2617) (Lefkow, J.). In that civil rights case, Plaintiff Diane Bond filed a nine count amended complaint against the City of Chicago, several CPD officers, the then- and former-CPD superintendents, and the former administrator of the CPD's Office of Professional Standards. As in this case, Bond brought a *Monell* claim against the City. *See Bond v. Utreras*, Case No. 04 C 2617, R. 222 (9/12/06 Minute Entry). Although Dr. Whitman analyzed data of reported police misconduct and drafted a report to support Bond's claims, the case settled before his testimony could be evaluated by the court. *Id*. at R. 248 (Release & Settlement Agreement), R. 249 (3/23/07 Agreed Order of Dismissal). The other case, *Ramirez v. City of Chicago et al.*, is presently set to go to trial in October 2011. *See Ramirez*, Case No. 05 C 317, R. 391 (6/3/11 Minute Entry). That court has suggested it may admit Dr. Whitman's expert testimony at trial. *Id*. at R. 330 (11/17/09 Mem. Op. & Order).

11th District between February 2002 and May 2005 (Defendant Officer Abbate's previous assignment); (iii) CR files involving excessive force complaints against on-duty Chicago police officers assigned to the 25th District between January 2005 and February 2007 (the District where the incident took place, for the time period in which the four Chicago police officers who responded to the incident were assigned to that District); and (iv) CR files involving complaints against off-duty Chicago police officers, citywide, between 2002 and 2007. (Whitman Rept., 1-7.)

Dr. Whitman hired a research assistant to help him code, input, and analyze the data. He imported the City-created data sheets into SAS, a statistical software package. For the 25th District and citywide data, where the City produced copies of the actual CR files, Dr. Whitman relied on summaries created by Plaintiff's counsel, which his research assistant independently verified for accuracy. To create those summaries, Plaintiff's counsel coded each CR file for various variables, including but not limited to whether the incident occurred on or off duty, the date of the incident, whether or not the complainant signed the affidavit required to initiate an investigation, whether the accused officer provided a statement to the CPD investigators, whether any other police officers were present during the alleged incident, and the investigator's ultimate finding. (*Id*. at 4.) Dr. Whitman's research assistant entered those summary coding sheets into a database, spot checking them to independently verify the accuracy of Plaintiff's counsel's coding and to "ensure that bias (intentional or unintentional) did not influence the collection of the data and thus [Dr. Whitman's] findings." (*Id*. at 5.)

In order to contextualize his data analyses and draw conclusions therefrom, Dr. Whitman compared his results to data set forth in a U.S. Department of Justice, Bureau of Justice Statistics

8

Report entitled "Citizen Complaints About Police Use of Force" (hereinafter, the "DOJ Report"). (R. 280-1, Pl.'s Resp. to Mot. to Bar Whitman, Ex. E-Itemization of Data Sets Examined by Dr. Steven Whitman, at 39.) He also relied on his previous analysis of complaints against Chicago police officers in *Bond v. Utreras et al.*, in which he analyzed 10,646 CR files involving complaints of brutality, false arrest, and planting evidence against Chicago police officers citywide between January 1999 and December 2004. (*Id*. at 37.) For his analysis in *Bond*, Dr. Whitman also looked specifically at "repeater" data – Chicago police officers against whom multiple complaints (ten or more) had been filed between May 2001 and May 2006. (*Id*. at 37-38.) Dr. Whitman employed standard statistical tests of significance in conducting his comparisons.

C.   Dr. Whitman's Opinions

Dr. Whitman's opinions fall into two categories: quantitative data analysis, and qualitative conclusions presumably drawn therefrom. In his quantitative data analyses, Dr. Whitman calculated the percentage of excessive force complaints that the CPD's investigative department "sustained"[7] for each of the relevant data sets he reviewed (11th District, 20th District, 25th District, and citywide). From these calculations, he determined whether the differences between the rates are or are not statistically significant (i.e., whether they are "meaningfully" significant due to "real" causes, or whether the variance is due to random chance). He performed the same comparison between the CPD sustained rates and the sustained rates listed for other large police departments in the DOJ Report. Separately, Dr. Whitman reviewed the

---

[7] When the CPD "sustains" a complaint against a Chicago police officer, it finds that the allegation was supported by sufficient evidence to justify disciplinary action (i.e., the allegation was meritorious and founded).

9

complaints in each data set to determine the number of "repeaters" (i.e., Chicago police officers against whom citizens filed multiple excessive force complaints), and for those "repeaters," calculated how frequently the CPD sustained complaints against them. Dr. Whitman also reviewed the data sets to attempt to discern whether and how often Chicago police officers witnessed – but did not report – incidents of police misconduct about which citizens complained. He then calculated the frequency with which the CPD charged officer-witnesses who did not report the incidents for their failure to report the incidents. Finally, Dr. Whitman analyzed a small data set of CR files initiated against Chicago police officers for driving under the influence of alcohol ("DUI"), and compared that data to general DUI statistics.

Dr. Whitman's qualitative analyses address the questions Plaintiff posed at the outset – namely, (1) whether the data "speaks to the question of whether Officer Anthony Abbate had reason to believe that he could act with impunity," (2) whether the data suggests the existence of a "code of silence" in the CPD, and (3) what the DUI data "describe." (Whitman Rept., at 8, 16, 19.) Using the results of his data analyses as a backdrop, Dr. Whitman offers several opinions. He opines that "the probability of an excessive force complaint being sustained in the City is very low," and that "the situation is even gloomier than these data would suggest." (*Id*. at 11, 12.) Dr. Whitman additionally observes that the "true" sustained rate is likely considerably lower than his calculations suggest due to citizens underreporting complaints and the Police Board's frequent reversals of "sustained" findings. (*Id*. at 13.) Dr. Whitman opines on the connection between sustained rates and "effective deterrence," and on the "implications of all of these officers being complained against time and time again for excessive force with the result being virtually no sustained complaints," before concluding, "[a]ll of this suggests that there is

indeed a pervasive environment of impunity." (*Id*. at 12, 16.)

To address Plaintiff's question regarding the existence of a "code of silence," Dr. Whitman uses the 'failure to report' data as a proxy and makes findings of how many police officers "should have" been charged with failure to report and the significance of the CPD's failure to charge those officers. (*Id*. at 16-18.) Dr. Whitman states that his data support the existence of a "code of silence" in two ways: first, by suggesting that the CPD's internal investigations "conceal" instances in which Chicago police officers "fail[] to report the misconduct of another officer by failing to investigate such allegations." (*Id*. at 18 n. 4.) Dr. Whitman also opines that the data suggests that the CPD is "complicit in the 'code of silence' of its members by not properly recording the number of instances in which an officer is accused of failing to report the misconduct of another officer, which results in the CPD having no data identifying the problem at all." (*Id*.) Finally, Dr. Whitman cites his analysis of the DUI data as "point[ing] toward a code of silence." (*Id*. at 21.) He arrives at this conclusion because, in his opinion, "the most likely explanation for so few arrests is that off-duty CPD officers are pulled over for DUI and then let go when the potential arresting officer finds out that the potential DUI driver is also an officer." (*Id*.)

## II.     Dr. Whitman Lacks Foundation For His Qualitative Conclusions

"'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). In performing its gatekeeping function, the Court must ascertain not just whether "an expert witness is qualified in

general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Id.* at 617 (internal quotation and citation omitted). Assuredly, "experts commonly extrapolate from existing data." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.2d 416, 419-20 (7th Cir. 2005) (quotation omitted). "Reliable inferences," however, "depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert." *Id.* (citation omitted). "The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (internal citations omitted)).

Here, Dr. Whitman lacks foundation for his qualitative conclusions. Despite Dr. Whitman's impressive credentials and experience as a biostatistician and epidemiologist, by his own admission, he knows nothing about police departments, police misconduct, investigations into police misconduct, or the process by which the CPD disciplines its police officers – the subjects that lie at the heart of this case. In response to the City's questions on these points at his February 5, 2010 deposition, Dr. Whitman consistently admitted that his expertise lies in data analysis, and that what he was "trying to do in this [case] is display all the data [he] had, explain what it meant as well as [he] could, and not go beyond [his] professional expertise." (Whitman Dep., 144:21-24.) *See also id.* at 27:10-31:1 (conceding he has no background in or familiarity with policing, investigations into police misconduct, police departments' disciplinary systems, or mechanisms by which citizens may file complaints against police officers), 143:3-144:24 (admitting that he has no knowledge of what an "appropriate" sustained rate would be to prevent creating a "pervasive environment of impunity"), 185:20-187:1 (admitting that he has no understanding of what effectively deters police misconduct), 194:17-20 (conceding he has no

understanding of the effect of sustained rates on officers' conduct), 208:21-212:5 (agreeing that his opinions about a "code of silence" are not based on his professional experience, but rather make sense to him on a personal level), 213:4-214:1 (conceding that his "code of silence" theory is a starting point for a discussion, and that the value in his opinion is his data analysis), 233:11-236:10 (questioning the reliability of the DUI data Plaintiff provided him and expressing discomfort with his attendant analysis).

Although Dr. Whitman's quantitative background provides him with sufficient foundation to present his data analysis, nothing in his academic or professional pursuits provides a basis for the conclusions he presumes to derive from the data in this case. It is clear that he simply models his conclusions off Plaintiff's questions. "[A] court is expected to reject any subjective belief or speculation." *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 816 (7th Cir. 2004) (internal citations omitted). *See also Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (finding expert's opinion inadmissible where he "presented nothing but conclusions . . . no discussion of hypotheses considered and rejected"). The Court thus grants the City's motion in part and excludes Dr. Whitman's qualitiative conclusions as to what his data analyses suggest about the CPD.

### III. Dr. Whitman's Quantitative Analyses Are Generally Admissible

While not contesting Dr. Whitman's mathematics credentials, the City disputes the reliability of Dr. Whitman's methodology. Specifically, the City challenges his reliance on (1) the data summaries the City produced involving complaints against Chicago police officers assigned to the 11th and 20th Districts, (2) Plaintiff's counsel's summaries of CR files for the 25th District, and (3) a U.S. Department of Justice analysis of complaints against police officers. In a

13

footnote, the City also challenges the relevance of the *Bond* analysis to this case. The Court considers each argument in turn to determine whether the City's criticisms of Dr. Whitman's report impacts the admissibility of his quantitative analyses, "or only, as the Supreme Court put it in *Bazemore*, their 'probativeness' or weight." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000) (citing *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)).

### A. Dr. Whitman's Analyses of Sustained Rates In The 11th & 20th Districts Are Admissible

The City argues that Dr. Whitman's analyses regarding the 11th and 20th Districts are unreliable because the underlying data overstates the actual number of CR files initiated against Chicago police officers in those Districts during the relevant time periods. According to the City, this "overcounting" of data results from Plaintiff's imprecisely worded document request – the discovery request that dictated which documents the City produced in this case – which requested information about complaints against police officers *assigned* to the 11th and 20th Districts at the same time as Defendant Officer Abbate, but did not limit the request to complaints filed against the officers *during* those periods. To illustrate the effect of that phrasing on Dr. Whitman's analysis, the City cites as an example one Chicago police officer who was assigned to the 11th District at the same time as Defendant Officer Abbate (between February 2002 and May 2005). The City produced 49 CR files relating to complaints against that officer, which Dr. Whitman included in his analysis of the 11th District. Fifteen of those complaints, however, arose from incidents occurring after May 2005. Dr. Whitman did not exclude those post-May 2005 CR files from his analysis. On that basis, the City contends that Dr. Whitman's analyses of the 11th and 20th Districts are unreliable and should be excluded. In response,

14

Plaintiff asserts that the time periods are unimportant, and that the relevant information is the proportion of complaints that are deemed "sustained" following an investigation.

*Daubert*'s "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (citations omitted). Although "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire Co.*, 526 U.S. at 141 (quoting *Daubert*, 509 U.S. at 594); *see also Mihailovich*, 359 F.3d at 919 ("[T]he *Daubert* framework is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered."), the methodology used by social science experts to reach their conclusions must "adhere to the same standards of intellectual rigor that are demanded in [their] professional work" in order to be reliable. *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (citation omitted). "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000) (citing *Kumho Tire Co.*, 526 U.S. at 141). Because Dr. Whitman based his analyses of the sustained rates in the 11th and 20th Districts on reliable evidence and arrived at reasonably informed estimates, the Court denies the City's request to exclude these data analyses. The City can address its challenges through cross examination.

**B.    Dr. Whitman Independently Verified the Accuracy of Plaintiff's Summaries**

Next, the City argues that Dr. Whitman's reliance on coded data sheets that Plaintiff's counsel created to summarize the CR files relating to the 25th District and off-duty Chicago police officers is impermissible under Rule 702 and *Daubert*. As in its other motions to exclude

Plaintiff's expert witnesses, the City relies primarily on *Sommerfield v. City of Chicago*, 254 F.R.D. 317 (N.D. Ill. 2008) for this proposition. Based on Dr. Whitman's description of the process by which he independently verified the accuracy of Plaintiff's coded data sheets – a process he undertook with the express goal of ensuring that his analyses were not tainted by any "intentional or unintentional" bias in Plaintiff's counsel's coding – the Court rejects the City's argument. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000) (district courts are responsible for determining whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed."). Dr. Whitman may present his analyses of these data.

### C. Dr. Whitman May Rely On The Government Report

The City argues that Dr. Whitman misinterprets the findings of the DOJ Report and that the opinions he draws therefrom are thus unreliable. "[I]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 506 (7th Cir. 2003). Furthermore, "the rules of evidence do not limit what type of information an expert may rely upon in reaching his opinion; even if that information would not otherwise be admissible in a court proceeding, an expert witness may rely upon it so long as it is the type of information on which others in the field reasonably rely." *Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d 685, 703 (7th Cir. 2008). The DOJ Report, entitled "Citizen Complaints about Police Use of Force," "presents data on citizen complaints about use of force and complaint dispositions in large [police] agencies." (R. 310, City Reply in Support of its Mot. to Exclude Steven Whitman,

Ex. B-DOJ Report.) Specifically, the DOJ Report analyzes data from the 2003 Law Enforcement Management and Administrative Statistics survey, which is sponsored by the Bureau of Justice Statistics and the Office of Community Oriented Policing Services. (*Id*.) This government report is relevant to Dr. Whitman's analysis, and it was reasonable for Dr. Whitman to rely on it in conducting his analysis for this case.

### D. Dr. Whitman's *Bond* Analysis Is Relevant

In a footnote, the City asks the Court to exclude Dr. Whitman's incorporation of his prior analysis of police misconduct complaints from *Bond v. Utreras et al.* on the grounds of relevance. (R. 266, City Mot. to Exclude Steven Whitman, at 8 n. 26.) Because Dr. Whitman's analysis is relevant, the Court denies the City's request. The Seventh Circuit has clearly stated that "in order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case." *Smith*, 215 F.3d at 720 (emphasis added). "No one piece of evidence has to prove every element of plaintiff's case; it need only make the existence of 'any fact that is of consequence' more or less probable." *Adams*, 231 F.3d at 425 (citing Fed. R. Evid. 401).

Here, Plaintiff offers Dr. Whitman's data analysis to support her *Monell* claim against the City. To establish *Monell* liability against the City, Plaintiff must show that (1) she suffered a deprivation of a federal right, (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that (3) proximately caused her constitutional injury. *Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005); *see also Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009) ("A municipality . . . may be liable for a section 1983 violation if, among other things: (1)

17

it has a permanent and well-settled municipal customer or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury"). Unconstitutional policies or customs include: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that a person with final policymaking authority caused the constitutional injury. *See Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008); *see also Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002) ("One way or another, the policy must be shown to be that of the municipality itself."). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (citation omitted)). Dr. Whitman's analysis of the complaint data in *Bond* provides additional relevant data for Plaintiff's *Monell* claim, and it is thus relevant and admissible.

As a general observation, if the City wishes to further challenge the data upon which Dr. Whitman relied, or the results he reached in his data analyses, it may cross-examine Dr. Whitman about "his conclusions and the facts on which they are based." *Smith*, 215 F.3d at 719. "Vigorous cross-examination, presentation of contrary evidence, and careful jury instruction . . . are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion to exclude Dr. Whitman's expert testimony. Dr. Whitman's quantitative data analyses are admissible. Dr. Whitman lacks foundation to offer qualitative opinions on those data, and his opinions in that regard are thus excluded.

**Date:** June 29, 2011

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**