# Ekl, Williams
## & Provenzale LLC
Attorneys and Counselors at Law

KAROLINA OBRYCKA V. CITY OF CHICAGO, ET AL.

# Exhibit HH
(David Naleway Deposition Transcript)

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


| | | |
|---|---|---|
| KAROLINA OBRYCKA, MARTIN | ) | |
| KOLODZIEJ, and EVA CEPIASZUK, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 07 C 2372 |
| CITY OF CHICAGO, a Municipal | ) | Judge |
| Corporation, ANTHONY ABBATE, | ) | Amy J. St. Eve |
| JR., GARY ORTIZ, PATTI | ) | |
| CHIRIBOGA, and JOHN DOE, | ) | |
| Defendants. | ) | |

The deposition of DAVID NALEWAY,
called by the Plaintiffs for examination,
pursuant to notice and pursuant to the Federal
Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions for the purpose of discovery, taken
before Maribeth Reilly, a Notary Public in the
State of Illinois and a Certified Shorthand
Reporter of the State of Illinois, at 219 South
Dearborn Street, Chicago, Illinois, on
January 16, 2009, commencing at 10:30 a.m.

Page 2

1 PRESENT:
2 MR. PATRICK J. PROVENZALE
3 (Ekl Williams, PLLC
4 901 Warrenville Road, Suite 175
5 Lisle, Illinois 60532)
6 Appeared on behalf of the Plaintiffs;
7
8
9 MS. ANNE McINNIS
10 (City of Chicago, Special Litigation Counsel
11 30 North LaSalle Street, Room 1720
12 Chicago, Illinois 60602)
13 Appeared on behalf of Defendant City
14 of Chicago;
15
16
17 MR. MICHAEL J. MALATESTA
18 (Apicella & Malatesta
19 134 North LaSalle Street, Suite 320
20 Chicago, Illinois 60602)
21 Appeared on behalf of Defendant
22 Anthony Abbate.
23
24 REPORTED BY: MARIBETH REILLY, C.S.R.

Page 3

1 I N D E X
2 WITNESS        EXAMINATION BY        PAGE
3 DAVID NALEWAY      Mr. Provenzale        4
4          Mr. Malatesta    151
5
6
7
8
9
10
11 E X H I B I T S
12
13 NALEWAY DEPOSITION        MARKED
14 EXHIBIT NUMBER        FOR ID
15
16 (No deposition exhibits were marked.)
17
18 * * * * *
19
20
21
22
23
24

Page 4

1 (Witness duly sworn.)
2 MR. PROVENZALE: Lieutenant, will you
3 please state your full name, and spell your last
4 name for the record.
5 THE WITNESS: Lieutenant David
6 Naleway, that's N as in Nancy, a-l-e-w-a-y.
7 MR. PROVENZALE: Let the record
8 reflect that this is the deposition of
9 Lieutenant David Naleway, taken pursuant to
10 agreement of the parties as to the time and
11 location, and a Court order as to the location,
12 and that the Federal Rules of Civil Procedure
13 and the Local Rules of the Northern District,
14 Eastern Division apply.
15 DAVID NALEWAY,
16 called as a witness herein on behalf of the
17 Plaintiffs, having been first duly sworn, was
18 examined and testified as follows:
19 EXAMINATION
20 BY
21 MR. PROVENZALE:
22 Q. Lieutenant, how are you employed
23 today?
24 A. Chicago Police Department.

Page 5

1 Q. How long have you been employed by
2 the Chicago Police Department?
3 A. Since 1992.
4 Q. Prior to your employment with the
5 Chicago Police Department, what was your
6 immediate employment?
7 A. I worked for a company Flying Tigers,
8 who was eventually bought out Federal Express.
9 Q. How old are you today?
10 A. 55.
11 Q. So when you started in the Chicago
12 Police Department, you were --
13 A. 38.
14 Q. -- approximately --
15 A. 37.
16 Q. -- 37, 38?
17 How long had you worked for Flying
18 Tigers or whatever its predecessor company?
19 A. Combination of 19 years.
20 Q. What did you do for them?
21 A. Ramp service, cargo.
22 Q. The entire 19 years?
23 A. Yes.
24 Q. Prior to your employment at, you

2 (Pages 2 to 5)

Page 6

1  know, whatever the predecessor or the successor
2  company, did you -- what was your highest level
3  of education prior to being employed there?
4      A.  High school.  Well, one year of
5  college.
6      Q.  Where was the one year of college at?
7      A.  Wilbur Wright Junior College.
8      Q.  Did you obtain any degrees?
9      A.  No.
10     Q.  Where did you graduate from high
11 school?
12     A.  Lane Technical
13     Q.  During your employment, the 19 years
14 that you were employed, did you obtain any
15 additional education?
16     A.  No.
17     Q.  Or formal education?
18     A.  With the police department, I have,
19 yes.
20     Q.  I am talking about just during the
21 employment that you had prior?
22     A.  No.
23     Q.  So prior to 1992, your highest level
24 of education was your high school diploma,

Page 7

1  correct?
2      A.  And one year of college.
3      Q.  Do you have any military background?
4      A.  No.
5      Q.  And your employment with the Flying
6  Tigers or FedEx, whatever entity it was, did you
7  ever work in any type of security or
8  investigatory responsibility?
9      A.  No.
10     Q.  Why did you go or apply to the
11 Chicago Police Department?
12     A.  Got tired of working out at the
13 airport in the cold.
14     Q.  Change of job?
15     A.  Yes.
16     Q.  Did anyone assist you in getting
17 employment with the Chicago Police Department?
18     MS. McINNIS:  Object to vague.
19     You can answer.
20     THE WITNESS:  I don't understand your
21 question.
22 BY MR. PROVENZALE:
23     Q.  I mean, did you know somebody who was
24 a Chicago police officer who recommended you, or

Page 8

1  somebody who was a City employee who recommended
2  you?
3      A.  It was a testing procedure.
4      Q.  Okay.  I am talking about any
5  individuals who that you are aware of made any
6  type of recommendation on your behalf for hiring
7  and employment?
8      A.  I don't understand your question.
9  It's a civil service test.
10     Q.  Okay.  Aside from the test, are you
11 aware of anybody who offered any type of
12 recommendation for your employment with the
13 Chicago Police Department?
14     A.  That doesn't make any sense to me.
15 Your question doesn't make any sense to me.
16     Q.  Do I take it your answer is no, or
17 yes?
18     A.  I am not understanding your question.
19 Everyone has to take a test.  You pass it.  You
20 move on to the next question.
21     Q.  Whether anybody -- whether or not
22 there is a test requirement, are you aware of
23 whether anybody ever made any type of
24 recommendation on your behalf for your

Page 9

1  employment with the City of Chicago?
2      A.  I just don't understand your
3  question.  I really don't.  You have to take a
4  test to get the job.
5      Q.  I understand that.  But whether you
6  take a test or not, somebody can still make a
7  recommendation on your behalf.  They are -- they
8  are independent, have nothing to do with one
9  another propositions.
10     So I am assuming you took the
11 test and passed, right?
12     A.  Yes.
13     Q.  Setting that aside, are you aware of
14 whether anybody ever made a recommendation on
15 your behalf to be with the City of Chicago?
16     A.  There was a background investigation.
17     Q.  Were there any recommendations made
18 on your behalf during the background
19 investigation?
20     MS. McINNIS:  Object to speculation.
21 Assumes he's actually seen them.
22     THE WITNESS:  I don't know.
23 BY MR. PROVENZALE:
24     Q.  I am not asking whether you have seen

3 (Pages 6 to 9)

Page 10

1   it. I am asking whether you are aware if
2   anybody provided any recommendation on your
3   behalf for employment with the City of Chicago?
4       A.   I just -- I don't understand what you
5   are asking.
6       Q.   Did you have to fill out an
7   application?
8       A.   Yes.
9       Q.   Was part of that application listing
10  people as references?
11      A.   Yes.
12      Q.   Did any of the people that you listed
13  as references provide a recommendation on your
14  behalf for employment with the City of Chicago?
15          MS. McINNIS:  Object to vague and
16  speculation.
17          You can answer.
18          THE WITNESS:  I don't know.
19  BY MR. PROVENZALE:
20      Q.   Were any of the people that you
21  provided as references employees of the City of
22  Chicago at the time or former employees of the
23  City of Chicago?
24      A.   I don't recall who I had listed as

Page 11

1   references.
2       Q.   You attended the Chicago Police
3   Academy?
4       A.   Yes, I did.
5       Q.   You completed the course work and
6   obtained certification?
7       A.   Yes.
8       Q.   And what was your first assignment
9   while you were still in the police academy?
10      A.   In the police academy?
11      Q.   Well, I mean, obviously when you
12  completed the police academy, and then part of
13  the police academy is actually being an
14  assignment pending your approval after the
15  probationary period, correct?
16      A.   Yes.
17          MS. McINNIS:  Object to the form of
18  the question.
19          Go ahead.
20          THE WITNESS:  You have a field
21  assignment.
22  BY MR. PROVENZALE:
23      Q.   What was your first field assignment?
24      A.   14th District.

Page 12

1       Q.   As a patrolman?
2       A.   Yes.
3       Q.   What shift?
4       A.   Midnights.
5       Q.   And for what period of time was that
6   assignment --
7       A.   My --
8       Q.   -- at that rank?
9       A.   My field training, three months.
10      Q.   And was that all during the year of
11  1992?
12      A.   Beginning of 1993.
13      Q.   Do you know what the date of your
14  employment was?
15      A.   29, June, 92.
16      Q.   Once you completed your field
17  assignment, what was your next?
18      A.   15th District.
19      Q.   So some time after the three months
20  of your initial field assignment, you were
21  transferred to the 15th District?
22      A.   Yes.
23      Q.   As a patrolman?
24      A.   Yes.

Page 13

1       Q.   What shift were you on at that point?
2       A.   Afternoons, third watch.
3       Q.   Approximately the 3:00 to 11:00
4   shift; is that right?
5       A.   Yes.
6       Q.   How long a period of time were you
7   assigned to the 15th District as a patrolman?
8       A.   About a year and a half
9   approximately.
10      Q.   So from some time in the middle of
11  1993 through the end of '94?
12      A.   Middle of '94, probably somewhere
13  around there, in that area.
14      Q.   Sometime in '94?
15      A.   Sometime in '94.
16      Q.   What was your next assignment after
17  that?
18      A.   17th District.
19      Q.   At what rank?
20      A.   Patrolman.
21      Q.   What shift?
22      A.   I was a gang tactical officer.
23      Q.   You had a unit assignment?
24      A.   It was a tactical assignment.

4 (Pages 10 to 13)

Page 14

1    Q.   It was a district tactical
2  assignment?
3    A.   District tact.
4    Q.   Prior to your assignment to that
5  tactical unit, did you have any gang crime
6  certifications like NEMRT?
7    A.   No.
8    Q.   Or through the ISP or anything like
9  that?
10    A.   No.
11    Q.   Did you obtain any law enforcement
12  training certifications regarding gang crime law
13  enforcement during the time that you were in the
14  gang tactical unit in the 17th District?
15    A.   No.
16    Q.   The answer is no?
17    A.   No.
18    MS. McINNIS:  Just wait for him to
19  finish his question.
20    MR. PROVENZALE:  Sometimes -- I know
21  you know where I am going, but sometimes my
22  questions are, unfortunately, long.
23  BY MR. PROVENZALE:
24    Q.   How long a period of time were you in

Page 15

1  the gang tactical unit in the 17th District?
2    A.   Until beginning of 1996.
3    Q.   So some time -- from the period
4  sometime in '94 to the beginning of '96, you
5  were in the gang unit, correct --
6    A.   Yes.
7    Q.   -- at the 17th District?
8    What was your next assignment then
9  at the beginning of '96?
10    A.   I was promoted to the rank of
11  sergeant.
12    Q.   When did you take the test?
13    A.   Oh, I don't remember when I took the
14  test.
15    Q.   Was it the first time you took the
16  test that you were promoted?
17    A.   Yes.
18    Q.   Do you remember what your rank was on
19  the list?
20    A.   I believe it was number 300 or low
21  300s.
22    Q.   Were you aware at the time whether
23  there were any other higher ranked first time
24  testees for the rank of sergeant than yourself?

Page 16

1    In other words, do you know of any
2  other applicants who were first-time candidates
3  for the rank of sergeant who were ranked higher
4  than you?
5    A.   I have no idea.
6    Q.   How long were you -- what district
7  were you assigned in as sergeant?
8    A.   16th District.
9    Q.   So sometime from the beginning of the
10  year of 1996 through what period of time were
11  you sergeant in the 16th District?
12    A.   The beginning of 2003.
13    Q.   So for approximately seven years,
14  somewhere in that timeframe?
15    A.   It was about six and a half years.
16    Q.   During the period of time, those six
17  and a half years, were you street sergeant or
18  were you a desk sergeant or what capacity?
19    A.   Street sergeant.
20    Q.   The entire time?
21    A.   There were days here and there that I
22  would work the desk.
23    Q.   But your general assignment was
24  street?

Page 17

1    A.   98 percent of the time it was on
2  street, yes.
3    Q.   What shift were you in when you first
4  started?
5    A.   Midnights.
6    Q.   Did you stay in that throughout the
7  whole time?
8    A.   I did have a burglary routine also
9  assigned to the 16th District, but it was all
10  midnights.
11    Q.   What was your next assignment
12  following your rank of holding rank of sergeant
13  in the 16th District?
14    A.   Promoted to the rank of lieutenant.
15    Q.   That was when?
16    A.   The beginning of 2003.
17    Q.   Do you remember when you took the
18  test for that?
19    A.   No.
20    Q.   Was it the first time that you took
21  the test that you received a promotion?
22    A.   Second.
23    Q.   Do you remember when the first time
24  was that you had taken the test?

Page 18

1    A.   No.
2    Q.   What was your first assignment in the
3 rank of lieutenant?
4    A.   15th District.
5    Q.   And what shift?
6    A.   Midnights.
7    Q.   How long a period of time did you
8 maintain the midnight shift lieutenant rank?
9    A.   Being low in seniority, I was bounced
10 around from shift to shift.
11    Q.   Was it generally in what capacity?
12 Watch commander?
13    A.   Watch commander.
14    Q.   For whatever shift you were working,
15 that was your rank or your position for that
16 shift?
17    A.   Basically, yes.
18    Q.   How long a period of time were you
19 lieutenant in the 15th District?
20    A.   One year.
21    Q.   So from some time in '03 to some time
22 in '04 or was it --
23    A.   '04, February of 04.
24    Q.   And then what happened in February of

Page 19

1 '04?
2    A.   I was reassigned to Internal Affairs
3 Division.
4    Q.   What position did you hold upon your
5 appointment or assignment to IAD?
6    A.   Commanding officer of general
7 investigations section.
8    Q.   Who were your immediate supervisors
9 at the time of your appointment in IAD?
10    A.   Assistant deputy superintendent Karen
11 Rowan.
12    Q.   Anyone parallel in rank to her as
13 your supervisor, or was she the next immediate
14 person?
15    A.   Next immediate.
16    Q.   And then there is no one else on her
17 level of rank?
18         MS. McINNIS:  Object to form.
19 BY MR. PROVENZALE:
20    Q.   In IAD?
21         MS. McINNIS:  Object to the form of
22 the question.
23 BY MR. PROVENZALE:
24    Q.   In other words, she was your

Page 20

1 immediate supervisor?
2    A.   Yes.
3    Q.   But there wasn't anyone else of equal
4 rank who was also an immediate supervisor of
5 yours?
6    A.   Equal rank to her?
7    Q.   Yes.
8    A.   No.
9    Q.   Who else then in the chain of command
10 was up from you?
11    A.   Superintendent.
12    Q.   So that would have been Phil Cline at
13 the time?
14    A.   Yes.
15    Q.   At the time of your appointment in
16 '04, there were 3 sections of IAD; general
17 investigations, special investigation and
18 confidential.  Is that right?
19    A.   That's correct.
20    Q.   Who were the lieutenants in charge of
21 special and confidential at the time of your
22 appointment?
23    A.   Lieutenant Susan Clark was special
24 investigations.  And Lieutenant Trancatello, I

Page 21

1 do not know how to spell it, was in charge of
2 confidential section.
3    Q.   At the time of your appointment in
4 2004, you had sergeants and detectives who
5 reported to you in the general investigation
6 section; is that correct?
7    A.   Sergeants.  No detectives.
8    Q.   There were no detectives.  The
9 detectives were assigned to one of the other
10 investigator sections?
11         MS. McINNIS:  Object to the form;
12 speculation.
13         THE WITNESS:  At that time, I am not
14 sure if there were any detectives assigned to
15 the confidential section.
16 BY MR. PROVENZALE:
17    Q.   At some point after your appointment,
18 were detectives assigned to the confidential
19 investigation section?
20    A.   Yes.
21    Q.   At the time of your appointment, was
22 Sergeant Stehlik one of your subordinate
23 officers?
24    A.   No.  He came later.

Page 22

1  Q. How about Sergeant Maraffino?
2  A. He came later.
3  Q. And Sergeant Martin?
4  A. He was there when I arrived.
5  Q. The assignment of cases to the
6  individual sections of IAD came from whom, as
7  your understanding was, when you were first
8  assigned in 2004?
9      MS. McINNIS: Object to form;
10  speculation.
11  BY MR. PROVENZALE:
12  Q. To your understanding, who made the
13  assignment decision of cases within IAD between
14  the or among the three investigative divisions?
15      MS. McINNIS: Same objection; form
16  and speculation.
17      THE WITNESS: At the time that I came
18  in, those decisions were being made by Karen
19  Rowan.
20  BY MR. PROVENZALE:
21  Q. And was this a collaborative process
22  where there would be conferences or meetings
23  regarding the referrals from OPS that came in?
24  Or would it just be her decision alone, in your

Page 23

1  understanding of it?
2      MS. McINNIS: Object to speculation
3  and incomplete hypothetical.
4      THE WITNESS: I am not sure I am
5  understanding what you are asking.
6  BY MR. PROVENZALE:
7  Q. What I am asking is whether or not at
8  the time when you came in in terms of the
9  decision-making process to which investigative
10  section a case would be assigned, were there any
11  kind of like conferences that you participated
12  in to give input as to whether or not the case
13  should be assigned to your division, or whether
14  it should be assigned to special or
15  confidential?
16      MS. McINNIS: Object to the form.
17      THE WITNESS: I don't recall specific
18  conversations. I am sure there might have been.
19  BY MR. PROVENZALE:
20  Q. I am talking about just as a matter
21  of the procedure of the assigned cases?
22  A. It was not a daily thing, no.
23  Q. It wasn't like once a week or once
24  a -- with whatever frequency it was that you and

Page 24

1  the other section heads in IAD would meet with
2  ADS Clark -- ADS Rowan and discuss where each
3  case should be assigned?
4  A. No. There were daily assignments.
5  Q. But whatever the frequency was,
6  whether it was daily, couple of times a day,
7  once a week, whatever the frequency was, there
8  was no regular meeting where you and the other
9  division chiefs and the ADS in charge would
10  discuss where to assign a case?
11  A. No.
12  Q. In the time that you were in IAD from
13  February of '04 up to February of '07, do you
14  recall being involved in the decision-making
15  process for the assignment of any specific case?
16  A. Ever, yes.
17  Q. How many, as you sit her today, do
18  you recall being involved in, the
19  decision-making process of which division a case
20  would be assigned?
21  A. I couldn't even give a guess as to
22  that. I have no idea.
23  Q. I mean, is it multiples like many
24  cases, or was the rare exception that that would

Page 25

1  occur?
2  A. In five years, there were many times.
3  Q. In terms of how you were involved in
4  any of those, did any of those involve the ADS
5  calling you and asking you to come to her office
6  to discuss where a case should be assigned?
7  A. It was not that type of a thing. It
8  was usually if she was not available.
9  Q. That's what I want to get at. So
10  more of a substitute in her absence?
11  A. Substitute would be a perfect word.
12  Q. Was there a specific division chief
13  assigned to act as the -- or act in place of the
14  ADS to assign cases?
15      MS. McINNIS: Object to form.
16  BY MR. PROVENZALE:
17  Q. Or was that just like a rotating
18  responsibility, if she wasn't there, then one of
19  the three of you would handle the
20  responsibility?
21  A. I acted in her place numerous times.
22  Q. To your knowledge, was there a set
23  schedule that said, you know, that sort of like
24  the floater to take the responsibility of

7 (Pages 22 to 25)

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 26

1 assignment of cases if the ADS wasn't available,
2 or was it just whoever was just available?
3      MS. McINNIS: Object to form, lacks a
4 timeframe.
5 BY MR. PROVENZALE:
6     Q. I am talking about through the entire
7 time from February of '04 to February of '07
8 again.
9     A. I am not aware of any policy that
10 what is in effect.
11     Q. Like a schedule or something like
12 that?
13     A. No, there was never a schedule.
14     Q. On those occasions in which you acted
15 in the capacity of substitute of the ADS to make
16 assignment of cases, was there anything of
17 reference available to you that you were aware
18 of that you would look at to make the
19 determination of which unit a case should be
20 assigned to?
21     MS. McINNIS: Object to form.
22     THE WITNESS: There are specific
23 cases that go to specific sections.
24

Page 27

1 BY MR. PROVENZALE:
2     Q. That's what I am saying. How do you
3 know? Is that because somebody told you that,
4 and that's the way you were trained? Or is
5 there a book that says this kind of case goes
6 here, this case of case goes here?
7     A. There is no book. It's just what
8 cases go to each sections.
9     Q. Based upon -- is it just in your
10 recollection of the circumstances where you
11 acted as substitute, was it simply your
12 understanding that this kind of a case goes to
13 this section?
14     A. Yes.
15     Q. And your recollection, from where did
16 you obtain that understanding?
17     A. The specific responsibilities of each
18 section.
19     Q. How did you become aware of the
20 specific responsibilities of each section?
21     A. Experience, knowledge.
22     Q. It wasn't as if there was a reference
23 book somewhere that you looked to see, well,
24 this is this section's responsibility, so that's

Page 28

1 how -- the kind of case you assign to it?
2     MS. McINNIS: Objection; asked and
3 answered.
4     THE WITNESS: No. We know what each
5 section's responsibilities are.
6 BY MR. PROVENZALE:
7     Q. From February of '04 to February of
8 '07, were you in -- were you the head of the
9 general investigation section?
10     A. Yes.
11     Q. At some point in time, Sergeant
12 Stehlik and Sergeant Maraffino had come on to be
13 your subordinate officers in the general
14 investigation section; is that correct?
15     A. Yes.
16     Q. Do you recall when they came in with
17 respect to February of '07?
18     A. I don't recall the dates.
19     Q. Prior to February of 2007, had you
20 ever been involved -- as the head of general
21 investigations been involved in coordinating the
22 investigation of a case that was assigned to
23 more than one investigative division in IAD?
24     MS. McINNIS: Object to the form of

Page 29

1 the question.
2     THE WITNESS: I don't recall anything
3 specific, but we would help each other out all
4 the time, yes.
5 BY MR. PROVENZALE:
6     Q. Aside from helping each other out --
7 well, let me ask you this. In cases that prior
8 to February of 2007, where you helped out
9 another of the divisions in IAD, is it just an
10 informal assistance? Or was that something that
11 was part of the original assignment of the case
12 where two different sections were assigned to
13 investigate one case or both?
14     MS. McINNIS: Object to the form.
15     THE WITNESS: A case may be
16 transferred to another section, but it would
17 never be assigned to two different
18 investigators.
19 BY MR. PROVENZALE:
20     Q. So let me get that out of the way.
21 In your recollection prior to February of 2007,
22 you had never recalled a -- you don't recall a
23 circumstance where a case was assigned
24 simultaneously to two different investigative

8 (Pages 26 to 29)

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 30

1  sections; is that correct?
2      A.   I don't know what you mean by
3  assigned. I am not sure what you mean.
4      Q.   You used the word assigned in your
5  last answer, so I am using the word assign in
6  the same way that you used it.
7      A.   Well, I am not understanding your
8  question here.
9      Q.   Let's talk about the assignment
10 process.
11     A.   Okay.
12     Q.   When a case is assigned to you, how
13 is it assigned?
14     A.   It comes from the front, front
15 office.
16     Q.   ADS whomever, whether it be ADS Rowan
17 at the time, or ADS Kirby later, would transmit
18 the case to general investigations for
19 investigation; is that correct?
20     A.   Correct.
21     Q.   As part of that transmittal was there
22 like a face sheet to the assignment?
23     A.   Yes.
24     Q.   And every case that was assigned

Page 31

1  would have that face sheet, correct?
2      A.   Correct.
3      Q.   That would be the OPS face sheet, or
4  was it a face sheet or IAD? In other words, I
5  want to make a distinction between the face
6  sheet for the CR file versus a face sheet for an
7  assignment within IAD?
8      A.   That's all the same face sheet.
9      Q.   So when you -- when a case is
10 assigned within IAD to a particular division,
11 there is a designation on the face sheet as to
12 which division it's assigned, correct?
13     A.   There is a designation as to who the
14 assigned investigator is.
15     Q.   When there is a designation as to who
16 the assigned investigator is, that is as a fact
17 a designation to a particular investigative
18 division because investigators are assigned to
19 specific divisions, right?
20     A.   Correct.
21     Q.   In your experience prior to February
22 of 2007, were you ever aware of a circumstance
23 where more than one investigator was assigned to
24 investigate a case inside IAD where those

Page 32

1  investigators were parts of different
2  investigative divisions of IAD?
3      A.   Two names on one?
4      Q.   Right.
5      A.   Not that I'm aware of.
6      Q.   You had mentioned that sometimes you
7  would help each other out?
8      A.   Yes.
9      Q.   And meaning that one investigative
10 division would assist another investigative
11 division in an investigation, correct?
12     A.   Yes. We would support each other.
13     Q.   Can you give me examples of what
14 types of support would be -- in your experience
15 was provided by either your division or another
16 division to yours in the course of investigating
17 cases prior to February of '07?
18     A.   If we needed surveillance, I would
19 contact the confidential section.
20     Q.   What else?
21     A.   If one of the other sections needed a
22 police officer's powers removed, I normally
23 would take care of that.
24     Q.   Notice of suspension, for example?

Page 33

1      A.   Notice of suspension to actually
2  remove police powers.
3      Q.   The actual form that you hand them
4  and say that you have been stripped of your
5  powers?
6      A.   Yes. We would process that, yes.
7      Q.   What about manpower issues, just if
8  somebody needed additional investigators to
9  assist on a case, and anything like that to your
10 recollection ever occur prior to February of
11 2007?
12     A.   Not that I am -- I can't give any
13 specifics.
14     Q.   In your recollection, the help that
15 you have referred to that one investigative
16 section would provide to another investigative
17 section related to the specific responsibilities
18 or investigative techniques that each section
19 would normally carry out?
20     A.   Can you ask me that again.
21     Q.   For example, if you needed
22 surveillance, you would go to the investigative
23 section that conducted surveillance as part of
24 its investigations confidential section?

9 (Pages 30 to 33)

Page 34

1    A.   Yes.
2    Q.   Likewise, if another -- if the
3  confidential section or the special
4  investigation section needed assistance with
5  serving a notice of suspension or processing a
6  request to strip an officer of his police
7  powers, that would be a general investigation
8  section responsibility, and that would be the
9  type of request that would be asked of your
10  division. Correct?
11   A.   It's not that it was -- those
12  responsibilities weren't delegated to specific
13  sections, but that's what we did.
14   Q.   You would normally carry those out so
15  that's why you would be requested to help with
16  that type of thing?
17   A.   Yes.
18   Q.   Because that's what you were more
19  familiar with doing?
20   A.   Yes.
21   Q.   And that's kind of all I am getting
22  at. It's not so much that it was a strict
23  delineation of responsibilities for each
24  investigative section. It was more you are

Page 35

1  familiar with doing that type of thing, can you
2  assist us in doing that; is that correct?
3    A.   Yes. I up until a year ago, I did
4  coordinate what we call the call-out team. And
5  so, yes, I had more experience with that.
6    Q.   What is the call-out team?
7    A.   If there is a major incident off
8  hours that needs, required our assistance or
9  guidance, I had a group of sergeants that
10  rotated, and they would be sent out to the
11  field.
12   Q.   Sort of like a rapid response?
13   A.   Yes.
14   Q.   In connection with those occasions
15  prior to February of '07 in which assistance was
16  provided either by your section to another
17  section or by another section to your section of
18  IAD, in your experience would coordination of
19  efforts occur?
20      MS. McINNIS: Object to the form of
21  the question, vague.
22      THE WITNESS: Coordination?
23  BY MR. PROVENZALE:
24   Q.   Right. In other words, well, answer

Page 36

1  it the way -- if you need me to expound, I will
2  try to.
3    A.   Well, I would never just go out and
4  do something without being requested.
5    Q.   And when you say requested, by whom
6  are you referring? By another investigative
7  section head; by one of the other lieutenants?
8    A.   Could have been -- it could have
9  been --
10      MS. McINNIS: Object to the form of
11  the question, incomplete hypothetical.
12  BY MR. PROVENZALE:
13   Q.   Go ahead.
14   A.   It could have been the deputy, or it
15  could have been one of the other lieutenants.
16   Q.   When assistance was requested, to
17  your recollection, prior to February of '07,
18  were there ever any occasions where you would
19  take any part of the investigation or pursue any
20  part of an investigation that wasn't
21  specifically requested, but that you felt was an
22  appropriate investigative step?
23      MS. McINNIS: Object to form,
24  incomplete hypothetical.

Page 37

1      THE WITNESS: I am not privy to the
2  allegations, so I would never move forward on
3  something that I didn't know.
4  BY MR. PROVENZALE:
5    Q.   So prior to February of 2007, on
6  those occasions where you provided help to
7  another one of the investigative sections, it
8  would have been -- it was in your recollection
9  specifically a request to do a particular thing
10  and not a collaboration in the investigation; is
11  that right?
12   A.   Correct.
13   Q.   Do you recall -- well, let me ask
14  you: Prior to February, say, February 21st of
15  2007, had you ever heard of the name Anthony
16  Abbate?
17   A.   I don't know what the date was that I
18  first learned of that, that name so.
19   Q.   Whatever the first date was that you
20  had learned of that name, prior to that date,
21  had you ever heard of that name? That's a
22  stupid question.
23   A.   You are asking me to assume -- I
24  don't recall the first date.

Page 38

1    Q.  No, no.
2         MS. McINNIS: He will ask it a
3    different way.
4    BY MR. PROVENZALE:
5    Q.  It came out a different way than I
6    intended it.  Let me ask the question in way
7    that actually makes sense.
8         Prior to the date that you first
9    heard the name in connection with the
10   investigation that you conducted back in 2007,
11   had you ever heard of the name Anthony Abbate
12   before?
13   A.  Never.
14   Q.  When you became aware of the name in
15   February of 2007, whatever the date was, at that
16   time did you become aware that there were family
17   members of this individual who worked for the
18   Chicago Police Department?
19   A.  Are you saying prior?
20   Q.  As of the date that you learned of
21   his name?
22   A.  I did not know that there were family
23   members.
24   Q.  So prior to the date that you had

Page 39

1    first heard the name Anthony Abbate you had --
2    strike that.
3         After the date that you had
4    learned of the name Anthony Abbate, you did not
5    put two and two together and realize that his
6    father was a detective in the 4th District?
7         MS. McINNIS: Object to the form of
8    the question.
9         THE WITNESS: I had never heard the
10   name Abbate. I had no knowledge.
11   BY MR. PROVENZALE:
12   Q.  When you were in any of your district
13   assignments, and I said the 4th District.  I
14   meant Area 4.  In any of your district
15   assignments, did you ever work within Area 4?
16   A.  No.
17   Q.  In any of your district assignments,
18   did you ever work within Area 2?
19   A.  No. Oh, I take that back. I might,
20   I might have. I know I guest -- I was a guest
21   watch commander on a couple of occasions in Area
22   2. I think it was Area 2.
23   Q.  In what timeframe?
24   A.  It was as a lieutenant.

Page 40

1    Q.  Sometime after '03?
2    A.  When I first made -- yes, it would
3    have been '03.
4    Q.  At what district was that at?
5    A.  I was guest watch commander in
6    numerous districts. Most of the time, 99
7    percent of the time, I was the guest in Area 5.
8    I don't ever recall guesting in Area 4. Area 1,
9    a couple of times, Area 2 maybe once or twice.
10   Q.  Do you remember what districts in
11   Area 2?
12   A.  No, I don't.
13   Q.  As you sit here today, to the best of
14   your recollection, you are not aware of ever
15   having any type of either social, working or
16   familial relationship with Anthony Abbate; is
17   that correct?
18   A.  Never.
19   Q.  As you sit here today, you are not
20   aware of having any social, working or familial
21   relationship with his father Carmen or Carmel or
22   his brother Terry; is that correct?
23   A.  I don't know what either one of them
24   look like. I can't say for certain. I have

Page 41

1    never been in the same room with either one of
2    them, but I do not know those names.
3    Q.  And that's -- I mean, the names --
4    you don't know anyone by the name of Carmel
5    Abbate or Terry Abbate, correct?
6    A.  No, I do not.
7    Q.  Or Carmen Abbate?
8    A.  No, I do not.
9    Q.  I have seen it spelled two different
10   ways.
11        MR. MALETESTA: It is Carmel.
12        MR. PROVENZALE: I have seen it
13   spelled two different way.
14        MR. MALETESTA: Carmel with an L.
15   BY MR. PROVENZALE:
16   Q.  Do you remember where you were when
17   you first heard the name Anthony Abbate?
18   A.  I was with Deputy Kirby. I was in
19   the headquarters building.
20   Q.  Prior to that time, had you been
21   aware that there was either an OPS or an IAD
22   investigation ongoing related to efforts to
23   identify a Chicago police officer who was
24   involved at a -- in a fight at a bar?

11 (Pages 38 to 41)

Page 42

1      MS. McINNIS: Objection to the form
2 of the question; assumes facts not in evidence.
3      THE WITNESS: Prior to what time?
4 BY MR. PROVENZALE:
5   Q.  Prior to the time you heard the name
6 Anthony Abbate?
7   A.  No. That was the first time.
8   Q.  When you heard his name, did you hear
9 his name in connection with allegations that he
10 was involved in a fight at a bar? Or tell me,
11 why don't you tell me what were the
12 circumstances under which you heard his name?
13   A.  That there was an investigation
14 ongoing about a fight in a bar, yes.
15   Q.  Where were you at headquarters?
16 Were you in ADS Kirby's office or somewhere
17 else?
18   A.  The first time -- I can't be positive
19 as to the first time that the name was brought
20 up. I really don't remember.
21   Q.  Do you remember who it was that
22 relayed the information to you?
23   A.  It would have been Deputy Kirby.
24   Q.  Do you recall whether anyone else was

Page 43

1 present at the time?
2   A.  The first time that the name was
3 brought up, no, I don't recall anyone else being
4 present.
5   Q.  What do you recall ADS Kirby relating
6 to you regarding whatever it was that Anthony
7 Abbate was involved in or the investigation of
8 it?
9   A.  The first I was made aware of
10 anything, she had asked me to come with her down
11 into the computer forensics lab to view a video.
12   Q.  And I take it, you don't recall what
13 day this occurred, correct?
14   A.  No, I don't.
15   Q.  Did you accompany her down to the
16 computer forensics lab, or did you go down by
17 yourself, or what happened?
18   A.  No. I rode down the elevator with
19 her.
20   Q.  Was anybody else accompanying the two
21 of you on the way down there?
22   A.  At some point in time, I don't know
23 if he was in the elevator with us or not, but at
24 some point in time, we came across Mike Duffy

Page 44

1 from OPS.
2   Q.  Could have been in the room? Could
3 have been on the way?
4   A.  Could have been in the lobby. I
5 don't remember.
6   Q.  Do you remember having any
7 conversation with Mike Duffy or ADS Kirby,
8 having any conversation with Mike Duffy when you
9 came in contact with him?
10   A.  I don't recall having any
11 conversation with Mike Duffy. Whether or not
12 Deputy Kirby did, I don't recall.
13   Q.  Was anyone with Mike Duffy when you
14 came into contact with him?
15   A.  No.
16   Q.  And what else do you recall on the
17 way to the room, if anything?
18   A.  Nothing else.
19   Q.  Not coming into contact with any
20 other persons?
21   A.  I don't recall anyone else, no.
22   Q.  When you got to the computer
23 forensics lab, can you tell me what happened?
24   A.  One of the people from the forensics

Page 45

1 lab -- my understanding is that there was a
2 problem viewing a video. Mike Duffy was
3 carrying around an all-in-one computer, a hard
4 drive attached to the monitor, and he was
5 seeking assistance to view that video.
6   Q.  And what were the, whoever the tech
7 was at the computer forensics lab assisting him
8 trying to retrieve whatever it was of, a video
9 on the all-in-one computer you referred to?
10   A.  That was my understanding, yes.
11   Q.  Was that your understanding because
12 that was a discussion amongst people there, or
13 was that your understanding because you put it
14 together by what they were doing?
15   A.  We were in the computer forensics
16 division. That was my understanding
17   Q.  Let me ask you: Do you remember who
18 it was that you learned from the fact that there
19 was difficulty retrieving information from that
20 all-in-one computer?
21   A.  Mike Duffy.
22   Q.  During the time that efforts were
23 made to retrieve information from that computer,
24 was there any discussion between or among

12 (Pages 42 to 45)

Page 46

1    anybody in the room?
2       A.   No.  Actually it went pretty quickly.
3       Q.   At the time that you were in this
4    room, do you remember being aware of the name
5    Anthony Abbate, in other words, you had learned
6    it from ADS Kirby prior and on the way down, or
7    was that something that you learned during that
8    meeting?
9       A.   I was not aware of the name at that
10   point.
11      Q.   Did other people arrive other than
12   those people who were in the room when you first
13   got there?
14      A.   There was Deputy Kirby, there was
15   myself, there was Mike Duffy, there was the, I
16   believe it was the computer tech was Sergeant
17   Hudspeth.  I do not know how to spell his name.
18          I don't recall anyone else there
19   at that particular moment.
20      Q.   At some point, did Sergeant Hudspeth,
21   was he successful in retrieving information from
22   the computer?
23      A.   Yes.  He -- almost immediately he was
24   able to get it up.

Page 47

1       Q.   And were you able to view any of the
2    video at that time?
3       A.   Yes.
4       Q.   The first time that you saw anything
5    by way of video footage, had anyone else arrived
6    in the room?
7          MS. McINNIS:  Object to the form of
8    the question.  Other than the people that he's
9    already said were there?
10          MR. PROVENZALE:  Right, anyone else.
11   BY MR. PROVENZALE:
12      Q.   He said he was there, Kirby,
13   Hudspeth, Mike Duffy.  Did anyone else come in
14   prior to the time that you first saw footage?
15      A.   I don't recall anyone else being
16   there.  The door was to my back.  It's a very
17   small room.  I don't recall anybody else there
18   at that particular moment.
19      Q.   What do you recall viewing?  What was
20   the first thing you -- in terms of the totality
21   what you first viewed?  What did you see?
22      A.   What I would know to be a bar, bar
23   scene, people at a bar, sitting at a -- in a
24   tavern.

Page 48

1       Q.   Anything occurring on the video in
2    terms of any criminal conduct?
3       A.   Not at first.
4       Q.   How long of a video do you recall
5    watching before something happened?
6       A.   We watched a couple of minutes
7    before things started happening.
8       Q.   And when you say things started
9    happening, there was some physical confrontation
10   between a male patron in the bar and the
11   bartender; is that correct?
12      A.   Actually there was -- prior to that,
13   there was what appeared to be a confrontation
14   between two males.
15      Q.   All right.  Two of the patrons in the
16   bar, correct?
17      A.   They appeared to be patrons, yes.
18      Q.   While you were watching this, could
19   you hear was there audio with the video?
20      A.   I don't recall audio.
21      Q.   After you -- and did you watch it all
22   the way straight through the first time that you
23   had seen it?  Or did anybody stop it along the
24   way, freeze frame it, slow it down, or anything

Page 49

1    like that?
2       A.   I don't recall anybody stopping it.
3    I believe it just ran normal speed.
4       Q.   Do you recall how the video ended, in
5    other words, at what point it terminated, what
6    was going on in the footage, the first time?  I
7    am talking about the first time you saw it?
8       A.   How it ended?
9       Q.   Yes.  At some point I am sure it
10   stopped playing.  What was going on when it
11   stopped playing?
12      A.   People were moving out of the camera.
13      Q.   Had the confrontation between the
14   bartender and the male patron or person who
15   appeared to be the male patron just completed by
16   the time that the tape stopped, or did it run on
17   for minutes after that point?
18      A.   I don't know if it continued to run.
19   I -- the person that was involved in the
20   confrontation moved out of camera range, and I
21   don't recall seeing anything else after that.
22      Q.   I want to kind of get a handle of
23   when you -- the first time you watched it.  I
24   mean, did you watch it to make sure that nothing

Page 50

1  else came in the picture or to see anything that
2  happened for, you know, 5, 10, 15, 20 minutes
3  after the confrontation occurred between the
4  bartender and this male patron? Or was it more
5  or less right after the confrontation appeared
6  to be over, whoever was playing it, stopped it?
7      MS. McINNIS: Object to the form of
8  the question.
9      THE WITNESS: It wouldn't have been
10 20 minutes after that we -- we watched it.
11 BY MR. PROVENZALE:
12     Q.   Let me ask you: The first time that
13 you watched it, do you recall seeing any Chicago
14 police officers in the footage?
15     A.   No.
16     Q.   Uniformed Chicago police officers?
17     A.   No.
18     Q.   To the best of your recollection,
19 during that first viewing of the footage, the
20 people who were present in the room were
21 yourself, Deb Kirby, Sergeant Hudspeth and Mike
22 Duffy. Is that fair to say?
23     MS. McINNIS: Object; asked and
24 answered.

Page 51

1  BY MR. PROVENZALE:
2      Q.   I am talking for the duration of the
3  time you watched?
4      A.   The duration of the time? Sergeant
5  Stehlik may have arrived at some point in time.
6      Q.   At some point in time, he was in the
7  room and may have been during while the video
8  was playing or shortly after, something like
9  that?
10     MS. McINNIS: Objection;
11 mischaracterizes his testimony.
12     THE WITNESS: I can't answer that
13 with certainty.
14 BY MR. PROVENZALE:
15     Q.   I just want to confirm, at some point
16 in time Sergeant Stehlik was there, correct?
17     A.   I believe so.
18     MS. McINNIS: Object to the form of
19 the question.
20 BY MR. PROVENZALE:
21     Q.   You just don't recall at what point
22 he arrived during the course of time that you
23 were there?
24     A.   I believe he arrived.

Page 52

1      Q.   Do you recall anybody else arriving
2  at any time while you were in that room?
3      A.   No.
4      Q.   So the entire list of attendees in
5  this room and viewing of the video was yourself,
6  Deb Kirby, Sergeant Hudspeth, Mike Duffy and
7  Sergeant Stehlik; is that correct?
8      A.   Possibly Sergeant Stehlik.
9      Q.   Possibly, okay.
10     During the course of the time
11 that -- well, strike that.
12     Did you view it more than once
13 while you were in that room?
14     A.   Yes.
15     Q.   How many times do you recall
16 reviewing any portion of the video, whether it
17 be, you know, just the middle of it or from
18 beginning to end or whatever?
19     A.   At least three times.
20     Q.   Do you remember any -- did you make
21 any comments during any of the playing of the
22 video regarding what you were observing on the
23 video?
24     A.   Just how we were all appalled as to

Page 53

1  what we were watching.
2      Q.   And again, I want to kind of break it
3  down as much as possible. You said we were all
4  you appalled. I am referring specifically to
5  anything you recall you saying specifically?
6      A.   I don't recall specifics of what I
7  said.
8      Q.   Is it fair to say that the general
9  substance of your comments was that you were
10 appalled, you specifically, was that you were
11 appalled by what was depicted in that video?
12     A.   Yes.
13     Q.   Do you recall anything specifically
14 that ADS Kirby had said during any of the
15 viewings of the video while you were all in that
16 room?
17     A.   No.
18     Q.   Did she -- setting aside that you
19 don't recall what she specifically said, do you
20 recall her making any general statements
21 consistent with what your expression was about
22 how you perceived the footage?
23     A.   I couldn't recall anything specific
24 that she said.

14 (Pages 50 to 53)

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 54

1    Q.   Again, we are setting specifics
2  aside.  Do you generally recall that her
3  comments -- well, let me ask you.  Do you recall
4  her making any comments at all during the
5  viewing of the video?
6    A.   She spoke, yes.
7    Q.   Do you recall -- generally, do you
8  recall that her comments were consistent with
9  what you had expressed about the video?
10    A.   Yes.
11       MS. McINNIS:  Object to form.
12  BY MR. PROVENZALE:
13    Q.   Do you recall Mike Duffy making any
14  comments during the course of any of the
15  playings of the video?
16    A.   I don't recall Mike Duffy speaking.
17    Q.   Do you recall Sergeant Hudspeth
18  saying anything during any of the playings of
19  the video?
20    A.   No.
21    Q.   Do you recall Sergeant Stehlik saying
22  anything during the time that any of the videos
23  were played?
24    A.   Again, I don't -- I can't

Page 55

1  specifically state he was there at that
2  particular time.  So, no, I wouldn't recall him
3  saying anything.
4    Q.   After you had watched the video
5  several times, whatever it was two, three times,
6  whatever, was there my conversation as to what
7  was going to be done and how this matter was
8  going to be handled by IAD?
9    A.   At that particular time?
10    Q.   Or OPS?
11       Yes.
12    A.   No.
13    Q.   Tell me what happened once the
14  viewings were done, what happened?
15    A.   The viewings were done.  I went back
16  upstairs to the 5th floor.  Deputy Kirby
17  summoned me into her office.
18    Q.   And what happened there?
19    A.   She called up the Assistant State's
20  Attorney's Office.
21    Q.   And who did she connect with?
22    A.   It was not on speakerphone.  I
23  believe she was talking to Bilyk.
24    Q.   Tom Bilyk?

Page 56

1    A.   I am not sure of his first name.
2    Q.   He was the Assistant State's Attorney
3  in charge of the public integrity unit at the
4  State's Attorney's Office?
5    A.   Yes.
6    Q.   To your understanding?
7    A.   Yes.
8    Q.   Whoever it was, that was the position
9  of that person?
10    A.   Yes.
11    Q.   Could you hear anything that Tom
12  Duffy was saying or whoever -- I'm sorry.  Could
13  you hear anything that Mr. Bilyk was saying on
14  the other end?
15    A.   No.  It was not on speakerphone.
16    Q.   What did you hear ADS Kirby saying?
17    A.   She was trying to explain the
18  situation.
19    Q.   When you say -- what was she saying
20  in substance?  Even if you can't remember
21  specifically, generally what was she describing?
22    A.   She was --
23       (Phone interruption)
24       MS. McINNIS:  I'm sorry, after this

Page 57

1  question, can we take a break so you can check
2  it.
3       THE WITNESS:  It's all right.
4       MS. McINNIS:  You don't need to check
5  it?
6       THE WITNESS:  No, I'm fine.
7       She was relating about the
8  video we had just watched.
9  BY MR. PROVENZALE:
10    Q.   What was she relating about it?
11    A.   What she had just viewed.
12    Q.   Do you recall how -- what was it that
13  she said about it?
14    A.   I couldn't recall specifics.
15    Q.   What about just generally the
16  substance of what she was relating?
17    A.   Just that there was a physical
18  confrontation that she had just viewed on a
19  video.
20    Q.   Did she express -- did she make any
21  comment about what her feelings were about what
22  she had seen and what she was relating about the
23  video?
24    A.   I don't recall specifics.

Page 58

1 Q. How about generally, did she express
2 any type of opinion or feeling to whomever it
3 was on the other end of the phone about what the
4 video depicted?
5 A. I don't recall her expressing
6 feelings.
7 Q. How about opinions?
8 A. No, I don't recall that.
9 Q. Was anybody else in the room at the
10 time that this telephone conversation was going
11 on between Deb Kirby and whom you believe to be
12 Tom Bilyk or Mr. Bilyk?
13 A. Sergeant Stehlik came in to her
14 office at some point. I don't know for certain
15 that she was still in conversation on the phone
16 when he came in.
17 Q. Do you know where Sergeant Stehlik
18 had gone between the time that you left the
19 room -- the computer lab room and the time that
20 you went up into Deb Kirby's office?
21 MS. McINNIS: Object to form and
22 speculation.
23 THE WITNESS: I don't know. I am
24 assuming he went back to his office.

Page 59

1 BY MR. PROVENZALE:
2 Q. Do you know how -- let me ask this:
3 Do you know whether he was summoned to come into
4 Deb Kirby's office or whether he just wandered
5 in?
6 MS. McINNIS: Object to the form of
7 the question.
8 THE WITNESS: I don't recall.
9 BY MR. PROVENZALE:
10 Q. You never called him in; is that
11 correct?
12 A. I don't believe I did, no.
13 Q. Are you aware of whether Deb Kirby
14 called him in?
15 A. Not that I'm aware of.
16 Q. As of the time that Deb Kirby had
17 phoned the State's Attorney Office, at that time
18 were you aware of the name Anthony Abbate?
19 A. I don't recall at what point I became
20 aware of his name.
21 Q. Prior to the time that Deb Kirby had
22 called the State's Attorney's Office, had you
23 had any conversation with her regarding what
24 charges may or may not -- criminal charges may

Page 60

1 or may not have been supported by what was
2 depicted in that video footage?
3 A. Prior to her conversation?
4 Q. Yes.
5 A. No.
6 Q. Again, we are talking about the
7 conversation that she had with whoever she
8 talked to at the State's Attorney's Office whom
9 you believe to be Mr. Bilyk, right?
10 A. Correct.
11 Q. You don't remember any conversation
12 with her about that, correct?
13 A. No.
14 Q. Do you know whether she had any
15 conversation with Sergeant Stehlik prior to the
16 time she placed the phone call to the State's
17 Attorney's Office during which time you were
18 present?
19 MS. McINNIS: Object to form and
20 speculation.
21 THE WITNESS: Not that I'm aware.
22 BY MR. PROVENZALE:
23 Q. Are you aware of whether she had any
24 conversation of what criminal charges may or may

Page 61

1 not have been supported by what was depicted on
2 that video footage outside of your presence
3 prior to the time she called the State's
4 Attorney's Office?
5 MS. McINNIS: Object to form and
6 speculation.
7 THE WITNESS: I wouldn't know what
8 was done outside of my presence.
9 BY MR. PROVENZALE:
10 Q. Well, if she came back, she called
11 you into her office, and she said -- she made
12 some comment about how she had had a
13 conversation with somebody. Then without you
14 having been present during the conversation, you
15 would know about it. Did anything like that
16 occur?
17 A. No.
18 Q. As of the time that ADS Kirby had
19 called the State's Attorney Office, were you
20 aware through any source of whether ADS Kirby
21 had made up her mind about what the appropriate
22 charges were or were not as supported by the
23 evidence depicted on that video footage?
24 MS. McINNIS: Object to speculation

Page 62

1    as to what is in Deb Kirby's mind.
2        THE WITNESS: No. She was calling
3    the State's Attorney's Office for guidance.
4    BY MR. PROVENZALE:
5        Q.   Do you recall ever having any
6    conversation between or among yourself, Sergeant
7    Stehlik and Deb Kirby -- Do you need to take
8    that?
9        A.   No.
10       Q.   Do you recall having any conversation
11   between or among yourself, Deb Kirby and
12   Sergeant Stehlik regarding what the appropriate
13   charges were or were not based upon what was
14   depicted in that video footage prior to the time
15   that Deb Kirby called the State's Attorney's
16   Office that day?
17       A.   I don't recall that.
18       Q.   Do you recall having formed an
19   opinion in your mind of what the appropriate
20   charges were or were not as of the time that Deb
21   Kirby had called the State's Attorney's Office
22   that day?
23       A.   No.
24       Q.   Prior to the time that Deb Kirby

Page 63

1    called the State's Attorney's Office, do you
2    ever recall having a conversation with Sergeant
3    Stehlik between or among yourself, Sergeant
4    Stehlik and Deb Kirby regarding your, or one of
5    their beliefs, based upon their experience with
6    the State's Attorneys that the State's Attorney
7    would charge it one particular way or another,
8    based upon what was on the video?
9        A.   Prior to the phone call?
10       Q.   Yes.
11       A.   No, I don't recall any conversation.
12       Q.   Do you recall during the conversation
13   between ADS Kirby and Mr. Bilyk, or whom you
14   believe to be Mr. Bilyk, that the name Anthony
15   Abbate came up during their conversation, at
16   least at the end of it that you could hear?
17       A.   No.
18       Q.   Do you recall from what you could
19   hear on her end of the conversation becoming
20   aware that there was some discussion going on
21   between the two of them about what the
22   appropriate charges should or should not be
23   based upon what was depicted in that video
24   footage that you had seen?

Page 64

1        A.   I don't know what was going on
2    through Deb Kirby's mind at that time.
3        Q.   I am not asking what's going on in
4    her mind. I am asking from what she was saying,
5    did it become apparent to you during their
6    conversation -- during her conversation with
7    whoever was on the other line that they were
8    discussing what were or were not appropriate
9    charges that would be supported by the evidence
10   that was depicted on the footage?
11       A.   She was talking about seeking the
12   highest possible charge possible.
13       Q.   Did you hear her express either an
14   opinion or a statement of fact about what was
15   the highest in her mind, what was the highest
16   charge possible for what was depicted on that
17   video?
18       A.   I don't recall that.
19       MS. McINNIS: Do you want to take a
20   break?
21       THE WITNESS: No. It's just the
22   office.
23       MS. McINNIS: Let's take a couple of
24   minutes.

Page 65

1        (WHEREUPON, short break was had.)
2    BY MR. PROVENZALE:
3        Q.   During the course of the conversation
4    that Deb Kirby was having with the person whom
5    you believe to be Mr. Bilyk, do you recall
6    learning from her end of the conversation that
7    any decision had been made as to what the
8    appropriate charge was for what was depicted on
9    that videotape?
10       A.   She told me later that the State's
11   Attorney was not authorizing anything in
12   relation to a felony.
13       Q.   And I am not talking about what you
14   might have learned later. I am talking during
15   the course of the conversation, do you remember
16   hearing her end of it and putting together that
17   they had made a decision or a decision was made
18   as to what the appropriate charge should have
19   been?
20       A.   I couldn't hear what the other party
21   was saying. So she would have had to have
22   related that to me.
23       Q.   I am only asking from the end of what
24   you could hear from her, you never learned

17  (Pages 62 to 65)

Page 66

1  anything like that just from hearing her end of
2  the conversation?
3      A.  No, nothing that I could surmise.
4      Q.  That's what I was getting at.
5  Thereafter then she informed you that the
6  State's Attorney had not authorized, is that the
7  phrase you used?
8      A.  They were not authorizing, I don't
9  know if that's the exact word that she used,
10 anything in relation to a felony charge.
11     Q.  Let me ask you as best you can recall
12 specifically, what phrase did she use in terms
13 of expressing the State's Attorney's, whatever
14 it was, either denial or rejection or whatever
15 of felony charges?
16     A.  I don't recall specifics.
17     Q.  Do you recall whether or not,
18 regardless of what the specifics were, did she
19 relate anything to you to the effect of the
20 State's Attorney is not -- in other words,
21 withholding judgment at this time until further
22 investigation could be done?  Or was it your
23 understanding based upon what Deb Kirby had told
24 you that they had just not authorized it at all?

Page 67

1      A.  It was my understanding that the
2  State's Attorney's Office was not interested in
3  any type of felony charge.
4      Q.  At what point did she tell you that
5  that this was the conversation she had with
6  Mr. Bilyk?  Was it like right after the
7  conversation, or when was it?
8      A.  It was shortly thereafter the
9  conversation.
10     Q.  Same day?
11     A.  Oh, yes.
12     Q.  Were you and her still in the office
13 together?
14     A.  I believe we were still in the
15 office, yes.
16     Q.  Do you recall whether Sergeant
17 Stehlik was in the office as of that time?
18     A.  I don't recall.
19     Q.  Other than relating this information
20 about the State's Attorney not authorizing
21 felony charges, was there anything else that was
22 discussed in that conversation after Deb Kirby
23 terminated the phone call?
24     A.  What conversation?

Page 68

1      Q.  The conversation where she related to
2  you what the State's Attorney had decided
3  regarding not authorizing felony charges.  Was
4  there anything else discussed in that
5  conversation that you had with Deb Kirby?
6      A.  I don't recall everything that was
7  said.
8      Q.  Was there any discussion regarding
9  what kind of investigation was going to be done?
10     A.  Investigation?
11     Q.  Investigation into identifying who
12 this individual was, whether there was other
13 witnesses, anything like that?
14         MS. McINNIS:  Object to form.
15         THE WITNESS:  I believe at that point
16 we had a name.
17 BY MR. PROVENZALE:
18     Q.  Do you remember at what point it was
19 that you learned the name between the time that
20 you had come up from the 5th floor, and the time
21 that you were having -- that Deb Kirby had
22 terminated the phone call with Mr. Bilyk?
23     A.  I don't recall exactly when she told
24 me the name.  I don't know.

Page 69

1      Q.  Do you know whether or not she had
2  learned the name during the phone call with
3  Mr. Bilyk?
4      A.  I don't know when she learned the
5  name.
6      Q.  Prior to that time, whenever she had
7  learned it, prior to that time, she hadn't
8  related it to you; is that correct?
9      A.  Prior to the viewing, during the
10 viewing, she had not related it to me.  Sometime
11 after that.
12     Q.  It could have been that prior to the
13 time that you had gone into her office, you had
14 known the name Anthony Abbate as being connected
15 with this bar beating case?
16     A.  It was after I viewed the video.
17 Some time after that.  I don't know when.
18     Q.  So after that, but before -- after
19 you viewed the video, but before Deb Kirby had
20 told you that the State's Attorney had not
21 authorized any felony charges; is that correct?
22     A.  I can't be specific about that.  I
23 don't remember at what point in time she told me
24 the name.

18 (Pages 66 to 69)

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 70

1    Q.    So the best you can say as you sit
2   here today, is after you had viewed the video,
3   but when after that, you don't recall, correct?
4    A.    After I viewed the video, at what
5   particular point in time, I don't recall.
6    Q.    But as you sit here today, you do
7   recall that you were aware of the name Anthony
8   Abbate as of the time that she was discussing
9   with you the context of the State's Attorneys
10  not authorizing felony charges; is that correct?
11   A.    In the subsequent conversation, yes.
12   Q.    When you say subsequent conversation,
13  you mean subsequent to the phone call, right?
14   A.    Yes.
15   Q.    So aside from that fact, now that you
16  knew who Anthony Abbate was, was there any
17  discussion that you had with Deb Kirby or
18  Sergeant Stehlik in Deb Kirby's office regarding
19  what investigation would be done in connection
20  with the case?
21   A.    I didn't know who Anthony Abbate was.
22   Q.    You'll have to forgive me because I
23  thought you just said that you were aware of his
24  name at that time?

Page 71

1    A.    The name, the name.  You are saying
2   that I knew who he was.  I did not know who he
3   have.
4    Q.    I don't want to be --
5    A.    When I was made aware of his name.
6   Now you can ask the question.
7    Q.    As of the time that you were aware of
8   his name --
9    A.    Okay.
10   Q.    -- you were sitting in Deb Kirby's
11  office after the phone call with Tom Bilyk that
12  she had, correct?
13   A.    Correct.
14   Q.    Did you and she have a conversation
15  about what the appropriate investigation was
16  going to be regarding Anthony Abbate's
17  involvement in this bar beating?
18       MS. McINNIS:  Object to form as far
19  as investigation.  It's undefined.
20       THE WITNESS:  Not at that particular
21  time, no.
22  BY MR. PROVENZALE:
23   Q.    As of that point in time, are you ~
24  aware of whether or not she had made a decision

Page 72

1   regarding assignment of that investigation to
2   any particular division within IAD?
3    A.    That investigation was already
4   assigned to OPS.
5    Q.    Because it was an excessive force
6   allegation, it was an OPS case as far as you
7   understood?
8    A.    Yes.
9    Q.    Do you know why at that point IAD was
10  involved?
11   A.    I believe that OPS asked Internal
12  Affairs for assistance.
13   Q.    Regarding what?
14   A.    OPS cannot do anything criminal.
15  They have no powers, and we were being asked to
16  help them with the criminal investigation.
17   Q.    Was that something directly from Mike
18  Duffy to your understanding, or who did it come
19  from?
20   A.    I don't know who it came from.
21   Q.    How did you learn that OPS had made a
22  request for assistance?
23   A.    Deputy Kirby.
24   Q.    When did she tell you that?

Page 73

1    A.    Some time that evening.
2    Q.    Did she tell you the scope of that
3   assistance that was requested?
4    A.    At some point she did meet with me
5   and tell me what she wanted me to do, yes.
6    Q.    At what point did she do that?
7    A.    It was after the phone conversation
8   with the State's Attorney's Office.
9    Q.    When after?
10   A.    Shortly thereafter.  I couldn't be
11  specific as to times.
12   Q.    The same day?
13   A.    Same day, yes.  Everything happened
14  the same day.
15   Q.    I mean, this was all very late at
16  night, right?
17   A.    Yes, it was.
18   Q.    And it was -- you were called into
19  the office after your shift had ended, correct?
20   A.    I should have been already done with
21  my dinner at home, yes.
22   Q.    And so what I want to be specific
23  about is in terms of your going to headquarters,
24  viewing the video, going up to Deb Kirby's

19 (Pages 70 to 73)

Page 74

1 office and then having this conversation after
2 the phone call with -- after her phone call with
3 Mr. Bilyk all occurred on this same day that you
4 were called in, correct?
5 A.   Yes.
6 Q.   As I understand it, the substance of
7 the conversation, the post-phone call
8 conversation that you recall as you sit here
9 today in its entirety was simply limited to Deb
10 Kirby advising you that the State's Attorney had
11 not authorized any felony charges; is that
12 correct?
13 A.   They were not interested in pursuing
14 any type of felony charges.
15 Q.   Were you aware of any -- were there
16 any other subjects or topics discussed during
17 that post-phone call conversation that you had
18 with Deb Kirby in her office?
19 A.   I don't recall anything else in her
20 office.
21 Q.   All right.  How about for the
22 remainder of the time that you were at
23 headquarters for the rest of that night.
24 A.   Yes, there were further

Page 75

1 conversations.
2 Q.   What's the next conversation that you
3 recall occurring after that initial post-phone
4 call conversation where she related to you that
5 the State's Attorney was not authorizing felony
6 charges?
7 A.   She asked me to put together people
8 to dispatch to -- one location was to go and
9 interview the victim in this matter to be
10 interviewed for criminal charging to determine
11 probable cause.  And the second function that
12 she directed me to do was to go out and to
13 attempt to locate Officer Abbate.
14 Q.   Was it during this conversation where
15 she was telling you investigative steps that she
16 wanted you to take care of or your division, I
17 take it is what she was talking about, right, to
18 take care of?  Not you personally, but your
19 investigators, right?
20 A.   Right.
21 Q.   Was it during this conversation that
22 she had with you when she was telling you what
23 investigative steps she wanted to be handled by
24 you or your division that she related to you

Page 76

1 that Mike Duffy had requested this assistance or
2 that OPS had requested the assistance?
3 A.   I don't recall at what point she told
4 me that we were assisting OPS in their
5 investigation.
6 Q.   As of the time that you had this
7 conversation with Deb Kirby, do you remember
8 being aware that the assistance was -- that your
9 involvement was as an assist at the request of
10 OPS because there were criminal charges
11 involved, or it was just your assumption that
12 that was the case?
13 A.   More likely than not, an assumption.
14 Q.   As you sit here today, you don't
15 recall that Deb Kirby had filled you in on that
16 ever, or it was just your assumption always, or
17 at some point she actually did?
18 A.   She told me that we were going to
19 assist OPS.  I know from knowledge that OPS
20 cannot do criminal investigations.
21 Q.   Let me just put it to you this way:
22 To the best of your recollection, at what point
23 did Deb Kirby tell you that, aside from that
24 being your assumption because that's your

Page 77

1 experience?
2 A.   It would be after the phone
3 conversation with the State's Attorney's Office.
4 Q.   As you sit here today, you don't
5 recall whether it was during this -- during or
6 prior to this conversation you had with Deb
7 Kirby where she is telling you what
8 investigative steps she wants the general
9 investigation section to take; is that correct?
10 A.   It would have been prior to that.
11 Q.   Okay.  That's all I wanted to know.
12 At that time your -- Detective
13 Dion Boyd, he worked in IAD, correct?
14 A.   He was assigned to Internal Affairs,
15 yes.
16 Q.   He was assigned to the confidential
17 investigation section?
18 A.   Yes.
19 Q.   And that would have been the section
20 that was -- that Lieutenant Calloway was in
21 charge of, correct?
22 A.   Yes.
23 Q.   Any time prior to the time that Deb
24 Kirby had told you that she wanted you to have

20 (Pages 74 to 77)

Page 78

1 somebody go out and interview the victim, and
2 she told you that she wanted you to go and
3 locate Anthony Abbate, had you had any
4 conversation with either Deb Kirby while
5 Lieutenant Calloway was present or with
6 Lieutenant Calloway directly regarding the
7 Anthony Abbate incident?
8    A.   I never saw Lieutenant Calloway that
9 evening. I did not talk to Lieutenant Calloway
10 that evening.
11    Q.   After Deb Kirby had given you these
12 assignments of things she wanted to be done, did
13 you have any subsequent conversation with
14 Lieutenant Calloway the next day or thereafter
15 regarding specifically accomplishing these
16 requests?
17    A.   I don't believe so, no.
18    Q.   Did you assign to anyone the
19 responsibility to interview the victim?
20    A.   Yes.
21    Q.   Who did you assign that to?
22    A.   That assignment went to Sergeant
23 Stehlik and Sergeant -- or Detective Boyd.
24    Q.   Was that an assignment that you made

Page 79

1 for Detective Boyd, or was it -- I mean, how did
2 he get involved, given that he is in a different
3 investigative section than you?
4        MS. McINNIS: Objection to form and
5 speculation.
6        If you know?
7        THE WITNESS: I believe Deputy
8 Kirby -- because at the time that this was
9 happening, I have a very limited staff on
10 afternoons, and we needed some other help, and I
11 believe that Deputy Kirby reached out to the
12 confidential section for additional people.
13 BY MR. PROVENZALE:
14    Q.   Is it fair to say that this is the
15 first occasion in your experience of working at
16 IAD -- strike that.
17        This is the only occasion up to
18 this point in your assignment to IAD where a
19 manpower shortage required having to borrow an
20 investigator from another section?
21        MS. McINNIS: Object to the form of
22 the question.
23        THE WITNESS: Are you saying the only
24 time?

Page 80

1    MR. PROVENZALE: Yes.
2        THE WITNESS: No. We have helped out
3 before.
4 BY MR. PROVENZALE:
5    Q.   On a manpower issue, on a shortage of
6 manpower issue? I am not talking about --
7        MS. McINNIS: Same objection to form.
8        THE WITNESS: Needed additional
9 manpower, yes, we have helped out each other,
10 yes.
11 BY MR. PROVENZALE:
12    Q.   How many times prior to the February
13 of 2007 were you aware that investigative
14 sections in IAD loaned their personnel to other
15 investigative sections because of manpower
16 shortages?
17        MS. McINNIS: Object to form.
18        THE WITNESS: It's not so much a
19 manpower shortage. It's needing additional
20 bodies.
21        I'm aware of one time where I had to
22 loan some of my investigators to confidential
23 section for three days for surveillance
24 purposes.

Page 81

1 BY MR. PROVENZALE:
2    Q.   Prior to February of '07?
3    A.   Yes.
4    Q.   Prior to February of '07 was there
5 ever an occasion where you had to borrow bodies
6 from other sections to assist some investigation
7 that was assigned to your division?
8    A.   I have utilized detectives from the
9 confidential section, yes.
10    Q.   Well, aside from utilizing them as a
11 result of a need for bodies, not just because
12 you used them to carry out some investigative
13 function that they are more accustomed to do,
14 but specifically because you didn't have the
15 bodies to do it?
16    A.   I needed additional people that
17 night, yes.
18    Q.   And when did that occur prior to
19 February of '07?
20    A.   No. February of '07?
21    Q.   I am talking about prior to February
22 of '07?
23    A.   I don't recall specific incidents.
24    Q.   As of the time that you had requested

21 (Pages 78 to 81)

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 82

1    the assistance of the confidential investigation
2    section to loan you a body --
3        A.   I did not make that request.
4        Q.   Well, who -- you are saying ADS Kirby
5    had made that request?
6        A.   I believe so, yes.
7        Q.   Prior to the time that that request
8    had been made, are you aware of whether or
9    not -- strike that.
10           Were you specifically aware of any
11   allegation in connection with this Anthony
12   Abbate's involvement in the bar beating that
13   indicated that Mr. Abbate after the bar beating
14   had threatened the bar owner or the bartender
15   with false arrest or planting drugs on them?
16       A.   Was I aware of that?
17       Q.   Yes.
18       A.   No, never.
19       Q.   Any time after you had met with Deb
20   Kirby when she had given you the instructions of
21   what investigative steps she wanted,
22   interviewing the victim and locating Mr. Abbate,
23   did you ever learn that there was allegations
24   made by anybody who was a witness to this

Page 83

1    incident or connected to the bar that Mr. Abbate
2    had communicated threats of false arrest or
3    planting drugs on them or bar patrons?
4        A.   I have never heard that, no.
5        Q.   Prior to the time that Detective Boyd
6    and Sergeant Stehlik went out to interview the
7    victim, did you have any conversation with
8    either one of them about what you wanted done?
9        A.   General conversation, yes.
10       Q.   With either one or both of them?
11       A.   I believe both of them were in the
12   office.
13       Q.   And at that time, what did you tell
14   them?
15       A.   I believe I gave them the information
16   on the victim, and they were instructed to
17   attempt to locate her, and interview her in
18   regards to her criminal complaint.
19       Q.   At that time when you met with them,
20   this would have been the day following that
21   night that you were in the headquarters looking
22   at the video and everything else you have
23   testified about that night. Correct?
24       A.   It was the same night.

Page 84

1        Q.   It was the same night when you met
2    with Detective Boyd and Sergeant Stehlik?
3        A.   Yes. We responded immediately.
4        Q.   At that time, do you recall having
5    any of the investigative documentation that had
6    been compiled by OPS prior to that night?
7        A.   I was not in possession of any of
8    that, no.
9        Q.   Prior to the time that you sent
10   Detective Boyd and Sergeant -- that you gave
11   them the assignment to go and interview the
12   victim, had you ever seen any documents from OPS
13   relating to statements that the victim had made
14   or any other witness had made regarding what had
15   occurred in the bar that night?
16       A.   No.  OPS was conducting an
17   administrative investigation, and I cannot see
18   that.
19       Q.   Were you aware as of the time that
20   you had instructed Sergeant Stehlik and
21   Detective Boyd to go interview the victim that
22   the victim had already given a sworn statement
23   to OPS?
24       A.   That would have been an

Page 85

1    administrative. I was sending out Stehlik and
2    Boyd for criminal.
3        Q.   At the time that you had given them
4    the assignment to go and take the victim's
5    statement, were you aware that the victim had
6    already given a sworn statement to OPS?
7        A.   No.
8        Q.   Do you know whether or not Detective
9    Boyd or Sergeant Stehlik were aware of anything
10   like that?
11           MS. McINNIS: Objection; speculation.
12           THE WITNESS: Not that I'm aware.
13   BY MR. PROVENZALE:
14       Q.   Were you aware of whether they had
15   reviewed anything like that prior to the time
16   they went out and interviewed the victim?
17       A.   Not that I'm aware of.
18       Q.   Other than directing them to go out
19   and interview the victim, was there any other
20   direction that you gave them with respect to
21   meeting with the victim?
22       A.   No.
23       Q.   Was their sole -- in your
24   understanding, was their sole responsibility

22 (Pages 82 to 85)

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 86

1  that you would assign them to do was just to go
2  out and take a statement from the victim?
3      A.  In regards to the criminal
4  investigation, yes.
5      Q.  Correct.
6          At that time when you had sent
7  them out, was it your understanding that they
8  were to obtain the victim's -- the victim --
9  strike that.
10         At the time that you sent them
11 out, was it your understanding in your
12 assignment to them that they were to obtain the
13 signed complaint from the victim against Anthony
14 Abbate?
15     A.  Yes, and seek the highest possible
16 charge that we could.
17     Q.  Which was what?
18     A.  Which was what?
19     Q.  Right.
20     A.  At that time, we didn't know what the
21 highest charge would be.
22     Q.  Well, when you told them to go out
23 and take the victim's statement, did you tell
24 them to prepare any form complaints for her to

Page 87

1  sign?
2      A.  I don't remember those specific
3  instructions.
4      Q.  Did you tell them that they should
5  prepare a complaint for battery, take it out to
6  her and have her sign it and bring it back?
7      A.  I believe that they were told that if
8  she would sign a complaint, to have one signed,
9  yes.
10     Q.  Complaint for what?
11     A.  I -- that was to be determined by
12 them.
13     Q.  By whom?
14     A.  Detective Boyd and Sergeant Stehlik.
15     Q.  And what?
16     A.  They were the preliminary
17 investigators in a criminal matter.
18     Q.  What were they to base their decision
19 on what to charge on?  On her statement alone?
20     A.  She was the alleged victim, yes.
21     Q.  Other than their taking a statement
22 of the victim, and Sergeant Stehlik possibly
23 having viewed the video, I mean as -- let me ask
24 you this.

Page 88

1          Let me back up:  As of the time
2  you had sent them out to go and interview the
3  victim, were you aware Sergeant Stehlik had seen
4  the video?
5      A.  At that point, yes, I believe he had
6  seen the video.
7      Q.  And to the best of your
8  recollection -- in fact, he had even come into
9  the room at some point during the time that Deb
10 Kirby was talking with Mr. Bilyk in her office;
11 is that correct?
12         MS. McINNIS:  Objection to form,
13 mischaracterizes his prior testimony.
14         THE WITNESS:  I don't know at what
15 point he came in.  I do believe he was in the
16 office.
17 BY MR. PROVENZALE:
18     Q.  Are you aware of whether or not
19 Sergeant Stehlik knew that the State's Attorney
20 had told Deb Kirby that they were not
21 authorizing felony charges?
22         MS. McINNIS:  Object to form;
23 speculation.
24         THE WITNESS:  I don't know what

Page 89

1  Sergeant Stehlik was aware of that evening in
2  regards to that conversation.
3  BY MR. PROVENZALE:
4      Q.  Did you ever tell him that the
5  State's Attorney was not authorizing felony
6  charges prior to the time or during the time
7  that you were giving him the assignment to go
8  out and interview the victim?
9      A.  I don't recall that conversation.
10     Q.  You don't recall the conversation,
11 meaning you don't recall whether you had told
12 him that or not?
13     A.  I don't recall telling him whether or
14 not the State's Attorney was even interested in
15 reviewing the matter for felony charges.
16     Q.  When you told him that he should go
17 and interview the victim and file the most -- or
18 most serious charges -- what was the phrase you
19 used?
20     A.  Highest possible charge.
21     Q.  Highest possible charges.  Did you
22 tell him the highest possible charges except any
23 felonies?
24     A.  No.

23  (Pages 86 to 89)

Page 90

1    Q.   You just told him the highest
2  possible charges, correct?
3    A.   Yes.
4    Q.   Was there any discussion between or
5  among yourself, Detective Boyd and Sergeant
6  Stehlik, when you gave them this assignment as
7  to what you thought the appropriate charge was?
8    A.   I would not have an opinion as to
9  that without interviewing the alleged victim,
10  and I was not doing that.
11    Q.   What information were you expecting
12  to obtain from the alleged victim that wasn't
13  depicted on the video that was going to assist
14  in some way in determining what the appropriate
15  charge was?
16    A.   Extent of injuries.
17    Q.   As of that time, no one had told you
18  what the extent of her injuries were?
19    A.   No.
20    Q.   Deb Kirby hadn't told you?
21    A.   No.
22    Q.   Mike Duffy hadn't told you?
23       MS. McINNIS: Objection; asked and
24  answered.

Page 91

1       MR. PROVENZALE: You can answer.
2       THE WITNESS: No.
3  BY MR. PROVENZALE:
4    Q.   Is it your understanding that in the
5  assignment, your understanding of the assignment
6  that you had given the two of them, is that they
7  were to go out, interview the victim, make their
8  own assessment as to what were the highest
9  possible charges, have her sign a blank
10  complaint form, and then bring it back and then
11  fill it in and then process the charges?
12       MS. McINNIS: Objection; compound
13  form.
14       THE WITNESS: A lot of questions
15  there.
16  BY MR. PROVENZALE:
17    Q.   Well, you can answer it unless I
18  mean --
19    A.   Can you rephrase the question?
20    Q.   How would you like me to rephrase it?
21  I am trying.
22    A.   One at a time.
23    Q.   Was it your understanding that in the
24  assignment that you were giving them, they were

Page 92

1  to go out, and No. 1, interview the victim?
2    A.   Correct.
3    Q.   No. 2, make an assessment based upon
4  their law enforcement experience as to what the
5  highest possible charges are that are supported
6  by her statement that she gives them?
7    A.   Her statement and the evidence, yes.
8    Q.   And whatever they may have seen on
9  the video, correct?
10    A.   Yes, and extent of injuries.
11    Q.   And to assess the extent of injuries,
12  whatever the evidence was that she said that in
13  their assessment would support whatever the
14  highest possible charges were.  Correct?
15    A.   Correct.
16    Q.   And then to have her sign a blank
17  complaint form, correct?
18    A.   No one was ever instructed to sign a
19  blank complaint form.
20    Q.   Was she to sign a complaint form?
21  Was that one of their responsibilities was to
22  have her sign a complaint form when they went to
23  interview her?
24    A.   I believe the instructions were to

Page 93

1  ascertain whether she was willing to sign a
2  complaint.
3    Q.   And having established her
4  willingness, and assuming she was willing to do
5  so, to then do what?
6    A.   I did not give those instructions.  I
7  did not -- they are experienced police officers.
8  They would know what to do.
9    Q.   But this was all sort of -- in your
10  understanding, the assignment was a fluid
11  process.  They were to take it step-by-step and
12  then move on from there, and not take anything
13  as presumed in terms of what she was going to
14  say, and what she wasn't going to say that might
15  support criminal charges, correct?
16       MS. McINNIS: Object to the form.
17       THE WITNESS: I don't know what you
18  mean by presumed.  She presumed?
19       MR. PROVENZALE: No.  They presumed
20  when they went out to talk to her.
21       THE WITNESS: There was no
22  presumption on their part.
23  BY MR. PROVENZALE:
24    Q.   There shouldn't have been any

Page 94

1  presumption to them on what their appropriate
2  charges were prior to talking to her, at least
3  in your understanding of the assignment,
4  correct?
5      A.  Correct.
6      Q.  In your mind, it would have been
7  inappropriate for them to have given her a blank
8  complaint form to simply sign and then to later
9  fill it in, correct?
10     A.  In my mind?
11     Q.  Yes.
12     MS. McINNIS:  Object to the form of
13  the question.
14         Could you read that back.
15         (WHEREUPON, said record was
16         read back, as requested.)
17  BY MR. PROVENZALE:
18     Q.  In your mind, it would have been
19  inappropriate for them to have presented the
20  victim with a blank complaint form for her
21  signature for them to fill it in with the
22  charges and the allegations at some later time,
23  correct?
24     MS. McINNIS:  Object to form;

Page 95

1  speculation and incomplete hypothetical.
2      THE WITNESS:  I would not present a
3  blank complaint form without filling it in.
4  BY MR. PROVENZALE:
5      Q.  I mean a complaint form itself is a
6  verification that the allegations are true and
7  correct by the complainant, correct?
8      A.  Yes.
9      Q.  So it would be inappropriate under
10 any circumstances to have ask someone to sign a
11 blank complaint form only to be filled out at a
12 later point when that -- when the person signing
13 isn't present, correct?
14     MS. McINNIS:  Objection to
15 speculation, incomplete hypothetical as to what
16 others would do.
17         You can go ahead and answer.
18     THE WITNESS:  I don't know what they
19 did.
20 BY MR. PROVENZALE:
21     Q.  I am asking you just in terms of
22 matter of procedure in general.  It would be
23 inappropriate for an officer to have a
24 complainant sign a blank complaint form without

Page 96

1  the allegations filled in, only for the officer
2  to fill in the allegations at a later point
3  because the person wouldn't be swearing to
4  anything if it was blank.  Correct?
5      A.  Yes, correct.
6      Q.  You have testified that you did not
7  know at the time that you had given these two
8  individuals, Sergeant Stehlik, Detective Boyd
9  the assignment to go and take the victim
10 statement that you were not aware that the
11 victim had given a sworn statement to OPS; is
12 that correct?
13     A.  I was not aware of that.
14     Q.  Is that something that you would have
15 wanted to have been aware of and that you would
16 want your investigators to be aware of so that
17 they could prepare to question and take a
18 statement from the witness --
19     MS. McINNIS:  Objection.
20     MR. PROVENZALE:  -- or the victim?
21     MS. McINNIS:  Object to speculation;
22 incomplete hypothetical.
23     THE WITNESS:  We were conducting a
24 criminal investigation.  OPS was conducting an

Page 97

1  administrative investigation.  They are two
2  different things.
3  BY MR. PROVENZALE:
4      Q.  So someone who gives a sworn
5  statement, in your mind, in an OPS investigation
6  has no impact on a criminal investigation, is
7  that correct, that IAD conducts?
8      A.  That's not what I am saying.
9      Q.  Well, as an investigator, wouldn't
10 you have wanted to have known if a witness whom
11 or an alleged complainant whom you are going to
12 interview had already given a sworn statement
13 about what you were going to ask them questions?
14     A.  We could not charge criminally on
15 what she told OPS in an administrative
16 investigation.  They had to conduct their own
17 interview.
18     Q.  I am not questioning that.  What I am
19 saying is wouldn't you have wanted to know what
20 she had told OPS before you go out and talk to
21 her in connection with the criminal?
22     A.  That would not have biased my
23 thoughts.
24     Q.  What she said under oath on another

25. (Pages 94 to 97)

Page 98

1  occasion would have biased your thoughts on what
2  questions you were going to ask her in your
3  criminal investigation?
4      A.  It may.
5      Q.  So in your mind, a valid
6  investigation includes not being aware of other
7  statements that a person has made?
8      A.  You asked me if I wanted to know.
9      MS. McINNIS:  Mischaracterizes his
10 testimony, incomplete hypothetical and
11 argumentative.
12 BY MR. PROVENZALE:
13     Q.  You had also mentioned that the other
14 request that Sergeant -- that ADS Kirby had
15 given you was to locate Mr. Abbate; is that
16 correct?
17     A.  Correct.
18     Q.  Whom did you assign that
19 responsibility to?
20     A.  Sergeant Maraffino and Sergeant
21 Martin.
22     Q.  And both of those officers were in
23 the general investigation section, correct?
24     A.  Yes.

Page 99

1      Q.  Both of them have investigative
2  experience, correct?
3      A.  Yes.
4      Q.  To your knowledge, prior to their and
5  during their assignment in IAD, they have
6  interviewed witnesses and victims?
7      A.  I would assume so, yes.
8      Q.  Can you tell me in terms of your
9  assignment of these responsibilities why it was
10 that you picked Sergeant -- Detective Boyd to
11 conduct the investigative interview portion of
12 what ADS Kirby had requested you to do, as
13 opposed to having Sergeant Maraffino or Martin
14 accompany Sergeant Stehlik to do that?
15     A.  Deputy Kirby is the one who assigned
16 Detective Boyd because of his experience to go
17 interview the victim.
18     Q.  Did you have a conversation with her
19 that let you know that it was because of his
20 experience that she made that assignment, or is
21 that your assumption?
22     A.  She told me that he was going to go
23 interview her.
24     Q.  Right.  Did she say I am having him

Page 100

1  go to interview her because of his experience?
2      A.  He was a detective.  I assumed that
3  is why she picked him.
4      Q.  It's your assumption that she
5  assigned him because of his experience; is that
6  correct?
7      A.  Yes.
8      Q.  As of the time that you had assigned
9  Sergeants Maraffino and Martin to locate
10 Mr. Abbate, had you done any investigate legwork
11 to identify how he could be located?
12     A.  We looked up, obviously, his
13 assignment, where he was assigned.
14     Q.  When you say "we did," who do you
15 mean by we?
16     A.  It's a general term for the general
17 investigation section.  I don't know who
18 actually went onto the computer to look it up,
19 but at some point we had to find out where he
20 was assigned.
21     Q.  IAD has a computer database that has
22 access to the officers' home phone number, cell
23 phone number, home address, district of
24 assignment, shift assignment?

Page 101

1      A.  I don't believe we have access to
2  cell phone numbers.  I believe we have to get
3  that from the district of assignment.
4      Q.  But you have the district of
5  assignment, correct, and access to that
6  information in the computers at IAD?
7      A.  Yes.
8      Q.  And you have access to information as
9  to their home address in the computers at IAD,
10 correct?
11     A.  Yes.
12     Q.  And their shift assignment, as well,
13 correct?
14     A.  Shift assignment, furlough
15 selections, day off group.
16     Q.  Did you contact the 20th District, or
17 did somebody else contact the 20th District
18 prior to the time that you -- or had anybody
19 prior to the time you were --
20     A.  20th District was not contacted.
21     Q.  Do you know who, if anybody,
22 contacted the 20th District after you gave the
23 assignment to Maraffino and Martin?
24     A.  By contact, you will have to describe

26 (Pages 98 to 101)

Page 102

1   contact.
2        Q.   Calling over there or going over
3   there to inquire where is he at, is he on shift
4   right now, did he call in sick, where is he?
5        A.   Sergeant Martin and Sergeant
6   Maraffino drove to the 20th District.
7        Q.   And at that time, did they -- did you
8   come to learn later that they did not locate him
9   because he had called in sick or he had shown up
10  and left sick?
11       A.   Yes, I subsequently learned that,
12  yes.
13       Q.   How did you learn that?
14       A.   I believe Sergeant Maraffino was the
15  one who called me.
16       Q.   And did he call you while he was --
17  At what point did he call you?
18       A.   I'm assuming it was shortly after his
19  arrival in the 20th District.
20       Q.   So it was -- did the assignment and
21  then the phone call that you received back from
22  Sergeant Maraffino occur on the same day?
23       A.   Yes.
24       Q.   At that point, did he tell you what

Page 103

1   they were going to do to try to locate him since
2   he wasn't at work?
3        A.   I gave them instructions.
4        Q.   What did you tell them to do?
5        A.   I told them to try his house.
6        Q.   Did they call you and let you know
7   what they had found out?
8        A.   Yes.
9        Q.   What did they tell you?
10       A.   Told me that there was no response at
11  the door.
12       Q.   Then did you give them further
13  instructions at that point?
14       A.   I instructed them to try the father's
15  house.
16       Q.   Do you know whether they found him
17  there?
18       A.   They did not.
19       Q.   Did you give them any other
20  instructions to attempt to locate him?
21       A.   Our attempts at that point were
22  exhausted. We had no other knowledge as to
23  where he may have been.
24       Q.   At no time did you or anyone or

Page 104

1   Sergeant Maraffino or Sergeant Martin call the
2   20th District to ask for Mr. Abbate's cell phone
3   number; is that correct?
4        A.   I don't know that. I don't know.
5        Q.   Well, did you?
6        A.   I did not, no.
7        Q.   Did you instruct either one of them
8   to do that?
9        A.   No.
10       Q.   Did you instruct either one of them
11  to call the 20th District to find out -- to
12  speak with his regular partner to find out if
13  that person might know where he is at?
14       A.   I believe some time that evening
15  there was a conversation with his partner of
16  that evening.
17       Q.   Who had that conversation?
18       A.   I believe it was Sergeant Maraffino
19  and Sergeant Martin, but I can't be certain.
20       Q.   Was it in person or over the phone,
21  do you know?
22       A.   I don't recall.
23       Q.   How was it that you learned that
24  either one of them had had a conversation with

Page 105

1   the person who was to have been Mr. Abbate's
2   partner that evening?
3        A.   Through conversation with either one
4   of them.
5        Q.   Do you remember was it telephonic, or
6   it was in person when they told you this
7   information?
8        A.   It would have been telephonic.
9        Q.   What did they tell you that the
10  individual, his partner that evening, had told
11  them about where Mr. Abbate was or might have
12  been?
13       A.   I don't believe that they asked or he
14  told them that. I believe the gist of the
15  conversation was as to why he suddenly had left
16  work that evening, claiming to be ill, I believe
17  it was.
18       Q.   And what did that person provide by
19  way of information about that?
20       A.   He had no clue. My understanding was
21  that Mr. Abbate had received a phone call and
22  suddenly asked to be taken into the station.
23       Q.   He had received a phone call on his
24  cell phone while they were out on patrol?

27 (Pages 102 to 105)

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 106

1    A.  Yes.
2    Q.  What other information did either
3  Sergeant Maraffino or Sergeant Martin relay to
4  you about the conversation they had with this
5  individual other than that?
6    A.  I don't recall anything else
7  specifically.
8    Q.  To your knowledge, they did not ask
9  this individual where he -- where Mr. Abbate may
10  have been at that time?
11    A.  I don't know if they asked that.
12    Q.  You don't know -- do you know whether
13  or not they asked this individual, who is his
14  partner, whether he had Mr. Abbate's cell phone?
15    A.  I don't know if they asked that.
16    Q.  Do you know how it was that Sergeant
17  Maraffino and Sergeant Martin had come into
18  contact with this partner?
19    A.  I believe it was in the station.
20    Q.  What I mean -- let me be more clear
21  about it.
22        Was it at your request that they
23  follow up with this individual, or did they do
24  that on their own as a next step of attempts to

Page 107

1  locate Mr. Abbate?
2    A.  I believe that it was on their own.
3    Q.  Do you recall whether or not either
4  of those -- either Sergeant Maraffino or
5  Sergeant Martin ever made paper on this
6  conversation that they had with the partner?
7    A.  I don't recall.
8    Q.  Do you recall ever asking them to
9  create a To/From or just a general report on it?
10    A.  I believe that they did general
11  reports on their attempt to locate.
12    Q.  Regarding having spoken with the
13  partner?
14    A.  I don't know if that was contained in
15  that report.
16    Q.  That's what I am asking you is in
17  terms of their reporting on the results of their
18  attempt to locate Mr. Abbate, those would have
19  been submitted to you for approval, correct?
20    A.  Yes.
21    Q.  Do you recall in connection with
22  reviewing any of those reports that they
23  submitted to you for approval that you directed
24  them to include information that they had failed

Page 108

1  to include?
2    A.  Can you say that again.
3    Q.  Yes.  In any of the reports that they
4  submitted to you summarizing their efforts to
5  locate Mr. Abbate, after this initial request
6  that you had given them during the conversation
7  that you were talking about when you assigned
8  them the responsibility to locate Mr. Abbate,
9  did you ever give the report back to them and
10  tell them, hey, you forgot to include
11  circumstances regarding your conversation with
12  the partner where he advised you that Abbate had
13  received a phone call and left suddenly?
14        MS. McINNIS:  Object to form; vague.
15        THE WITNESS:  I don't believe I ever
16  gave back reports.
17  BY MR. PROVENZALE:
18    Q.   As you sit here today, do you recall
19  any report that was submitted to you by either
20  Sergeants Maraffino or Martin detailing the
21  information that you just testified about that
22  they told you -- one or the other told you over
23  the phone that Mr. Abbate had received a phone
24  call while on patrol and then went back to the

Page 109

1  station and left work?
2        MS. McINNIS:  Objection; asked and
3  answered.
4        THE WITNESS:  I don't recall that.
5  BY MR. PROVENZALE:
6    Q.   Did you ever speak directly with
7  Captain Anderson at the 20th District?
8    A.   Yes, I have spoken with Captain
9  Anderson.
10    Q.   In connection with this
11  investigation?
12    A.   Yes.
13    Q.   When did you have that conversation
14  with him?
15    A.   It was a couple of days later,
16  possibly.
17    Q.   A couple of days later from what?
18    A.   From the first night of when I
19  dispatched Sergeant Maraffino and Sergeant
20  Martin to the 20th District.
21    Q.   And when you spoke with Captain
22  Anderson, what did you talk with Captain
23  Anderson about?
24    A.   She -- Oh, by that time, everything

28  (Pages 106 to 109)

Page 110

1  had been out, and she was just relating to me
2  that she couldn't believe that he had run into
3  the station the way he did and told her that he
4  was going home, and he literally ran down the
5  hall.
6      Q.  When you say everything was out, what
7  do you mean by that, everything was out?
8      A.  That he was being -- we were
9  attempting to locate him.
10     Q.  Was it your understanding through
11 your conversation with Captain Anderson that she
12 was relating to you that Mr. Abbate was aware
13 that IAD was looking for him?
14         MS. McINNIS:  Objection.
15 BY MR. PROVENZALE:
16     Q.  Is that what you understood her to
17 say?
18         MS. McINNIS:  Object to the form of
19 the question; speculation.
20         THE WITNESS:  She never said that.
21 BY MR. PROVENZALE:
22     Q.  You related some -- you related that
23 she told you there was some relationship between
24 everything being out and him running through the

Page 111

1  station and leaving ship abruptly; is that
2  right?
3      A.  No, that's not correct.
4          MS. McINNIS:  Objection.
5  BY MR. PROVENZALE:
6      Q.  Clear it up for me so I understand
7  it.  She was telling you that everything was
8  out, explain that to me?
9      A.  When we talked a couple of days
10 later.
11     Q   Yes.
12     A.  At that time, everyone knew that we
13 were looking for Mr. Abbate.
14     Q.  And then she was just relating that
15 back to understanding why he was -- in her mind,
16 why he was running out of the station?
17         MS. McINNIS:  Objection to form,
18 speculation as to what was in her mind.
19         THE WITNESS:  I don't know what was
20 in her mind.  I don't believe she said that.
21 BY MR. PROVENZALE:
22     Q.  What you understood her to be saying.
23 What was she relating that fact that it was out
24 that IAD was looking for Mr. Abbate in

Page 112

1  connection with what she had observed his
2  behavior to be a couple of days earlier in
3  running down the hall and leaving his shift in
4  the middle of it?
5      A.  It had nothing to do --
6          MS. McINNIS:  Objection to form and
7  compound.
8          THE WITNESS:  It had nothing to do
9  with each other.
10         MR. PROVENZALE:  That's what I wanted
11 to clear up.
12 BY MR. PROVENZALE:
13     Q.  Did you ever speak with Mr. Abbate's
14 partner directly, the person who was on shift at
15 the time when he got the phone call and then
16 left abruptly?
17     A.  No.
18     Q.  I think I asked you this, but just to
19 be clear, you don't know who that individual is;
20 is that correct?
21     A.  No, I don't.
22     Q.  Do you know whether or not Sergeants
23 Maraffino or Martin recorded that information
24 anywhere?

Page 113

1      A.  I don't know.
2      Q.  During the conversation that you had
3  with Captain Anderson a couple of days later
4  after you had assigned Sergeants Maraffino and
5  Martin to go and locate Mr. Abbate, did she ever
6  relate to you that Mr. Abbate had told her when
7  he came back into the station on that day that
8  he wasn't feeling good and he was going home?
9      A.  I believe that was the gist of the
10 conversation.
11     Q.  But she also told you that he ran
12 down the hallway?
13     A.  Yes.
14     Q.  Did she make any comment to you
15 during the phone call that she had with you that
16 she found it odd that he would be running if he
17 wasn't feeling well?  In other words, that
18 things weren't adding up?
19     A.  She did not say anything like that.
20         MS. McINNIS:  Let's take a quick
21 break.
22         (WHEREUPON, short break was had.)
23 BY MR. PROVENZALE:
24     Q.  I think the last question I had asked

1 you whether or not in the conversation that you
2 had with Captain Anderson that she had made any
3 comment to you that things weren't adding up
4 between him saying he wasn't feeling well and
5 running down the hall?
6    A.  She never said that, no.
7    Q.  Other than the efforts that Sergeants
8 Maraffino and Martin made on that night that you
9 had given them the assignment to go out and try
10 to locate Mr. Abbate, and your follow-up call
11 with Captain Anderson, between that time and the
12 day that Mr. Abbate was first arrested, did you
13 assign anyone else to try to locate Mr. Abbate?
14    MS. McINNIS:  Object to the compound
15 nature of the question.
16    THE WITNESS:  There would have been
17 probably several attempts.
18 BY MR. PROVENZALE:
19    Q.  In that intervening timeframe?
20    A.  Yes.
21    Q.  Let's talk about those.
22     After the night that Sergeant
23 Maraffino and Sergeant Martin had gone to the
24 20th District and then talked to Mr. Abbate's

1 partner at that time, and gone to his house and
2 his father's house, what was the next efforts
3 that you are aware that either one of them made
4 to try to locate Mr. Abbate?
5    A.  I could probably answer a little bit
6 better if I knew exactly what day of the week
7 that the first night we were out.
8    Q.  Well, according to -- well, I will
9 just ask you to assume according to Sergeant
10 Maraffino's report, he and Sergeant Martin went
11 out to the 20th District, spoke with the
12 captain, followed up to Mr. Abbate's house, and
13 then went to his father's house.  That all
14 occurred on February 22nd.
15    A.  I understand that.  I am asking for
16 the day of the week.
17    Q.  Friday.
18    A.  A Friday.
19    Q.  I believe -- the 19th was a Tuesday.
20    MS. McINNIS:  Are you sure it was the
21 Tuesday and not a Monday?
22    MR. PROVENZALE:  I am almost
23 positive, but I can tell you right now.
24    MR. MALATESTA:  What's the date?

1    MR. PROVENZALE:  February 22, '07.
2 It might have been a Monday.
3    MS. McINNIS:  I think it's Monday.
4    MR. MALATESTA:  February 22nd, '07
5 was a Thursday.  19th was a Monday.
6    (WHEREUPON, discussion was had
7       off the record.)
8 BY MR. PROVENZALE:
9    Q.  So it was Thursday was the night that
10 according to Sergeant Maraffino's report, he and
11 Sergeant Martin had gone out to the 20th
12 District, okay.
13    A.  Friday we probably would have made
14 the same attempts to locate him.  Saturday and
15 Sunday our offices are closed.
16    Q.  So are you aware of on Friday what
17 attempts -- you say probably.  I want to know in
18 your knowledge as you sit here today, what
19 attempts Sergeant Martin or Maraffino made to
20 locate Mr. Abbate?
21    A.  They would have gone to the house
22 again.
23    Q.  Do you know that for a fact that they
24 would have done that, or you just were assuming

1 they would have done that?
2    A.  I would expect them to do that.
3    Q.  Would they have made any To/From
4 report in connection with that follow-up efforts
5 to locate Mr. Abbate that would have occurred
6 the following day?
7    A.  If nothing would have changed,
8 probably not.
9    Q.  Nothing would have changed meaning
10 what?
11    A.  In terms of no answer, no response at
12 the doors.
13    Q.  Likewise to his father's house as
14 well, they would have done that?
15    A.  Yes.
16    Q.  At some point in time after that
17 initial assignment that you had given to
18 Sergeants Maraffino and Martin to locate
19 Mr. Abbate, did you learn that Mr. Abbate was in
20 some sort of rehabilitation center?
21    MS. McINNIS:  Object to the form of
22 the question.
23    THE WITNESS:  I assumed that.

30  (Pages 114 to 117)

Page 118

1　BY MR. PROVENZALE:
2　　Q.　At what point did you make that
3　assumption?
4　　A.　The thought had gone threw my mind
5　because we were coming up with no contact with
6　him whatsoever. I did reach out to our
7　department's EAP people, and all they would
8　confirm is that they did have contact with
9　Mr. Abbate, which led me to believe that he was
10　in some kind of treatment.
11　　Q.　Let's back that up because I am not
12　familiar with EAP. What is that?
13　　A.　Employee Assistance Program.
14　　Q.　You contacted them; is that correct?
15　　A.　Yes.
16　　Q.　Do you remember when it was that you
17　contacted them with respect to the initial
18　assignment that you gave to Sergeants Maraffino
19　and Martin to locate Mr. Abbate?
20　　A.　Being that the incident the first
21　night was Thursday, more than likely, I would
22　have contacted them on Monday.
23　　Q.　Prior to that date, were you aware of
24　whether you had learned at all that Mr. Abbate

Page 119

1　may have been or was actually in a
2　rehabilitation facility?
3　　A.　No.
4　　Q.　Other than your assignment to
5　Sergeant Stehlik and Detective Boyd to interview
6　the victim, did you give either one of them any
7　other assignments in connection with the IAD's
8　criminal investigation of Mr. Abbate?
9　　A.　I don't believe so.
10　　Q.　Do you know of any reason why
11　Detective Boyd -- strike that.
12　　　Did you ever direct Detective Boyd
13　to contact the 20th District to try to locate
14　Mr. Abbate?
15　　A.　I never gave those instructions, no.
16　　Q.　Best you can, describe for me your
17　suspicion that blossomed into you actually
18　acting on it to call EAP about Mr. Abbate's
19　whereabouts?
20　　A.　It's just what it was. It was a
21　suspicion on my part.
22　　Q.　But, I mean, like in terms of it
23　developing, just that no one could find him, so
24　you suspected that that was all that was the

Page 120

1　basis of your suspicion that he was in some sort
2　of rehabilitation facility?
3　　A.　Yes. I had nowhere else to look.
4　All I had was his address, his father's address.
5　I did not know who his associates were. Our
6　attempts to locate him were negative, and other
7　options started going through my mind.
8　　Q.　Through the course of your
9　investigation of him up to the point where you
10　made the decision to call EAP, were you -- did
11　you learn any information that he had a
12　substance abuse problem?
13　　　MS. McINNIS: Objection to the form
14　of the question.
15　　　THE WITNESS: No. I was not aware.
16　I did not know the man.
17　BY MR. PROVENZALE:
18　　Q.　Prior to February, prior to your
19　involvement in the circumstance in February of
20　'07, had you ever known police officers who were
21　under investigation for criminal conduct to have
22　made themselves unavailable by going into a
23　rehab facility?
24　　A.　I know officers have placed

Page 121

1　themselves into rehab. I don't know if I would
2　use the term to avoid investigation.
3　　Q.　Well, is there a Chicago Police
4　Department policy, written policy, that you are
5　aware of, whether it be department-wide or just
6　within IAD, that restricts the ability of the
7　Chicago Police to investigate anyone while they
8　are -- strike that -- to interview or
9　interrogate anyone, whether they be a police
10　officer or a civilian, while they are in a
11　health care facility?
12　　A.　I believe that would come under
13　federal law of HIPAA.
14　　Q.　Where did you learn that from?
15　　A.　Where did I learn what from?
16　　Q.　You said you believe that falls under
17　federal law HIPAA. Where did you come to the
18　belief that HIPAA covers some circumstance of
19　the ability of the Chicago Police to interview
20　or interrogate somebody who is in a health care
21　facility?
22　　　MS. McINNIS: Object to the form of
23　the question.
24　　　THE WITNESS: HIPAA precludes me from

31　(Pages 118 to 121)

Page 122

1    finding out where someone is.
2    BY MR. PROVENZALE:
3        Q.   Where did you learn -- where did you
4    come to that belief?  I mean, did you read
5    HIPAA?  Did you -- were you trained in that or
6    instructed in that by somebody in the Chicago
7    Police Department?  Where did that belief come
8    from?
9        A.   I have never read, sat down and read
10   HIPAA, HIPAA law.  But through working with the
11   medical section, police department medical
12   section and through personnel, I believe those
13   to be the guidelines.
14       Q.   Guidelines being formal written
15   guidelines or guidelines being things that are
16   in practice, in your belief or your
17   understanding?
18       A.   That's just my understanding.
19       Q.   Of what?  That these are formal
20   written guidelines somewhere, not federal law,
21   but incorporated into the policies and
22   procedures or general orders of the Chicago
23   Police Department, or just this is the way that
24   things are handled as a matter of practice?

Page 123

1        A.   I have never seen those types of
2    orders.
3        Q.   Let me ask you just in general.  In a
4    circumstance where an individual is involved in
5    a reckless homicide because he was intoxicated
6    while he was operating a motor vehicle, and that
7    vehicle is, obviously, injured in that, kills
8    somebody else, and then is taken to a health
9    care facility somewhere.
10           Are you telling me that your
11   understanding of federal law is that you cannot
12   find out where that individual is taken in order
13   to obtain evidence from him or to interrogate or
14   question that individual?
15       A.   It's my understanding that because I
16   did not know what facility he was in, there was
17   nothing further I could do.
18       Q.   Your understanding is you cannot
19   obtain through any method other than asking a
20   hospital whether or not somebody is a patient
21   there, like finding a family member, looking for
22   witnesses, or anything like that to locate where
23   somebody whom you want to interview or
24   interrogate is being treated at?

Page 124

1        A.   It's my understanding that
2    rehabilitation facilities will never confirm
3    that someone is actually there seeking
4    treatment.
5        Q.   Well, that's assuming that you know
6    where the person is at to begin with?
7        A.   Correct.
8        Q.   So that you know which facility to
9    ask about, correct?
10       A.   That's correct.
11       Q.   I am talking about from any other
12   source, asking a family member, a father, a
13   brother, friend, a girlfriend or a partner do
14   you know where this guy is at, so that you could
15   then go to the facility and then say we know he
16   is here, we need to interview or interrogate
17   him?
18       A.   The only other location that we
19   attempted was the father, and there was no
20   response at that house.
21       Q.   I understand that.  I am talking
22   about in the general.  You are saying that once
23   you hear a suspect is in a medical treatment
24   facility, whether it be a rehab facility or

Page 125

1    hospital, the federal law prevents you from
2    learning where that individual is at from any
3    source, and then interrogating or questioning
4    that individual at that facility.  Is that your
5    understanding?
6        A.   I believe the facility doesn't have
7    to allow us in.
8        Q.   So that is correct, that's your
9    understanding?  Is that right?
10       A.   That's my understanding.
11       Q.   On that Monday when you contacted
12   EAP, what did they tell you?
13       A.   All they can tell me is that they had
14   contact with him.  That is it.
15       Q.   Did they tell you what the contact
16   was?
17       A.   No.
18       Q.   Did they tell you specifically where
19   he was at, not in terms of the name or address
20   of the place, but what type of facility it was?
21       A.   They cannot tell me any of that.
22       Q.   Is it your assumption when you spoke
23   with them on phone that he was in a rehab
24   facility?

MARIE WALSH FITZGERALD, C.S.R. - (630) 241-4511

Page 126

1    A.   That's my assumption, my guess.
2    Q.   Tell me sort of the mechanics of how
3  this works.  If a Chicago Police Department
4  employee checks himself into a hospital or rehab
5  facility or whatever, is it -- he is the one
6  that contacts EAP to notify them so that if
7  anybody is looking for him in connection with
8  him not showing up for work, that district or
9  supervisor, whomever, can call EAP and confirm
10 that he is somewhere where it's okay that he is
11 not at work that day?
12   A.   EAP has counselors.  Chicago Police
13 Department member can go to EAP, and they will
14 assist in locating the facility.
15   Q.   So there is sort of like a referral
16 source for the City employees as to where they
17 can -- where an employee can go get treatment?
18   A.   Yes.
19   Q.   Do you have any information in
20 connection with this case that Mr. Abbate had
21 gone through EAP to obtain his referral for
22 whatever treatment he allegedly received?
23   A.   Even if I asked that question, EAP is
24 not allowed to reveal any of that information

Page 127

1  whatsoever.
2    Q.   Again, what I am asking is just
3  whether you received any of that information?
4    A.   There is no way I would have received
5  that information.
6    Q.   From any source, not necessarily from
7  EAP, from anybody?
8    A.   No.
9    Q.   Prior to you having called EAP on
10 February, whatever the date was, that Monday
11 2007?
12   A.   I believe it was Monday.
13   Q.   You believe it was.
14        You have already testified that
15 you were aware of officers having gone into
16 rehabilitation while they were under
17 investigation by IAD for some criminal conduct;
18 is that correct?  Not necessarily in your words
19 to make themselves unavailable, but for whatever
20 reason?
21   A.   Yes.
22   Q.   How many prior to February of this
23 circumstance in February of 2007, were you aware
24 of?

Page 128

1    A.   I couldn't even fathom a guess as to
2  that.
3    Q.   Was it more than a hundred, less than
4  a hundred?
5    A.   It was less than a hundred.
6    Q.   Was it more than ten or less than
7  ten?
8    A.   Ten, twenty, I -- that's a wild
9  guess.  I really --
10   Q.   I just kind of want to get the
11 boundaries.  It's certainly not a hundred,
12 right?
13   A.   No, it's not a hundred.
14   Q.   Is it as high as 50 or could be or
15 somewhere in that range?
16   A.   I don't think it would go as high as
17 50, but I don't know of every single officer
18 that has gone out and sought treatment.
19   Q.   I am just asking in your experience
20 with cases that were assigned to the general
21 investigation section while you were in IAD
22 where officers who were the suspects of the
23 investigation were in some sort of
24 rehabilitation facility for a period of time

Page 129

1  during the investigation?
2    A.   It has happened, yes.
3    Q.   And the number of times that that has
4  happened?
5    A.   It's not as high as 50.
6    Q.   Can you be any more specific; lower
7  than 50, like not as high as?
8    A.   No. I couldn't guess.
9    Q.   Somewhere between 10 and 50?
10   A.   Yes.
11   Q.   At any time prior to the time that
12 you called EAP, had you coordinated any
13 investigatory efforts with Lieutenant Calloway?
14   A.   No.
15   Q.   Is the extent of your request for the
16 involvement of one of Lieutenant Calloway's men,
17 Detective Boyd, simply the request and no other
18 collaboration?
19   A.   I didn't make the request.
20   Q.   I'm sorry, ADS Kirby had made that?
21   A.   Yes.
22   Q.   Other than that request that had been
23 made by ADS Kirby, you had no contact with
24 Lieutenant Boyd up to the point where you called

33 (Pages 126 to 129)

Page 130

1   EAP?
2       A.   Lieutenant?
3       Q.   Lieutenant Calloway.
4       A.   No, I had no contact with him.
5       Q.   Once you had followed up on your
6   suspicion, called EAP and inquired about
7   Mr. Abbate, at that point you had confirmed that
8   he wasn't -- that he was in a rehab facility or
9   somewhere where you couldn't get at him for that
10  time period?
11      A.   That was my guess.
12      Q.   It wasn't anything confirmed, in
13  fact, by you at that point? It was your
14  suspicion that given their response, that's
15  where he was?
16      A.   Given their response of them
17  verifying they had contact with him, it was my
18  assumption that he had been entered into a
19  rehabilitation facility.
20      Q.   For all you know, it could have been
21  a hospital, not necessarily a rehabilitation
22  facility, he could have had some physical
23  illness, correct?
24      A.   Correct.

Page 131

1       Q.   At that point, did you communicate
2   that information to anybody in IAD?
3       A.   I had spoken to Deputy Kirby, yes.
4       Q.   What did you tell her?
5       A.   I told her that it was my belief that
6   due to EAP confirming that they had contact with
7   Mr. Abbate, that he was in some type of a
8   treatment facility.
9       Q.   What did she tell you to do at that
10  point?
11      A.   I believe it was that it was almost
12  fruitless to continue attempting to locate
13  Mr. Abbate at that point, and to wait until we
14  had some type of confirmation on that.
15      Q.   What instruction did she give you
16  regarding any effort to confirm that?
17      A.   We would have to wait for someone to
18  call us and let us know.
19      Q.   So there was nothing at that point
20  that you were aware of that -- strike that.
21           There was nothing that Deputy
22  Kirby told you to do at that point that was
23  affirmative in terms of attempting to locate
24  where he is at or what his condition was? It

Page 132

1   was simply just to wait for him or someone else
2   on his end to contact IAD; is that correct?
3       A.   Correct.
4       Q.   Other than that angle of the
5   investigation of locating Mr. Abbate, was there
6   anything else investigative that -- any other
7   investigator steps that Deb Kirby had instructed
8   you to do other than interview the victim and
9   attempt to locate Mr. Abbate?
10      A.   No, that was it.
11      Q.   After you had contacted EAP, had the
12  conversation with Deb Kirby, did you have a
13  conversation with anybody else in IAD advising
14  them of what your suspicion was?
15      A.   No, not -- not that I can recall
16  specific, no.
17      Q.   Did you ever tell either Sergeants
18  Maraffino or Martin that they should call off
19  their attempts to locate him because they are
20  not going to find him?
21      A.   I don't know if I gave them explicit
22  instructions or just didn't tell them to go out
23  and look for him anymore. I don't remember
24  which way it was.

Page 133

1       Q.   Do you know whether they were
2   continuing to go out and look for him,
3   notwithstanding the fact that you had a
4   suspicion that he might be in a rehab facility?
5   In other words, just in case he wasn't, that
6   they would continue to go and try and locate
7   him?
8       A.   They wouldn't have done that without
9   my instructions as to that. They did have other
10  responsibilities to attend to.
11      Q.   Well, tell me why they wouldn't have
12  done that without your instructions?
13           MS. McINNIS: Objection to
14  speculation, what somebody else would or would
15  not do.
16  BY MR. PROVENZALE:
17      Q.   The reason I asked you is previously
18  you said they would have gone ahead and followed
19  up the following day on their own?
20      A.   Right.
21      Q.   So why wouldn't they have done it
22  later on on their own without your instructions?
23           MS. McINNIS: Same objection to the
24  form.

1    THE WITNESS: I would have told them
2  to follow up on it. If I gave them no further
3  instructions to follow up, they probably would
4  have assumed that they were done at that point.
5  BY MR. PROVENZALE:
6    Q.   And that's what I want to kind of get
7  a handle on. Did you ever tell them to your
8  recollection, once you have talked to EAP and
9  you had some of your suspicion confirmed that he
10  wasn't going to be available to be located, that
11  you told them just, you know, call off the dogs
12  for now, let's wait and then see what happens?
13    MS. McINNIS: Object to the form of
14  the question.
15    THE WITNESS: I may have. I don't
16  recall the specific conversation.
17  BY MR. PROVENZALE:
18    Q.   As you sit here today, other than
19  your assumption that they had followed up the
20  day following the initial assignment that you
21  had given them that night that all this
22  transpired on the 22nd, you don't know whether
23  they followed up on any other occasions to try
24  to location Mr. Abbate, is that correct, prior

1  to the time that he was arrested?
2    A.   Not that I'm aware of, no.
3    Q.   But you don't remember ever telling
4  them that specifically?
5    A.   I don't recall that specific
6  conversation, no.
7    Q.   At any point — at some point after
8  that, you learned that -- did you learn that he
9  was out of whatever facility he was in that was
10  the obstacle to your ability to locate him?
11    A.   I learned that he was coming out.
12    Q.   And from whom did you learn that?
13    A.   I received a phone call at work. I
14  believe it was his original attorney Needham.
15    Q.   Tom Needham?
16    A.   Yes.
17    Q.   And what did he tell you?
18    A.   Told me that it was my -- it was his
19  understanding that we had been looking for
20  Mr. Abbate, and Mr. Abbate would be getting out
21  of the hospital the next week.
22    Q.   What day did he call you?
23    A.   I don't recall what it was. It was
24  towards the end of the week, possibly Wednesday,

1  Thursday.
2    Q.   Between the time that you had spoken
3  with EAP and the time that Tom Needham had
4  called you, was there any investigation that you
5  are aware of that IAD had done to attempt to
6  locate what facility Mr. Abbate was at?
7    A.   Not that I'm aware of.
8    Q.   What else did you and Mr. Needham
9  discuss regarding the expected release of
10  Mr. Abbate from the hospital?
11    A.   Mr. Needham told me that at that time
12  when Mr. Abbate was going to be released, he
13  would be willing to turn himself in.
14    Q.   Are you aware of as of that time
15  anyone communicating previously to Mr. Needham
16  that there was an outstanding complaint for a
17  criminal offense against Mr. Abbate that he
18  would have to turn himself in on?
19    A.   That was the only conversation I had
20  with Mr. Needham regarding this.
21    Q.   Do you know how it was that
22  Mr. Needham knew ahead of time there was a
23  complaint sworn out against him for a criminal
24  office?

1    MS. McINNIS: Object to form;
2  speculation.
3    MR. PROVENZALE: At the time that he
4  called you?
5    THE WITNESS: I have no idea why he
6  called me. I never sought out Mr. Needham.
7  BY MR. PROVENZALE:
8    Q.   What I am saying is: Do you know how
9  it was that he knew that there was a complaint
10  filed out against his client prior to the time
11  that he called you when he told you that
12  Mr. Abbate would surrender? Did he tell you
13  during the conversation that there was a
14  complaint, he needs to surrender, or was it your
15  impression he knew that already when you had the
16  conversation with him?
17    MS. McINNIS: Object; form,
18  speculation, compound.
19    THE WITNESS: There was no talk of
20  Mr. Needham knowing of a complaint. And all he
21  told me was that Mr. Abbate was willing to turn
22  himself in. He didn't use the word surrender.
23  BY MR. PROVENZALE:
24    Q.   Prior to that time that Mr. Needham

Page 138

1  ...had contacted your office, are you aware of any
2  communication directed to Mr. Abbate advising
3  him of the fact that IAD was looking for him?
4         MS. McINNIS: Objection to form,
5  vague.
6         THE WITNESS: I have no idea what was
7  communicated to Mr. Abbate.
8  BY MR. PROVENZALE:
9     Q.   I am talking about they left a card,
10  Maraffino or Martin left a card at his
11  residence, telling him please call IAD
12  immediately, or that they left something in his
13  locker at the 20th District telling him that, or
14  a certified letter was sent to his residence or
15  to his emergency contact, anything like that? A
16  communication to him advising him that IAD
17  wanted to talk with him?
18     A.   I don't know of -- I know that they
19  were at the house, and I know business cards
20  were left. I don't know how that would have
21  been communicated to Mr. Abbate by someone else.
22     Q.   Nobody staked out his house, right?
23     A.   No.
24     Q.   There is no surveillance on his home

Page 139

1  to see if or when he was going to return to his
2  house, correct?
3     A.   Correct.
4     Q.   So there is -- I mean, there is no
5  way you can say that after they left a card or a
6  letter or something at his house that he
7  wouldn't have gotten it coming to his house when
8  no one was around, right?
9         MS. McINNIS: Objection to form;
10  argumentative.
11         THE WITNESS: I don't know.
12  BY MR. PROVENZALE:
13     Q.   But to your knowledge, you don't know
14  what -- you don't know of any kind of
15  communication that was directed to Mr. Abbate to
16  let him know IAD was attempting to contact him;
17  is that correct?
18         MS. McINNIS: Objection; asked and
19  answered.
20         THE WITNESS: No, I don't know that.
21  BY MR. PROVENZALE:
22     Q.   After you had the conversation --
23  well, strike that.
24         When you had this conversation

Page 140

1  with Mr. Needham were specific arrangements made
2  for Mr. Abbate to turn himself in, being a time
3  and a place?
4     A.   He was -- he asked what he could do,
5  and I told him to have him come to headquarters
6  building as soon as he got out of the hospital.
7     Q.   Did you receive any other
8  communication from either Mr. Abbate or
9  Mr. Needham after that phone call?
10     A.   No.
11     Q.   Did you advise Deb Kirby that you had
12  received a phone call from Mr. Needham about
13  Mr. Abbate turning himself in?
14     A.   Yes.
15     Q.   Did you do it the same day that you
16  received the phone call or some time after?
17     A.   No, the same day.
18     Q.   Was there any conversation between
19  yourself and Deb Kirby about that?
20     A.   I am sure there was. I can't recall
21  specifics.
22     Q.   So at some point after, you get a
23  call from whom regarding the specifics of when
24  Mr. Abbate was going to show up and turn himself

Page 141

1  in?
2     A.   From whom?
3     Q.   Yes. Did you receive a phone call,
4  or did he just show up out of the blue.
5     A.   No. Mr. Needham had told me that he
6  would be getting out of the hospital next week.
7  That was the only conversation I had until
8  Mr. Abbate came to internal affairs. I
9  believe he gave me the date, whatever the
10  date that he came in, that the police powers
11  were removed.
12     Q.   According to the records, March 14th
13  is the date that he turned himself in --
14     A.   Okay.
15     Q.   -- at headquarters.
16         Do you recall whether or not there
17  was a phone call from anyone ahead of time
18  advising you or anybody else in IAD that he is
19  coming in now?
20     A.   No.
21     Q.   You never spoke with Tom Needham that
22  day, correct, the day Mr. Abbate turned himself
23  in?
24     A.   Mr. Needham had made it clear that he

Page 142

1 was not coming to headquarters.
2    Q. But you never spoke to him on that
3 day that Mr. Abbate turned himself in?
4    A. No, I did not.
5    Q. You didn't speak to Mr. Abbate as
6 well, correct?
7    A. Correct.
8    Q. Did you speak with anybody who was --
9 who represented Mr. Abbate, whether it be a
10 family member, a friend or anything where they
11 advised you that he was turning himself in on
12 that day?
13    A. No.
14    Q. So as far as him having turned
15 himself in on the 14th, your recollection is
16 that Mr. Needham was the one who told you that
17 that day that's the day he would be turning
18 himself in?
19    A. Yes.
20    Q. Did you inquire of Mr. Needham when
21 you had him on the phone as to where Mr. Abbate
22 was?
23    A. No.
24    Q. You didn't ask him whether he was in

Page 143

1 a hospital or rehabilitation facility?
2    A. He told me that when he got out of
3 the hospital, he would be turning himself in.
4    Q. He referenced it as a hospital; is
5 that correct?
6    A. A hospital.
7    Q. Did you ask him what hospital
8 Mr. Abbate was in?
9    A. No, I did not.
10    Q. Mr. Abbate then turned himself in on
11 the 14th; is that correct?
12    A. If that's the day of the report, yes.
13    Q. Thereafter, you were requested to
14 have your personnel serve Mr. Abbate with a
15 notice of suspension; is that correct?
16    A. Not the notice of suspension.
17    Q. With the what?
18    A. With removal of the police powers.
19    Q. Right. That was on the 14th?
20    A. Yes.
21    Q. Or the day that he turned himself in,
22 correct?
23    A. Yes.
24    Q. I am talking about after that day, at

Page 144

1 some point after that day, were you asked to
2 serve Mr. -- you asked to have someone in your
3 division serve Mr. Abbate with the notice of
4 suspension?
5    A. Yes. I believe this was at least a
6 year later.
7    Q. A year later?
8    A. The following year maybe.
9    Q. Yes. In March of '08, does that
10 sound about right?
11    A. Yes.
12    Q. After Mr. Abbate had turned himself
13 in on March 14th, did you make any attempts to
14 identify what hospital he had been in?
15    A. No.
16    Q. Did Deb Kirby ever ask you to look
17 into that?
18    A. No.
19    Q. Give me just a minute real quick.
20    Did you ever speak with Detective
21 Boyd and -- let me just say, did you ever speak
22 with Detective Boyd and Sergeant Stehlik about
23 what the victim had told them when they went to
24 interview her?

Page 145

1    A. It did come up in conversation
2 with -- I don't believe I saw Detective Boyd any
3 further the night that they -- after they
4 interviewed her. I did have some general
5 conversation with Sergeant Stehlik, though.
6    Q. Are you aware of Detective Boyd and
7 Lieutenant Calloway going to the State's
8 Attorneys -- strike that -- to OPS on the day
9 after the night when you had been at
10 headquarters and looked at the video and made
11 your initial assignments?
12    MS. McINNIS: Don't answer that
13 question as posed.
14    Aware of them other than his
15 attorneys, then I will let him answer?
16    MR. PROVENZALE: Yes, that's with
17 that stipulation
18    MS. McINNIS: With that stipulation.
19 BY MR. PROVENZALE:
20    Q. With that stipulation, other than
21 through your counsel?
22    A. I am not aware of that.
23    Q. Did you ever -- so you never spoke
24 with either Keith Calloway or Dion Boyd about

37 (Pages 142 to 145)

Page 146

1    any meeting that they attended at OPS, where Mike
2    Duffy, Tom Bilyk, Lauren Freeman, and both of
3    them were at when the video was displayed again?
4        A.   I have no knowledge of that.
5        Q.   Based upon your conversation with Deb
6    Kirby the night that she had this phone call
7    with Mr. Bilyk in her office, the conversation
8    you had with her afterwards, did you understand
9    from what she relayed, Tom Bilyk had said that
10   the State's Attorney was outright rejecting the
11   possibility of any felony charges in connection
12   with what was shown in that videotape? Or that
13   just that they weren't authorizing it at that
14   time, pending further investigation?
15       A.   They were not interested in pursuing
16   it at all.
17       Q.   Okay. Have you ever spoken with Deb
18   Kirby where you discussed any change in position
19   that the State's Attorney took about what --
20   whether they were going to consider felony
21   charges against Mr. Abbate for what was shown in
22   that videotape?
23       A.   I don't recall any conversation about
24   that.

Page 147

1        Q.   Well, at some point after Mr. Abbate
2    had turned himself in, you learned that the
3    State's Attorney authorized felony charges, is
4    that correct related to the conduct -- to his,
5    Mr. Abbate's conduct that's displayed in that
6    videotape of the bar beating?
7        A.   I think I learned that more through
8    the media than anything else.
9        Q.   Well, regardless -- I didn't say who
10   you learned it from. I said at some point after
11   he turned himself in, you learned that?
12       A.   Yes.
13       Q.   When you learned that in your mind,
14   did that sound like a 180 on the State's
15   Attorney's position about whether or not -- or
16   your understanding of the State's Attorney's
17   position, about whether or not they were
18   authorizing felony charges at all?
19       A.   My opinion?
20       Q.   Yes.
21       A.   It's a complete 180.
22       Q.   Did you talk with anybody at IAD
23   about that?
24       A.   I am sure that there was lunchtime

Page 148

1    conversation; nothing formal...
2        Q.   Well, in any way, formal or informal,
3    did you talk with anybody about your opinion
4    that the State's Attorney had pulled a 180 on
5    that?
6        A.   I am sure I did, yes.
7        Q.   Who did you talk to?
8        A.   I could not even begin to guess.
9        Q.   Did you ever talk to Deb Kirby about
10   that?
11       A.   I don't know.
12       Q.   Did you ever talk to Keith Calloway
13   about that?
14       A.   No.
15       Q.   Did Keith Calloway -- did you ever
16   talk to Keith Calloway in any way after the
17   media reports of the State's Attorneys
18   authorizing felony charges regarding that
19   decision?
20       A.   I have never had a conversation
21   regarding this matter with Keith Calloway.
22       Q.   Let me ask you: In connection with
23   what you saw on that videotape, were you aware,
24   personally aware of any legal basis for felony

Page 149

1    charges that could have been brought against
2    Mr. Abbate as of the evening when you first saw
3    the video?
4        A.   Without knowing the charge that was
5    ultimately presented, which I had never heard
6    of, it did not appear to me to reach the level
7    of an aggravated battery.
8        Q.   That's what I am getting at. As of
9    the night that you first saw the video, and then
10   you had the conversations with Deb Kirby and
11   then she talked with Tom Bilyk, and then you
12   talked with her again afterwards.
13           On that day, you were not aware
14   that there was a subsection of the aggravated
15   battery statute that provided for an enhancement
16   of a simple battery where there is only bodily
17   harm to that of aggravated battery because the
18   incident occurred in a public place of
19   amusement?
20       A.   I had never heard of that charge
21   before.
22       Q.   Or a public place of accommodation;
23   is that correct?
24       A.   Right.

Page 150

1    Q.   You had never heard of that before?
2    A.   I had never heard of that charge
3  before.
4    Q.   Had you ever spoken with anyone ever
5  other than your counsel who has advised you that
6  any attorney at the State's Attorney Office had
7  indicated that they had to do research in order
8  to identify that subsection of the aggravated
9  battery statute prior to the time that they
10  charged it?
11    A.   I don't know what the State's
12  Attorney's Office was researching.
13    Q.   That's what I am asking you.  Did
14  anybody ever tell you that other than your
15  counsel?
16    A.   No.
17    Q.   Did anybody ever tell you -- Let me
18  finish.
19         Did anybody ever tell you that
20  someone from the State's Attorney's Office told
21  them that that's what the State's Attorneys had
22  to do in order to identify that particular basis
23  to charge aggravated battery?
24    A.   No.

Page 151

1    MR. PROVENZALE:  I don't have
2  anything further.
3         EXAMINATION
4           BY
5       MR. MALATESTA:
6    Q.   Through the course of your
7  involvement in this investigation, and this may
8  have been touched on a little bit earlier, but
9  did you ever discover any evidence, or did your
10  investigation ever reveal that Mr. Abbate had
11  tried to threaten or intimidate any witnesses
12  involved in this matter?
13    A.   I was not made aware of that at all.
14    Q.   So you have never heard or seen any
15  materials based on your involvement in this
16  investigation that indicate that?
17    A.   I never heard that.  I never heard
18  that rumor.  I never saw any type of report as
19  to that.
20    Q.   And that would also include the
21  victim of the battery, in this case, Karolina
22  Obrycka?
23    A.   Correct.
24    MR. MALATESTA:  Thank you,

Page 152

1  Lieutenant.
2    MS. McINNIS:  Signature is reserved.
3    (FURTHER DEPONENT SAITH NOT)
          * * * * * * * *

Page 153

1         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3  KAROLINA OBRYCKA, MARTIN    )
   KOLODZIEJ, and EVA CEPIASZUK, )
4         Plaintiffs,     )
       vs.         )  No. 07 C 2372
5  CITY OF CHICAGO, a Municipal  )   Judge
   Corporation, ANTHONY ABBATE,  )  Amy J. St. Eve
6  JR., GARY ORTIZ, PATTI      )
   CHIRIBOGA, and JOHN DOE,    )
7         Defendants.    )
8         This is to certify that I have
9  read the transcript of my deposition taken on
10  January 16, 2009 in the foregoing cause,
11  consisting of Pages 1 - 152, inclusive, and that
12  the foregoing transcript accurately states the
13  questions asked and the answers given by me,
14  with corrections, if any, appearing on the
15  attached correction sheet(s).
16         ___correction sheets attached.
17
18
19         _____
20              DAVID NALEWAY
21  SUBSCRIBED AND SWORN TO
   BEFORE ME THIS___DAY OF
22  _____,A.D., 2009.
23  _____
      NOTARY PUBLIC.
24

                              39  (Pages 150 to 153)

Page 154

1   STATE OF ILLINOIS)
                    ) SS:
2   COUNTY OF DU PAGE)
3           I, MARIBETH REILLY, a Notary Public
4   within and for the County of DuPage, State of
5   Illinois, and a Certified Shorthand Reporter of
6   said State, do hereby certify that heretofore,
7   to-wit, on January 16, 2009, personally appeared
8   before me at 219 South Dearborn Street, Suite
9   219, in the City of Chicago, County of Cook and
10  State of Illinois, DAVID NALEWAY, Witness, in a
11  certain cause now pending and undetermined in
12  the United States District Court, Northern
13  District of Illinois.
14          I further certify that the said DAVID
15  NALEWAY, was by me first duly sworn to testify
16  the truth, the whole truth, and nothing but the
17  truth in the cause aforesaid; that the testimony
18  then given by said witness was reported
19  stenographically by me, in the presence of the
20  said witness, and afterwards reduced to
21  typewriting; and the foregoing is a true and
22  complete and correct transcript of the testimony
23  so given by said witness as aforesaid.
24          I further certify that the signature

Page 155

1   of the witness to the foregoing deposition was
2   reserved.
3           I further certify that I am not
4   counsel for nor in any way related to any of the
5   parties to this suit, nor am I in any way
6   interested in the outcome thereof.
7           In testimony whereof, I have hereunto
8   set my hand and affixed my Notarial Seal this
9   1st day of June, A.D., 2009.
10
11
12
13
14  _____
                Certified Shorthand
                      Reporter
15                  Notary Public
16              DuPage County, Illinois.
17  C.S.R. No. 084-002306
18
19
20
21
22
23
24