# Ekl, Williams
## & Provenzale LLC
Attorneys and Counselors at Law

KAROLINA OBRYCKA V. CITY OF CHICAGO, ET AL.

████████████████

# Exhibit II
(Joseph Stehlik Deposition Transcript)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KAROLINA OBRYCKA, MARTIN )
KOLODZIEJ, and EVA CEPIASZUK, )
)
Plaintiffs, )
)
-vs- ) No. 07 C 2372
)
CITY OF CHICAGO, a Municipal )
Corporation, ANTHONY ABBATE, )
JR., GARY ORTIZ, PATTI )
CHIRIBOGA, and JOHN DOE, )
)
Defendants. )

The deposition of JOSEPH STEHLIK, called for examination pursuant to notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Selena Fiore, a notary public within and for the County of Cook and State of Illinois, at 219 South Dearborn Street, 12th Floor, Chicago, Illinois, on the 13th day of August, 2008, at the hour of 1:21 o'clock p.m.

Reported by: Selena Fiore, C.S.R.
License No. 084-001986

**Page 2**

1   APPEARANCES:
2
3       EKL WILLIAMS, PLLC,
        MR. PATRICK L. PROVENZALE,
        901 Warrenville Road, Suite 175,
4       Lisle, Illinois, 60532,
5       representing Plaintiffs;
6
        CITY OF CHICAGO,
7       MS. BARRETT ELIZABETH RUBENS and
        MR. JAMES T. McGOVERN,
8       30 North LaSalle Street, Suite 1720,
        Chicago, Illinois, 60602,
9
        representing Defendant City of Chicago;
10
11      NIELSEN, ZEHE & ANTAS, PC,
        MR. MICHAEL J. MALATESTA,
12      55 West Monroe Street, Suite 1800,
        Chicago, Illinois, 60603,
13
        representing Defendant Anthony Abbate, Jr.

**Page 3**

1                   I N D E X
2
3   WITNESS                    EXAMINATION
4   JOSEPH STEHLIK
5       By Mr. Provenzale          4, 115
6       By Ms. Rubens              113
7       By Mr. Malatesta           114, 116
8
9
10
11                  E X H I B I T S
12
13  NUMBER                  MARKED FOR ID
14
15  Deposition Exhibit No. 1         80
16
17
18
19
20
21
22
23
24

**Page 4**

1       MR. PROVENZALE: You can swear him in.
2           (Witness sworn.)
3           JOSEPH STEHLIK,
4   called as a witness herein, having been first duly
5   sworn was examined and testified as follows:
6           EXAMINATION
7   BY MR. PROVENZALE:
8       Q. Good afternoon, Sergeant.
9           If you could just please state your full
10  name for the record and spell your last name.
11      A. It's Joseph Stehlik, S-t-e-h-l-i-k.
12      Q. Are you a sergeant with the Chicago Police
13  Department?
14      A. Yes.
15      Q. How long have you been employed with the
16  Chicago Police Department as a sworn police officer?
17      A. I'm in my 24th year.
18      Q. And did you become a probationary officer
19  with the Chicago Police Department while you were in
20  the police academy?
21      A. Yes.
22      Q. And then you went directly from graduation
23  to the police academy and the completion of your
24  probationary period to an assignment as a patrol

1 (Pages 1 to 4)

MARIE WALSH FITZGERALD, C.S.R.
(630) 241-4511

Page 5

1   officer?
2        A.   That's correct.
3        Q.   Where was that first assignment at?
4        A.   The 21st police district.
5        Q.   Do you know what the geographic boundaries
6   of the 21st District were back then?
7        A.   Back then it was probably 16th Street to --
8   it jogged around and went all the way out to Hyde
9   Park which is like 60th and the lakefront.
10       Q.   Okay.  And what was the western border?
11       A.   The western border, some of it was Cottage
12  Grove and all the way to like the expressway, the
13  borderline of the Dan Ryan Expressway.
14           If you went down 31st to the Dan Ryan that
15  ran along that that was our boarder.  That bordered
16  the 9th District.
17       Q.   How long a period of time were you assigned
18  as a patrol officer in the 21st District?
19       A.   I left there in December of '87.
20       Q.   That was about 14 years, 13, 14 years?
21       A.   No, two and a half years, December of '87.
22       Q.   And then what was your next assignment?
23       A.   I was assigned to the gang crime south
24  investigation unit.

Page 6

1        Q.   Was that an area assignment?
2        A.   Out of Area 1.  It was an assignment out of
3   Area 1.  It covered Area 1 and Area 2.
4        Q.   Is that plain clothes?
5        A.   Both plain clothes and uniform.
6        Q.   Did you still hold the rank of patrolman in
7   that assignment?
8        A.   Yes.
9        Q.   And how long were in that assignment?
10       A.   Until July of 1990.
11       Q.   And then where did you go at that point?
12       A.   I was promoted to detective.
13       Q.   What area?
14       A.   Area 3 up until it closed in 1992.
15       Q.   So from July of '90 --
16       A.   Well, August of 1990 until I believe
17  October of '92 when they closed down Area 3.
18       Q.   Okay.  And then what happened?
19       A.   I was reassigned to Area 1.
20       Q.   Okay.
21       A.   All within the homicide unit.
22       Q.   And for how long a period of time was that
23  assignment in Area 1 detectives?
24       A.   Until I was promoted to sergeant in

Page 7

1   November of 2004, 14 years.
2        Q.   So that was approximately '92 to '04,
3   something like that?
4        A.   Area 1 was from '92 until '04, November of
5   '04 or October of '04.
6        Q.   So you said October of '04?
7        A.   I entered the academy in October of '04, and I
8   graduated November 1st of '04 as a sergeant.
9        Q.   What was your first assignment as a
10  sergeant?
11       A.   7th District Englewood on midnights.
12       Q.   Were you a street sergeant or a --
13       A.   Yes, street sergeant.
14       Q.   Did you ever in any capacity in the 7th
15  District function as a desk sergeant?
16       A.   No.
17       Q.   You were on midnights for how long?
18       A.   Six months.
19       Q.   And then what?
20       A.   I was transferred to the internal affairs
21  division.
22       Q.   So from November '04 to approximately May
23  of '05 you were in the 7th District midnights as a
24  street sergeant?

Page 8

1        A.   Correct.
2        Q.   And then you moved into IAD after that?
3        A.   Correct.
4        Q.   Then you've been in IAD from May of '05
5   approximately until the current time?
6        A.   That's correct.
7        Q.   When you were in Area 1 detectives up until
8   October -- approximately October of 2004, were you
9   assigned there at the same time that Detective or
10  Sergeant Skala was assigned there?
11       A.   Sergeant Skala was never signed to Area 1,
12  no.
13       Q.   Do you know what area he --
14       A.   No, I don't.
15       Q.   I understand that Sergeant Bigg is another
16  IAD sergeant currently assigned or was at least in
17  February/March of 2007; is that correct?
18       A.   As far as I can remember, yes.
19       Q.   Had you ever had any assignments with --
20  any area detective assignments with Sergeant Bigg
21  prior to working alongside with him?
22       A.   No.
23       Q.   In IAD, right?
24           So nothing prior to your working with him?

2  (Pages 5 to 8)

Page 9

1    A.  I never met the man before.

2    Q.  Do you know any of the -- do you know

3  Anthony Abbate?

4    A.  Not at all.

5    Q.  Did you know him prior to February/March of

6  2007?

7    A.  No.

8    Q.  Did you know any of his family members who

9  were Chicago Police officers?

10    A.  No.

11    Q.  Did you know of a detective by the name of

12  Carmen Abbate --

13    A.  No.

14    Q.  -- while you were working in Area 1?

15    A.  No.

16    Q.  And in your role as a street sergeant in

17  the 7th District none of the patrol officers in your

18  assignment were to your knowledge relatives of

19  Anthony Abbate as you sit here today?

20    A.  Not that I knew about, no.

21    Q.  And you haven't learned that as you sit

22  here today, correct?

23    A.  That's correct.

24    Q.  Sergeant, have you ever -- to your

Page 10

1  knowledge have you ever been named as a subject of a

2  complaint register investigation or file?

3    MS. RUBENS:  I'd just object to relevance, but

4  you can answer.

5    THE WITNESS:  Yes, I have.

6  BY MR. PROVENZALE:

7    Q.  How many times?

8    And let's talk as of February 22nd of 2007,

9  prior to that time.

10    A.  I couldn't give you a number.

11    If you were asking me I would probably say

12  a couple.

13    Q.  Was it more than ten to your knowledge?

14    A.  No.

15    Q.  Was it more than five to your knowledge?

16    A.  Maybe.

17    Q.  It might be somewhere in that --

18    A.  It might be somewhere in that vicinity.

19    Q.  What do you recall were the subjects of the

20  complaints that you were identified as being named

21  in?

22    A.  Most of them probably had to do with my

23  arrests when I was in the gang crime south unit.

24    More than likely they were probably

Page 11

1  brutality is what they were alleging.

2    Q.  As you sit here today do you have any

3  independent recollection of any individual complaints

4  that you were aware of where investigations were

5  undergone -- where investigations were done?

6    A.  You lost me.

7    Q.  As you sit here today do you have any

8  independent recollection of any particular

9  investigation in connection with a CR file that you

10  were named in?

11    A.  Regarding me?

12    Q.  Yes.

13    A.  No.

14    Q.  To your knowledge the best of your

15  recollection is that they probably dealt with

16  excessive force complaints but you're not sure; is

17  that correct?

18    A.  I believe so.

19    Q.  Okay.  Are you aware of whether any of

20  those complaint register files were sustained?

21    A.  None of them.

22    Q.  Do you know whether any of them were

23  determined to be unfounded?

24    A.  I don't recall.

Page 12

1    Q.  And let me just ask you do you know what

2  the results of any of those were other than you know

3  that they weren't sustained?

4    Do you know what the actual findings on any

5  of those complaint register investigations were?

6    A.  I can't recall.

7    It was so long ago.

8    Q.  Let me ask you prior to your assignment to

9  internal affairs did you have to go through any type

10  of an interview or vetting procedure for your

11  assignment to IAD?

12    A.  Yes.

13    Q.  What was that?

14    A.  I interviewed with the deputy.

15    Q.  With the deputy superintendent?

16    A.  Deputy Kirby.

17    Q.  And that would have been sometime around

18  October of '04 or prior to that?

19    A.  I believe it was sometime April or May of

20  '05.

21    Q.  I'm sorry, of '05.

22    Before you went in?

23    A.  Before I went into the unit, correct.

24    Q.  Do you recall what was the interview --

3 (Pages 9 to 12)

Page 13

1  what occurred during the interview?
2        What kind of questions were you asked?
3     A. I couldn't recall exactly.
4        Asked probably what I did before, where I
5  came from, what kind of investigations I handled, and
6  did I have a resume present and just basic questions.
7     Q. Was there ever any type of topic covered
8  with you regarding the identification of conflicts in
9  connection with you going into IAD and conducting
10  investigations of other police officers or dealing
11  with witnesses with whom you may have a conflict and
12  therefore cannot be involved?
13        MS. RUBENS: I'd just object to vague and
14  relevance.
15        You can answer.
16        THE WITNESS: I'm not sure what you mean by
17  that.
18        You mean would I have a conflict in
19  conducting an investigation?
20        You're asking me if I was assigned an
21  investigation would I have a conflict. If it was
22  someone I knew then it would be brought up that
23  that's someone I know. I can't handle the
24  investigation. It would be reassigned to somebody

Page 14

1  else.
2  BY MR. PROVENZALE:
3     Q. That's what I'm getting at.
4        I'm talking about before you got into IAD
5  was that subject ever covered with you in connection
6  with identifying --
7     A. By the deputy?
8     Q. -- or discussing with you your ability to
9  identify what is a conflict and what isn't a conflict
10  for something that you would be involved in as an
11  investigator in IAD.
12     A. By the deputy?
13     Q. Yes.
14     A. Yes.
15     Q. And was there any type of -- other than the
16  discussion, was there any type of formal training
17  that you were given prior to your assignment to IAD
18  where you were given some sort of education or
19  training about how to identify conflicts to determine
20  whether something is or is not a conflict?
21     A. I was a detective for 14 years. I could
22  pretty much see if it was a conflict right off the
23  bat.
24        No, I was never given any formal training.

Page 15

1     Q. Okay. When you started in IAD what was the
2  structure of IAD in terms of the divisions that were
3  there, the investigative divisions?
4        MS. RUBENS: I object to foundation.
5        You can answer if you have that knowledge.
6        THE WITNESS: Well, it's run by -- it was run by
7  an assistant deputy superintendent. Then there was a
8  general investigation section, a confidential
9  investigation section, and a special investigation
10  section.
11        There were two lieutenants that ran --
12  actually three lieutenants, one for each section,
13  general, confidential, and special.
14  BY MR. PROVENZALE:
15     Q. Were you assigned to a particular
16  investigative division when you started in IAD?
17     A. I was assigned to confidential when I first
18  came in.
19     Q. And who was your lieutenant when you were
20  assigned to confidential?
21     A. It was Juan Rivera.
22     Q. And how long -- for a how long a period of
23  time after May of '05 were you in the confidential
24  investigation section?

Page 16

1     A. A year.
2     Q. So up to May of '06 approximately?
3     A. Correct.
4     Q. And was Lieutenant Rivera your lieutenant
5  through that entire period of time?
6     A. No.
7     Q. At what point of time was he replaced and
8  who replaced him?
9     A. I can't give you the exact date, but he was
10  promoted, and then we ran on an interim acting CO
11  which would have been Keith Calloway, and then
12  another sergeant took -- he was promoted out. Then
13  another sergeant took his spot.
14     Q. Where was Keith Calloway promoted out to?
15     A. I believe he was promoted to lieutenant and
16  sent to the 6th District, I believe.
17     Q. Do you recall about when that was?
18     A. I couldn't tell you the exact date, no.
19     Q. Let me ask you back in March -- February
20  and March of 2007 in connection with this case, who
21  was your lieutenant in IAD?
22     A. Dave Naleway.
23     Q. And he was in charge of general
24  investigations?

4 (Pages 13 to 16)

Page 17

1    A.  That's correct.
2    Q.  As you sit here today do you have any
3 understanding of the decision making process when IAD
4 is involved in an investigation of a complaint of how
5 it's determined what section a complaint is given to
6 for investigation, what investigative section?
7    MS. RUBENS:  Objection, vague, calls for
8 speculation, and foundation.
9        You can answer.
10    THE WITNESS:  I don't have anything to do --
11 someone assigns those jobs.  There's a person in the
12 office who assigns or I think it's actually done by
13 the chief.  Now it's the chief.
14        I think there's a conference done and the
15 chief determines where that investigation is going to
16 go, but I have no knowledge until these guys get
17 their jobs.
18 BY MR. PROVENZALE:
19    Q.  And that's what I'm asking you.
20        As you sit here today you have no idea how
21 it is that they determine whether it goes into
22 general, special, or confidential investigations when
23 it gets assigned; is that correct?
24    A.  That's correct.

Page 18

1    Q.  In February and March of 2007 who else was
2 assigned under Lieutenant Naleway in the general
3 investigation section where you were at?
4    MS. RUBENS:  Objection, foundation.
5        You can answer.
6    THE WITNESS:  There were numerous people.  I
7 can't remember all the names.
8 BY MR. PROVENZALE:
9    Q.  Was Sergeant Kenneth Bigg, was he one of
10 them that was assigned directly under Lieutenant
11 Naleway?
12    A.  No.
13    Q.  What was his assignment at that time?
14    A.  At that time he was assigned to the
15 confidential section.
16    Q.  Sergeant Maraffino, was he in IAD at that
17 time?
18    A.  Yes.
19    Q.  Was he assigned to general investigations
20 under Lieutenant Naleway?
21    A.  Yes.
22    Q.  And again we're talking about the same time
23 period.
24        This is February/March of '07; is that

Page 19

1 correct?
2    A.  That's correct.
3    Q.  How about Sergeant Martin?
4    A.  He was assigned to the general
5 investigation section under Lieutenant Naleway.
6    Q.  At that same time, right?
7    A.  Same time.
8    Q.  As you sit here today you don't recall
9 anyone else who was assigned in the general
10 investigation section as a sergeant back in
11 February/March of '07?
12    A.  I mean I can tell you names that I remember
13 because I have friends up there and I know they were
14 assigned there.
15        There's some people I know that were
16 assigned to the general investigation section that I
17 know.
18    Q.  Who do you remember?
19    A.  I mean there's -- Sergeant Ray Broderdorf
20 works in general.
21    Q.  Can you spell that?
22    A.  B-r-o-d-e-r-d-o-r-f.
23        The administrative sergeant, Sergeant Marcy
24 Solas, S-o-l-a-s.  There was Sergeant Tyrone Jackson

Page 20

1 or Tyrone Jordan, I'm sorry, Tyrone Jordan.
2        I mean everybody has offices.  I have to
3 try and remember all the sergeants and all the
4 offices.
5    Q.  How about Sergeant Brown?
6    A.  I know a Sergeant Matt Brown.  He's
7 currently assigned as our administrative sergeant for
8 the chief.
9    Q.  I'm sorry, go ahead, finish.
10    A.  He's assigned to the chief, the chief's
11 administrative sergeant.
12    Q.  And that's Matt Brown?
13    A.  That's Matt Brown.
14    Q.  So he was not assigned to any investigative
15 division back in February/March of '07, he was
16 assigned directly to the chief as the administrative
17 sergeant?
18    A.  He's assigned there right now.
19        In '07 I believe -- I'm not going to say
20 for sure, but I believe he was assigned to
21 confidential, Sergeant Matt Brown.
22    Q.  Prior to your involvement in this
23 investigation which as I understand it began sometime
24 around February 22nd of 2007 -- and if I'm wrong on

MARIE WALSH FITZGERALD, C.S.R.
(630) 241-4511

Page 21

1 that correct me, but I'm just going to operate from
2 that assumption because that's what the paperwork
3 indicates.
4    Prior to that day do you recall any
5 investigations that you were involved in as an IAD
6 sergeant where more than one investigative division
7 was working on the same case, in other words that
8 both confidential and general were working on the
9 same case or special and general, whatever the
10 combination, or all three?
11    A. No, not that I can recall.
12    Q. Since that time have you become aware of
13 any circumstance of a case that you've been involved
14 in where that has occurred, where more than one
15 investigative section was investigating the same
16 case?
17    A. No.
18    Q. Other than your involvement have you heard
19 of any such a circumstance prior to February 22nd of
20 2007 where more than one investigative section of IAD
21 was investigating the same case?
22    A. No, not that I can recall; no.
23    Q. I have -- the first indication in the
24 paperwork that I have of your involvement in this

Page 22

1 investigation is a report that was generated by Dion
2 Boyd who was a detective at the time in the
3 confidential investigation section indicating that
4 you had a meeting in Lieutenant Naleway's office on
5 February 22nd.
6    Let me first ask you do you remember a
7 meeting occurring in Lieutenant Naleway's office on
8 February 22nd in connection with some allegation
9 against Anthony Abbate?
10    A. There was a meeting, but it wasn't in
11 Lieutenant Naleway's office.
12    Q. Let me ask you where do you remember
13 meeting in connection with this case the first time,
14 your first knowledge of some allegation against
15 Anthony Abbate?
16    A. My first meeting was when the lieutenant
17 grabbed me and says I need you to take a look at
18 something, Naleway.
19    Q. Do you recall what day that occurred on?
20    A. I can't recall a date, no.
21    Q. Was it the same day that you had -- let me
22 ask you this.
23    At some point in time do you recall having
24 a meeting where yourself, Lieutenant Naleway,

Page 23

1 Sergeant Martin, Sergeant Maraffino, and Detective
2 Boyd were all present?
3    A. I don't recall that.
4    Q. So go ahead and tell me now. Lieutenant
5 Naleway grabbed you and says he wants you to take a
6 look at something?
7    A. That's correct.
8    Q. Where were you when this occurred?
9    A. In the internal affairs offices.
10    Q. Was he -- were you at your desk and he's
11 walking by?
12    A. I believe I had just got to work and he
13 grabbed me in the hallway before I went in my office.
14    Q. Did he give you any further -- in this
15 initial conversation did he give you any further
16 information about what it was that he wanted you to
17 take a look at?
18    A. He said he wanted me to take a look at a
19 video.
20    Q. Anything else that he said that you recall
21 in that initial contact he had with you?
22    A. No.
23    Q. And what happened next?
24    A. We went downstairs from the fifth floor to

Page 24

1 I don't recall what floor it was in the detective
2 division. I'm not familiar with every floor.
3    Q. You're talking about Area 1?
4    A. No, at 35th and Michigan, at headquarters.
5    Q. And when you got down there did he have the
6 video with him when you guys traveled down there or
7 did you get it down?
8    What happened?
9    MS. RUBENS: Objection, foundation, speculation.
10    Answer if you know.
11    THE WITNESS: The video was already down there.
12 The video monitor was down there. That was sitting
13 on a desk.
14 BY MR. PROVENZALE:
15    Q. Who else was in the room then when you got
16 in there where the video monitor was?
17    A. There was another individual. I don't know
18 who it was.
19    Q. Was he a police officer?
20    A. I believe he was a detective.
21    Q. Do you know Dion Boyd?
22    A. I know Dion Boyd.
23    Q. It wasn't Dion Boyd?
24    A. No.

6 (Pages 21 to 24)

Page 25

1    Q.   How do you know he was a detective?
2    A.   I believe I worked with Dion Boyd in
3  Area 1.
4    Q.   No, I'm talking about this individual who
5  was in the room that you didn't know who it was.
6    A.   He was in the detective division area where
7  only detectives would be.  I assumed it was a
8  detective.
9    Q.   So other than your assumption that he was a
10  detective because of where this individual was,
11  anything else that you know of that identifies him as
12  a detective?
13       In other words did you see a detective
14  badge or did he identify himself?
15    A.   He was dressed in civilian clothes.
16    Q.   As you sit here today do you know whether
17  that individual was a state's attorney or an OPS
18  investigator?
19    A.   There was an OPS investigator, but I don't
20  know them personally either.
21       There was an OPS investigator who carried
22  that video monitor over to that office.
23    Q.   All right.  So let's talk about this.
24       Tell me everything you know that -- in

Page 26

1  terms of what occurred leading up to when you get in
2  this room before the video was played.
3       Lieutenant Naleway contacts you, says I
4  want you to take a look at a video.  You guys go down
5  to the third floor, and what do you remember
6  happening at that time?
7       MS. RUBENS:  I'm just going to object, vague and
8  calling for a narrative.
9       You can answer.
10       THE WITNESS:  They played the videotape.
11  BY MR. PROVENZALE:
12    Q.   Well, obviously you've already just said
13  somebody carried in the video monitor.
14    A.   It was an OPS investigator.  I don't know
15  who it was.
16       He carried it over from 35th and State at
17  the IPRA building and he got it over to there, and he
18  had set it on the desk for us to view the tape that
19  was stored in our drive.
20    Q.   How was it that you knew that this
21  individual had carried the --
22    A.   When we got down to the third floor the
23  lieutenant said an investigator from OPS brought this
24  over.

Page 27

1    Q.   And was that investigator from OPS still
2  there?
3    A.   I believe he was there, but I can't recall
4  if he was there.  I believe he was there.
5    Q.   The one individual that you've identified
6  as assuming was a detective, what did that individual
7  look like in terms of --
8    A.   He was about six foot five, glasses.  I
9  don't remember if he had facial hair or not.  He
10  had -- 220 pounds, 225 pounds.  He was dressed in
11  civilian dress.
12    Q.   What race was he?
13    A.   Male white or male white Hispanic.  I'm not
14  positive.
15    Q.   Was he wearing like street clothes or a
16  suit?
17    A.   Street clothes like a tac guy would dress.
18    Q.   Do you know who Mike Duffy is?
19    A.   I know he works at OPS, but do I know him
20  personally?
21    Q.   Right.  You don't know as you sit here
22  today whether it was Mike Duffy that was in that
23  room?
24    A.   No.

Page 28

1    Q.   Do you remember the OPS individual?
2    A.   I don't know who it was.  I couldn't even
3  describe him for you.
4    Q.   So no description in terms of height,
5  weight?
6    A.   Nondescriptive.
7       I mean I didn't even pay attention to him.
8    Q.   So other than yourself, Lieutenant Naleway,
9  and this individual that you assumed to be a
10  detective, was there anyone else present in the room
11  at the time that the video was played?
12    A.   I believe also Deputy Kirby came down when
13  the video was played.
14    Q.   Was she there prior to the time it started
15  or did she walk in while it was going?
16    A.   I can't recall that.
17    Q.   Was there any conversation that you had
18  with yourself and Lieutenant Naleway or this
19  individual who you assumed to be a detective prior to
20  the time the video was played in connection with what
21  was on the video?
22    A.   No.
23    Q.   And then what do you remember seeing the
24  video depicting?

MARIE WALSH FITZGERALD, C.S.R.
(630) 241-4511

Page 29

1    A.  Of a bar and then people drinking at a bar
2   and then a fight breaking out in the bar.
3        Q.  Did you say anything during the course of
4   the video and watching the video in terms of reacting
5   to the video in any way?
6        A.  No.
7        Q.  Did Lieutenant Naleway?
8        A.  No.
9        Q.  Did this other individual whom you assumed
10  to be a detective?
11       A.  I don't recall him saying anything.
12       Q.  And did ADS Kirby say anything?
13       A.  No.
14       Q.  What was your understanding as to the
15  purpose of watching the video prior to the time that
16  you watched it?
17       MS. RUBENS:  Objection, foundation, speculation.
18         You can answer.
19       THE WITNESS:  I'm assuming to determine what
20  that person might be charged with, to watch what was
21  going on in that videotape.
22  BY MR. PROVENZALE:
23       Q.  When you say you're assuming that is that
24  because there was never any conversation with anyone

Page 30

1   leading up to the point where the video was played as
2   to why you were watching the video?
3        A.  I believe after they played that someone, I
4   don't recall who, said that's an off duty police
5   officer.
6          I didn't know him.  I didn't know anybody
7   out there.  I didn't know who it was.  I just watched
8   the fight go on there, and then someone at the end of
9   the tape said that's an off duty police officer, and
10  then I said that looks like a simple battery.
11       Q.  And you don't recall who it was that said
12  that?
13       A.  No.
14       Q.  Did you say that that looks like a simple
15  battery before or after you had learned that the
16  individual on the tape was identified as a police
17  officer?
18       A.  I probably said it before and after.
19       Q.  Well, I'm not asking you what you probably
20  said.  I'm asking what you recall having said.
21       MS. RUBENS:  And if you don't recall you don't
22  recall.
23       THE WITNESS:  I probably said it -- I said it
24  before I found out he was a police officer.

Page 31

1   BY MR. PROVENZALE:
2        Q.  You're absolutely sure of that?
3        A.  Positive.
4        Q.  And at the time that you said it did you
5   have some suspicion that that individual was a police
6   officer because it was an IAD matter that you were
7   looking at a video at the direction of Lieutenant
8   Naleway?
9        A.  No.
10       Q.  What else was discussed after the video was
11  played in connection with any circumstances about
12  that video?
13       A.  I don't know what you mean by that.
14       Q.  Well, I mean did anybody say well, we've
15  got to investigate this or we're going to follow up
16  on it or --
17       A.  My assumption was that if I was brought
18  down there to look at it I was going to be
19  investigating it or helping to investigate it.
20       Q.  And my question is what was discussed about
21  that?
22       A.  After we viewed the videotape we were going
23  to go upstairs and talk about how we're going to
24  investigate this.

Page 32

1        Q.  So did someone say all right, let's go up
2   and talk about what we're going to do about it?
3        A.  The deputy.
4        Q.  Deputy Kirby did?
5        A.  That's correct.
6        Q.  Who then goes upstairs?
7        A.  Myself, Lieutenant Naleway, Deputy Kirby.
8        Q.  What about this individual whom you assumed
9   to be a detective?
10       A.  He stayed downstairs.
11       Q.  And where did you go when you got up, back
12  up to the fifth floor?
13       A.  Yes.
14       Q.  And where did you go?
15       A.  The deputy's office.
16       Q.  And did you bring the video with?
17       A.  No, we did not.
18       Q.  You left it back down on the third floor?
19       A.  Correct.
20       Q.  How long was the video that you saw?
21         How long was it?
22       A.  The portion that I saw?
23       Q.  Uh-huh.
24       A.  Minutes.  It was only minutes.

MARIE WALSH FITZGERALD, C.S.R.
(630) 241-4511

Page 33

1    Q.  So tell me -- now you go back up to Deputy
2   Kirby's office.  What happens in Deputy Kirby's
3   office?
4    A.  The discussion is about that that's an off
5   duty police officer.  Then she said she was going to
6   contact the felony review unit regarding charges.
7   She made a phone call.
8       It was discussed what I thought of it as a
9   detective, what I observed on the tape.  We talked
10  about the charging that I charged people before, and
11  then she contacted I believe it was Tom Bilyk from
12  the state's attorney's office.
13   Q.  So prior to the time that you all went
14  upstairs did Deputy Kirby make any comment about what
15  she thought was the proper charge of what was --
16   A.  Not that I recall, no.
17   Q.  Did the individual whom you believe to be a
18  detective, did that individual say anything?
19   A.  No.
20   Q.  And did the OPS individual say anything?
21   A.  No.
22   Q.  And did Lieutenant Naleway say anything?
23   A.  No.
24   Q.  So you were the only one to have expressed

Page 34

1   an opinion about what the proper charge was when you
2   were still downstairs on the third floor after you
3   had watched the video?
4    A.  That's correct.
5    Q.  When you made that comment did anyone ask
6   you your opinion or did you just volunteer it?
7    A.  I just volunteered it.
8    Q.  When you got back upstairs then did Deputy
9   Kirby express an opinion about what the appropriate
10  charge was when you were having the discussion in her
11  office?
12   A.  We had talked about charges by the Cook
13  County State's Attorney's Office and charges they had
14  brought before regarding cases and my experience with
15  the Cook County State's Attorney's Office and her as
16  a police officer, what she observed and what we
17  observed on the tape.  It was discussed and talked
18  that based on what we saw it was a simple battery
19  charge.
20   Q.  Okay.  So --
21   A.  It was three police officers talking about
22  what we saw.
23   Q.  And what I want to get at so I understand
24  it, your recollection is that the conversation that

Page 35

1   you had with Deputy Superintendent Kirby and
2   Lieutenant Naleway was to the effect that the state's
3   attorney's office typically charges these as simple
4   battery so that's the appropriate charge; is that
5   correct?
6    A.  The conversation was what is the charge
7   that you think is appropriate for what you just
8   observed on the video.
9       My opinion was that's a simple battery.
10  Her opinion was let's call the state's attorney's
11  office and run it by them to make their final
12  decision about what we should do.
13   Q.  And so did she express an opinion one way
14  or the other about whether it should be a misdemeanor
15  battery or a felony aggravated battery?
16   A.  She didn't express an opinion about that at
17  all.
18   Q.  Okay.  So your recollection is that she
19  just basically said let's let the state's attorney
20  decide?
21   A.  That's correct.
22   Q.  And what about Lieutenant Naleway, did he
23  express any kind of opinion during the course of your
24  conversation about what he thought the appropriate

Page 36

1   charge should be?
2    A.  I don't recall if he expressed an opinion
3   about what the charge should be, no.
4    Q.  You mentioned that during the course of the
5   conversation that a topic of discussion was that the
6   normal way that the state's attorney would handle a
7   case like that --
8    A.  That came out of my mouth.
9    Q.  Out of your mouth, okay.  That's what I
10  want to get at is who was the speaker on the end of
11  that discussion.
12   A.  I made the comment that the state's
13  attorney's office with the dealings that I had for 14
14  years that was a simple battery.
15   Q.  Did anybody in the room disagree with you
16  other than ADS Kirby saying well, let's call the
17  state's attorney to find out?
18       Did anybody say I disagree, I've had cases
19  where they've done something differently?
20   A.  Not that I can recall, no.
21   Q.  And then your recollection is that after
22  the conversation that you had with Lieutenant Naleway
23  and Deb Kirby about what you saw on the video and
24  your opinions she then called Tom Bilyk?

9 (Pages 33 to 36)

Page 37

1    A.  I'm assuming it was Tom Bilyk.  I don't
2  recall.
3         I believe it was Tom Bilyk, felony review.
4  She contacted them directly.
5    Q.  So whoever it was it was felony review that
6  she was contacting?
7    A.  Somebody from the state's attorney's
8  office, one of those supervisors up there at felony
9  review.
10    Q.  Other than what you've told me, do you
11  recall anything else that was discussed during the
12  course of that conversation that you had with
13  Lieutenant Naleway and Assistant Deputy
14  Superintendent Kirby?
15    A.  About charging or the investigation?
16    Q.  Well, let's just talk about charging.
17    A.  No, that was all we talked about as far as
18  charging.
19    Q.  How about as far as the investigation?
20    A.  Let's see if we can try and find him now.
21    Q.  Okay.  At that point did you know -- did
22  anyone identify who the individual was, that they
23  knew who it was?
24    A.  On the tape?

Page 38

1    Q.  Yes.
2    A.  I believe that we were informed by OPS that
3  it was Anthony Abbate.
4    Q.  That's what I'm getting at.
5    A.  Me personally was I informed, no; but I
6  learned from the lieutenant that it was Anthony
7  Abbate.
8    Q.  All right.  At what point did you learn
9  that from Lieutenant Naleway?
10    A.  Could have been on the elevator ride back
11  up.
12         I don't recall exactly.
13    Q.  All right.  Do you recall as you were in
14  the room when the OPS individual was in there whether
15  or not the OPS individual and Lieutenant Naleway were
16  talking?
17    MS. RUBENS: Objection, foundation, speculation.
18    THE WITNESS: I don't recall if they were
19  talking or not.
20         I was watching the tape.
21  BY MR. PROVENZALE:
22    Q.  Let me ask you do you know whether or not
23  Lieutenant Naleway learned the identity of the police
24  officer in the video as being Anthony Abbate when you

Page 39

1  were in that room or whether he had learned it at
2  some time prior, and I'm talking about in the room
3  where you watched the video?
4    A.  I don't know where he learned about it.
5    Q.  Did he ever tell you one way or the other
6  at some point since then as to when it was that he
7  learned that the identity of the person in the video
8  was Anthony Abbate?
9    A.  No, he never told me.
10    Q.  Up in ADS Kirby's office all you know is
11  someone told Lieutenant Naleway that this is Anthony
12  Abbate and Lieutenant Naleway shared that with you,
13  correct?
14    A.  Correct.
15    Q.  Did Lieutenant -- was there any discussion
16  as to how it was that he was identified, that the
17  person in the video was identified as Anthony Abbate?
18    A.  I believe OPS made the identification.
19         I don't know exactly how.  I can't tell you
20  exactly how I know.
21    MS. RUBENS: He's asking if there was any
22  discussion about it.
23    THE WITNESS: Oh, was there any discussion about
24  it in that room, no.

Page 40

1  BY MR. PROVENZALE:
2    Q.  Since that day have you learned how it was
3  that Anthony Abbate was identified as the person in
4  that video?
5    A.  Not firsthand knowledge, no.
6    Q.  Well, from any source, whether somebody
7  told you hearsay, second, third, whatever.
8    A.  No, not that I can recall; no.
9    Q.  Other than Lieutenant Naleway identifying
10  him as Anthony Abbate and the discussion of we've got
11  to go get him, was there anything else discussed in
12  connection with the investigation?
13    A.  Interviewing the victim.  He said we need
14  to interview the victim too.
15    Q.  Was there anyone else present in the room
16  at that time that came into the room during the
17  discussion or anything like that?
18    A.  No.
19    Q.  So this entire discussion regarding the
20  investigation and the charging was just between or
21  among yourself, Lieutenant Naleway, and ADS Kirby; is
22  that correct?
23    A.  Correct.
24    Q.  When she called whomever it was at the

Page 41

1   state's attorney's office was that the end of the
2   meeting or did it continue after that point?
3       A.  After they hung up with the state's
4   attorney then it was determined to go interview the
5   victim and try and find Abbate.
6       Q.  Tell me what you recall hearing on your end
7   of the conversation that you could hear of Deb Kirby
8   talking.
9       A.  It was on the speakerphone.
10      Q.  Tell me what you heard the conversation
11  was.
12      A.  She ran by -- she introduced everybody who
13  was sitting in the office.  She informed him of what
14  she had.  She said it was an off duty police officer
15  that was on the tape.  She said it's a bar fight,
16  he's taking some swings at her, but a lot of them are
17  misses, there's some kicking going on, but from what
18  we can see on the tape it appears it's a simple
19  battery.
20      Q.  And at that point did you know who it was
21  that was on the other end?
22      A.  I believe it was Bilyk, but I can't recall.
23      Q.  Male or female?
24      A.  It was a male.

Page 42

1       Q.  What comments if any do you recall the male
2   on the other end making during or after Deb Kirby had
3   told him what you had?
4       A.  He asked if that's what you guys all think,
5   if that's what you think, then I'm okay with that,
6   that's okay.
7       Q.  Do you recall anything else that he said?
8       A.  No.
9       Q.  This person whom you believe to be a
10  state's attorney on the other end of the line, did he
11  make any indication as to any follow-up investigation
12  that should be done?
13      A.  No, not that I can recall; no.
14      Q.  All the recommendations for follow-up
15  investigation or the discussion about it was just
16  amongst yourself, Lieutenant Naleway, and ADS Kirby;
17  is that correct?
18      A.  That's correct.
19      Q.  Was this individual on the phone then while
20  you were talking about that?
21      A.  No.
22      Q.  You terminated the call?
23      A.  She terminated the call, yes.
24      Q.  From your discussion from the conversation

Page 43

1   with this individual on the other end who was the
2   state's attorney did it sound to you like that
3   individual had already seen the videotape?
4       MS. RUBENS:  Objection, foundation, calls for
5   speculation.
6       THE WITNESS:  It didn't seem like it, no.
7   BY MR. PROVENZALE:
8       Q.  And that's what I'm getting at.
9           Was there anything during the course of the
10  conversation that suggested to you that the
11  individual on the other end of the phone at the
12  state's attorney's office had seen the video that you
13  and Lieutenant Naleway and Deb Kirby had just seen?
14      A.  Nothing in the conversation that I heard,
15  no.
16      Q.  Prior to the time that Deb Kirby terminated
17  that telephone conversation were there any
18  arrangements made for follow-up meetings with the
19  state's attorney's office for them to take a look at
20  the video or for them to be involved in the
21  investigation, follow-up investigation?
22      A.  I don't recall that.
23      Q.  As you sit here today your recollection is
24  simply that the individual on the other end of the

Page 44

1   phone said something to the effect of well, if that's
2   what you think then go ahead with that misdemeanor
3   charge, and that was the termination of the call?
4       A.  Then she terminated the call with him and
5   then told us -- you know, we discussed our part of
6   the investigation.
7       Q.  So tell me everything that you recall
8   yourself, Deb Kirby, and Lieutenant Naleway
9   discussing in terms of what was going to be done next
10  in the investigation?
11      A.  I said before we had to interview the
12  victim and try and find Abbate.
13      Q.  All right.  Anything else other than
14  interview the victim and locate Abbate?
15      A.  Not that I can recall, no.
16      Q.  Other than what we've discussed at this
17  point, do you recall anything else that was discussed
18  amongst yourself, Lieutenant Naleway, and ADS Kirby
19  while you were in her office after you had viewed the
20  video of the bar fight?
21      A.  Not that I can recall, no.
22      Q.  Did the meeting terminate at that point
23  after you had all discussed what it was you were
24  going to do next in terms of identifying Abbate and

Page 45

1  locating the victim?
2      MS. RUBENS: Asked and answered.
3      You can answer again.
4      THE WITNESS: Yes, let's do our job.
5  BY MR. PROVENZALE:
6      Q. So what did you do next?
7      A. Then I went out and I waited for Detective
8  Boyd to get there because she wanted a detective to
9  go along for the interview.
10     And then Lieutenant Naleway told Sergeant
11 Maraffino and Sergeant Martin try and find Abbate.
12     Q. So at some point in time yourself,
13 Lieutenant Naleway, Dion Boyd, Sergeant Maraffino,
14 and Sergeant Martin are all more or less in the same
15 place at the same time discussing what's going to be
16 done next?
17     A. Never, no.
18     Q. That's not correct?
19     A. No.
20     Q. Tell me to your recollection what was --
21 what happened once Detective Boyd was brought in on
22 the -- Strike that.
23     Let me ask you first how was Detective Boyd
24 brought in on this investigation as far as you're

Page 46

1  aware at that time?
2      MS. RUBENS: Objection, foundation, calls for
3  speculation.
4      THE WITNESS: I believe Detective Kirby
5  requested that he come over.
6  BY MR. PROVENZALE:
7      Q. Did she call him or did she call his
8  lieutenant or do you know what she did?
9      A. I'm assuming she called his office.
10     MS. RUBENS: You're not required to assume.
11 Just testify what you know.
12 BY MR. PROVENZALE:
13     Q. Just what you know.
14     A. I don't know.
15     Q. He showed up at some point later?
16     A. Yes.
17     Q. And who was present when he showed up?
18     A. Me.
19     I don't recall who else was there when he
20 showed up.
21     Q. Was Lieutenant Naleway there?
22     A. I don't know where he was, but he was on
23 the floor.
24     MS. RUBENS: I'll just say vague as to where.

Page 47

1  BY MR. PROVENZALE:
2      Q. Well, I'm talking like present when he
3  arrived, present where you were.
4      Was Lieutenant Naleway there when Dion Boyd
5  arrived where you were?
6      A. No.
7      Q. To your knowledge did Detective Boyd ever
8  have a discussion with Lieutenant Naleway where you
9  saw them talking and you didn't know what they were
10 talking about?
11     A. I don't recall.
12     I never saw that.
13     Q. When Detective Boyd got there what did you
14 and he talk about if anything?
15     A. Driving out to the victim's house.
16     Q. As of that point in time were you aware
17 whether or not from any source the victim had been
18 interviewed previously?
19     A. Yes, I was aware of that.
20     Q. And how did you become aware of that?
21     A. I believe we had -- I know I had copies of
22 the OPS interview.
23     Q. So in connection with the copies of the OPS
24 interview you had a typed statement that she had

Page 48

1  signed; is that correct?
2      A. I don't recall.
3      Q. Do you recall who it was that was the
4  officer who took the statement from OPS, the
5  investigator?
6      MS. RUBENS: Objection, vague.
7      THE WITNESS: I don't understand the question.
8  BY MR. PROVENZALE:
9      Q. When you saw the statement from OPS do you
10 remember seeing who the investigator was that took
11 the statement?
12     A. I don't recall a name on it, no.
13     Q. Do you know who Investigator Kamalick is,
14 K-a-m-a-l-i-c-k?
15     A. I don't know him personally, no.
16     Q. Ever hear of him?
17     A. No.
18     Q. As you sit here today then you don't know
19 whether or not Investigator Kamalick was the one who
20 had taken the victim's statement that you had the
21 opportunity to read as of that point when you and
22 Detective Boyd had met?
23     A. As I sit here today I don't know that
24 person.

12 (Pages 45 to 48)

Page 49

1    Q.  Did you get -- in addition to the statement
2  that you read, did you see a sworn affidavit or
3  certification from the victim as to the truth of what
4  was in the statement?
5    A.  I saw a copy of a sworn affidavit, yes.
6    Q.  Did you see any other supplemental reports
7  in connection with additional statements that the
8  victim had given regarding more detail about what
9  happened in the bar or what happened after Abbate
10  left and when responding officers arrived or anything
11  like that?
12    A.  No, I don't recall seeing anything like
13  that.
14    Q.  As of the time that you had met with
15  Detective Boyd, so when Detective Boyd shows up, at
16  that time had you learned anything regarding whether
17  Anthony Abbate after the fight in the bar occurred
18  had threatened the bartender or the owner of the bar
19  with false arrest or planting evidence on them in
20  order to get the videotape from them?
21    A.  I didn't know anything about that.
22    Q.  So as of the time that you met with
23  Detective Boyd you never heard any allegation that
24  Anthony Abbate had threatened or intimidated any of

Page 50

1  the witnesses or parties involved in the bar fight
2  that had occurred days before; is that correct?
3    A.  That's correct.
4    Q.  And during the course of the conversation
5  that you and Lieutenant Naleway and ADS Kirby had
6  with this individual from the state's attorney's
7  office in that meeting that we've already discussed,
8  there was never any discussion regarding that kind of
9  an allegation, that Anthony Abbate had threatened the
10  bartender or the owner of the bar with false arrest
11  or planting evidence or arresting people for DUI when
12  they left the bar?
13    A.  That's correct.  That never came up.
14    Q.  Do you recall how it was that you learned
15  of where the victim was when you were preparing to go
16  and take a statement from her?
17    A.  I believe it had a home address listed on
18  the information that we had from OPS.
19    Q.  Tell me everything, as you sit here today,
20  everything you recall reviewing from OPS prior to the
21  time that you went to take the victim's statement.
22    A.  There was a copy of a case report.  There
23  was a copy of a statement.  There was a copy of an
24  affidavit.

Page 51

1    I just remember those striking me.  If
2  there was other paperwork I don't recall what was in
3  there.
4    Q.  The case report, was this a handwritten
5  case report or was it one of the --
6    A.  It was a copy of a handwritten general
7  offense case report, a photocopy.
8    Q.  Do you recall that copy of the general
9  offense case report that was handwritten that you saw
10  whether it identified Anthony Abbate as the suspect
11  or offender?
12    A.  In that case report that I saw it did not.
13    Q.  And your recollection what it identified
14  was the offender was someone named Tony, last name
15  unknown, with a general physical description?
16    A.  I don't recall if it said his name in the
17  offender's box.  I don't recall.
18    Q.  In any event the actual identity of the
19  offender in the report that you read was not known;
20  is that correct?
21    MS. RUBENS:  Asked and answered.
22    THE WITNESS:  That's correct.
23  BY MR. PROVENZALE:
24    Q.  And the only -- Strike that.

Page 52

1    When you had discussed the investigative
2  avenue of taking a statement from the victim with ADS
3  Kirby and Lieutenant Naleway in ADS Kirby's office --
4    A.  The taking a statement was never discussed.
5  We were going to go out and interview the victim.
6    Q.  Go and interview her.  That's what I meant.
7    A.  That's two different things then.  Taking a
8  statement and interviewing is two different things.
9    Q.  Let's say interviewing her.
10    MS. RUBENS:  Thank you for clarifying.
11  BY MR. PROVENZALE:
12    Q.  When you had discussed going out and
13  interviewing the victim had you already had in your
14  possession and reviewed the prior statement and the
15  sworn verification that the victim had made and given
16  to OPS?
17    A.  You asked me that already.
18    The sworn affidavit and the statement was
19  part of that package I saw.
20    Q.  I'm talking about -- really what I'm
21  getting at, Sergeant, is when you saw those things.
22    A.  Before we left.  We had that before we
23  left.
24    Q.  Before you left like right when you met

13  (Pages 49 to 52)

Page 53

1   with Detective Boyd that's when you looked over the
2   things or did you already have those materials when
3   you were in ADS Kirby's office?
4       That's what I'm getting at.
5       A.  Before Detective Boyd got there I was given
6   a copy of all that stuff.  I reviewed it before
7   Detective Boyd got there.
8       Q.  Was that after your meeting that you had?
9       A.  That was after the meeting with the ADS.
10      Q.  After you had reviewed those materials did
11  you go back to ADS Kirby or to your lieutenant and
12  say why are we going out to interview a victim who's
13  already given a sworn statement?
14      A.  No.
15      Q.  At that point you have the OPS report that
16  has the victim's contact information on it.
17      Did you contact the victim to let her know
18  that you were coming?
19      A.  No.
20      Q.  Why didn't you do that?
21      A.  I wanted to show up at her doorstep and
22  interview her in person.
23      Q.  Without any advance warning, correct?
24      A.  That's correct.

Page 54

1       Q.  And you and Detective Boyd then went to her
2   house unannounced, correct?
3       A.  Correct.
4       Q.  And when you arrived tell me did she answer
5   the door or did somebody else?
6       A.  She answered the door.
7       Q.  And what was her demeanor when she answered
8   the door?
9       A.  She was pleasant.
10      Q.  She wasn't surprised to see anybody from
11  the Chicago Police Department?
12      A.  No.
13      Q.  She didn't exhibit any apprehension of you
14  being there unannounced?
15      A.  No.
16      Q.  Tell me what you said to her or what
17  Detective Boyd said to her and what she said to you
18  when she first opened the door.
19      A.  I identified myself as a sergeant with the
20  police department from internal affairs.  He
21  identified himself as a detective from internal
22  affairs.  He said we'd like to speak to you about the
23  incident that happened at the bar.
24      Q.  And what was her response to that?

Page 55

1       A.  She said sure, you guys can't get in the
2   front door here, it's messed up, you guys mind
3   walking around the back and coming in, and we said no
4   problem.
5       Q.  So at no time did she ever say anything to
6   the effect of why am I giving another statement, I've
7   already given several statements to the police
8   department?
9       A.  Never said that.
10      Q.  So you go around to the back door and come
11  in the house?
12      A.  Correct.
13      It's an apartment building.
14      Q.  And tell me what happens when you get into
15  her apartment.
16      A.  We walked up a back stairway.  She opened
17  up the door and led us into a small kitchenette area
18  of her apartment.
19      Q.  Did you all sit down at the kitchen table?
20      A.  At the kitchen table, correct.
21      Q.  And tell me what the conversation was when
22  you sat down.
23      A.  We told her we'd like to ask you a couple
24  questions about what happened.  She said sure, no

Page 56

1   problem.
2       Q.  Who was this that's talking?
3       A.  Both of us were talking.
4       Q.  Both you and Detective Boyd?
5       A.  Yes.
6       Q.  And one or the other or both of you said
7   we'd like to ask you some questions and she says
8   okay?
9       A.  Yes.
10      Q.  And you identified the questions that you
11  want to ask her about what had happened at the
12  bar; is that correct?
13      A.  I asked some questions, could you tell us
14  again what happened at the bar.
15      Q.  Okay.  And what do you remember her telling
16  you?
17      A.  She said he came in, he ordered a couple
18  drinks, he was drinking with his friends, he was
19  hitting his buddy, he had a few drinks, then he
20  ordered a round of drinks for the bar, he couldn't
21  pay for them, someone else paid for them, then he
22  ordered another round of drinks, he said he can't pay
23  for them, then someone else paid for them, then he
24  tried to order another round, she said you don't have

14  (Pages 53 to 56)

Page 57

1 any money and I'm not going to serve you any more
2 drinks.
3    Q. Everything that you just relayed there, is
4 that a summary of what she said --
5    A. Pretty much.
6    Q. -- or did she just basically narrate it the
7 way that you just did?
8    A. No, I'm summarizing it for you.
9    Q. So this is sort of a question and answer,
10 she'd say something, you'd ask her questions, she'd
11 answer back, something like that?
12    A. Correct, but I can't recall all the
13 questions I may have asked or he may have asked.
14    Q. You never created a report in connection
15 with the interview you conducted of Karolina Obrycka
16 on that date; is that correct?
17    A. That's correct.
18    Q. After you had learned that initial -- did
19 you ask her any questions in follow-up for details
20 about her injuries or where he hit her or how it felt
21 or anything like that?
22    A. I asked her about her injuries.
23    Q. And what did she say?
24    A. She says I have some bruises on my arms.

Page 58

1 She didn't show it. She says I'm bruised on my back,
2 and she lifted up her shirt. She showed me her back,
3 and I could see a slight bruise.
4    Q. Did you take any pictures of the injuries?
5    A. No, I did not.
6    Q. Prior to the time that you had left, in the
7 materials that you had reviewed back at IAD did you
8 see any photographs of injuries that were taken of
9 her prior to that time?
10    A. I did not see any photographs, no.
11    Q. Were you aware when you left to go speak
12 with her whether or not any photographs had been
13 taken of any injuries?
14    A. If I recall correctly I thought I saw in
15 the narrative that photographs were taken of her.
16    Q. And you're talking about the narrative of
17 what?
18    A. The OPS report that I had reviewed.
19    Q. So let me clarify then because I
20 misunderstood.
21       As I understood it you said that you had an
22 opportunity to review a statement that she had made?
23    A. Right.
24    Q. A sworn verification that she had executed

Page 59

1 regarding that statement?
2    A. Right.
3       I consider that statement from her an OPS
4 report.
5    Q. You said a narrative and I'm thinking maybe
6 there's something else.
7    A. To me a statement is a narrative of a
8 statement. That's a narrative.
9    Q. I want to make sure all of our definitions
10 are right so I don't misunderstand anything.
11    A. Okay.
12    Q. When you just said that you remember seeing
13 in the narrative you're talking about the narrative
14 statement that she had executed to OPS --
15    A. Correct.
16    Q. -- that you had the opportunity to review
17 prior to going, correct?
18    A. Correct.
19    Q. Okay. Do you recall any other reports that
20 you had reviewed other than -- listen so you don't
21 jump on me -- the original case report, her narrative
22 statement with the sworn verification?
23    A. Sworn affidavit.
24    Q. And sworn affidavit.

Page 60

1       Anything else?
2    A. There were other reports there. As I
3 stated before I don't recall what they were. I can't
4 recall, but I remember those definitely were in
5 there?
6    Q. Let me put it out there like this.
7       At a minimum whatever it was you reviewed
8 none of it indicated any statement from any person
9 indicating that Anthony Abbate after the beating had
10 threatened the owner of the bar and the bartender
11 that if they didn't turn the video over that he was
12 going to falsely arrest them, plant drugs on them
13 and/or customers coming out of the bar?
14    A. I didn't see any of that when I reviewed
15 any of the paperwork.
16    Q. The bruise that you saw on her back you
17 said -- you had mentioned it was on her right side?
18    A. Other side.
19    Q. Left side?
20    A. Uh-huh.
21    Q. Do you recall what the dimensions of that
22 bruise were?
23    A. No, I don't.
24    Q. Do you recall like what stage of the bruise

15 (Pages 57 to 60)

Page 61

```
 1   it was in?
 2        A.  It wasn't dark.
 3        Q.  Do you recall when you saw that bruise of
 4   connecting that up with some -- one of the punches
 5   that actually landed from or a kick that you saw
 6   Anthony Abbate do on the video that you had seen?
 7        MS. RUBENS:  I'm just going to object to
 8   foundation.
 9            He's not a reconstructionist, but you can
10   answer.
11        THE WITNESS:  I'm assuming that that's where it
12   came from was a kick.
13            I mean the way it was on her back it
14   wouldn't have been from a punch I would assume.  My
15   assumption as a police officer would be that you were
16   kicked in the back.
17   BY MR. PROVENZALE:
18        Q.  Well, what I'm asking is --
19        A.  Could I have seen that when I watched the
20   videotape seeing if that was the exact blow that she
21   took, no, no.
22        Q.  Did you ever go back to the video to verify
23   that what you saw on that location of her body lined
24   up with some blow that was --
```

Page 62

```
 1        A.  No.
 2        Q.  Let me finish the question.
 3        A.  I only watched that videotape that one time
 4   until people saw it on the news.  That's it.
 5        Q.  And just for this poor lady's sake you and
 6   I talking is going -- she's going to get up and walk
 7   out.  So you've got to let me finish the question,
 8   okay?
 9        A.  Okay.
10        Q.  So after you had interviewed her you did
11   not go back and review that tape, correct?
12        A.  That's correct.
13        Q.  Did she make any statement to you during
14   this interview where she recalled any facts about
15   knowing who the individual was that had attacked her?
16        A.  By name?
17        Q.  Yes.
18        A.  Full name?
19        Q.  Yes.
20        A.  No.
21        Q.  What did she say?
22            Tell me everything you recall her saying
23   during this interview that you and Detective Boyd did
24   of her regarding her identifying who it was that had
```

Page 63

```
 1   beat her up.
 2        A.  I'll never be able to recall everything she
 3   said, but I know she said it was a -- she believed it
 4   was a policeman and his name was Tony.
 5            That's what I can remember her saying.
 6        Q.  Did she say anything else other than just
 7   that his name was Tony?
 8            Did she say his last name is something
 9   like?
10        A.  No.
11        Q.  She never said anything like that?
12        A.  No.
13        Q.  At some point -- well, strike that.
14            So she generally described to you what had
15   occurred in terms of this individual attacking her
16   and then the circumstances leading up to it of him
17   drinking and her cutting him off and then she showed
18   you the injuries.
19            Anything else other than what you've said
20   so far on those subjects?
21            Any other subjects that she discussed with
22   you during the course of this interview?
23        A.  No, just what happened in the bar.
24        Q.  So what happened then at that point once
```

Page 64

```
 1   you concluded taking a statement from her -- I should
 2   say an interview with her?
 3            What did you do?
 4        A.  We told her we're going to try and arrest
 5   him for simple battery, we're going to try and put
 6   him in jail, I need you to sign a complaint right
 7   now, would you sign a complaint.
 8        Q.  All right.  And so you told her you were
 9   going to arrest him?
10        A.  We're going to try and arrest him, yes.
11        Q.  And what was her response when you said
12   that?
13        A.  She said good, he belongs in jail.
14        Q.  Is that -- those are -- to the best of your
15   recollection that's verbatim what she said?
16        A.  That's not verbatim.  That's to the best of
17   my recollection, good, he belongs in jail.  That's my
18   interpretation of what she said.
19            I can't recall exactly.
20        Q.  As you sit here today whether she said just
21   simply good or good, he belongs in jail, you don't
22   recall; is that correct?
23        A.  No, I don't recall.
24        MS. RUBENS:  Asked and answered.
```

16 (Pages 61 to 64)

Page 65

BY MR. PROVENZALE:
Q. Did you already have complaint forms that were filled out when you went to go see her?
A. I don't recall.
It might have been a blank complaint form that I had her sign for battery. It was a misdemeanor complaint.
Q. Was anything typed into it prior to the time that you left?
A. No, I don't think -- I don't recall typing anything into the complaint before I left the office.
Q. So it didn't identify People of the State of Illinois versus Anthony Abbate?
A. No, it did not.
Q. It didn't identify that on such and such, the fill in the blanks in terms of the name of the defendant, the date?
A. I don't recall if it did or did not, no.
Q. To the best of your recollection it was a blank?
A. It was just a blank misdemeanor form, correct.
Q. And so what you presented was a blank misdemeanor complaint form for her to sign; is that

Page 66

correct?
A. For simple battery. I believe the simple battery part was filled out, I believe.
I can't recall. I can't recall.
Q. So regardless you presented to her a complaint; is that correct?
A. A misdemeanor complaint for battery, yes.
Q. Did you explain to her what that was?
A. Yes, it was a misdemeanor complaint saying that he struck you and kicked you and when he was arrested he would be charged and we would notify you of the court date.
Q. Did she ask you any questions about what all that meant?
A. No.
Q. She signed it; is that correct?
A. That's correct.
Q. Did you or Detective Boyd witness her signature in her presence?
A. You know, I don't recall.
Q. And your testimony is that you told her that you would notify her of the court information after he was arrested; is that correct?
A. That's correct.

Page 67

Q. At that point then you had terminated the interview and left?
A. Correct.
Q. After she signed it?
A. Correct.
Q. Other than what you've testified about in connection with the events and the conversation that occurred during the course of the interview, is there anything else that you recall that occurred that you think is important in connection with what happened in that interview?
A. No.
Q. You then left the interview, is that correct, to go back to IAD --
A. That's correct.
Q. -- with Detective Boyd?
A. That's correct.
Q. And when you arrived back at IAD tell me what you did.
A. Lieutenant Naleway was still there. We told him we had interviewed Obrycka, and he told me that Sergeant Maraffino and Sergeant Martin were out looking for Abbate.
Q. And did he tell you where they were looking

Page 68

for him at?
A. I believe he said they were going to go to where he was supposed to be at work and then they were going to go to his residence.
Q. Were you aware what district Abbate was assigned at that time?
A. I don't recall.
Q. Prior to your returning to IAD had you had any conversations with either Sergeant Maraffino or Sergeant Martin about their involvement in the investigation?
A. Prior to leaving Obrycka's house?
Q. Right.
In other words when you were back at IAD prior to even going to her house did you ever talk with them or were present with when they were either being assigned part of the investigation or talking about --
A. I heard them being assigned by Lieutenant Naleway to try and find him and then they knew I was going to interview her.
Q. And Detective Boyd was present at that time I take it?
A. I don't recall if he was present or not.

17 (Pages 65 to 68)

Page 69

1    Q.   During the course of the interview with
2   Miss Obrycka did she ever tell you what her
3   experiences -- what she had done with OPS
4   investigators prior to that time?
5    A.   Not that I recall, no.
6    Q.   Do you remember her saying anything that
7   OPS had taken pictures of her injuries prior to the
8   time that you and Detective Boyd got there?
9    A.   I don't recall her saying that.
10   Q.   Do you remember her saying anything about
11  her having picked Mr. Abbate out of a photo lineup
12  prior to the time that you and Detective Boyd showed
13  up at her house?
14   A.   I don't recall if that came up either.
15   Q.   Did you report back to Lieutenant Naleway
16  what it is that you had learned from the victim
17  Karolina Obrycka after your interview with her?
18   A.   It was the same thing he already knew
19  about.
20       There was nothing -- we just reported we
21  interviewed her and we had her sign a complaint.
22   Q.   The answer is no then you didn't report
23  back to him about --
24   A.   I reported back to him.

Page 70

1       I didn't learn anything new.  That should
2   be my answer.  I didn't learn anything new that we
3   already didn't know.
4    Q.   So that's what I'm getting at.
5       You get back to IAD, you do go to him and
6   you tell him we didn't learn anything new, we had her
7   sign a complaint?
8    A.   That's correct.
9    Q.   And that was the entirety of your report
10  back to him; is that correct?
11   A.   That's correct.
12   Q.   And then after reporting back to Lieutenant
13  Naleway then did you and Detective Boyd have a
14  conversation about who was going to paper that
15  portion of the investigation?
16   A.   No.
17   Q.   Was there some preexisting understanding as
18  to who was going to do that?
19   A.   Yes.
20   Q.   Because the detective always does that?
21   A.   That's correct.
22   Q.   All right.  Did you do -- the privileges.
23   A.   Well, I was a detective so I know.  If the
24  sergeant says you do the report you do the report,

Page 71

1   and we're not allowed as sergents to do a detective
2   supplementary report just so you guys are aware of
3   that.
4    Q.   And that's an IAD policy or is that --
5    A.   That's a bureau of investigative services
6   policy.
7    Q.   But regardless of who did the actual
8   investigative report or supplemental report you
9   didn't do any to/froms regarding any other
10  circumstances of what you learned during the course
11  of your interview with her or anything else; is that
12  correct?
13   A.   That's correct.
14   Q.   Tell me what your next involvement was in
15  this case after you had returned and reported to
16  Lieutenant Naleway that you didn't learn anything new
17  and you had had her sign a complaint.
18   A.   My next involvement -- well, those guys
19  returned and said they didn't find her.
20       So that was the end of my tour for that
21  day.
22   Q.   Find her or him?
23   A.   Him, I'm sorry, they didn't find him.
24       They returned and said they weren't able to

Page 72

1   find him.  So my tour ended at midnight so I went
2   home.
3    Q.   So Sergeants Maraffino and Martin returned
4   at some point later on that night?
5    A.   Later on in the evening, right.
6    Q.   And what did they -- you had a conversation
7   with them or did you hear them reporting to somebody?
8    A.   I had a conversation with them.
9    Q.   What do you remember -- and if you can
10  specify who it was that you remember learning it
11  from, what do you remember learning?
12   A.   It was probably Sergeant Maraffino, that
13  they didn't find him at work and they didn't find him
14  at his house.
15   Q.   Did they learn any information as to his
16  whereabouts from anyone other than just showing up at
17  places and not finding him there?
18   A.   They had just showed up at places and they
19  didn't find him there.
20   Q.   Are you aware of whether they did any
21  further investigation to attempt to locate him by
22  talking with family members of Abbate or anything
23  like that?
24   A.   I don't know.

18  (Pages 69 to 72)

Page 73

1    Q.  At that time when they had returned back to
2  IAD that evening did they advise you that well,
3  apparently he's checked into a rehab facility
4  somewhere and we can't get him?
5    MS. RUBENS:  I object to vague as to they.
6    Did anyone advise him?
7  BY MR. PROVENZALE:
8    Q.  I'm saying did either Maraffino or Martin
9  advise you that they had learned that Abbate had
10  checked into a rehab facility?
11    A.  They didn't tell me that that night, no.
12    Q.  So the end of your tour comes.  You're done
13  with your shift.
14    What's your next involvement in this case
15  after that day?
16    A.  The next day I returned for my tour of duty
17  at 4:00 and I learned -- I believe the lieutenant
18  informed me that Abbate has checked himself into a
19  rehab facility.
20    Q.  And you're talking about Lieutenant
21  Naleway?
22    A.  Correct.
23    Q.  What did -- did he tell where it was that
24  he learned that information from?

Page 74

1    A.  He did not.
2    I don't recall, no.
3    Q.  Did he tell you what rehab facility it was?
4    A.  No.
5    Q.  Did he tell where the rehab facility was
6  at?
7    A.  No.
8    Q.  Was he telling you this because he wanted
9  you to go and locate Abbate or was this just sort of
10  an informational follow-up to let you know where
11  things stood, or what was your understanding of him
12  telling you this?
13    A.  There was no reason to look for him anymore
14  because you couldn't find him anyway.
15    Q.  Well, the looking for him portion of the
16  investigation was Martin and Maraffino's job, right?
17    A.  But I mean if one of those sergeants wasn't
18  coming in that night then it would fall back on a
19  sergeant that was present.
20    Q.  In any event it's your understanding he was
21  informing you to generally let you know as part of
22  the investigation and whether it means for you not to
23  look for him any further, we know where he's at, you
24  don't have to look for him?

Page 75

1    A.  We know he's in a rehabilitation facility,
2  we can't get to him, we can't find him, so there's no
3  reason to look for him.
4    Q.  But other than that Lieutenant Naleway did
5  not share with you how he learned that information or
6  from whom he learned it; is that correct?
7    A.  That's correct.
8    Q.  Is it correct that as of the end of your
9  shift the prior day, the day you had Karolina Obrycka
10  sign the complaint after you had interviewed her,
11  that you did not obtain a warrant at that time from a
12  judge?
13    A.  That is correct.
14    Q.  And the next day you did not obtain a
15  warrant; is that correct?
16    A.  That is correct.
17    Q.  In fact you didn't obtain a warrant on the
18  case until March 14th; is that correct?
19    A.  I did not obtain a warrant.
20    Q.  In fact there was never a warrant obtained,
21  right?
22    A.  I don't recall.
23    I don't know.
24    Q.  Did you ever have a conversation with

Page 76

1  Lieutenant Naleway or ADS Kirby where either of them
2  directed you not to get a warrant signed by a judge
3  to arrest Mr. Abbate on the sworn complaint of
4  Miss Obrycka?
5    A.  Never had any type of conversation like
6  that at all.
7    Q.  Was there ever any discussion that you were
8  present during at which time either ADS Kirby or
9  Lieutenant Naleway discussed the timing of obtaining
10  a warrant for Mr. Abbate on the sworn complaint
11  Miss Obrycka had signed in your presence?
12    A.  Never had any type of discussion like that
13  with either one of them.
14    Q.  After you had learned that Mr. Abbate was
15  in a rehab facility from Lieutenant Naleway do you
16  recall any discussion of well, don't you think we
17  ought to get a warrant now because it doesn't look
18  like he's going to turn himself in?
19    A.  Never a discussion about that at all.
20    Q.  Generally on cases that you've been
21  involved in prior to this time in February of 2007,
22  so whatever this day was in February of '07, in your
23  experience on cases where an officer was accused of
24  committing a crime and that IAD was involved to the

19 (Pages 73 to 76)

Page 77

1   extent of doing a criminal investigation and charging
2   portion of it, where IAD did not get an arrest
3   warrant on the complaint signed by a citizen?
4       A.  I can only answer me personally; and no,
5   I've never done it.
6           I can't answer for the other sergeants that
7   are up there.
8       Q.  I'm just asking you personally.
9       A.  No, never done it.
10      Q.  And your experience is because you simply
11  contact the officer and tell them to surrender,
12  correct?
13      A.  That's usually the way it's done, correct.
14      Q.  Have you ever been involved in a case
15  personally where you could not locate the officer and
16  a supervisor then didn't tell you well, you better go
17  get a warrant so that we have it if he's not going to
18  turn himself in?
19      A.  You're talking as a sergeant or as a
20  detective?
21      Q.  I'm talking about as a sergeant in IAD, in
22  an IAD investigation.
23      A.  No.  Me personally I've never had that
24  happen, no.

Page 78

1       Q.  In every case that you were involved in
2   prior to this case in which a citizen swore out a
3   complaint for whatever, misdemeanor or felony --
4   well, it wouldn't be a felony -- for a misdemeanor,
5   that you were able to contact and locate the officer
6   and direct him to surrender shortly after the
7   complaint was signed; is that correct?
8       A.  Me personally I've never handled anything
9   like that until Abbate.
10      Q.  Well, then let's talk about that then.
11          So prior to this case had you ever been
12  involved in a case where an officer was charged with
13  a crime as part of an IAD investigation?
14      A.  Me personally, no.
15      Q.  So prior to this time you didn't have any
16  practice of whether or not you would or would not
17  pursue a warrant along with a complaint because you
18  had never obtained a sworn complaint against a police
19  officer as an IAD investigator, correct?
20      A.  I've never obtained a sworn complaint
21  against a police officer.
22          Sworn affidavits, yes; but never a sworn
23  complaint against a police officer, no.
24      Q.  I'm talking about criminal.

Page 79

1       A.  Right.
2           No, I've never obtained a sworn complaint
3   against a police officer; no.
4       Q.  And it's correct that up to the point in
5   time where Mr. Abbate did finally surrender on March
6   14th to you and to Sergeant Bigg that there was no
7   discussion that you had with either ADS Kirby or
8   Lieutenant Naleway about obtaining a warrant for his
9   arrest on the sworn complaint of Karolina Obrycka; is
10  that correct?
11      A.  That's correct.  There was never a
12  discussion about a warrant.
13      Q.  And therefore you were never directed to do
14  that or not directed to do that correct?
15      A.  Correct, no discussion of a warrant.
16      Q.  Other than the following day then -- we're
17  talking about the day when Lieutenant Naleway
18  informed you of where it was that Mr. Abbate is
19  apparently at -- what was your next involvement in
20  the circumstances of the investigation of Mr. Abbate?
21      A.  When I came into work one afternoon at 4:00
22  and the lieutenant informed me that Abbate was to
23  turn himself in at 6:00 that evening.
24      Q.  Lieutenant Naleway again?

Page 80

1       A.  Yes, sorry, Lieutenant Naleway.
2       Q.  And you prepared an arrest report in
3   connection with that circumstance; is that correct?
4       A.  That's correct.
5       MR. PROVENZALE:  And I'm just going to ask the
6   court reporter if I can get an exhibit sticker.
7           (Stehlik Deposition Exhibit No. 1 was
8           marked for identification.)
9   BY MR. PROVENZALE:
10      Q.  Sergeant, I'm going to show you a one-page
11  document.
12      A.  It's a supplementary report.
13      Q.  It's not an arrest report.  It's a
14  supplementary report.
15          I'm going to ask you can you just tell me
16  do you recognize that document?
17      A.  Yes.
18      Q.  And that's a supplementary report that you
19  authored in connection with the arrest of Mr. Abbate
20  when he turned himself in on March 14th of 2007; is
21  that correct?
22      A.  That's correct.
23      Q.  And you note in this supplementary report
24  that the victim was notified of the court

Page 81

```
 1   information?
 2       A.  Correct.
 3       Q.  What did you do?
 4       A.  I called her on her cell phone.
 5       Q.  Do you recall where it was that you had
 6   obtained her cell phone information?
 7       A.  It was part of the personal information
 8   that OPS obtained.
 9       Q.  And so what telephone did you call her
10   from?
11       A.  Phone number at work, phone at work.
12       Q.  One of the phones in IAD?
13       A.  Yes, probably the phone from my office.
14       Q.  Do you know whether or not on the other end
15   of those calls they come up blocked or --
16       A.  It should come up City of Chicago.
17       Q.  What did you tell her?
18       A.  I said Abbate was placed under arrest, I'm
19   going to give you your court information, do you have
20   a pencil or a pen to write this down.
21           She said hold on a minute.  She got back to
22   me.  I said he's going to court at Grand and Central,
23   5555 West Grand, he's going to court on the 12th of
24   April 2007 and his court time is 13:30 hours which is
```

Page 82

```
 1   1:30 in the afternoon.
 2           I had her read it back to me.  I said okay,
 3   you got it, good luck, make sure you go to court.
 4       Q.  Did you tell her the branch info?
 5       A.  Branch 23-4.  Yes, I'm sorry, I forgot
 6   that, 5555 West Grand, Branch 23.
 7       Q.  And you've recorded in your supplementary
 8   report that information on the bottom.
 9           I take it that's the information that as
10   you just testified that you relayed to her over
11   the phone; is that correct?
12       A.  That's correct.
13       Q.  Did you ever send any kind of a written
14   notification to her as follow-up?
15       A.  I don't recall.
16       Q.  After you had left her house in conclusion
17   of the interview that you and Detective Boyd had with
18   her did you leave her a copy of the complaint that
19   you had her sign?
20       A.  No.
21       Q.  I know you don't recall exactly what was on
22   the complaint form and that it may have been blank or
23   it may have just said a simple battery on it.
24           Do you recall whether when you got back to
```

Page 83

```
 1   IAD that afternoon that you filled out the remainder
 2   of the complaint?
 3       A.  I did not fill it out.
 4       Q.  Do you know if anybody did or who did if
 5   anybody?
 6       A.  It was eventually filled out when he was
 7   arrested.
 8       Q.  So you're talking about on the day of the
 9   14th the remainder of it was filled out?
10       A.  When he was arrested, correct.
11       Q.  And who filled it out?
12       A.  I don't recall.
13       Q.  Do you know what portions of it were filled
14   out at that point?
15       A.  I'm assuming -- I shouldn't say assume.
16       MS. RUBENS:  Don't guess.
17       MR. PROVENZALE:  Yes, I don't want you to guess.
18       THE WITNESS:  I don't know.
19           I don't recall what was filled out on the
20   form, no.
21   BY MR. PROVENZALE:
22       Q.  In Field 90 on the supplementary report it
23   identifies extra copies required.
24           Do you see that?
```

Page 84

```
 1       A.  Yes.
 2       Q.  Who's identified in there?
 3       A.  Mine has a stamp on it.
 4           I believe that's Area 5 homicide gang sex.
 5   They would handle follow-ups to any batteries, and a
 6   normal copy would be a copy would go to the district.
 7       Q.  Which district?
 8       A.  25.
 9           Whatever beat is up at the top, beat of
10   occurrence, would get a copy of this, and a copy
11   would also go to the detective area for the detective
12   whose name is at bottom to follow up on it.
13       Q.  Mr. Abbate showed up at IAD, correct?
14       A.  Correct.
15       Q.  And you and Sergeant Bigg processed him; is
16   that correct?
17       A.  Filled out the paperwork, correct.
18       Q.  Did Sergeant Bigg have any contact with
19   Mr. Abbate during the course of processing and
20   filling out the paperwork?
21       MS. RUBENS:  I object to foundation and
22   speculation.
23       THE WITNESS:  I don't recall if he did or not.
24
```

Page 85

BY MR. PROVENZALE:

Q. Prior to that time did you know whether or not Sergeant Bigg had any personal relationship with Mr. Abbate or any of his family members?

A. I do not know any of that.

Q. At any time did you see Sergeant Bigg interact with Mr. Abbate that evening when Mr. Abbate had surrendered himself?

A. I did not see him interact with him, no.

Q. In any way he did not interact with him?

A. Until we processed or drove him to the 1st District lockup.

Q. So that was --

A. After the processing or after the report was completed.

Q. And taking him to the 1st District would have just been for lockup purposes, correct?

A. Correct.

Q. You would have completed all of the inventory -- property inventory, personal information, booking procedures, when he surrendered himself prior to taking him to lockup, correct?

A. An arrest report and a complaint would have been prepared prior to taking him there.

Page 86

Q. And your testimony is during the entire course of that booking or processing at IAD where Mr. Abbate surrendered you handled the entirety of that personally; is that correct?

A. I did the arrest report.

I don't recall if -- I don't recall if I did the complaint or Detective Bigg did the complaint. I don't recall, but I know I did the arrest report. That supplementary report was done after.

Q. As of March 14th prior to the time that Lieutenant Naleway had told you that arrangements had been made for Mr. Abbate to surrender at 6:00 had you had any conversations with Lieutenant Naleway from that point -- between that time and when he had told you that Abbate was in a rehab facility in connection with the investigation of Mr. Abbate for any purpose?

A. No.

Q. So after you had the conversation with Mr. -- with Lieutenant Naleway about Mr. Abbate being in a rehab facility the next thing you talked to Lieutenant Naleway about regarding Mr. Abbate is that he's going to surrender himself at 6:00?

A. That would be correct.

Page 87

Q. Did Lieutenant Naleway in that conversation when he notified you of Mr. Abbate coming in give you any information about Mr. Abbate -- the circumstances of him leaving the rehab facility or how it was that he learned that Mr. Abbate was going to surrender himself?

A. I don't recall any of those facts, no.

Q. Where did you place Mr. Abbate when he turned himself in at the IAD?

A. He was escorted to a large conference room right on the floor there.

Q. Was he searched and cuffed?

A. No, he was not searched and cuffed; no.

Q. He was technically in custody at that point, correct?

A. Correct.

Q. And during the course of time that you were preparing the paperwork was he just alone in a room?

A. No.

Q. Who was present with him?

A. Sergeant Maraffino was present with him.

Q. And do you know whether or not he and Sergeant Maraffino had any conversation?

A. No, I don't.

Page 88

Q. Prior to the time that you placed him in the room had you inquired whether he would be willing to make any statement or be interviewed in connection with his involvement?

A. I advised him of his rights, asked him if he'd like to speak and he said no.

Q. Did you advise him of his rights after he had turned himself in?

A. Yes, after he was placed into the conference room; yes.

Q. Are you aware of whether -- Strike that.

Is it your understanding that at some point in time prior to him turning himself in somebody had made arrangements with Mr. Abbate for him to turn himself in at a particular time?

A. I was informed by the lieutenant that Abbate was turning himself in at 6:00. That's all I knew.

Q. Did you ever become aware of any effort that anyone made to take a statement or interview Mr. Abbate in connection with his involvement in what happened in the bar or anything else prior to the time that he had surrendered himself at 6:00 or approximately 6:00 on March 14th?

22 (Pages 85 to 88)

Page 89

```
 1      A.  I don't know anything about that, no.
 2      Q.  Well, did you ever inquire about that, has
 3  anybody taken a statement from this guy because we
 4  wanted to do it earlier and it was --
 5      A.  I never inquired about it, no.
 6      Q.  Other than the conversation in ADS Kirby's
 7  office that you had with her and Lieutenant Naleway
 8  where the speakerphone conversation occurred, from
 9  that point in time up to the point in time where you
10  received Mr. Abbate when he surrendered himself at
11  IAD, did you have any other conversations with
12  ADS Kirby in connection with this investigation of
13  Mr. Abbate --
14      A.  No.
15      Q.  -- and the charging?
16      A.  No.
17      Q.  When you read him his rights did you read
18  him his rights off a preprinted form or did you just
19  do it from memory?
20      A.  Memory.
21      Q.  And did you provide him with a waiver form
22  to see if he would sign it or did you just assume he
23  was going to invoke?
24      A.  I didn't present him a waiver form.
```

Page 90

```
 1      Q.  Who else was present at the time that you
 2  read him his rights?
 3      A.  I believe Sergeant Maraffino was sitting in
 4  the room with him.
 5      Q.  So you were in the room where Mr. Abbate
 6  was with Sergeant Maraffino when you read Mr. Abbate
 7  his rights?
 8      A.  I gave it to him from memory, yes.
 9      Q.  And he declined to waive them, correct?
10      A.  That's correct.  He didn't want to make a
11  statement.
12      Q.  Did he invoke counsel at that time?
13      Did he say I've got an attorney, I'm not
14  saying anything?
15      A.  I don't recall.
16      Q.  And what you have in your report is just
17  that he declined to make any statement regarding this
18  incident.  I read that verbatim out of your report.
19  You can see it there.
20      Does that refresh your recollection or as
21  you sit here today you just don't recall one way or
22  the other?
23      A.  Me when I put declined to make any
24  statement he's not going to say anything.  He didn't
```

Page 91

```
 1  say anything.
 2      Q.  In other words he's invoking his right to
 3  remain silent?
 4      A.  Correct.
 5      Q.  My question is more specific.
 6      You did not record -- you have no
 7  recollection of him ever saying I want to talk to an
 8  attorney?
 9      A.  He never said that, no.
10      Q.  And you're not aware of any further effort
11  by anyone's part to try to go back and see if he
12  would be willing to talk later on, correct?
13      A.  I'm not aware of anybody trying to do that,
14  no.
15      Q.  You never did that either?
16      A.  No.
17      Q.  You and Sergeant Bigg drove him over to the
18  1st District?
19      A.  Correct.
20      Q.  Was there any conversation in the car on
21  the way?
22      A.  Just between Bigg and I, just general
23  stuff, weather, what's going on.
24      Q.  No conversation with Mr. Abbate?
```

Page 92

```
 1      A.  No.
 2      Q.  Did he make any statements in the car?
 3      A.  No.
 4      Q.  Did either you or Sergeant Bigg at any time
 5  while you were present make any comment to him like
 6  don't worry, it's no big deal, anything like that?
 7      A.  No, no.
 8      Q.  Did you have a case file where all the
 9  materials that were related to this investigation in
10  IAD were kept that was like a central case file for
11  all the investigators to have access to or did you
12  have your own personal one?
13      A.  I didn't keep any of it.
14      Q.  What did you do with the signed complaint
15  when you got back to the --
16      A.  I held on to it until he was arrested, but
17  I didn't keep any of the paperwork after he was
18  arrested.
19      Q.  All right.  That's what I'm getting at.
20      You've already mentioned that there was
21  some OPS records that were made available to you
22  prior to going to talk to Karolina, right?
23      A.  Yes.
24      Q.  Were those kept in like a central case file
```

23 (Pages 89 to 92)

Page 93

1 or were they just loose papers that were handed to
2 you?
3     MS. RUBENS: Objection, foundation, calls for
4 speculation.
5     THE WITNESS: I don't -- they were loose papers
6 given to me.
7     I don't recall who kept them after it was
8 all over. They were loose papers that were given to
9 me.
10 BY MR. PROVENZALE:
11     Q. To your recollection was there -- well, let
12 me ask you.
13     In general on cases when you are assigned
14 to them and there's already some background
15 information that was done by OPS prior to the time
16 that you got involved -- let me back that whole
17 question up and I'll ask you.
18     Have you ever had a case that you were
19 involved in prior to this where IAD got involved in
20 an investigation that OPS already had ongoing?
21     A. No.
22     Q. Have you since?
23     A. No.
24     Q. When Mr. Abbate turned himself in to IAD

Page 94

1 had he driven himself or did somebody drive him?
2     MS. RUBENS: Foundation and speculation.
3     THE WITNESS: I believe his father drove him.
4 BY MR. PROVENZALE:
5     Q. And did his father walk him in?
6     MS. RUBENS: Same objections.
7     THE WITNESS: He showed up on the elevator on
8 his own. I believe he was at the front door by
9 himself.
10 BY MR. PROVENZALE:
11     Q. Now as of the time you had processed --
12 well, that you had done the paperwork, taken
13 Mr. Abbate in on his surrender on March 14th, had you
14 by that time learned any information regarding
15 Mr. -- any accusation against Mr. Abbate of having
16 threatened the owner of the bar or Karolina, that in
17 the days following the incident that occurred at the
18 bar that Mr. Abbate was going to falsely arrest
19 people or plant drugs on them if they didn't turn the
20 video over to him?
21     A. I have no knowledge of that at all.
22     Q. Do you remember ever hearing that, those
23 kinds of allegations against Mr. Abbate, from the
24 time that you first got involved when you met with

Page 95

1 Lieutenant Naleway to go see the video up until
2 today?
3     A. I heard all that on the news, saw that in
4 the news, read it in the paper. That's where I heard
5 it from.
6     Q. And that would have been circumstances that
7 you learned after Mr. Abbate had surrendered himself
8 on the 14th, right?
9     A. That's correct.
10     Q. So as of the time that Mr. Abbate
11 surrendered himself on March 14th or at that time did
12 you contact Miss Obrycka to ask her whether or not
13 she had any input that she wanted to give in terms of
14 what kind of a bond Mr. Abbate should have?
15     A. I only contacted her after he was processed
16 and gave her the court information.
17     Q. Do you know how it was that the bond was
18 handled for Mr. Abbate after he surrendered and you
19 finalized the complaint or whoever finalized the
20 complaint then submitted it to get filed?
21     A. I don't understand the question.
22     Q. Well, there's no warrant.
23     A. Right.
24     Q. And so you've just got a complaint and

Page 96

1 somebody surrendering on a complaint.
2     A. On a misdemeanor charge the bond --
3     Q. Is $1,000 normally, right?
4     A. I have nothing to do with bond. That's set
5 by the district or the watch commander of a district.
6     Q. And my question to you specifically is did
7 anybody ever contact you and say hey, there's certain
8 things that you need to keep aware of when you set
9 the bond in this case because there's more going on?
10     A. Nobody contacted me about that at all, no.
11     Q. And in terms of the bond as I understand it
12 it was a recog bond on this or an I bond; is that
13 correct?
14     MS. RUBENS: Foundation, speculation.
15     He just said he didn't know anything about
16 bonds.
17 BY MR. PROVENZALE:
18     Q. Did you say that? I'm sorry, it went right
19 past me.
20     A. I don't know what the bond was set.
21     Q. I take it then from your answer then that
22 you never communicated to anybody that there needed
23 to be special conditions on the bond for any
24 particular reason?

24 (Pages 93 to 96)

Page 97

1    A.  No, I never communicated that to anybody.
2    Q.  Because you didn't know of any that needed
3  to be placed, correct?
4    A.  That's correct.
5    Q.  Do you know whether or not Lieutenant --
6  Strike that.
7      Do you know whether or not Lieutenant
8  Naleway had ever communicated with anyone that you've
9  learned since then that he tried to say hey, you
10  know, somebody needs to get the bond to something
11  other than what the standard bond is on a simple
12  battery?
13    A.  I never learned of any of that.
14    Q.  Let me ask you just in terms of -- you've
15  been a police officer for 25 years, and learning what
16  you learned on the news in the days following
17  Mr. Abbate having surrendered himself would you agree
18  that it would have been an appropriate bond condition
19  that a no contact order be entered for Mr. Abbate at
20  least to the extent that at the time that he
21  surrendered on the battery there were allegations
22  that he had threatened and intimidated witnesses?
23    MS. RUBENS:  Objection, relevance, incomplete
24  hypothetical, compound.

Page 98

1      You can answer.
2  BY MR. PROVENZALE:
3    Q.  I'm just asking your opinion.
4    A.  Someone said you're a former state's
5  attorney.  You know as police officers we have
6  nothing to do with bond.  We don't do anything with
7  it.  We present what we have.
8      You got a simple battery.  The desk
9  sergeant gets it.  The watch commander makes the
10  ultimate decision.  I didn't tell the watch commander
11  that he had any special conditions.  I presented a
12  simple battery case report to the watch commander in
13  a simple battery arrest.
14      I don't make any decisions on -- for 25
15  years I never made that decision.
16    Q.  I understand that, and I know you don't
17  have any involvement in that especially when --
18    A.  You're asking me after the fact when I had
19  found out.  Then after the fact when I had found out
20  there would have been a deeper investigation, but
21  this is all after my initial contact with him.
22    Q.  You were in the dark about anything else
23  about --
24    A.  All that stuff that you're asking me I was

Page 99

1  in the dark about.  I knew nothing about that when he
2  was arrested for this.
3    Q.  Okay.  I take it from your comment then
4  that had you known about those things you would have
5  handled it differently, correct?
6    A.  I mean any police officer I think had they
7  known about that would have handled it differently.
8      If you're aware of other circumstances as a
9  detective you would have made someone else aware of
10  those.
11    Q.  You're aware that about a week after --
12  within a week after Mr. Abbate had surrendered
13  himself to you that a felony warrant complaint was
14  issued for Mr. Abbate for aggravated battery?
15    A.  I wasn't aware of that.  I heard it on the
16  news.
17    Q.  You're aware of that today?
18    A.  I'm aware of it today, yes.
19    Q.  And you were aware of it shortly after it
20  happened because you saw it on the news?
21    A.  Correct.
22    Q.  Tell me what did you see on the news?
23    A.  That he was arrested for aggravated battery
24  I believe.

Page 100

1    Q.  Did you see Sergeant Skala or Dion Boyd on
2  the news when you had seen the story about Mr. Abbate
3  being arrested?
4    A.  No.
5    Q.  Did you ever talk with Sergeant Skala or
6  Detective Boyd after you had seen on the news that
7  Mr. Abbate had been arrested about anything that
8  occurred during the course of time that they arrested
9  him?
10    A.  No.
11    Q.  Have you ever talked to them about it?
12    A.  No.
13    Q.  I'm only asking for your understanding.  If
14  you don't know you don't know.
15      But do you know why Sergeant Skala would
16  have been involved in the investigation if yourself,
17  Sergeant Maraffino, and Sergeant Martin from general
18  investigations were involved already and Detective
19  Boyd from confidential investigations was involved?
20    A.  I don't know.
21    Q.  Other than -- Strike that.
22      Can you tell me how it was that Sergeant
23  Bigg was assigned to handle the intake and processing
24  of Mr. Abbate?

25  (Pages  97  to  100)

Page 101

1      A.  I don't know.
2      Q.  You've already told me that Lieutenant
3  Naleway was the one who told you you're going to
4  handle it.
5          Do you know how it was that -- whether
6  Lieutenant Naleway was the one that told Sergeant
7  Bigg about it?
8      A.  I don't know.
9      Q.  Did you ever hear about a meeting occurring
10  over at OPS with Tom Bilyk and Lauren Freeman from
11  the state's attorney's office along with Dion Boyd?
12      A.  No, I did not.
13      Q.  Did you ever have a conversation with Dion
14  Boyd where he told you that he was at a meeting over
15  at OPS with --
16      A.  No.
17      Q.  Let me finish the question and then you can
18  say no.
19      A.  Sorry.
20      Q.  -- where he was over at OPS with Keith
21  Calloway, Tom Bilyk, and Lauren Freeman and other OPS
22  individuals where the tape was viewed again?
23          MS. RUBENS:  Just in general I just want to
24  instruct you not to discuss anything you've learned

Page 102

1  through counsel, myself, Mr. McGovern, or
2  Miss McInnis.
3  BY MR. PROVENZALE:
4      Q.  My question is only about whether you
5  talked to Dion Boyd about it, whether he ever told
6  you I was at this meeting where we saw the video.
7      A.  I've never spoken to Dion Boyd about that
8  after the fact.
9      Q.  As of the time that you and Dion Boyd had
10  gone to go over to interview Karolina Obrycka were
11  you aware at that time of whether he had seen the
12  video?
13      A.  I'm not aware if he saw the video or not.
14      Q.  Nothing as you sit here today that you
15  recall that in your conversation with him indicated
16  that he had already seen the video?
17      A.  At that time on that date that him and I
18  went together, no, I don't recall him seeing the
19  video.  It was never brought up.
20      Q.  When you drove Mr. Abbate from IAD over to
21  the 1st District, you and Sergeant Bigg, you were in
22  an unmarked squad?
23      A.  My squad car, yes.
24      Q.  Cage?

Page 103

1      A.  No cage.
2      Q.  Was Mr. Abbate handcuffed in the back?
3      A.  Yes, he was.
4      Q.  Had you searched him prior to placing him
5  in the vehicle?
6      A.  Yes, he was.
7      Q.  Was he searched prior to the time that he
8  was placed in the room in IAD where he and Sergeant
9  Maraffino were sitting?
10      A.  I can't answer that.  I didn't search him.
11      I can't answer if he was searched by
12  anybody else.
13      Q.  Okay.  Did you do any kind of property
14  inventory of him prior to taking him over to the 1st
15  District where you'd check to see if he had a wallet
16  or whatever on him?
17      A.  No.
18      Q.  I take it then at some point he surrendered
19  himself and then he was delivered to you by whomever
20  received him at IAD; is that correct?
21          MS. RUBENS:  Foundation, speculation.
22  BY MR. PROVENZALE:
23      Q.  In other words when he showed up at IAD you
24  said he came up the elevator.

Page 104

1          He was already within the secured perimeter
2  of IAD?
3      A.  Of the building, right.
4      At that point he still had his star and ID
5  so he was allowed access up to the fifth floor.  At
6  that point he was allowed entry onto the fifth floor.
7  It's a secured floor.  He can't get in.  You have to
8  open up the door to let him in.
9      Q.  So somebody let him in?
10      A.  I believe Lieutenant Naleway let him in.
11      We were all standing there waiting for him
12  to come up.  They called and said he's on his way up.
13      Q.  So do you know -- did you see anybody
14  search him at that point?
15      A.  No.
16      Q.  From that point until the time when you
17  searched and prior to placing him in the vehicle do
18  you know whether anybody had searched him?
19      A.  No, I do not.
20      Q.  Even a pat down?
21      A.  I don't know.
22      MR. PROVENZALE:  Can we take like five minutes?
23      I think I'm almost done.
24      (Short recess.)

26  (Pages 101 to 104)

Page 105

BY MR. PROVENZALE:

1  Q.  Just a quick couple follow-ups.
2      At some point in time you learned -- your
3  testimony is the first you learned that Mr. Abbate
4  had been arrested on aggravated battery after you had
5  already processed him and arrested him for the simple
6  battery was on the news; is that correct?
7      A.  That's how I learned, yes.
8      Q.  After you had learned it did you speak
9  with -- I mean did you follow up at IAD and say what
10  the heck happened, why did they charge him with
11  aggravated battery?
12     A.  No, I did not.
13     Q.  You didn't talk to anybody about that?
14     A.  Some things are greater than me.
15     Q.  That's the God honest truth.  I know what
16  you're talking about.
17     So in any event you never had -- did you
18  hear anybody talking about it at IAD?
19     A.  No.
20     Q.  Not Lieutenant Naleway?
21     A.  Not to me about it personally, no.
22     I didn't hear anybody talk about it.
23     MS. RUBENS:  And I'll just object to time frame.

Page 106

BY MR. PROVENZALE:

1  Q.  Well, I'm talking about at any time from
2  when it happened up until today other than any
3  conversations you had where you were present with
4  your lawyers and anybody else from IAD.
5      A.  I mean generally he's being charged and
6  arrested, but that's -- every policeman talks about
7  that policeman has been charged with a felony now,
8  but just generally he was arrested and charged with a
9  felony.
10     Q.  I'm talking about the about-face that it
11  sounds like from your recollection that the state's
12  attorney pulled on being okay with a misdemeanor at
13  first and then going back and charging as a felony.
14     Did anybody talk about that?
15     MS. RUBENS:  I object to the characterization of
16  your question, but you can answer.
17     THE WITNESS:  Did anybody talk about the state's
18  attorney's about-face in charging that as a felony,
19  yes, a lot of people talked about that; yes.
20     BY MR. PROVENZALE:
21     Q.  Who do you remember talking about that?
22     A.  Every person in the police department.
23     12,500 policemen talked about how the

Page 107

1  state's attorney charged someone with a felony that
2  I've never seen in 14 years as a detective.  That's
3  my personal opinion.
4      Q.  What I'm talking about is of those 12,500
5  that you actually heard or spoke with about.
6      A.  I mean I can list a whole 50 names here.
7  Everybody I know that's a policeman said that.
8      Q.  Did you ever talk with Lieutenant Calloway
9  about --
10     A.  No.
11     Q.  -- about the state's attorney's decision?
12     A.  No.
13     Q.  Did you ever talk with Lieutenant Naleway?
14     A.  No.
15     Q.  Did you ever talk with Deb Kirby?
16     A.  No.
17     Q.  Did you ever talk with any state's
18  attorneys?
19     A.  No.
20     Q.  Dave Navarro?
21     A.  No.
22     Q.  Lauren Freeman?
23     A.  No.
24     Q.  Tom Bilyk.

Page 108

1      A.  No.
2      Q.  I'm going to guess that you have an opinion
3  about it.
4      Tell me how did you receive it when you
5  heard about it happening?
6      A.  My opinion doesn't matter here.
7      Q.  It matters to me.  I want to know what your
8  opinion is.
9      A.  If you turn that microphone off I'll tell
10  you my opinion.
11     MS. RUBENS:  Specifically an opinion about what?
12     BY MR. PROVENZALE:
13     Q.  What is your opinion about the state's
14  attorney's decision to charge an aggravated battery
15  given what you've testified to today about the
16  circumstances that occurred leading up to you having
17  a complaint signed for --
18     A.  Circumstances that were presented to the
19  state's attorney's office as they had been for the
20  last 24 years I've been on the police department that
21  is a simple battery.
22     I've never seen anybody charged with that
23  charge before in my 24 years on the police
24  department.  That's my opinion.

27 (Pages 105 to 108)

Page 109

1  Q.  Do you know of anybody in the Chicago
2  Police Department who disagreed -- who disagrees with
3  that opinion you've just expressed who thought that
4  it should have been charged as a felony just based
5  upon what was on the videotape?
6  A.  Me personally I don't know anybody, no.
7  Q.  Have you ever spoken with Keith Calloway in
8  any way regarding his involvement in this case --
9  A.  No.
10  Q.  -- outside of any conversation you had with
11  him in the presence of your lawyers?
12  A.  No.
13  Q.  Have you heard from anyone other than your
14  attorneys as to what his opinion is about whether or
15  not Mr. Abbate should have been charged with a felony
16  at the --
17  A.  It got too long.  You lost me.
18  Q.  Me too.  Now I can't even repeat the
19  question.  Let me remember what I was asking.
20      Have you learned from anyone other than
21  Keith Calloway --
22  MS. RUBENS:  And other than your attorneys.
23  BY MR. PROVENZALE:
24  Q.  -- and other than your attorneys about what

Page 110

1  Keith Calloway's opinion is about whether or not Mr.
2  Abbate should have been charged with an aggravated
3  battery just based upon what was on the videotape?
4  A.  No.
5  Q.  I just wanted to clarify one thing.
6      After you had spoke with Lieutenant Naleway
7  when he told you that Mr. Abbate was in a rehab
8  facility, you did not follow up to try to locate
9  Mr. Abbate at any time after that and up until the
10  time when Lieutenant Naleway told you on the 14th
11  that Mr. Abbate was going to surrender; is that
12  correct?
13  A.  I'm familiar with HIPAA rules, and that's
14  correct, I didn't follow up with it.
15  Q.  My question is aside from what your
16  familiar with, you did not make any follow-up to
17  locate where he was at?
18  A.  That's correct.
19  MS. RUBENS:  Asked and answered.
20  THE WITNESS:  That's correct.
21  BY MR. PROVENZALE:
22  Q.  Tell me what HIPAA rules you're familiar
23  with that would prevent you from locating Mr. Abbate.
24  MS. RUBENS:  Objection, relevance, calls for a

Page 111

1  legal conclusion.
2  BY MR. PROVENZALE:
3  Q.  Well, you've raised it.  So I would like to
4  just explore that.
5  A.  The rules of privacy.
6      You're not allowed to learn any information
7  about any person who's in a hospital.  They won't
8  give you that information.
9  Q.  Even where they're at?
10  A.  That's correct.
11  Q.  Even a person who's got a sworn complaint
12  out against them?
13  A.  That's correct.
14  Q.  In your 25 years as a police officer you
15  never interviewed a suspect when he was in the
16  hospital being treated?
17      You never went in to take a statement?
18  A.  Before the HIPAA rule was enacted, yes,
19  sir, I did.
20  Q.  Well, how many times did you do that?
21  A.  Hundreds.
22  Q.  Your understanding is that since whatever
23  HIPAA rules you're referring to were enacted that you
24  can't even go into a hospital and interview a suspect

Page 112

1  to take a statement from them or to arrest them?
2  MS. RUBENS:  Again I object, incomplete
3  hypothetical, calling for a legal conclusion.
4  MR. PROVENZALE:  I'm just asking his
5  understanding.  That's all.
6  THE WITNESS:  My understanding is you have to go
7  to the hospital administration who then has to go
8  upstairs to get his permission to get you to come up
9  and interview him.
10      You just can't walk in and interview people
11  like you used to years ago.
12  BY MR. PROVENZALE:
13  Q.  That's your understanding of it?
14  A.  That's my understanding of it.
15  Q.  Do you know is there an actual department
16  policy at the Chicago Police Department that
17  prohibits officers from interviewing suspects when
18  they're in the hospital being treated that requires
19  the officer to get the permission of the hospital to
20  question the suspect first?
21  MS. RUBENS:  Objection, vague, compound,
22  incomplete hypothetical, and foundation.
23  THE WITNESS:  I don't know if there's such an
24  order that exists.

28  (Pages 109 to 112)

Page 113

1  BY MR. PROVENZALE:
2      Q. I take it then when Lieutenant Naleway told
3  you that Mr. Abbate was in a rehab facility you
4  understood Lieutenant Naleway to be telling you
5  there's nothing we can do right now, we're going to
6  have to wait until he gets out; is that correct?
7      A. That was my assumption, yes, when he told
8  me that.
9      MR. PROVENZALE: That's it.
10         Thanks very much.
11     MS. RUBENS: Mike?
12     MR. MALATESTA: Do you have anything?
13     MS. RUBENS: I just wanted to clarify one thing.
14         EXAMINATION
15 BY MS. RUBENS:
16     Q. When you and Sergeant Bigg were
17 transporting Anthony Abbate from 35th and Michigan to
18 the 1st District was anyone else in the car?
19     A. Sergeant or Detective Randy Bacon was in
20 the car with us also.
21     Q. Okay. Where was he seated?
22     A. He was sitting in the back seat next to
23 Abbate.
24     Q. And why did Detective Bacon accompany you

Page 114

1  and Bigg and Abbate on that ride?
2      A. He is a detective and if any supplementary
3  reports had to be prepared he would have prepared
4  them.
5      MS. RUBENS: Okay. That's all I have.
6         EXAMINATION
7  BY MR. MALATESTA:
8      Q. Just real quick so I can clarify your
9  opinions on this.
10         In your 24 years experience as a police
11 officer you've investigated cases of battery before,
12 correct?
13     A. That's correct.
14     Q. Batteries involving offenders hitting
15 victims with their fists, correct?
16     A. Correct.
17     Q. And in that 24 years of experience have you
18 ever seen or experienced an offender being charged
19 with a felony after striking a victim with just their
20 fist?
21     A. No.
22     Q. Is that what you meant in terms of your
23 opinions regarding felony charges in this particular
24 case versus misdemeanor charges and the way it was

Page 115

1  charged?
2      A. That's correct.
3      MR. MALATESTA: That's all the questions.
4      MR. PROVENZALE: I just need to follow up on
5  that real quick. I have to have the last word.
6  Otherwise then it doesn't seem like I'm winning, but
7  let me ask the question anyway.
8         FURTHER EXAMINATION
9  BY MR. PROVENZALE:
10     Q. Mr. Malatesta just asked you questions
11 about have you ever handled a case where a felony was
12 charged for someone hitting someone with their hands.
13 I'm going to ask you more specifically in a case
14 similar to the one that we've got here.
15         Have you ever been involved in
16 investigating a case where a police officer was the
17 one who was alleged to have been striking another
18 person with their hands and then had that be charged
19 in any way as a crime other than this case here?
20     A. No, I never investigated that.
21     Q. And are you aware of any circumstance like
22 that ever coming up previously even though you're not
23 aware of it but you heard about it?
24     A. Not that I can recall, no.

Page 116

1      MR. PROVENZALE: Okay. That's it.
2      MS. RUBENS: Do you have anything?
3         FURTHER EXAMINATION
4  BY MR. MALATESTA:
5      Q. Would a police officer be charged any
6  differently than a regular citizen for a particular
7  battery?
8      A. I mean I'll wait and defer that to when the
9  radio is off.
10         I don't know how you want me to answer
11 that. I mean if a police officer and his wife get
12 involved in a domestic and he hits her, would he be
13 charged with domestic battery, yes, the charge would
14 be domestic battery. It could be a felony. It could
15 be a misdemeanor.
16     Q. Let me ask you this.
17         Officers as opposed to regular citizens
18 we'll say are not charged any differently when they
19 commit a certain offense, correct?
20     A. That's correct.
21     MR. MALATESTA: That's all the questions I have.
22     MS. RUBENS: I think we'll waive signature.
23
24     AND FURTHER DEPONENT SAITH NOT AT 3:15 P.M.

29 (Pages 113 to 116)

Page 117

```
 1    STATE OF ILLINOIS )
                       ) SS:
 2    COUNTY OF C O O K )
 3          I, SELENA FIORE, a notary public within and
 4    for the County of Cook and State of Illinois, do
 5    hereby certify that heretofore, to-wit on the 13th
 6    day of August, 2008, personally appeared before me,
 7    at 219 South Dearborn Street, 12th Floor, Chicago,
 8    Illinois, JOSEPH STEHLIK, a witness in a certain
 9    cause now pending and undetermined in the United
10    States District Court for the Northern District of
11    Illinois, Eastern Division, Illinois, wherein
12    KAROLINA OBRYCKA, MARTIN KOLODZIEJ, and EVA CEPIASZUK
13    are the Plaintiffs, and CITY OF CHICAGO, a Municipal
14    Corporation, ANTHONY ABBATE, JR., GARY ORTIZ, PATTI
15    CHIRIBOGA, and JOHN DOE are the Defendants.
16          I further certify that the said witness was
17    first duly sworn to testify the truth, the whole
18    truth and nothing but the truth in the cause
19    aforesaid; that the testimony then given by said
20    witness was reported stenographically by me in the
21    presence of the said witness, and afterwards reduced
22    to typewriting by Computer-Aided Transcription, and
23    the foregoing is a true and correct transcript of the
24    testimony so given by said witness as aforesaid.
```

Page 118

```
 1          I further certify that the signature to the
 2    foregoing deposition was waived by counsel for the
 3    respective parties.
 4          I further certify that the taking of this
 5    deposition was pursuant to Notice, and that there
 6    were present at the deposition the attorneys
 7    hereinbefore mentioned.
 8          I further certify that I am not counsel for
 9    nor in any way related to the parties to this suit,
10    nor am I in any way interested in the outcome
11    thereof.
12          IN TESTIMONY WHEREOF:  I have hereunto set
13    my hand and affixed my notarial seal this _____ day of
14    _____, 2008.
15
16
17          _____
            NOTARY PUBLIC, COOK COUNTY, ILLINOIS
18
19
20
21
22
23
24
```

30  (Pages 117 to 118)