# Ekl, Williams
## & Provenzale LLC
Attorneys and Counselors at Law

KAROLINA OBRYCKA V. CITY OF CHICAGO, ET AL.

███████████████

# Exhibit JJ
### (Deb Kirby Deposition Transcript)

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KAROLINA OBRYCKA, MARTIN   )
KOLODZIEJ, and EVA CEPIASZUK,  )
                            )
     Plaintiffs,    )
                    ) No. 07 C 2372
  -vs-         ) Judge
                    ) Amy J. St. Eve
CITY OF CHICAGO, a Municipal   )
Corporation, ANTHONY ABBATE, JR.,  ) Nan R. Nolan
GARY ORTIZ, PATTI CHIRIBOGA, and  )
JOHN DOE,           )
                    )
     Defendants.   )

     The deposition of DEBRA KIRBY, called by the
Plaintiffs, for examination, taken pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for the
United States District Courts, pertaining to the taking of
depositions, taken before MARIE WALSH FITZGERALD, Certified
Shorthand Reporter and Notary Public within and for the
County of DuPage and State of Illinois, at 219 South
Dearborn Street, Suite 1241, Chicago, Illinois, on the 12th
day of March, 2009, at 10:34 a.m.

---

Page 2

1  APPEARANCES:
2     EKL WILLIAMS, PLLC,
3     (901 Warrenville Road
4     Suite 175
5     Lisle, Illinois 60532), by:
6     MR. PATRICK L. PROVENZALE,
7       Appearing on behalf of the Plaintiffs;
8
9     CITY OF CHICAGO, SPECIAL LITIGATION UNIT,
10    (30 North La Salle Street
11    Room 1720
12    Chicago, Illinois 60602-2580), by:
13    MS. BARRETT E. RUBENS and
14    MR. JAMES T. McGOVERN,
15    and
16    CITY OF CHICAGO,
17    SENIOR COUNSEL POLICE POLICY LITIGATION DIVISION,
18    (30 North La Salle Street
19    Room 1610
20    Chicago, Illinois 60602,) by:
21    MR. GEORGE J. YAMIN, JR.,
22      Appearing on behalf of the Defendants,
23  City of Chicago;
24

---

Page 3

1     APICELLA & MALATESTA,
2     (134 North La Salle Street
3     Suite 320
4     Chicago, Illinois 60602), by:
5     MR. KENNETH C. APICELLA,
6       Appearing on behalf of Defendant,
7  Anthony Abbate;
8
9     LAW OFFICES OF BARRY KREISLER, P.C.,
10    (3001 West Armitage Avenue
11    Chicago, Illinois 60647), by:
12    MS. MELANIE PENNYCUFF,
13      Appearing on behalf of the Defendant,
14  Gary Ortiz.

---

Page 4

I N D E X

| WITNESS | PAGE |
|---|---|
| DEBRA KIRBY | |
| Direct Examination - Mr. Provenzale | 5 - 121 |
| Cross-Examination - Mr. Yamin | 121 - 127 |
| Cross-Examination - Ms. Rubens | 128 - 129 |
| Cross-Examination - Mr. Apicella | 129 - 135 |
| Redirect Examination - Mr. Provenzale | 135 - 139 |

E X H I B I T S

(No Exhibits Marked.

---

Page 5

1      (Witness duly sworn.)
2      DEBRA KIRBY,
3 called as a witness herein, having been first duly sworn,
4 was examined upon oral interrogatories and testified as
5 follows:
6      DIRECT EXAMINATION
7      By Mr. Provenzale
8   Q. Would you please state your full name and spell
9 your last name for the record?
10   A. It's Debra Kirby. D-e-b-r-a, K-i-r-b-y.
11     MR. PROVENZALE: Let the record reflect that this
12 is the deposition of Debra Kirby, taken pursuant to
13 agreement of the parties as to the time and location, as
14 well as prior notice that it was rescheduled.
15     The Federal Rules of Civil Procedure apply as well
16 as the Local Rules of the Northern District of Illinois.
17 BY MR. PROVENZALE:
18   Q. Can you tell me how you are employed today?
19   A. I am employed by the Chicago Police Department.
20   Q. You are a City of Chicago employee?
21   A. Yes, I am.
22   Q. What is your position with the Chicago Police
23 Department?
24   A. I am the general counsel.

Page 6

1   Q. How long have you held that position?
2   A. It will be one year March 16th.
3   Q. How long have you been employed by the City of
4 Chicago in any capacity?
5   A. 22 and a half years.
6   Q. What was the first position you held with the
7 City of Chicago?
8   A. June 1986 I was hired as a patrol officer,
9 probationary.
10   Q. June of '86?
11   A. Yes.
12   Q. How long a period of time did you hold that rank?
13   A. I was promoted to detective in 1990, August, I
14 believe.
15   Q. How long a period of time did you hold that rank?
16   A. I was promoted to sergeant in 1996 or 7. I'm not
17 sure of the exact year.
18   Q. And for how long a period of time did you hold
19 that rank?
20   A. I was promoted to lieutenant in 1999.
21   Q. How long did you hold that rank?
22   A. I was promoted to commander in 2002.
23   Q. And for how long a period of time did you hold
24 that rank?

Page 7

1   A. I was promoted to ADS in July of 2004. That's the
2 rank I hold currently.
3   Q. What district assignments did you have while you
4 held the rank of patrol officer from '86 to '90?
5   A. I was assigned for training in the 5th District,
6 which is on the Southwest Side, far Southwest Side, East
7 Side of Chicago. I was there for the training period, which
8 at that time I believe ran about nine months. I went to the
9 8th District temporarily, probably for about four months,
10 and then I was returned to the 5th District, where I served
11 the entire time I was a patrol officer.
12   Q. And what area were you assigned as detective from
13 August of '90 through sometime in '96 or '97?
14   A. I had a few different positions. In August of '90
15 I was assigned to Area 2. I remained in Area 2 probably
16 until about 1993, maybe mid year, at which time I was
17 assigned to the chief of detectives, and I remained there
18 until I was promoted to sergeant.
19   Q. Is that at headquarters?
20   A. Yes.
21   Q. Where was your assignment as sergeant from
22 sometime in '96 or '97 until '99?
23   A. When I was promoted to sergeant, I was assigned to
24 the 8th District. Probably within a year I was tasked to

Page 8

1 head a grant program and develop the domestic violence
2 program for the Chicago Police Department, which is where I
3 was until I was promoted to lieutenant.
4   Q. And where was your lieutenant assignment at?
5   A. Went back to the 8th District again. I was there
6 approximately a year, year and a half, and I was then
7 assigned to the vice control section. I was in charge of
8 the licensing unit.
9   Q. Which section was that?
10   A. Vice control.
11   Q. Vice control.
12     And that was until your --
13   A. Until I was promoted to commander.
14   Q. And what was your assignment as commander?
15   A. As commander I was promoted to oversee the vice
16 control section, and I was there until I was promoted to ADS
17 in July of 2004.
18   Q. Your assignment to the grant program for the
19 domestic violence, developing the domestic violence program
20 that was a city-wide assignment?
21   A. Yes.
22   Q. And your assignment to vice control as lieutenant
23 and then in your promotion to the position of commander
24 where you oversaw that, that was city wide?

Page 9

1      A. Yes. I mean, they are not specific units. The
2  vice control section, it would be like the narcotic section,
3  right, so city wide responsibility.
4      Q. And then where was your first assignment as ADS?
5      A. ADS, I was in charge of the Internal Affairs
6  Division.
7      Q. Before we get into the structure of IAD, what's
8  your highest level of education?
9      A. I have a law degree from John Marshall.
10     Q. When did you obtain that?
11     A. In '92.
12     Q. Where did you obtain your undergrad?
13     A. U of I, Champaign. Got that in finance in 1984.
14     Q. Where did you go to high school?
15     A. Morgan Park High School.
16     Q. Prior to your employment with the Chicago Police
17 Department, did you have any military background?
18     A. No.
19     Q. Prior to your employment with the Chicago Police
20 Department, did you have any other sworn law enforcement
21 positions?
22     A. No.
23     Q. Did you go into the police academy right out of
24 college?

Page 10

1      A. No, I did not.
2      Q. What did you do in the interim?
3      A. I worked at the Board of Trade for Geldermann,
4  G-e-l-d-e-r-m-a-n-n.
5      Q. How long did you do that for?
6      A. Two years.
7      Q. And then you went into the --
8      A. The police academy, yes.
9      Q. At the time that you entered the police academy,
10 did you have any relatives who were employees of the City of
11 Chicago?
12     A. Yes, I did.
13     Q. And who were those?
14     MS. RUBENS: I just object to relevance.
15     You can answer.
16     THE WITNESS: 1984, my father was a fire fighter,
17 my uncle was a police detective, and I think that's all that
18 I had at that time.
19 BY MR. PROVENZALE:
20     Q. Did you list either your father or your uncle on
21 your application to the City of Chicago for the position of
22 police officer as references?
23     MS. RUBENS: Same objection, to relevance.
24     THE WITNESS: I don't recall.

Page 11

1  BY MR. PROVENZALE:
2      Q. As the ADS for IAD, when you started that
3  appointment in 2002, correct?
4      A. ADS IAD is 2004.
5      Q. I am sorry, 2004. Who was your -- who did you
6  immediately report to?
7      A. My immediate report was the superintendent,
8  Superintendent Phil Cline.
9      Q. As I understand it, at the time IAD was divided
10 into -- was it two divisions, there was administrative and
11 investigative? Why don't you tell me what's the immediate
12 structure, the hierarchy structure right below ADS?
13     MS. RUBENS: 1 just object to vague.
14     If you understand, you can answer.
15     THE WITNESS: The structure of IAD at the time
16 that I was appointed wasn't just to the -- the overview of
17 IAD was that there is basically five sections within IAD.
18 There is an administrative section, which is the day-to-day
19 business of IAD, then there is the advocate section, which is
20 focused on the adjudication of discipline, and then there
21 were three investigative sections; confidential, special,
22 and general.
23 BY MR. PROVENZALE:
24     Q. And each of them had a lieutenant assigned as the

Page 12

1  supervisor for each section? I mean, they were the next
2  rank below you, or did they hold different ranks, whoever
3  ran each of those sections?
4      MS. RUBENS: Objection to assuming facts.
5      You can answer if you can.
6      THE WITNESS: To clarify, the investigative
7  section, confidential, special, and general had a lieutenant
8  in charge of those.
9  BY MR. PROVENZALE:
10     Q. And then what rank was the person who was in
11 charge of the administration and advocate?
12     A. The administration section was -- I had an
13 administrative sergeant, they reported under me, and the
14 advocate section has a sergeant in charge of that.
15     Q. And each of those ranking officers, as you just
16 described for each of the sections, reported directly to
17 you?
18     A. Correct.
19     Q. As part of the operation of the administrative
20 section, was there a reporting mechanism in place back at
21 the time that you became ADS of IAD where categories of
22 complaints were tracked?
23     A. I'm not clear what you mean by reporting
24 mechanism.

Page 13

1  Q. Reporting mechanism means that there were some
2  record-keeping measures in place that would track the number
3  of certain categories of complaints, like excessive force
4  complaints versus false arrest complaints versus other types
5  of complaints of misconduct alleged against officers?
6       MS. RUBENS: Object to vague, confusion, and
7  compound, but you can answer.
8       THE WITNESS: I guess I am confused by what you
9  mean by mechanism.
10  BY MR. PROVENZALE:
11  Q. Well, was there a procedure? That's what I am
12  talking about. Was there some sort of procedure in place
13  where if I would come into IAD from OPS, related to some
14  allegation of officer misconduct and it was the
15  responsibility of the administrative section of IAD to keep
16  track of the category of complaint and then somehow report
17  it so that statistics were collected and maintained by the
18  Chicago Police Department of how many complaints of a
19  particular type of misconduct came in?
20       MS. RUBENS: Same objection, but you can answer.
21       THE WITNESS: You are asking a lot of questions.
22  Was IAD tasked with receiving information and storing
23  information? Yes, I can answer that.
24       MR. PROVENZALE: Okay.

Page 14

1       THE WITNESS: You asked a lot of other stuff --
2  BY MR. PROVENZALE:
3  Q. Well, my question was kind of trying to cut to the
4  quick, because there is information that I've received from
5  other witnesses as to kind of the structure and how the
6  information came in, so I'll go through it all just so there
7  is clarity about it.
8       Tell me what your understanding was as to how
9  statistics were maintained of the types of complaints of
10  misconduct that were levied against an officer by IAD?
11       MS. RUBENS: I object to foundation.
12       You can answer.
13       THE WITNESS: My question, I guess, or my
14  confusion is when you are talking of statistics and the role
15  of IAD, I'm not sure what you are talking about, because
16  there is a variety of information. I mean, IAD was tasked
17  with investigating, and so if you are questioning how
18  investigations are assigned, that's one thing, but if you
19  are just talking raw numbers --
20       MR. PROVENZALE: I'm talking raw numbers.
21  BY MR. PROVENZALE:
22  Q. In terms of, a file would come in and there would
23  be a complaint that the file was created, or somebody had
24  called in to OPS or had walked in and made a complaint

Page 15

1  against an officer for some type of misconduct, okay, and
2  that, as I understand it, whether it's an excessive force
3  complaint or some other type of complaint, and regardless of
4  whether OPS or IAD is going to handle the investigation, the
5  file is routed to IAD so that the complaint -- the type of
6  complaint that it is can be characterized and then cataloged
7  so that statistics are maintained of each type of complaint
8  that comes in?
9       MS. RUBENS: Object to compound and -- that's it.
10       You can answer.
11       MR. PROVENZALE: And if that's not correct, then
12  educate me on your understanding of the process. Do you
13  know what I mean?
14       THE WITNESS: I'm trying to. All right. When a
15  complaint is registered at OPS, and all complaints are
16  registered through OPS, the number is pulled, and so from
17  the registration of the complaint, there is an
18  identification of what that conduct is. OPS is responsible
19  for cataloging, I think is the term that you are looking
20  for, the complaints that they retain, so --
21  BY MR. PROVENZALE:
22  Q. So when you say cataloging, just so I understand,
23  explain to me what you mean by that. Just saying that it's
24  a -- coding it, saying it is this code for this type of

Page 16

1  complaint?
2  A. Correct.
3  Q. And once the complaint is coded, do they record
4  the fact that -- in some statistical database, you know,
5  that just accumulates all the raw data, the raw numbers of
6  how many of a certain code occur in a given time period, is
7  that OPS who records that information or is that IAD who
8  records that information?
9       MS. RUBENS: Object to foundation and calling for
10  speculation.
11       You can answer.
12       THE WITNESS: I'm not the technical person, so I
13  can't answer, I believe the data basing, where it's stored,
14  but to my understanding, it was never, at least not the
15  function of either IAD or OPS to have raw data. The data
16  that we are collecting is relative to investigation, so
17  whatever data is pulled out comes out of investigative
18  numbers and not just raw numbers.
19       MR. PROVENZALE: Okay. Well, then, why don't we
20  talk about just sort of the life of a complaint from
21  beginning to end. And I know this is a good time to break,
22  but why don't we do that now.
23       Let's go off the record.
24

Page 17

1	(WHEREUPON, Mr. Yamin entered the
2	deposition proceedings.)
3	(WHEREUPON, discussion was had
4	off the record.)
5	MR. PROVENZALE: We want to go on the record with
6	our positions.
7	MR. YAMIN: Yes.
8	MR. PROVENZALE: Back on the record.
9	Mr. Yamin and I have had a conference outside
10	regarding the subject matter of this witness' testimony in
11	the deposition today.
12	Prior to today's date, the plaintiff had issued
13	five categories requested for the identification of 30(b)(6)
14	witness representative deponents, and the City had
15	identified four witnesses as responsive to witnesses who
16	possess knowledge as to those five subject matter
17	categories. Those witnesses were Mike Duffy, Commander
18	Salemi, if I pronounced that correctly, Sergeant Dan Kivel,
19	and Officer Genevive Hutchenson. Deb Kirby was not
20	identified in response to any of the 30(b)(6) categories,
21	and, likewise, the City did not disclose her otherwise as a
22	30(b)(6) witness or as a 26(a)(2) witness to provide or
23	present any expert opinions in the case as of this point.
24	And it's the plaintiffs' intent to depose the

Page 18

1	witness as to her personal knowledge of the operation of the
2	Internal Affairs Division of the Chicago Police Department
3	and her personal knowledge of the events related to this
4	case, and the plaintiff would object to the witness
5	providing any expert testimony that would be required to be
6	disclosed under 26(a)(2) as the plaintiff would not have an
7	opportunity to develop the materials that may be used to
8	test the witness' opinions based upon collateral materials
9	and sources of information. So that's the plaintiff's
10	position.
11	MR. YAMIN: In response, the City would say that
12	it agrees with Mr. Provenzale that ADS Kirby was not
13	disclosed as a Rule 30(b)(6) witness. She's here by notice,
14	correct?
15	MR. PROVENZALE: It was agreement. It was prior
16	notice and it was rescheduled by agreement.
17	MR. YAMIN: Okay. So plaintiffs' notice, her
18	deposition, which is now going forward, the plaintiffs have
19	brought various claims against defendants, including what's
20	commonly known as a Monell claim against the City, and to
21	that extent -- and plaintiff is aware that ADS Kirby is a --
22	at the time of the incident was the head of the Internal
23	Affairs Division of the police department; therefore, as of
24	today, plaintiff is on notice that questions relevant to

Page 19

1	those claims, you know, would be appropriate to ask of her
2	while she is here.
3	At the moment the City does not intend to disclose
4	ADS Kirby as a Rule 26(a)(2) witness. The City does intend
5	to ask her questions that pertain to the Monell claim, and
6	will most likely go forward after plaintiffs are completed
7	with their questions. If, after the deposition,
8	developments in the case lead us to revisit this issue, the
9	attorneys have agreed to do that. The City's position is
10	that there would be no reason to re depose -- given what
11	I've just said, there will be no reason to re depose Ms.
12	Kirby at a later date, and this is plaintiffs, you know,
13	last best chance to inquire of her what they need to
14	inquire, as it is the City's chance to make its own record.
15	Thank you.
16	MR. PROVENZALE: And you can say what you want to
17	say, but, just for the record, given Mr. Yamin's comments
18	and what appears to be a line of questions that he will pose
19	to the witness regarding what may be expert testimony, where
20	her opinions are based upon things other than her personal
21	knowledge, that the plaintiff is reserving the right to re
22	depose her, in the event that those questions are asked and
23	answers are given.
24	MR. YAMIN: Okay. Thank you.

Page 20

1	MS. RUBENS: And neither side has been required to
2	tender their expert disclosures as of yet. The plaintiffs
3	are due on 4/27/09 and Defendants July 15, '09. So pursuant
4	to those dates, we will be disclosing our experts, which may
5	or may not include Deb Kirby.
6	MR. YAMIN: Can we go off the record for just one
7	second?
8	(WHEREUPON, discussion was had
9	off the record.)
10	BY MR. PROVENZALE:
11	Q. Ms. Kirby, I was just about to ask you questions
12	about the sort of life of a complaint of officer misconduct.
13	I would like to walk through that and hopefully educate
14	myself about how categories or codes of misconduct are
15	tracked. Let's say somebody -- let's get past whether it's
16	a walk-in complaint or a call in to 311 or somebody calls in
17	to 911, whatever it is, once OPS receives a complaint of
18	misconduct against a police officer at the intake level,
19	what does the intake person do?
20	A. Once --
21	MR. YAMIN: This is my area?
22	MS. RUBENS: Yes.
23	MR. YAMIN: I object to foundation.
24	You may answer that.

Page 21

1   BY MR. PROVENZALE:
2       Q.  I'm talking about, again, back at the time when
3   you were the ADS of IAD, which would have been from '04
4   through when?
5       A.  '08.  Sorry.  It is a year.  So '08.
6           Once a complaint is registered at OPS, and it is
7   OPS at the time that we are discussing, they review all
8   complaints through intake at the time, and they make the
9   determination as to which complaints they'll retain.
10      Q.  As I understand it, there are codes for categories
11  of complaints; is that correct?  Or there were codes back at
12  the time?
13      A.  That is correct.
14      Q.  And the intake person would receive the complaint
15  and then would categorize the complaint corresponding to a
16  specific code for that type of complaint; is that correct?
17      A.  At the time that OPS logs the complaint, it is not
18  categorized.
19      Q.  Okay.
20      A.  But for OPS complaints.
21      Q.  So a complaint number is given to the complaint?
22      A.  Correct.
23      Q.  At the intake level, correct?
24      A.  Correct.

Page 22

1       Q.  But there is no characterization by the intake
2   person as to what category or code number for that complaint
3   is to be assigned at that time; is that correct?
4       A.  For other than OPS complaints, that is correct.
5       Q.  Meaning other than excessive force complaints?
6       A.  OPS had more jurisdiction than just excessive
7   force.
8       Q.  What jurisdiction did OPS have beyond excessive
9   force?
10      A.  They retained domestic violence complaints where
11  the accused is a police officer, and they also retained
12  other complaints as identified by the superintendent.
13      Q.  That would be on sort of individual, case-by-case
14  basis?
15      A.  Correct.
16      Q.  So if it was not one of those three things, it was
17  not coded by OPS; is that correct?
18      A.  That is correct.
19      Q.  So let's assume that it was not one of those three
20  things where it was initially coded by OPS, what was the
21  next step after the intake receipt of that complaint?
22      A.  Once OPS made the determination that they were not
23  going to retain a complaint, it was forwarded on a daily
24  basis to the Internal Affairs Division.

Page 23

1       Q.  Who was the officer who received those in IAD?
2   Let's say, what section of IAD?  Why don't we start with
3   that.
4       A.  It went to the administrative section.  There were
5   two officers that served in that capacity.  On the date for
6   this case, I'm not sure which officer it would have been.
7       Q.  Well, what rank of person --
8       A.  It was a patrol officer.
9       Q.  It was one of the subordinates in the
10  administrative section?
11      A.  Correct.
12      Q.  Whoever it was, what was that person's
13  responsibility upon receipt of that complaint?  Let's just
14  specify in terms of cataloging or characterizing the
15  complaint for coding?
16      A.  On a daily basis, any complaints not retained by
17  OPS were forwarded to the Internal Affairs Division.  The
18  intake officer would then take those complaints, which were,
19  in essence, a face sheet, and review those for a variety of
20  purposes, one of them was to identify which category code it
21  would be identified in.
22      Q.  And then, in addition to that officer
23  characterizing and coding, how was the fact of the
24  characterization and the coding recorded?  Would that

Page 24

1   officer do it at that point, or would it be sent to somebody
2   else so that the raw data number or -- it was an '05 in this
3   particular complaint, and then someone inputs '05 into some
4   computer.  I mean, where did that happen at?
5       A.  I'm not certain if the intake person could do that
6   at that time.  I know that the ability changed over the time
7   I was at IAD, but it would have been either the intake
8   person or the records person would have done the entry on
9   the data.
10      Q.  In terms of that initial coding of the -- and
11  characterization of the complaint, was there any review
12  process where, after it was coded or characterized by the
13  intake officer, somebody else had eyeballs on that coding of
14  the complaint before it was, you know, recorded as raw data?
15          MR. YAMIN:  Objection; form.
16          You can answer.
17          THE WITNESS:  Yes, there was.
18  BY MR. PROVENZALE:
19      Q.  And describe that process for me?
20      A.  The challenge I am having here is that you are
21  focusing strictly on coding, and the intake process was not
22  necessarily primarily focused on coding.
23      Q.  Okay.
24      A.  So my ability to answer was more to the process

1  rather than to the --
2  Q. Then let's go through -- walk through the process.
3  So where does it go after the intake officer --
4  A. The intake officer would receive the day's
5  complaints. They would review the face sheets and they
6  would make an initial determination as to category, code,
7  and assignment. As the head of IAD for some period of time,
8  I was reviewing that to determine it was appropriate code
9  and assignment. At some point it was transferred to the
10  administrative lieutenant --
11  Q. Do you know whether that was done prior to
12  February 19th of '07?
13  A. I believe it was, but I'm not certain.
14  Q. The code and assignment, that's the phrase that
15  you used, so I hope I understand, is that, like, a tag line
16  for what happens in the intake, by the intake officer, code
17  and assignment?
18  A. Well, again, I'm not sure how you -- but the
19  intake person would have a CR number, they would have what
20  it was coded as, and then recommend an assignment, whether
21  it be field or IAD.
22  Q. So once he had completed that process, where did
23  it go from there, to the ADS would review it?
24  A. After the ADS reviewed it, or the lieutenant, as

1  the case may be, there was then, also, an additional review
2  within the records section by Sergeant Muzupappa, who has
3  responsibility for the data entry and record retention on
4  disciplinary records.
5  M-u-z-u-p-a-p-p-a.
6  Q. What was the scope of his review?
7  A. It's Phyllis Muzupappa, and her review --
8  Q. Or her review. Sorry.
9  A. Her review, frankly, was probably more in-depth to
10  the issue that you are looking at in terms of data. She
11  would review the face sheet, she would also be a secondary
12  check on the appropriate category code, and her staff would
13  be responsible for entering it into our computer system,
14  which tracked complaint investigations.
15  Q. So in terms of that intermediate step of review
16  between the intake officer and the records review officer,
17  Sergeant Muzupappa; is that right?
18  A. Correct.
19  Q. The step where either the lieutenant or the ADS
20  reviewed it, was that more for the investigative assignment,
21  as opposed to the coding, or was it everything?
22  A. My review was more focused on investigative
23  assignment.
24  Q. And when the face sheet would go to the record

1  section, her review was more directed to whether the
2  complaint was coded properly and then recorded?
3  A. That's my understanding, yes.
4  Q. While you were the ADS of IAD, were you aware of
5  any written protocols or guidelines that were used by either
6  the intake officer or by the records review in their
7  tertiary review of incoming complaints regarding the coding
8  of complaints?
9  MR. YAMIN: Objection to form.
10  THE WITNESS: As far as written documents, the
11  codes themselves have descriptors. There was some
12  guidelines that were being followed, whether there was the
13  memo form, I really don't recall.
14  The parties who have been doing it have been doing
15  it for a while. I really don't recall seeing any direct
16  documents.
17  BY MR. PROVENZALE:
18  Q. Were you aware at the time that you were the ADS
19  of IAD of any written protocols or guidelines related to
20  primary and sub-coding of allegations of misconduct
21  where there was a primary allegation and then there were
22  sub-allegations that were also recorded as well?
23  MR. YAMIN: I object to form.
24  THE WITNESS: No.

1  BY MR. PROVENZALE:
2  Q. If a complaint had come in, for example, a
3  complaint where there was an allegation of false arrest,
4  which would be, if it wasn't asked for by the superintendent for
5  OPS to handle, that would be a typical one IAD would handle;
6  is that correct?
7  A. Correct.
8  Q. If a complaint came in for false arrest against
9  one officer and then there were other officers who were
10  implicated as being present and not intervening or failing
11  to report that allegation of misconduct where they were
12  otherwise present, alleged to have been present during it,
13  how would the failure to report be coded, if it would be at
14  all in connection with an allegation of false arrest?
15  A. You are confusing intake with closing. Upon
16  intake there is initial categorization to the complaint. At
17  closing there is findings entered against individual
18  officers, so it's not equal.
19  Q. Okay. Well, at the intake level, and I don't want
20  to confuse them, I just want to limit it to the intake
21  level. There is nothing to that effect of coding what could
22  be reasonably characterized as a failure to report on other
23  officers who are alleged to have been present but did not
24  actually conduct the false arrest. At the intake level, it

Page 29

1  is just a false arrest; is that correct?
2      A.  At the intake level, if the allegation is a false
3  arrest, every portion identified with it at the initial
4  stage would be identified as a false arrest.
5      Q.  That's what I want to make sure, that there aren't
6  sub-allegations that may ultimately be developed and
7  recorded later on, at least as of the intake level and
8  records, the initial data entry in the records division by
9  that sergeant, it's just coded as whatever the primary
10  allegation is?
11      A.  Right.
12      Q.  So from that point, after it goes to the record
13  section for that additional review, where does the complaint
14  face sheet go from there?
15      A.  The actual assignment of the complaint, then,
16  would be either as identified to the field or to the
17  Internal Affairs Division.
18      Q.  In terms of up to that point and the actual
19  substance of the investigation, is there any input that you
20  as the ADS in charge of IAD would make by way of notation or
21  something saying, this needs to be done investigative --
22  these investigative steps need to be taken, or this -- you
23  know what I mean?  Some sort of substantive direction or
24  recommendation as to certain investigative steps that should

Page 30

1  be taken by whomever it gets assigned to?
2      A.  Off of the initial face sheet review?
3      Q.  Yes.
4      A.  I never say never, but I wouldn't do it that way.
5  If IAD was retaining something, there would be a
6  conversation with a lieutenant.
7      Q.  Is it fair to say that it was a pretty mechanical
8  process in terms of the intake and the review process of the
9  complaint going from the intake officer to either the
10  lieutenant or the ADS and then to the records division
11  before it gets sent out for assignment?
12      MR. YAMIN:  Objection to form.
13      THE WITNESS:  I guess I don't know what you mean
14  by mechanic.
15  BY MR. PROVENZALE:
16      Q.  I mean, you look at it, you make sure it looked
17  okay in terms of the proper recommendation for assignment,
18  as well as the coding of it, and then you wouldn't -- there
19  wouldn't be any, I guess, supplemental recommendations made
20  by you or the lieutenant in that intermediate step where
21  you'd say, well, you might want to think about this or think
22  about that when you sent it on to the records division prior
23  to it getting shipped off for assignment?
24      A.  That would be accurate.  What we are doing is

Page 31

1  basically assigning it.  Any type of investigative
2  recommendation step it would happen upon assignment, so,
3  correct, the intake was looking at coding and field
4  assignment, or whatever unit of assignment, and then moving
5  on for that part, correct.
6      Q.  And in the event that there was -- in the review,
7  let's say something was wrong, what would be the step that
8  would be taken in the event that something was identified in
9  that review process as being wrong?  Would it go back up the
10  line?  What would happen with it?
11      A.  There was always -- not always, but frequently
12  there was missing information, or perhaps a missed
13  assignment.  If there was a lack of clarity as to whether or
14  not something should be assigned to IAD or OPS, there would
15  be communications between supervisors at OPS and IAD.  You
16  know, sometimes we'd get complaints over a register and it
17  turned out to be an outside agency.  So that type of
18  information, or, I guess, misinformation, was more or less
19  mechanical as well.  The idea of verifying, is it, in fact,
20  a complaint against a Chicago Police Department member?  If
21  not, you know, there would be a closing of the complaint
22  immediately upon discovery.  So those were more or less, I
23  guess, routine practices as well.
24      If a category was wrong, but IAD assigned the

Page 32

1  category, so if my intake person, perhaps, gave it a wrong
2  number, data entry or just error in general, that would be
3  corrected as well, too.
4      Q.  Would you send it back to them to correct it, or
5  would you just go ahead and do it and then send it on to
6  records?  I am talking about your routine practice.
7      A.  It's more or less a contemporaneous practice is
8  that the face sheets would come to me, I would review it, if
9  my intake person wrote down a wrong code and I recognized
10  it, I would just draw through it and correct the code, or if
11  it was a misassignment, I would have it assigned to
12  what I thought was the proper unit.
13      Q.  I take it, given what you were attempting to
14  achieve, which was to make sure that there weren't any
15  mistakes along the -- you were still trying to streamline
16  the process to get the complaint directly to the
17  investigative aspect of it?
18      A.  Again, the focus for IAD was investigating the
19  complaint, and, you know, the belief is that is the
20  complaint -- all information changes.  So what's done at
21  intake may not necessarily be what we wind up with at the
22  end of the investigation.
23      Q.  If a complaint, after it goes through the records
24  review, if it is not assigned out to the field, if it stays

Page 33

1  within IAD, it's assigned to one of the three sections; is
2  that correct?
3      A.  Correct.
4      Q.  Who makes that decision, or who made that decision
5  along that review line?
6      A.  Generally, I did.
7      Q.  In terms of the three different sections of IAD,
8  was there any written protocol or guidelines as to what type
9  of case should be investigated by a specific investigative
10  division?
11      A.  There was the SOP, which kind of identified very
12  broadly the parameters of the sections. But, as far as
13  right line rules as to who had what, there were very few.
14      Q.  It was a case by case, your judgment, as to where
15  it would go?
16      A.  There was general parameters.
17      Q.  Well, other than general parameters, I mean, you
18  would apply the general parameters and then, on a case by
19  case basis, you determined whether there needed to be a
20  deviation from the general parameters or whether the general
21  parameters were appropriate in that circumstance?
22      A.  Correct.
23      Q.  As a general rule, when you made that assignment,
24  if you knew it was going to stay in IAD, you did not make

Page 34

1  any specific recommendations on the face sheet or in any
2  other notation attached to the face sheet that was sent down
3  to whatever investigative division it was sent to with
4  directions as to particular specifics of investigative steps
5  to be taken.  As a general rule, you didn't do that; is that
6  correct?
7      MR. YAMIN:  Objection; form.
8      THE WITNESS:  As a general rule, yes, I don't
9  recall doing that.
10  BY MR. PROVENZALE:
11      Q.  Once a complaint is forwarded by assignment to one
12  of the investigative divisions, is it the discretion of the
13  head of that division and whoever is assigned to investigate
14  it as to what investigative steps are going to be taken to
15  look into the complaint.  You know, assuming compliance
16  otherwise with what IAD requires for specific
17  investigations?
18      A.  Each unit had a commanding officer, so the
19  commanding officer was in charge of overseeing the
20  investigations.  So within that role, you know, those
21  decisions for the most part were theirs.
22      Q.  As I understand it, in 2004 there was a state
23  statute passed that the City of Chicago takes as requiring
24  that a complaint, in order for it to be investigated, has to

Page 35

1  have been made under oath by the complainant.  Are you
2  familiar with that statute?
3      A.  You are citing the statute incorrectly.
4      Q.  Well, what is your understanding of the statute?
5      A.  The statute requires that before any peace
6  officer, and it is not just the City of Chicago, could be
7  interviewed regarding a disciplinary matter, there has to be
8  a signed affidavit.
9      Q.  Have you ever heard of the phrase "affidavit
10  override" or "affidavit waiver" in connection with --
11      A.  Yes, I have.
12      Q.  Explain to me what you understand -- first of all,
13  do you understand those terms to be interchangeable?  Are
14  they both used, or is it just affidavit override that's
15  generally used?
16      A.  I'm not sure of any specific term used, but it
17  would have an affidavit override in my experience.
18      Q.  Explain to me what your understanding of that is?
19      A.  The City of Chicago negotiated additional ability
20  to investigate complaints against police officers beyond
21  what the statutory requirement was.
22      Q.  Where is that recorded, to your knowledge?
23      A.  Within the FOP contract.
24      Q.  The CBA?

Page 36

1      A.  Correct.
2      Q.  Do you know when that CBA incorporated that
3  provision?
4      A.  I believe it was after the state statute was
5  passed, because we were in negotiations to establish how the
6  affidavit process would work in Chicago.
7      Q.  Who has the authority to -- let's say, to start
8  with, who has the authority to request an affidavit
9  override?
10      A.  Either the head of -- well, it's a process.  Any
11  investigator can bring forth the fact that they believe that
12  this case warrants an override, but for formal approval of
13  the override, it has to be either the head of IAD for an OPS
14  matter or the head of IPRA now, but at the time OPS for an
15  IAD matter.
16      Q.  And my specific question was actually, I guess,
17  directed to, I mean, who can initiate the request?  Not
18  necessarily who is the one who makes the decision, but is
19  this essentially fair that any investigator assigned to a
20  complaint can say, hey, I think this is one that needs an
21  override, and then approach either his lieutenant or the ADS
22  and relay that?
23      A.  That would be correct.
24      Q.  And then it is up to the ADS to make that decision

Page 37

1  of whether or not to override the affidavit requirement, or
2  is there another step for approval of that?
3      A.  It would be up to the head of IAD to determine --
4  to make the request of OPS, IPRA would then approve the
5  override.
6      Q.  I see.  So all overrides had to be run through OPS
7  and/or IPRA, whatever it was called at the time?
8      A.  For IAD overrides, correct.
9      Q.  For IAD, okay.
10     So in your position as ADS of IAD throughout the
11 time that you were there, you never had the authority to
12 approve an affidavit override; is that correct?  You could
13 only seek the approval from the head of OPS or IPRA if that
14 was it at the time?
15     MR. YAMIN:  Objection.  That doesn't quite get her
16 testimony.
17     MR. PROVENZALE:  Okay.  Then clear it up for me.
18     MS. RUBENS:  Join.
19     THE WITNESS:  That's incorrect.  I had the
20 authority and the ability to approve overrides at the
21 request of OPS, and OPS has the ability and the authority to
22 approve overrides at the request of IAD.
23     MR. PROVENZALE:  I see.  Okay.
24 BY MR. PROVENZALE:

Page 38

1      Q.  So sort of in an out of house review process.  OPS
2  itself could not approve an affidavit override for one of
3  its investigations, likewise, IAD could not approve an
4  affidavit override for one of its investigations.  You had
5  to seek the approval of the head of the other department; is
6  that correct?
7      A.  That's correct.
8      Q.  In the entire time that you were the head of IAD,
9  did you ever approve any affidavit override request that
10 came from OPS or if it was IPRA at the time?
11     A.  Yes, I did.
12     Q.  How many do you recall doing?
13     A.  I have no -- I have no recollection of how many.
14     Q.  I mean, was it in excess of a hundred?
15     A.  I really don't have a recollection.  I don't
16 believe it to be a significant amount, but I can't give you
17 a set number.
18     Q.  Of the total percentage of override requests that
19 you received despite, you know, not being able to remember
20 the total number that you approved, what was the percentage
21 of your approvals of the total number of requests that you
22 received?  I mean, was it basically, whenever it was asked,
23 you gave it, or was it a very rare case that you gave it
24 when you were asked?

Page 39

1      A.  I don't recall, but for either agency to request
2  an override, basically we understood what, you know, was
3  required under the collective bargaining agreement and the
4  law, and if we were going forward with an override,
5  basically we knew we had the circumstances for it, at least
6  in my opinion.  But I don't recall how many I denied or
7  approved.
8      Q.  All right.
9         What was the paper trail on overrides, for lack of
10 a better word?  I mean, how were they relayed and how were
11 they tracked or recorded?  In terms of both a request for it
12 and then the approval process?
13     MR. YAMIN:  Objection to form.
14     THE WITNESS:  There is no database.  It would be a
15 paper request, the override would substitute for the
16 affidavit on the investigation.  The lack of an override
17 would probably be attached to the closed file on the CR as
18 well, so it would be part of the investigative file.
19 BY MR. PROVENZALE:
20     Q.  Meaning that, when you say the lack of an
21 override, meaning just like the empty form for what would
22 otherwise be -- well, let me ask you first:  Was there a
23 form for an override?
24     A.  No.

Page 40

1      Q.  Customarily, what was the form that it would take,
2  that an override would take, was it like a to-from or what
3  was it?
4      A.  Within IAD, and I cannot speak for OPS, if an
5  officer was seeking to go forward on an investigation that
6  needed an override, they would first try to come to
7  generally their commanding officer.  It may not have gone to
8  the sergeant depending upon the structure of the individual
9  unit.  In that time it would come to me in writing and I
10 would review it.  You know, certain incidents could be
11 investigated without an override form and without an
12 affidavit; however, if an affidavit was needed, then I would
13 draft a letter to OPS requesting the override, and then we
14 would forward that to OPS.
15     Q.  Aside from that sort of out-of-house review
16 process, was there a higher level of review in the
17 superintendent's office where if, you know, let's say you,
18 as the requested department to approve an OPS override
19 request, made a decision that you were not going to grant
20 the override, could OPS -- was there a mechanism in place
21 where OPS could go to the superintendent and say, we think
22 that we need this?
23     A.  Pursuant to the collective bargaining agreement,
24 it was just the head of IAD or OPS.  Could the

Page 41

1  superintendent have weighed in?  He is the superintendent,
2  but I have no --
3      Q.  I am not saying what he could have done, I am
4  saying, was there a mechanism in place for it?  Like, in
5  other words, there is nothing written in the CBA that said
6  that if an affidavit override was denied by OPS or IAD with
7  respect to the cross request, then there was a mechanism for
8  appeal to the superintendent's office?
9      A.  No.
10     Q.  Are you aware of any case when you were the head
11 of IAD where you brought the superintendent's office in to
12 weigh in on the denial of the override by OPS or IPRA?
13     A.  No, I'm not.
14     Q.  Are you aware of the reverse circumstance where
15 OPS or IPRA had brought the superintendent's office to weigh
16 in on your denial of an override request?
17     A.  No, I am not.
18     Q.  The to-from memos that you mentioned that the
19 investigating officer would present to his lieutenant, those
20 would be maintained in the CR file?
21     A.  If they existed, yes.
22     Q.  Was that a requirement, those type of to-from
23 memos would be generated either by the officer who was
24 investigating it or by the lieutenant or whoever it was that

Page 42

1  was initiating the request about an affidavit override to be
2  brought to your attention, or was it just at the discretion
3  of the officer whether to paper that request?
4      A.  The request had to be papered for me to review it,
5  so whether it was the lieutenant or the officer who drafted
6  it, I'm not certain.
7      Q.  But there had to be a paper on it?
8      A.  Yes.
9      Q.  Okay.  Was that just sort of like an oral edict,
10 if you are going to request an affidavit override, you got
11 to have a to-from presented to the ADS in order to get that,
12 or was there some written protocol or guideline about that?
13     MR. YAMIN:  Objection to form.
14     THE WITNESS:  I don't recall.  I do know that we
15 had a written practice on affidavit override.  I'm not sure
16 if that was contained within there.
17 BY MR. PROVENZALE:
18     Q.  You know, I don't remember seeing that in the SOP.
19 Do you know whether that was in the SOP or is that something
20 else that was, like, a memo that was just issued within IAD?
21     A.  It was most likely a memo issued within IAD
22 because the affidavit was a new practice.
23     Q.  Are you aware of whether or not any data has ever
24 been recorded regarding the rate of requests for affidavit

Page 43

1  overrides and/or approval of the requests for affidavit
2  overrides by any department of the City of Chicago?
3      MR. YAMIN:  Objection; foundation.
4      THE WITNESS:  No, I am not.
5  BY MR. PROVENZALE:
6      Q.  To your knowledge, there is no statistics that
7  reflect the rate of incidents of requests being made or
8  approvals being granted or denied; is that correct?
9      MR. YAMIN:  Same objection.
10     THE WITNESS:  To my knowledge, yes.
11 BY MR. PROVENZALE:
12     Q.  I had asked you earlier your recollection of the
13 number of affidavit overrides you have requested of the
14 approval of OPS or IPRA while you were the head of IAD.  How
15 many did you receive as the head of IAD from OPS or IPRA?
16     A.  I don't recall.
17     Q.  Even in terms of, like, an outside number, was it
18 more than 20 or less than 20 in the four years that you were
19 ADS?
20     A.  I really can't recall.  I do know it wasn't a
21 significant number, but I don't recall how many.
22     Q.  You said it was not a significant number?
23     A.  No.
24     Q.  In terms of the structure of the recording system

Page 44

1  that was in place for codes of misconduct allegations at any
2  time while you were the head of IAD, did you ever have any
3  input on how the codes were, let's say, just labeled?  Let's
4  start with that.
5      MR. YAMIN:  Objection to form.
6      THE WITNESS:  Yes, I did.
7  BY MR. PROVENZALE:
8      Q.  And what was that involvement?  Tell me about
9  that.
10     A.  You asked generally if I had any input --
11     Q.  Right.
12     A.  -- and I did, but there are a variety of places
13 that that happened.
14     Q.  Let's start with the first.
15     A.  We had changed the program, and we are currently
16 still developing a program known as auto complaint, with the
17 idea being that it would be in a completely automated
18 process and not paper, and so there was a significant amount
19 of work done on updating and changing categories in regards
20 to a new system that would be automated fully.
21     Q.  When did that process start of the development of
22 the automated aspect?
23     A.  That process started before I was appointed to the
24 IAD, and it was ongoing during the entire time that I was at

Page 45

1   IAD.
2       Q.  In terms of your input into the recording system
3   that was in place while you were the head of IAD, did you
4   have input into the description of allegations of misconduct
5   that were then divided into however many codes there were?
6       A.  There had been some modifications in regards to
7   the terms used and to ensuring consistent application to
8   coding within those specific terms.
9       Q.  Was there anything specifically that had prompted
10  those modifications to be made that you are aware of?  In
11  other words, that there was some statistical analyses that
12  had been done of the data that had been recorded up to a
13  certain point and someone recognized that there was
14  underreporting or over reporting of certain things so that
15  modifications had to be done?  Did anything like that ever
16  happen to your knowledge?
17      A.  The one thing I can recall, we had a tendency to
18  have a lot of things fall into the miscellaneous categories,
19  and so we had looked at to see what types of things were
20  being reported as miscellaneous to see whether or not they
21  could go back into another category properly or if I needed
22  to develop a new category.  That was one area.
23      Q.  Let me stop you before you get to the next.
24          How was that identified?

Page 46

1       A.  Honestly, I don't fully recall.  I think that the
2   idea of reviewing categories and how many numbers are
3   showing up in certain complaint categories within a certain
4   areas.  It's been a while since I've even seen an IAD code
5   table, but, you know, each code has certain number of
6   subcategories, as you identified, and then there is always,
7   generally, there was a miscellaneous.  So when a higher
8   number of coded categories are falling into the
9   miscellaneous, I am not a data guru, but I would say, is
10  that where those need to be, and if so, do we not have a
11  category that represents what these are.  So those are the
12  types of things that we are looking at.
13      Q.  Other than just the volume, I mean, are you aware
14  of whether it's just like somebody looked and said, well,
15  that looks like there's too many in the miscellaneous, maybe
16  we need to review that and break it down to see if that is,
17  in fact, some statistical anomaly that, you know, we need to
18  break down because it is not an accurate recording of what's
19  really going on, just by eyeballing it, or was there
20  actually, like, a statistical analysis to determine the
21  rates of incidence as compared to other departments in the
22  United States where the statistics were available?  I mean,
23  do you know what I am getting at, as to whether it was
24  actually just an actual study that was done, or whether

Page 47

1   somebody just looked at it and said, well, maybe there is
2   something wrong here and we need to look at it more closely?
3           MR. YAMIN:  Objection to form.
4           THE WITNESS:  You have asked me a lot of questions
5   there, but there was no formal study where we hired a
6   statistician coming in.  The idea was day-to-day management
7   of the information that IAD was in charge of.
8   BY MR. PROVENZALE:
9       Q.  The code reports that you had referenced, I think
10  that's the phrase you used for it.
11      A.  I don't know what I called it.
12      Q.  Okay.  Or code table, I think that's what you had
13  called it.  Was there an annual reporting to the
14  superintendent's office of just the raw data from each
15  district in the City of Chicago?
16      A.  Well, I don't know if it was to the
17  superintendent's office.  I mean, we do a -- through a
18  variety of reports going out, namely through the police
19  board on a monthly basis the amounts of complaints coming
20  in, and, you know, how many were assigned to IAD, how many
21  were assigned to OPS, from time to time we would examine
22  what were the background of complaints.  I am not certain
23  that that went to the superintendent's office.
24      Q.  Wherever it went, was there some regular reporting

Page 48

1   to some department of the City of Chicago where the raw
2   data, the numbers of particular categories of complaints was
3   communicated on a regular basis for monitoring purposes?
4       A.  I don't know about the term of regular, but there
5   are a variety of places in which complaint data, maybe not
6   all of it, but certain points, as applicable, was reported
7   out throughout the department.
8       Q.  Is it fair to say that whatever the reporting was
9   and whatever frequency it was, if it was regular or not, the
10  reporting was simply the raw data, the numbers, there was no
11  studies or statistical analyses done of the raw data from
12  which inferences of trends or anomalies were drawn that you
13  are aware of; is that correct?
14          MR. YAMIN:  Objection; form.
15          THE WITNESS:  When you keep studies and
16  statistical terms, I mean, information reported out was
17  reported out for certain purposes, and so the idea of
18  looking at court attendance, or something along that line,
19  depending upon what the issue was, I mean, there was
20  analysis based on specific issues sometimes at the request,
21  sometimes not.
22          Generally, it was raw data, but then there was
23  also information reported to unit commanders about specific
24  officers to the personnel division.  You know, the

1 discipline data was used for a variety of purposes in a
2 variety of ways.
3 BY MR. PROVENZALE:
4   Q.  When you say analysis, what type of analysis are
5 you talking about?
6   A.  You'd have to read back --
7     MR. PROVENZALE:  Can you read back her answer?
8   So you would refer to the data as there was some
9 type of analysis done.
10   Go ahead and read that back.
11     (WHEREUPON, the record was read by
12     the reporter as requested.)
13 BY MR. PROVENZALE:
14   Q.  And my question was:  You said there was some
15 analysis done.  What type of analysis are you talking about?
16   A.  It would be very basic analysis in terms of
17 comparisons, say, within an area to, you know, whether or
18 not certain districts or certain units, where their level of
19 complaints in comparison to similarly situated units.
20 We would do trends generically over, you know, whether or
21 not there is an increase in certain types of complaints
22 versus others.
23   Q.  These were raw data comparisons, though, correct?
24 Where you just look at the volume of complaints in one

1 district and compare them to the volume of complaints in
2 another district and just to see, is there a difference, and
3 then why is there a difference, and can we figure out what's
4 going on.  Maybe there is a problem in a district or maybe
5 there is underreporting in one district versus another,
6 something to that effect?
7   A.  Again, you know, IAD was focused mostly on
8 investigations, and so when data requests, what you
9 categorize as raw, I'm not sure.
10   Q.  Just the numbers, the volume.
11   A.  It wasn't always focused on volume.  It was
12 focused on trends.  It was focused on -- you know, sometimes
13 if there was an identified trend in certain areas that may
14 be focused on search issues, perhaps, you know.  And, again,
15 I am not speaking to anything specific, but I am trying to
16 figure out a way to answer your question.
17   Q.  And you are getting there, and I'm hoping that you
18 are being clear to my question.
19   You say trend, I mean, were these just sort of
20 looking to see if past years the raw numbers to see, here is
21 a number X in year one and then X plus 50 in year two and
22 then X minus 70 in year three, to see if there was increase
23 regularly -- or fluctuation up or down, or something like
24 that?  Is that essentially the trends that you're talking

1 about?
2   A.  That would be the most common analysis that was
3 provided.
4   Q.  There wasn't any statistical analysis, like an
5 extrapolation where there was some mean regression that was
6 identified to see if there was actually some direction of
7 something that was statistically supported as opposed to
8 just, well, let's look at the raw data and see if it's going
9 up or down from year to year; is that fair to say?
10     MR. YAMIN:  Objection.
11     THE WITNESS:  Again, you are trying to lump every
12 way that IAD data was used into one clean precept here, and
13 I can't say that.  I can say that, generally, a lot of the
14 focus and things of IAD and looking at data was based on
15 trend, more or less hot spots, that type of stuff, which I
16 didn't -- in your characterization of raw, it would be in
17 terms of, you know, mean regression and that other type of
18 data, it may have been used through other agencies in the
19 department, but a majority of what I would call data used by
20 IAD was focused on broader scale aggregate types of data
21 looking at what are the overall trends, what are the overall
22 problems, and if there was something that popped in that
23 regard, then that would bring it down to a more focused
24 review.

1 BY MR. PROVENZALE:
2   Q.  Just so -- I'll get past it, because I think I
3 have the answer.
4   What may have been done by way of actual
5 statistical analyses, where there was some sort of
6 historical data that was, you know, put into -- let's just,
7 for an example, a mean regression to identify it by
8 extrapolation, whether there were any trends or anything
9 that were going -- that were statistically significant,
10 nothing like that was done, to your knowledge?  It was more
11 focusing on specific areas by looking at the raw area to see
12 if there was a hot spot, that it was clearly some
13 irregularity from one year to the next or from a couple of
14 years versus the current year to see if something needed to
15 be attended to?
16   A.  You are asking me to commit to a very broad-based
17 question, and I can't commit to that because --
18   Q.  No, then --
19   A.  -- you keep bouncing to different types of things.
20   Q.  Let me withdraw my question.  I am going to ask
21 you very simply:  Are you aware of any type of -- the City
22 of Chicago implementing any type of statistical analysis to
23 other than just a year-to-year comparison of raw data to
24 assess the existence of, for example, trends in complaints

Page 53

1 reported?
2        MR. YAMIN: Objection to form and foundation.
3        THE WITNESS: Well, I am aware of because the
4 department is using, you know, PRS, the performance
5 recognition systems, which I believe addresses some of the
6 issues that you are raising, but I don't claim to have
7 expertise there.
8        The other thing, though, I guess the challenge
9 that I am having is, you keep talking about raw data year to
10 year comparison, and the way that the IAD data was used in
11 my opinion was more than that, but was anybody in IAD
12 conducting statistical regression models based on the data
13 received, I can answer no.
14 BY MR. PROVENZALE:
15    Q. The performance recognition --
16    A. System.
17    Q. -- when did that go into -- when was that
18 implemented?
19    A. I don't have the specific dates. I know that it
20 was being piloted while I was still in IAD, so I would
21 assume sometime -- it was under development the entire time.
22 When it was fully implemented was, I believe, sometime last
23 year, but there had been ongoing pilots with regards to PRS
24 for a period of time.

Page 54

1    Q. Are you aware of whether or not that system was in
2 place as of February 19th of '07?
3    A. I'm not sure. It may have been under pilot at
4 that time within districts, but I am not sure.
5    Q. Piloting would have been just for specific
6 districts, not city wide, correct?
7    A. Again, with the pilot on that system, certain
8 districts, it was a gradual roll-out, so I couldn't tell you
9 what districts, if any, were using it in 2007.
10    Q. Are you aware, does the City do any type of
11 regular audits on the -- and when I say regular, like an
12 annual audit on the recording of misconduct data?
13        MR. YAMIN: Objection to foundation and form.
14 BY MR. PROVENZALE:
15    Q. And let's just say the incidence of reporting of
16 complaints, not necessarily the incidence of discipline.
17    A. I've got two questions, the City and then what do
18 you mean by audit?
19    Q. Audit meaning that the City of Chicago, not the
20 Chicago Police Department, but some other division of the
21 City of Chicago conducts some statistical examination of the
22 city-wide misconduct reporting data for a given calendar
23 year?
24        MR. YAMIN: Same objection.

Page 55

1        THE WITNESS: To my understanding, there is not a
2 city department that does that.
3        MR. PROVENZALE: Outside of the police departmen[t]
4 is what I am talking about.
5        THE WITNESS: Outside of the police department,
6 right.
7        MR. PROVENZALE: I'm done with that questioning.
8 Do you want to take a break?
9        THE WITNESS: Yes.
10        (WHEREUPON, a short recess was had.)
11        MR. PROVENZALE: Back on the record.
12 BY MR. PROVENZALE:
13    Q. Before I move into the next line, I want to follow
14 up on an answer that you had given previously.
15        After an investigation is completed and findings
16 are made, what is the coding procedure at that point as
17 different from the intake? You said the intake versus
18 closing is different, so describe that for me.
19    A. Upon intake the category is generally attached --
20 and, mind you, I'm not familiar with the day-to-day intake,
21 but my understanding of it, in terms of the data stuff, is
22 that upon intake, the findings is attached to the CR, okay,
23 and so by virtue of the fact that if somebody is named on
24 the intake or not, that finding, the category code is

Page 56

1 attached to that individual; however, at the end of an
2 investigation, you can have different findings for different
3 individuals.
4        If the initial allegation, we will use your
5 example, was a false arrest, and that Officer Jones
6 committed the false arrest, and we know that Officer Jones
7 and Officer Smith were on the scene, it's my understanding
8 that initially both would be categorized, you know, with
9 false arrest. However, upon closing, there is a finding to
10 the CR, whether or not it was sustained or otherwise, and
11 there may be findings to the individuals. So Officer Smith
12 might be deemed culpable and would therefore have a findin[g]
13 for false arrest. Officer Jones might have been found to
14 not have been culpable of false arrest, and so, therefore,
15 it could have a separate finding, or he could have been
16 found culpable of some other misconduct. Perhaps he stole
17 something from him.
18        So Jones would be false arrest and Smith would be
19 theft. So you can have findings of individual to the
20 officer upon close, and that's not possible upon the
21 initiation of the complaint.
22    Q. Okay. I would like to confine -- I am going to
23 narrow your hypothetical, and let's talk specifically about
24 failures to report coding.

Page 57

1    As I understand, a failure to report is a code,
2    correct?
3    A.  I don't have a table in front of me, but I believe
4    it is.
5    Q.  In the circumstance where it comes in, let's say
6    there is --
7    A.  Hold on.
8    Q.  Sure.
9    A.  A failure to report, I know it's a rule violation,
10   I am not sure if it is a specific code violation, so I would
11   have to look at the code violation table to go ahead.
12   Q.  In the circumstance where a complaint comes in and
13   it's a false arrest complaint identifying, let's say three
14   officers, in connection with the false arrest, one of whom
15   actually effected the arrest, the other two of whom were
16   allegedly present at the time that the person was placed
17   into custody, and then the investigation is done, and then
18   the investigation is not sustained on the false arrest
19   allegation as to all three.  At any time in that type of
20   circumstance, is there ever any coding specific to the other
21   two officers that would identify that as alleged in the
22   initial complaint when it came in, their role was
23   effectively to have alleged to have been present when
24   misconduct occurred by another officer that they otherwise

Page 58

1    failed to report, that would be coded as a failure to
2    report, as opposed to the whole thing being code as a not
3    sustained false arrest?
4    A.  It would have to be an allegation that was
5    identified during the investigation, and so when you receive
6    an initial allegation, there is usually multiple allegations
7    within that, and so when an officer is interviewed, they
8    would be interviewed on whatever allegations were
9    identified.  So within your hypothetical, if one of the
10   additional allegations was a failure to report misconduct,
11   that, to my understanding, would be coded at the end as a
12   not sustained as well.
13   Q.  But under what code of misconduct?
14   A.  As I already told you, I don't know what the
15   specific code is for that.
16   Q.  Okay.
17   A.  But the idea being, at the close, the allegations
18   to specific individual officers are coded out.
19   Now, again, I claim no specific knowledge here,
20   and it's been a while since I've had to deal with the ins
21   and outs of IAD data.  You stated that you had Dan Kivel
22   here, Dan is intimately familiar with all of that
23   information, and what I can tell you is that at the closing,
24   to my understanding, and I have to make sure that I am not

Page 59

1    confusing the new system with the old, but the allegations
2    specific to the officer are what are recorded, and so those
3    are sometimes more than the initial CR finding.
4    Q.  Meaning that they are broken down more specific to
5    whatever the investigative findings are?
6    A.  That's my understanding.
7    Q.  Let's assume that, because I believe it is, let's
8    assume that failure to report is one of the coding
9    categories.  It was back in this time frame.  Are you aware
10   of -- strike that.
11   As you sit here today, you don't know whether or
12   not failure to report was a specific code within the coding
13   categories available back, let's say, prior to February 19th
14   of '07?
15   A.  Without the table, I can't guarantee it, no.
16   Q.  You were head of IAD in February of '07, correct?
17   A.  Correct.
18   Q.  And prior to February 19th of '07, did you ever
19   know Anthony Abbate?
20   A.  No, I did not.
21   Q.  Have you ever heard of his name?
22   A.  No, I had not.
23   Q.  His father, Carmen Abbate, was a detective in the
24   Chicago Police Department.  Did you ever work alongside him

Page 60

1    A.  No.
2    Q.  Did you ever know of him?
3    A.  No.
4    Q.  His brother, Terry Abbate, also was a Chicago
5    Police officer, did you ever know him?
6    A.  No.
7    Q.  You never heard of him?
8    A.  No.
9    Q.  When was the first time that you remember hearing
10   the name Anthony Abbate?
11   A.  Probably the day that OPS came over with the
12   videotape.
13   Q.  Prior to OPS getting to IAD with the videotape,
14   had you heard that there was an incident involving someone
15   who suspected to be an off-duty Chicago police officer that
16   was recorded on video, but the person's name wasn't known at
17   the time?
18   A.  I don't believe I was, no.
19   Q.  Did you hear about the video first or did you know
20   that Anthony Abbate was the person who was in a video at the
21   same time?  In terms of when you knew the name versus the
22   person in the video?
23   A.  I'm not certain.  I believe that -- I'm not
24   certain if the name was known at the time that I saw the

Page 61

1  video the first time.
2      Q. Even hearing about the --
3      A. It might have happened simultaneous. I don't
4  recall hearing anything about it until I was called down to
5  help Mike Duffy with the video.
6      Q. What was the first thing you remember hearing
7  about just the fact that something was caught on video
8  involving someone who might have been a Chicago police
9  officer? Was it IAD calling you and saying, hey, we're
10  coming over, we want to show you something, or were they
11  already there?
12      MS. RUBENS: Objection; form.
13      MR. PROVENZALE: I am sorry, OPS.
14      THE WITNESS: The first I recall hearing of it was
15  when I was called down to the supe's office and OPS was
16  already there.
17  BY MR. PROVENZALE:
18      Q. And who called you down there?
19      A. I don't recall. I don't know if it was his
20  secretary or -- I really don't know. I was just told, they
21  need you down to the supe's office. I don't even know if my
22  assistant told me.
23      Q. Do you remember what day this was, calendar wise?
24      A. I couldn't tell you what day it was calendar wise.

Page 62

1  It was after OPS had received the report. It was probably
2  within the two days, but off the top of my head, I couldn't
3  tell you what day it was.
4      Q. Well, what time was it when you had received this
5  call?
6      A. To my recollection, it was somewhat later in the
7  day, probably after 2:00 o'clock.
8      Q. You went down to the superintendent's office?
9      A. To the conference room.
10      Q. To the conference room, okay. Is this attached to
11  the superintendent's office or a part of it?
12      A. It's a suite. Yes, the superintendent's suite.
13      Q. Who was there when you got there?
14      A. I know that Hiram Grau was there, I know that Mike
15  Duffy was there. I honestly don't know who else was there.
16  There were several other individuals, and I am not firm as
17  to who they were.
18      Q. Do you remember whether Superintendent Cline was
19  there?
20      A. I'm not. I do know that I spoke with him, so I
21  would assume that he was there, but --
22      MS. RUBENS: You don't have to guess.
23      THE WITNESS: Yes. Right. I am not sure.
24  BY MR. PROVENZALE:

Page 63

1      Q. He may have been on the phone, he may have been
2  there in person, but at some point while you were there, you
3  spoke with him?
4      A. I did speak with him while I was down there, yes.
5      Q. You just don't remember whether it was in person
6  or on the phone; is that correct?
7      A. Yes.
8      Q. Do you remember Sheri Mecklenburg,
9  M-e-c-k-l-e-n-b-u-r-g?
10      A. No, I don't recall.
11      Q. Do you remember Monique Bond being there?
12      A. I don't recall.
13      Q. Do you remember anyone else from OPS being there
14  other than Mike Duffy?
15      A. No, Mike is the only one I remember being there.
16      Q. What was going on in the room when you got there?
17      MS. RUBENS: I object to vague.
18      You can answer.
19      THE WITNESS: I was told that OPS had an incident.
20  Mike was holding a monitor in his arms, and I was told that
21  they need IAD to help OPS with the investigation.
22  BY MR. PROVENZALE:
23      Q. Was the video playing when you walked in, or did
24  you get the impression that people had already seen it?

Page 64

1      A. I believe people there had seen it. I'm not sure
2  that it was playing when I walked in, and I am not sure if I
3  saw it then or afterwards.
4      Q. When you say afterwards, you mean at some point
5  after you arrived or after you left?
6      A. After I left. After I left from there, I was with
7  Mike, so I am not sure if I saw it while we were working
8  with the video people to try to get it to play out, but I do
9  know that I saw it at some point within that afternoon.
10      Q. Just not whether it was in the --
11      A. Conference room.
12      Q. -- superintendent's office? Okay.
13      What was anybody saying that led you to believe
14  that someone had already seen the video as of the point that
15  you walked into the conference room?
16      A. Again, I don't know if it is that they had seen
17  it, but by virtue of the fact that I was being called down,
18  you know, Grau, superintendent saying that we have a matter
19  led me to believe that they had an understanding of what the
20  matter was.
21      Q. Did anyone describe what it was that the matter
22  was when you went down there?
23      A. Again, I don't recall. So it's, like I said,
24  either I saw the video at that point and then was taking

Page 65

1  action, or I saw it as we went to go get the video
2  developed.
3      Q.  What do you recall of the conversation that you
4  had with Superintendent Cline?
5      A.  Basically, he wanted IAD to assist OPS. He wanted
6  IAD to assist OPS in whatever way was needed, and he wanted
7  to ensure that we relieve the officer of powers.
8      Q.  Did he give you that instruction?
9      A.  To my recollection, yes.
10     Q.  Was there any other discussion regarding
11  investigative wise what Superintendent Cline wanted IAD to
12  do to help OPS in connection with the investigation?
13     A.  No.
14     Q.  It was just work together to get whatever help
15  they need to give them help?
16     A.  Yes.
17     Q.  Can you tell me what, how you interpreted
18  peoples', I guess, demeanor or reaction to whatever it was
19  that they knew about what had occurred that required all of
20  this attention?
21     MS. RUBENS: Objection; foundation, it calls for
22  speculation, calls for a narrative answer, and outside of
23  the competence of this witness.
24     If you can talk to people's demeanor, go ahead.

Page 66

1      MR. PROVENZALE: Your interpretation of people's
2  demeanor.
3      THE WITNESS: It was being treated as a serious
4  matter. I mean, I was being called down to provide OPS with
5  whatever help they needed.
6  BY MR. PROVENZALE:
7      Q.  Did anyone make any type of comment when you were
8  in the room regarding either the severity of the underlying
9  incident or the non-severity of the underlining incident
10  that was being looked into that apparently was on video?
11     A.  Not to my recollection, no.
12     Q.  At some point after you first arrived at the
13  conference room, either in the conference room or at another
14  location, you saw the video; is that correct?
15     A.  Correct.
16     Q.  Do you remember who was present when you first
17  viewed the video?
18     A.  I don't, because I don't recall if I saw it in the
19  conference room or if I saw it later.
20     Q.  Do you remember, was it on the equipment that
21  Mike had that the video was seen or had it been pulled off
22  of there and recorded and played on something else?
23     MS. RUBENS: Objection; foundation.
24     THE WITNESS: I don't recall.

Page 67

1  BY MR. PROVENZALE:
2      Q.  What do you remember viewing in terms of the first
3  time you saw it? From beginning to end, in terms of you
4  just sort of what it showed?
5      A.  You know, the problem with this is, obviously, as
6  you are aware, that it's been seen so many times. To recall
7  what I saw the first time, it's difficult, you know, and was
8  it the first time I saw it or was it the second time I saw
9  it that, you know, certain things. I mean, I saw, you know,
10  a guy beating a woman behind a bar and that man was alleged
11  to be a police officer.
12     Q.  At the time that you saw the video the first time,
13  do you remember being aware that the person was identified
14  tentatively or confirmed as Anthony Abbate?
15     A.  It had to be, because that was all part of what
16  was going on at that time for IAD, so I must have known it
17  was Anthony Abbate at that time.
18     Q.  Do you know who it was that identified him as
19  Anthony Abbate?
20     A.  I am assuming that it was OPS, because when the
21  video was brought over, they had already been investigating
22  the matter.
23     Q.  Do you know what investigation they had done up to
24  that point?

Page 68

1      A.  No, I don't.
2      Q.  Do you know whether they had taken a statement
3  from the woman who was in the video at that point?
4      A.  I don't know if they had taken an initial
5  statement. At the point that I was brought in, I don't
6  think that they took a full statement from her, but I don't
7  recall.
8      Q.  Do you remember reviewing any documentation of an
9  OPS investigation up to that point by way of either their
10  summaries of interviews or statements of witnesses?
11     A.  I never reviewed an OPS investigation, no aspect
12  of it. It was separate and distinct.
13     Q.  And when I say review, I mean, just somebody
14  showed you a piece of paper and said, here is a statement
15  that she took, do you want to take a look at it, or that she
16  gave, or here is a summary of a statement that was taken by
17  this OPS investigation of this witness?
18     A.  We never did that. As the head of IAD, I never
19  would have seen any of their active investigative
20  information. Now, my detective assigned might have been
21  working with their investigator, but as the head of IAD, I
22  would not have seen that.
23     Q.  Would have aside, that did not happen specifically
24  in this case as well, correct?

Page 69

1    A.   Correct.
2    Q.   In the first viewing, do you remember seeing any
3  footage of events occurring after the beating ended, and
4  specifically, anything, footage showing either the phone
5  calls that were being made by people in the bar or the
6  police response to the bar?
7    A.   No, I don't recall that from the first viewing.
8    Q.   So the first viewing that you recall was simply
9  just beginning to end of what led up to the beating and then
10 basically when the beating stopped and that's about it?
11   A.   There may have been a full video, but, frankly, my
12 recollection of, you know, at least at the initial stages,
13 was focused on the actions of the officer who did the
14 beating.
15   Q.   As of that point in time, are you aware of any
16 efforts by OPS to obtain the case report of any police
17 officers who responded to the bar?
18       MS. RUBENS:  I just want to clarify at that point
19 in time.
20       MR. PROVENZALE:  Yeah, I am talking about at that
21 point --
22       MS. RUBENS:  When she saw the video?
23       MR. PROVENZALE:  Right.
24 BY MR. PROVENZALE:

Page 70

1    Q.   When you saw the video, were you aware of whether
2  OPS -- and, again, this is an investigation that OPS had
3  done themselves, whether they had obtained the case report
4  from the 25th District showing that police were called out
5  and responded to this bar beating after it had occurred?
6    A.   I guess I am having trouble placing myself in
7  terms of what you are asking.  You got to understand that
8  when I was called down and I saw this video for the first
9  time, my task was focused on what IAD needed to do, so I
10 wasn't, at least as the head of IAD, very focused on where
11 OPS was in their investigation at that point.
12   Q.   Well, even in assessing what IAD needed to do,
13 let's start with, were you aware that police had responded
14 to the bar as of the time that you saw the video so that you
15 were thinking, well, we need to get ahold of the case report
16 to find out what information was in the case report to see
17 what was reported at the bar and anything else, just as part
18 of the IAD investigation?
19   A.   Well, from my perspective, what I was doing at
20 that point was taking stuff that you are looking at and
21 assigning that to other individuals.  I was working with
22 Mike Duffy to get a monitor recorded in a way that could be
23 digested and got to the state's attorney, etcetera.  So my
24 job was to coordinate -- you got to understand, OPS is

Page 71

1  conducting an investigation separate and distinct.  My job
2  was to work on the criminal aspect, so I am calling in the
3  confidential section saying, get a detective over there.
4  I'm also talking to the general section, general
5  investigation section saying we got to relieve powers, when
6  you find this guy to relieve powers, so I am not looking at
7  specific investigative steps at this point, because it had
8  just been dropped in my lap, for lack of a better term, so
9  now I am trying to get the pieces in place to go forward
10 with the investigation.
11   Q.   You delegated generally, you handle the
12 investigation and you handle finding the guy so we can
13 relieve him of his police powers?
14   A.   Yes.
15   Q.   As of the time that you saw the video, you were
16 not aware of whether or not there had been a case report
17 prepared by any officers who may have responded to the
18 scene; is that correct?
19   A.   Well, I mean, immediately upon viewing, no, but at
20 some point within the next few hours when we are trying to
21 get all of the pieces in motion, yeah, there was a case
22 report, and I developed information that she reported to OPS
23 in person.  But at the time that I viewed the video, I
24 frankly didn't know what I was seeing.

Page 72

1    Q.   I am just trying to get the chronology.
2        So after you see the video, you have some initial
3  delegation of what you want to be done while you are working
4  with Mike Duffy to retrieve the footage off the hard
5  drive, correct?
6    A.   Yes.
7    Q.   And then at some point after that, then you begin
8  to learn more information specific to the response of the
9  Chicago police to that bar after the beating occurred; is
10 that correct?
11   A.   Correct.
12   Q.   When was the first time you saw the case report?
13 Did you see the case report from the 25th District that day?
14   A.   At some point I saw the case report.  I don't
15 believe it was that first day.
16   Q.   Do you remember when it was?
17   A.   I don't.  I really don't recall when I saw the
18 case report.
19   Q.   Do you know who it was that had obtained the case
20 report, whether it was OPS or someone to whom you had
21 delegated the investigation within IAD?
22   A.   It could have been either, but IAD would have easy
23 access to the case report.  So whether or not they both
24 derived the case report individually, I don't know.

Page 73

1    Q.  You also mentioned that you were aware, you became
2  aware that the bartender had given a statement to OPS
3  around the time that you learned that there was a -- that
4  the case report --
5    A.  Well, no, that's not what I said.  I said I was
6  aware that the bartender had -- well, the woman had reported
7  in person to OPS.
8    Q.  Okay.
9    A.  I wasn't sure whether or not a statement had been
10  taken at the time that I looked at the video, but, I mean, I
11  do know that a statement was subsequently, you know, taken
12  again.
13    Q.  At the time that you had seen the video and then
14  you had additional information coming in to you about the
15  existence of the case report and that the bartender had in
16  person gone to OPS to report what had occurred, did you
17  receive any information in this time frame regarding
18  additional allegations of efforts of the police officer to
19  obtain the videotape to destroy it or to keep it from
20  getting into OPS or IAD's hands?
21    A.  I wasn't aware of any, I guess, secondary or
22  corollary complaints upon the time that I became aware of
23  this matter.  The additional allegations of police inaction
24  or misconduct developed as the investigation developed, but

Page 74

1  on that first time, within that first framework of hours, I
2  was unaware of that.
3    Q.  Do you remember ever, in connection with the
4  investigation of the case, hearing some allegation that
5  Anthony Abbate, through another person, had communicated
6  threats to the owner of the bar and others in the bar that
7  if the videotape was not turned over to Mr. Abbate, that
8  people would be arrested, falsely arrested, leaving the bar
9  for drunk driving, or that people would be stopped and drugs
10  would be planted on them?
11    MS. RUBENS:  You can answer the question barring
12  anything you've ever learned from any of your attorneys in
13  this case.
14    THE WITNESS:  You asked a very specific question.
15  I would answer no to the specific question, but I did
16  hear --
17  BY MR. PROVENZALE:
18    Q.  How about generally?
19    A.  I did hear during the investigation that there
20  were allegations that there would be police action or some
21  sort of action against the bar owner and patrons.
22    Q.  And at what point do you remember you first heard
23  about that?  And let's just put that in reference to when
24  you first saw the video.  Was it the same day, was it within

Page 75

1  a week, or was it longer after that?
2    A.  It would have been within the earlier stages of
3  the investigation.  It definitely wasn't the first day.
4  Probably it would be within that subsequent, you know, week
5  period, you know, as information was breaking.
6    Q.  Do you remember whether you had learned that
7  information generally about some other obstruction efforts
8  of Mr. Abbate to obtain or destroy physical evidence prior
9  to or after the time that you had first communicated with
10  the State's Attorney's Office with anyone from the State's
11  Attorney's Office?
12    MR. APICELLA:  I object based on foundation and
13  mischaracterizes a prior answer.
14    MS. RUBENS:  Join.
15    THE WITNESS:  You are asking a question in a way
16  that I didn't answer, but I don't know -- I don't recall at
17  which point I learned of any of the, you know, the
18  subsequent allegations specifically.  And as far as
19  presentation to the State's Attorney's Office, I can't link
20  those.  I don't know when the presentation was or when those
21  allegations were raised.  And in this case, there were two,
22  I guess, charging conversations with the state's attorney,
23  so when that came into play, I couldn't tell you.
24

Page 76

1  BY MR. PROVENZALE:
2    Q.  Well, just with respect to the first conversation
3  that you had with anyone from the State's Attorney's Office
4  about anything in connection with the case.  You cannot
5  place it temporally, either before or after, as to when you
6  learned about these other allegations of efforts of
7  Mr. Abbate related to arresting patrons or the owner of the
8  bar; is that correct?
9    A.  That's correct.
10    Q.  You said that you were with Mike Duffy, efforts to
11  retrieve the recording off of the hard drive, were you
12  ultimately successful, or was someone in the Chicago Police
13  Department ultimately successful in getting recordings off
14  of the hard drive?
15    A.  You know, I'm not sure if it was the CPD that did
16  it, but clearly ultimately we got it off of the hard drive,
17  I guess, onto a disk.
18    Q.  Were multiple copies made or was it just one copy
19  that you made --
20    MS. RUBENS:  Objection.
21  BY MR. PROVENZALE:
22    Q.  -- the first time when you were aware of it?
23    MS. RUBENS:  Calls for speculation.
24    THE WITNESS:  I am not certain how many copies

Page 77

1 were made. I know that one copy was made for OPS, and I
2 believe one copy was made for IAD, but I am not sure.
3
4 BY MR. PROVENZALE:
5 Q. So did you retain a copy and then just deliver it
6 back to your lieutenant or officer who was handling the
7 case, or what happened with the copy for IAD?
8 A. Again, I am not certain if there was a copy for
9 IAD. If there was, it would have been attached to the
10 criminal investigation file. So the investigator would have
11 needed it, so they would have had it.
12 Q. When you delegated the investigative aspect of it
13 to the confidential investigation section, did you identify
14 a specific investigator you wanted to use on that, or did
15 you just delegate it to Lieutenant Calloway for him to pick
16 an investigator?
17 A. I told them I needed a detective, considering
18 there is a limited number of detectives, but aside from that
19 I didn't identify a specific individual.
20 Q. Okay. Let's talk about the manner in which you
21 had delegated the assignments.
22 Did you meet individually with or together with
23 Lieutenant Calloway and Lieutenant Naleway to tell them what
24 you wanted done, or how did you communicate the delegation?

Page 78

1 A. Lieutenant Naleway worked on the same floor as I
2 did, so he had the advantage, or disadvantage, of a
3 face-to-face delegation. Lieutenant Calloway works in an
4 off-site location, and so that would have been a phone call
5 to him. And the idea was that Dave, Lieutenant Naleway, was
6 working with Mike on -- he stepped in to work with the
7 computer forensic section and the relief of powers, and
8 Lieutenant Calloway was dealing with the criminal
9 investigative aspect.
10 Q. When did you first meet with Lieutenant Naleway?
11 I mean, was it right after you had gotten the copy of, or
12 copies were made of the video --
13 A. No.
14 Q. -- or was it the next day? When was it?
15 A. No. You're looking at this very linearly, and
16 that's not what happened. I mean, I had a multilevel
17 response going, and with Lieutenant Naleway, as I walked
18 back from the superintendent's conference room, I grabbed
19 Dave and said, okay, this is what I need. Now, did I go
20 downstairs first and try to get the computer people first to
21 start working with Mike and come up and get Naleway? That's
22 a possibility. But I know at some point Dave was down with
23 the computer people. So did we meet with Dave and then go
24 downstairs and did I go downstairs first and come up and get

Page 79

1 Dave? I'm not sure.
2 Q. Whatever the sequence of events was, when you met
3 with Lieutenant Naleway, you were aware of Anthony Abbate's
4 name at that point; is that correct?
5 A. Yes.
6 Q. And you gave him the name and you told him what
7 the general incident involved?
8 A. Right.
9 Q. Did you give him any specific directions as to how
10 to locate this individual, or did you say, just find him
11 and, you know, carry out your responsibility?
12 A. Dave is an expert in locating people, that's his
13 job, and so Dave was told that he needed to be relieved of
14 his powers and so --
15 Q. Okay. The phone call that you had with Lieutenant
16 Calloway, do you recall when it was that you had that phone
17 call?
18 A. Again, you know, it's multidimensional at some
19 point, within the time frame of talking to Dave, the
20 computer people, and trying to get going on that, so --
21 Q. What did you tell Lieutenant Calloway to do
22 specifically in terms of carrying out the investigation to
23 assist OPS?
24 A. I informed him that OPS had an investigation in

Page 80

1 which there is a police officer who was beating a woman on a
2 videotape, and that we are to work with OPS in bringing this
3 to a criminal charge, and I needed a detective to work it.
4 Q. As of that point did you have any conversation
5 with Lieutenant Calloway where you expressed your opinion as
6 what charges were appropriate?
7 A. I would say not initially, no.
8 Q. Well, let me ask you: The first time you saw the
9 videotape, what was your impression of what criminal charges
10 were supported by what was shown in the video?
11 MS. RUBENS: Objection. It calls for a legal
12 conclusion, incomplete hypothetical.
13 You can answer.
14 THE WITNESS: The first time I saw the video it
15 was more or less focused on disgust and knowing this police
16 officer should not be a police officer. Criminal charges,
17 you know, I knew that this guy was going to be charged one
18 way or another, but as to what were appropriate charges,
19 that didn't enter my mind on the first viewing of it.
20 BY MR. PROVENZALE:
21 Q. Do you remember when it was that you had in your
22 own mind come to a decision as to what you felt were the
23 appropriate criminal charges to be sought?
24 A. As the head of the Internal Affairs Division, I

Page 81

1  had tasked this criminal investigation to the detective and
2  to the unit it was responsible for, so my personal opinion
3  shouldn't and did not enter the equation, because, frankly,
4  it is the investigator's responsibility to get and identify
5  the evidence and present it to the state, and so I would
6  not, nor did I, you know, put an influence on that.
7      Q.  Well, I am not saying whether you put an influence
8  on anything, I am asking you, in your mind, when did you
9  come to a conclusion in your own mind as to what the
10  appropriate criminal charge was for what was recorded in
11  that video?
12      MS. RUBENS:  If ever.
13      MR. PROVENZALE:  Yeah, if ever.  If you never came
14  to a conclusion, then you never did.
15      THE WITNESS:  Well, I did direct -- it wasn't that
16  first day.  It was probably as more information came in or
17  we were able to develop information and I became aware of
18  investigative information.  Mind you, there was a fairly
19  short period of time between the initial video and then the
20  presentation to the state, we were going for felony charges.
21  And, I mean, that was known probably pretty early on, but I
22  would not say upon the instant viewing of the tape.
23  BY MR. PROVENZALE:
24      Q.  Okay.  And that's what I -- I understand this is a

Page 82

1  fluid process, and this is sort of an evolving information
2  circumstance, but, as you've described, at some point you
3  were going for felony charges, you being the IAD, the
4  Chicago Police Department?
5      A.  Correct.
6      Q.  And so at what point did that discussion begin, at
7  least in terms of your participation in it, prior to the
8  time that you first contacted the State's Attorney's Office?
9      A.  Well, it was standard operating procedure with IAD
10  that any time that there was a potential for felony
11  charging, we would go for felony charging, okay.  So we had
12  cases where it would not normally be a felony charge and so
13  we would still go for a felony, just for the fact that we
14  felt it was best practice because we would present the evidence
15  and it was the state that had to make the decision so we at
16  least can say that we went for felony charges.  And from the
17  perspective of the IAD protocol for criminal arrests, that's
18  what we always followed.
19      Q.  Well, when in this case did the discussion begin?
20  I mean, did it begin right off the bat where there was a
21  discussion in the conference room that, you know, we need to
22  work this case up because we are going to pursue and seek
23  approval from the state's attorney for felony or felonies in
24  connection with this, or did that conversation come up at

Page 83

1  some point after you had left the conference room?
2      MS. RUBENS:  Objection; foundation.
3      THE WITNESS:  You are putting something forth that
4  there was no conversation by me with anybody down in the
5  superintendent's conference room about charges.  I was told
6  to help OPS with the criminal investigation, and that's what
7  I was doing.  The decisions as to how we would present that
8  case I guess came about, not that night, clearly, but after
9  IAD had been involved in the investigation for a period of
10  time, and whether it was the following day or the day after,
11  I can't tell you, but I do know that prior to the meeting
12  with the State's Attorney's Office, that we were going for
13  felony charges.
14  BY MR. PROVENZALE:
15      Q.  Okay.  Did you participate in any conversation
16  with any either superior or subordinate officer discussing
17  the Chicago Police Department's position when you were going
18  to approach the state's attorney and present the case to
19  them?
20      A.  As to the state's attorney presentation?  No.
21      Q.  No one -- there was no discussion prior to your
22  first contact with the state's attorney with anyone at the
23  Chicago Police Department where it was discussed as to
24  whether felony charges would be sought or which felonies

Page 84

1  would be requested?
2      MS. RUBENS:  You mean with her and anyone else?
3      MR. PROVENZALE:  Yes, with you and anyone else.
4      THE WITNESS:  Superiors, no.
5      MR. PROVENZALE:  Superiors or subordinates.  I am
6  not limiting it.  I am saying with anyone prior to the time
7  that you went -- when you first communicated with the
8  state's attorney.
9      THE WITNESS:  Well, it would have been with a
10  subordinate, because it was my subordinate that presented it
11  to the state.
12  BY MR. PROVENZALE:
13      Q.  Who did you speak with?
14      A.  Well, Lieutenant Calloway, Dion Boyd.  I don't
15  know if there was a sergeant involved in the investigation.
16  I had had conversations with Lieutenant Naleway, but I don't
17  know if it was relevant to criminal charges.
18      Q.  And this conversation that you had with Lieutenant
19  Calloway and Dion Boyd was prior to the time that you first
20  communicated with the state's attorney, or when was it in
21  relation to that?
22      A.  You are referencing two different events.  There
23  was a presentation to the state, and you are also
24  referencing communication with the state.

Page 85

1    Q.  I am talking about -- I want to be clear about
2    this.  I am talking about the first time that you
3    communicated with the State's Attorney's Office regarding
4    this case.  In reference to that first communication, did
5    you have any conversation with anyone in the Chicago Police
6    Department, whether they be superiors, subordinate officers,
7    regarding whether felonies would be sought or what felony
8    would be requested?
9        MS. RUBENS:  I just object to the form and not
10   lying what the foundation of the first communication was.
11       THE WITNESS:  It's a very broad-based question
12   that you are asking me, too.  So, to the extent that you are
13   asking, did I talk to anybody inside the police department
14   before I spoke to the state on this matter, the answer would
15   be yes.
16   BY MR. PROVENZALE:
17       Q.  Regarding charging, specifically?
18       MS. RUBENS:  Just object to form.  That's not what
19   you asked.
20       THE WITNESS:  I don't know if I talked to anybody
21   about charging before I first talked to the state on this
22   matter.
23   BY MR. PROVENZALE:
24       Q.  Okay.  When is the first time that you -- when is

Page 86

1    the first communication that you recall having with the
2    state's attorney in connection with the case?
3        A.  It is my belief that before the charging meeting,
4    which happened with OPS and my detective and my lieutenant,
5    that I had a conversation with the state stating that we had
6    a matter and that we would be looking for charges.
7        Q.  And the presentation that you are referring to,
8    you didn't attend that meeting, correct?
9        A.  Correct.
10       Q.  Let's just talk about the first communication
11   that you had with the state where you directly had a
12   communication with the State's Attorney's Office.  Was that
13   in person or by telephone?
14       A.  It would have been by phone.
15       Q.  And did that phone call occur the night -- the
16   same day that you had viewed the video or a day after that?
17       A.  I can't tell you the specific date.  It most
18   likely wasn't that same night because of what I recall as
19   being late in the day and how things were breaking out, so
20   the conversation with the state either would have been maybe
21   the same day it was presented by my staff or, like, the day
22   before that.
23       Q.  And whatever the day was, it was prior to the time
24   that Lieutenant Calloway and Dion Boyd had gone over to OPS

Page 87

1    to have the actual conference with the state's attorney; is
2    that correct?  This phone call that you are talking about?
3        A.  You know, I am not real clear on that.  I believe
4    it was prior, but I'm not sure if it was after.  But what I
5    normally did was if we had a case coming into the state, I
6    would contact the party that would coordinate that case
7    first and say just that we had something come in.  I
8    honestly don't know if I did that the day before or if I did
9    it somewhere within the same day of the presentation.
10       Q.  Did you place the phone call to the State's
11   Attorney's Office or did they call you?
12       A.  You know, I don't recall, but within the context
13   of me giving notice to the state, it would most likely be
14   that I called them.
15       Q.  Were you in your office when you called them or
16   were you somewhere else?
17       A.  I don't recall.
18       Q.  Who did you speak with at the State's Attorney's
19   Office?
20       A.  It would have been Tom Bilyk.
21       Q.  Was anyone present in the room with you when you
22   were speaking with Tom on the phone?
23       A.  I don't recall.
24       Q.  Do you recall whether or not the phone call, you

Page 88

1    had it on speaker or whether you had it up to your ear?
2        A.  I don't recall.
3        Q.  What do you remember telling Tom Bilyk about the
4    case?
5        A.  Like I said, the only recollection I have right
6    now is that I spoke with Tom at some point stating that we
7    had a case that would be coming, and basically gave the
8    outline, you know, of what the video showed.
9        Q.  Did you express any opinion to him during the
10   conversation as to the severity of what had happened and --
11   well, let's start with that.  With the severity of what was
12   on the video?
13       A.  You know, there were several conversations, I
14   believe, with the state's attorney, so when we get to, what
15   did you say, when, where, and why, I'm not real clear on
16   that.
17       Q.  Okay.
18       A.  You know, I do know that I talked to Tom Bilyk
19   saying that we had a matter coming in.  I do know that my
20   people presented to Tom on what the case was, and I do know
21   that there was -- that the state's attorney said that there
22   wasn't a felony here, and I do know that we had a
23   conversation regarding that.  Now, whether or not that was
24   prior or after, I'm not sure, but based on the progression

Page 89

1 of things, I would think that that was either that same day
2 or somewhere after where we talked about what the charges
3 were.
4    Q. So, as you sit here today, you do not recall
5 whether or not your discussion with Tom Bilyk about the
6 propriety of charging was this first phone call that you had
7 with him prior to the time that Lieutenant Calloway and
8 Dion Boyd had conferenced with Tom over at OPS or whether
9 you had some communication after that conference?
10    A. You are referencing a discussion and I think what
11 I am testifying to is that there were several discussions.
12 When specific things were stated, I'm not sure, and you are
13 also identifying a conference with Tom Bilyk, which I
14 believe I testified that it was a presentation. The concern
15 that we had in presenting and whether or not this
16 conversation was prior or after, was that in my experience
17 of working with the Chicago Police Department, the
18 identifier for aggravated battery was physical injury, and
19 this was a challenge for us, which was, you know, we weren't
20 certain if the state was going to approve felony charges.
21    Q. I appreciate that. What I am trying to find out
22 is your best recollection of the sequence of events, and so
23 I am trying to make sure that I understand what you do
24 recall and don't recall. My specific question is, as to any

Page 90

1 conversation that you had -- the first conversation that you
2 had with Tom Bilyk where the topic of the -- where some
3 topic of the conversation involved what were the proper
4 charges for what was depicted in that videotape, you don't
5 recall whether or not that topic of conversation came up
6 with Tom Bilyk before or after your officers had made the
7 presentation to the state's attorney; is that correct?
8    MS. RUBENS: Object to asked and answered and
9 foundation.
10    MR. PROVENZALE: The first time you had that topic
11 come up.
12    THE WITNESS: I mean, I can't answer what I said
13 in the first time. I mean, all I know is that I had a
14 conversation with Tom, I had several. We would be seeking
15 charges, and we were going to seek felony. I don't know
16 when I had that conversation. I don't know if I had two
17 conversations or three before my people showed up. And I do
18 know that my people showed up and I know that I talked to
19 Tom afterwards. Now, how long all of these conversations
20 happened, I'm not sure.
21 BY MR. PROVENZALE:
22    Q. Do you remember ever having a conversation with
23 Tom Bilyk before your officers had made the presentation to
24 the state's attorney, where you had told Tom something to

Page 91

1 the effect of the video looks bad, but it's not -- it isn't
2 as bad as it looks, she wasn't hurt very bad, and he missed
3 a lot of the punches that he threw. Do you ever remember
4 having any conversation with him prior to the time that your
5 officers made the presentation to the state's attorney to
6 that effect?
7    A. I don't recall any conversation like that.
8    Q. Do you recall ever having any conversation with
9 Tom Bilyk where you relayed to him that you felt that the
10 appropriate -- that misdemeanor battery charge was your
11 recommendation for the appropriate charge?
12    A. I can tell you I never would make the
13 recommendation of a simple battery charge on that.
14 We were going for a felony.
15    Q. So your answer is, no, you never said that to
16 Tom Bilyk, correct?
17    A. Correct.
18    Q. I take it that after the presentation that your
19 officers had made, that they reported back to you what the
20 state's attorney decision was?
21    A. Yes.
22    Q. When did that occur? Do you remember whether it
23 was the same day that the presentation was made or was it a
24 different day?

Page 92

1    A. I'm not certain, but I'm pretty sure it's the same
2 day because they would have come over from OPS.
3    Q. Did both of them tell you about it, one or the
4 other?
5    A. I don't recall, but it would be likely that both
6 of them were in my office telling me. But I don't recall.
7    Q. Whoever it was, whether it was one or both, what
8 do you remember them relating to you?
9    A. That the state didn't see that this was a felony
10 charge and they weren't going to charge the felony.
11    Q. Can you tell me what -- did Lieutenant Calloway
12 ever make any comment to you that you recall in the context
13 of this whole presentation report that they gave you that he
14 argued with the state's attorney about their decision or
15 determination that felony charges weren't warranted?
16    A. I know that Lieutenant Calloway was not in
17 agreement, and I believe that he was upset. As to what
18 specifically he argued with the state, I don't recall.
19    Q. What I am asking specifically, do you remember him
20 telling you, I argued with them, when he reported back to
21 you about what had occurred? I understand that you --
22    A. Right. Right.
23    I don't understand him saying that I argued with
24 them, but it was Lieutenant Calloway's position that the

Page 93

1  state was just not looking at this the right way.
2  Q. Did Detective Boyd ever tell you that he had
3  argued with the state's attorneys who were at that
4  presentation about their decision that felony charges were
5  not warranted?
6  A. I believe that -- you know, I only recall really
7  speaking to Keith about that. I recall Keith's stance on
8  that. I'm sorry, Lieutenant Calloway's stance on that. I
9  don't have a clear recall of anything Dion said to me.
10  Q. After you had received the report back from them
11  that the state's attorney was not approving felony
12  charges -- well, strike that.
13  At the time that you received that back from them,
14  do you recall whether you were aware of the nature and
15  extent of the injuries that the bartender had sustained?
16  A. I'm sorry?
17  Q. As of the point in time when Lieutenant Calloway
18  comes back with or without Dion Boyd and reports to you what
19  the state's attorney's decision is after the presentation,
20  at that point in time do you remember whether you were aware
21  of what the nature and extent of the bartender's injuries
22  were?
23  A. I didn't have the full extent, but the general
24  extent of the injury, yes.

Page 94

1  Q. What was your understanding at that time of what
2  the general extent of the injury was?
3  A. Bruising, soreness, pain.
4  Q. In your mind, what was the basis for seeking
5  felony -- that the Chicago police were seeking felony
6  charges then, if the injuries to the bartender were clearly
7  not great bodily harm?
8  MS. RUBENS: I just object to form.
9  THE WITNESS: Because it was a police officer
10  involved.
11  BY MR. PROVENZALE:
12  Q. And that's it? That was your understanding
13  basically as a policy matter, you were going to ask for
14  felony charges just because it was a police officer and what
15  was shown on the video, not necessarily that the facts
16  supported it?
17  MS. RUBENS: I object to policy matter and the
18  witness' personal opinion.
19  THE WITNESS: It's not a policy matter. The idea
20  being that the actions of the police officer, as identified
21  in the video, were clearly egregious.
22  It is true that in my experience with the police
23  department and as a detective, that great bodily harm is
24  normally the predicate of getting a felony approval on

Page 95

1  aggravated battery from the State's Attorney's Office;
2  however, given the, I think the aggressiveness shown by the
3  officer and the fact that it was a police officer, we felt
4  that from maybe a basis for felony charges to the State's
5  Attorney Office and that's why we sought it.
6  BY MR. PROVENZALE:
7  Q. At this time were you aware of the subsection of
8  the ag bat statute that allowed for the enhancement of a
9  battery, a simple battery to an aggravated battery based
10  upon a specific location of where the events occur?
11  A. No, I wasn't.
12  Q. So after you hear the report back from
13  Keith Calloway, did you contact Tom Bilyk to find out what
14  was -- well, did you contact him?
15  A. I recall talking to Tom after the decision was
16  made. I don't know if it was that day or, you know, shortly
17  subsequent within the next two days.
18  Q. You called him?
19  A. Again, I don't recall that.
20  Q. And what do you remember telling him in this phone
21  call?
22  A. I think that just -- the overall conversation, as
23  I recall it, was just speaking to the fact that, you know,
24  you are not going to approve the felony, no, it's not there.

Page 96

1  And the focus on that -- well, we're going to, you know,
2  then we will do what we got to do.
3  Q. Meaning on your end that you will do what you have
4  to do?
5  A. Right. Right.
6  Q. Prior to the time that you called Tom or after,
7  did you go up your chain of command to advise the
8  superintendent that the state's attorney had rejected
9  charges?
10  A. I didn't state that I called Tom. At some point I
11  spoke to Tom.
12  Q. I am sorry. Before or after you spoke to him?
13  A. Yes. At some point, yes, I did inform the
14  superintendent that the state was not going to approve
15  felony charges.
16  Q. Did you advise him of that before you had spoke to
17  Tome after the presentation, or the first time you spoke to
18  him or after?
19  A. I don't know. My conversation with Tom doesn't
20  relate to me to the conversation with the superintendent.
21  I don't know when I spoke to Tom and when I spoke to the
22  superintendent.
23  Q. What was the superintendent's response to you
24  relaying to him the state's attorney's decision?

Page 97

1    A. I don't really recall any response.
2    Q. As of the point in time that you had met with
3    Keith Calloway after the presentation and the state's
4    attorney rejecting charges, as of that point in time, were
5    you aware of the additional allegations against Mr. Abbate
6    that he had threatened people at the bar to make false
7    arrests or plant drugs on patrons leaving the bar?
8    A. I don't believe I was, because if I was, that
9    would have been something that we could have presented, so I
10   don't have a recollection that I knew at that time.
11   Q. Do you know whether or not -- well, I take it,
12   then, that you don't know whether Tom Bilyk knew about those
13   or anybody at the state's attorney knew about those
14   allegations as well at that time; is that correct?
15   A. That's correct.
16       MS. RUBENS: Foundation.
17   BY MR. PROVENZALE:
18   Q. So what was Superintendent Cline's reaction?
19       MS. RUBENS: Asked and answered.
20       THE WITNESS: I don't recall what his reaction
21   was. I don't even know if I informed him in person, but I
22   informed him.
23   BY MR. PROVENZALE:
24   Q. I mean, did he give you any direction as to, you

Page 98

1    know, go back to them or whether he said, let me contact
2    them or anything like that?
3    A. I don't recall.
4    Q. At any point in time during the course of -- at
5    any point in time after you had delegated the investigation
6    to Keith Calloway up until the time where you met with him
7    after the presentation, were you given any status updates on
8    the confidential investigation division's investigation into
9    the case as to, you know, what they were doing and how
10   things were progressing?
11   A. I'm sorry, what's the time frame that you are
12   giving me?
13   Q. Between when you told Keith Calloway, this is your
14   job, go do it, conduct the criminal investigation, and when
15   he reported to you after the presentation. Did he give you
16   any updates as to what was going on with his investigation?
17   A. I'm sure he did. I don't know. I don't recall
18   what the specific updates were.
19   Q. Do you know of any reason why -- well, strike
20   that.
21       Did you ever direct anyone in the confidential
22   investigation section, and specifically either Keith
23   Calloway or Dion Boyd, to have the bartender sign a blank
24   complaint form to be filled in at some point later on once

Page 99

1    the charging decision was made?
2    A. No, I didn't direct anybody to do that.
3    Q. Would you agree with me that if that was done,
4    that that would have been improper?
5        MS. RUBENS: Objection; foundation, incomplete
6    hypothetical.
7        THE WITNESS: You shouldn't have somebody sign a
8    blank complaint form, I agree that that's improper.
9    BY MR. PROVENZALE:
10   Q. At any time prior to the presentation did you ever
11   direct either Keith Calloway or Dion Boyd to have the
12   complainant sign a misdemeanor battery complaint?
13   A. You mean the presentation to the state?
14   Q. At any time prior to the presentation that
15   Keith Calloway and Dion Boyd made to the state that you
16   characterized as a presentation, did you ever direct either
17   of them to go and have the bartender sign a misdemeanor
18   battery complaint?
19   A. No.
20   Q. Would you agree with me that given the fact that
21   the case was being presented to the state's attorney, or was
22   going to be presented to the state's attorney, that no
23   complaint should have been filed or should have been signed
24   by the complainant bartender until after the state's

Page 100

1    attorney had reviewed the case?
2        MS. RUBENS: Objection; incomplete hypothetical.
3
4    BY MR. PROVENZALE:
5    Q. Based upon what you wanted to be carried out in
6    connection with the investigation?
7        MS. RUBENS: Same objection.
8        THE WITNESS: Right. We shouldn't have had her
9    sign a misdemeanor complaint, because we were going for
10   felony charges.
11   BY MR. PROVENZALE:
12   Q. After you had reported to Superintendent Cline
13   about the state's attorney's decision, did you have any
14   further communications with Tom Bilyk about the state's
15   attorney's charging decision?
16   A. Did I have any further conversation after
17   initially telling him that the state didn't charge?
18   Q. Yeah. Generally, the sequence of events are: You
19   have a communication with Tom Bilyk prior to the
20   presentation, you don't recall exactly what was discussed in
21   that communication other than to let him know, we are going
22   to present something to you, correct?
23   A. Correct.
24   Q. And then the presentation occurs. And then after

Page 101

1  you learn that the state's attorney rejected charges, you
2  have another conversation with him, correct?
3      A.  Correct.
4      Q.  And in the subsequent conversation, you ask him to
5  explain what happened and he says, well, it's not there.
6  Something to that effect, correct?
7      A.  Correct.
8      Q.  And then you report to Superintendent Cline the
9  state's attorney's decision either in person or over the
10  phone, correct?
11      A.  Correct.
12      Q.  After that did you have any further conversation
13  with Tom Bilyk regarding the state's attorney's decision as
14  to charging the battery aspect of the case?  I mean, at some
15  point they approve charges, right?
16      A.  Right.
17      Q.  Okay.  That's what I am talking about is, did you
18  have any conversation -- let's put it this way:  Did you
19  have any further conversation with him before you found out
20  that they had changed their mind or approved charges?
21      A.  This case was problematic at a lot of levels, and
22  so, you know, I am sure that I conversed with Tom at some
23  point additionally.  I mean, I didn't have just two discreet
24  phone calls with him and then walked away from it.  What the

Page 102

1  nature of that was, etcetera, I am not certain, but it
2  wasn't Tom that informed me that the state's attorney had
3  changed their mind on the charges.
4      Q.  Who told you that?
5      A.  I believe it was Scott Cassidy.
6      Q.  And when did he tell you that?
7      A.  After we had arrested Abbate for the misdemeanor
8  battery.
9      Q.  When you spoke with Scott Cassidy and he told you
10  that there was going to be a felony charge, were you aware
11  of whether or not the video had hit the media by then?
12      A.  Oh, I am sure it had.
13      Q.  So, to the best of your recollection, the
14  chronology is that Abbate is arrested on the misdemeanor
15  charge, and then at some point after the video hits the
16  media, and then you have a conversation with Scott Cassidy
17  and he tells you, we're approving the felony charge?
18      A.  You know, I'm not sure when the -- I believe the
19  video was out before Abbate was arrested on a misdemeanor,
20  but I'm not sure.  So, again, I don't know when the -- you
21  know, when the video was released.
22      Q.  Well, what's your understanding of the
23  circumstances that prompted the state's attorney to, I
24  guess, in your opinion, change their mind?

Page 103

1      MS. RUBENS:  Objection; foundation, calls for
2  speculation.
3      THE WITNESS:  The only -- I mean, I don't know
4  what caused the state's attorney to change their mind.
5  BY MR. PROVENZALE:
6      Q.  What is your understanding of why they did it?
7      MS. RUBENS:  Are you asking for her personal
8  opinion?
9      MR. PROVENZALE:  Yeah, your personal opinion.
10      THE WITNESS:  It is my belief that they found that
11  they could actually bring forth the section that they
12  brought forth and get an aggravated battery charge on it.  I
13  have never seen that charged in Cook County before.  I think
14  they had to do some legal research to see whether or not
15  they could carry it out.
16  BY MR. PROVENZALE:
17      Q.  Did anybody at the State's Attorney's Office,
18  whether it be Lauren Freeman, Scott Cassidy, Dave Navarro,
19  Tom Bilyk, anybody else, ever tell you that they had never
20  rejected felony charges, they had deferred the decision
21  until further investigation?
22      A.  I believe it was after Abbate was arrested for the
23  battery, but I don't know if it was when I got notified that
24  they wanted to charge him with the aggravated battery or --

Page 104

1  it had to be at that time.  So at that point -- the
2  conversation that you are stating, I never really had.  The
3  conversation that I had was that they had to charge him on
4  an aggravated battery, why did we arrest him for the
5  misdemeanor.
6      Q.  That's what I am getting at.  And that was with
7  Scott Cassidy, correct?
8      A.  I believe it was Scott.
9      Q.  And he expressed to you in the context of this
10  conversation that it was his understanding that the State's
11  Attorney's Office had never said no to felony charges, just
12  that they deferred it until some further date when either
13  they were doing additional research or waiting for
14  additional investigation to be done, or something like that?
15      A.  No, that wasn't really conveyed in that
16  conversation.  It was more or less that, well, we wanted to
17  charge him with a battery, what are you doing arresting him
18  for a misdemeanor.
19      Q.  Meaning they wanted to charge him with the
20  aggravated battery?
21      A.  Aggravated battery.
22      Q.  It was your understanding in this conversation
23  that you had with Scott after Abbate had been arrested for
24  the battery?

Page 105

1    A.  The misdemeanor.
2    Q.  The misdemeanor.  That he was arguing, for lack of
3  a better word, about why -- that it was his understanding
4  that an aggravated battery was going to be charged, and why
5  did you arrest him for a simple battery.  Did I get that
6  right?
7    A.  No.  The conversation I had, and, like I said, it
8  was after the misdemeanor battery arrest by CPD.  There was
9  a call from the State's Attorney's Office, and I believe it
10  was Scott Cassidy who stated that, well, we were looking to
11  charge it individually with an aggravated battery.  The
12  overall gist of the conversation, I don't know if there was,
13  you know, a back and forth, but I stated, well, CPD was, you
14  know, informed that you guys weren't going to charge a
15  felony.  And at that point that's when there was some relay,
16  and it wasn't relative to, well, we're doing an ongoing
17  investigation or we wanted -- yeah, any of the technical
18  aspects of continued felony investigation was that, well,
19  no, we have a charge that we can place.  And so at that
20  point, I was like, well, fine.  We can upgrade the charge in
21  court.  What do you want done at this point?
22    Q.  In this conversation with Scott, did you ever
23  challenge him to say, well, where did you get the idea that
24  if you had approved felony charges, we met with Tom and

Page 106

1  Lauren, and they said there is nothing there.
2    A.  I don't know if it was in that conversation.
3       You have to understand, we wanted felony charges
4  from the get-go, so the fact that Scott identified a charge,
5  great, let's go for it.  But I'm sure that there were
6  subsequent conversations in regard to you identified because
7  the idea then became, well, when was this identified and how
8  was it identified.  And, frankly, at the end of the day as
9  the head of IAD, I had a felony charge, let's get it placed,
10  and we will deal with the rest of it.
11    Q.  Well, after the misdemeanor arrest happened is
12  when you had these conversations, conversation or
13  conversations with Scott about them wanting a felony charge;
14  is that correct?
15    A.  Right.
16    Q.  Were any of those conversations to the effect that
17  Scott was relaying to you that his understanding was that no
18  one from the State's Attorney's Office had rejected felony
19  charges previously in that he was either angry or disagreed
20  with the department's decision to arrest Abbate on a
21  misdemeanor battery --
22    MS. RUBENS:  Objection.
23  BY MR. PROVENZALE:
24    Q.  -- before that they had made any decision one way

Page 107

1  or the other?
2    MS. RUBENS:  Asked and answered three times.
3    THE WITNESS:  You know, I don't know if Scott and
4  I had the particular conversation.  I do know that once
5  Abbate was arrested for the misdemeanor, there was a
6  conversation in regards to the state attempted to state that
7  they didn't deny a felony charge.
8  BY MR. PROVENZALE:
9    Q.  Who had that conversation, to your knowledge?
10    A.  I honestly don't recall.  I know that it was
11  relayed to me through Lieutenant Calloway, and I could have
12  had that conversation with Scott as well.  You know, there
13  are so many things going on in this investigation that when
14  and what was said, but at some point the issue that you
15  raise was that the state asserted that they didn't deny
16  charges, and CPD asserts that the state did deny charges at
17  that first meeting.
18    Q.  Right.  That's what I want to get a handle on.
19       At what point in time did the State's Attorney's
20  Office convey that to anyone at CPD that you have learned
21  about or directly to you?
22    A.  It was only after the misdemeanor arrest, and I
23  believe it was in the conversation that I had with Scott
24  that they had a felony charge.  Now, whether or not there

Page 108

1  was a back and forth about when and how and who and that
2  conversation, I am sure that came at some point, but I don't
3  know if it was in that conversation.
4    Q.  Did Lieutenant Calloway or Dion Boyd ever tell you
5  all of who attended that presentation at OPS?
6    A.  The ones that I know were there, and whether or
7  not that was everybody, was Calloway, Boyd, Duffy, Freeman
8  and Bilyk.  Now, whether or not I had a sergeant there and
9  whether or not OPS had an investigator there, I don't
10  recall.
11    Q.  Do you remember whether Sergeant Maraffino was
12  there?
13    A.  I don't recall, but I don't think that he would
14  have been.
15    Q.  Parallel or contemporaneous with this whole
16  investigative track was also your direction for the location
17  and removal of police powers of Mr. Abbate; is that correct?
18    A.  Correct.
19    Q.  In connection with that whole sequence of events,
20  let's just generally, did you get regular updates from
21  Lieutenant Naleway about how the efforts were going to
22  locate?  Let's start with locating.
23    A.  Right.  That first night, basically, when they
24  went out, they couldn't find him, so he let me know that.

Page 109

1    Q.  Okay.
2    A.  I wasn't getting hourly reports or, you know, it
3  had taken some time because Abbate had removed himself from
4  the jurisdiction, be it in a hospital or whatever, so I
5  wasn't getting hourly updates.  But I was generally being
6  updated.
7    Q.  I want to get a handle on it, the time line.
8         What do you remember with respect to when you
9  first delegated the responsibility to Lieutenant Naleway's
10  section hearing that Abbate was in some sort of a hospital
11  or a facility?
12    A.  It would have been probably within the first
13  couple days that we were looking for him.
14    Q.  Who was it that informed you of that, was it
15  Lieutenant Naleway?
16    A.  I believe it was.
17    Q.  Do you recall how it was that he -- did he tell
18  you how it was that he learned that?
19    A.  Not that I recall.
20    Q.  Did he tell you he knew which facility Mr. Abbate
21  was believed to be in?
22    A.  Not that I recall.
23    Q.  What's your understanding as to the ability of the
24  Chicago police to question any suspect in a criminal case

Page 110

1  while they are at a medical or mental health treatment
2  facility?  I am not just talking about police officers, but
3  any suspect.
4    A.  I guess there is degrees of the authority of the
5  police department to identify and locate individuals within
6  hospitals, and so, clearly, when it's within the context of
7  a media investigation, the ability to interview suspects,
8  witnesses, victims, that's one aspect, when we are dealing
9  with mental health treatment facilities, that is.
10    Q.  What about a substance abuse treatment facility?
11    A.  I would lump that with mental health facility.  So
12  the first issue is whether or not we would be given access,
13  and then the second issue is that if access is not allowed,
14  generally we are dealing with some sort of a warrant
15  procedure.
16    Q.  So in this case you learn from Lieutenant Naleway
17  that Officer Abbate was in some facility somewhere, correct?
18    A.  Yes.
19    Q.  And you didn't get any information as to how it
20  was that he learned that he was in a facility or that he
21  knew where the facility was, correct?
22    A.  I don't know that Dave knew where the facility
23  was, but I don't have any recollection of how he got that
24  information.

Page 111

1    Q.  Did you ever inquire of Lieutenant Naleway about
2  why there was no further information about where this
3  facility was and whether there was any follow-up to find out
4  where Mr. Abbate was so that it could even be determined if
5  access would be granted or not?
6    A.  Part of the problem that we had in terms of what
7  we were dealing with on that part of the investigation is
8  that it is an administrative investigation, so the ability
9  of the employer to access information has issues.
10    Q.  Well, it's a criminal investigation, too, isn't
11  it?
12    MS. RUBENS:  I will just ask you to allow her to
13  finish her answer.
14    MR. PROVENZALE:  I thought she was done.
15    THE WITNESS:  That part of the -- you got to
16  understand, an IAD investigation is bifurcated always.
17  There is two aspects to every IAD investigation,
18  particularly when a police officer is accused of a criminal
19  conduct.  I've got administrative action responsibility and
20  I've got -- and so within this investigation, it was very
21  clear the distinction between the two.  I had confidential
22  doing my criminal.  I had OPS and IAD going forward with the
23  admin.  So the issue of where Mr. Abbate was, really,
24  frankly, had two factors for me, that, one, when a police

Page 112

1  officer is not immediately found on a relief of powers, I
2  have a tendency to want to make sure that they are safe,
3  that they have not committed suicide, and the second thing
4  is to find out where they are.  And in this matter, and as
5  in the past, sometimes it is relayed to the idea that this
6  person has checked themselves in for mental health treatment
7  or substance abuse treatment.  But that information in the
8  past had always been treated by IAD as HIPAA information.
9    Q.  Well, in connection with the circumstances
10  attended to this case, at some point while you were trying
11  to locate him, you learned that there was an allegation that
12  he had threatened to plant drugs on people or falsely arrest
13  them; is that correct?
14    A.  There was an allegation being investigated by OPS.
15    Q.  So there was concern that he was doing things that
16  would implicate his police powers unlawfully while his
17  whereabouts were not specifically accounted for, meaning no
18  one knew exactly where he was at or what he was doing; is
19  that correct?
20    MS. RUBENS:  Objection to time frame, and
21  mischaracterizes her previous testimony as to time frame.
22    THE WITNESS:  Again, the subsequent allegations
23  and whether or not those were occurring while he was
24  allegedly in a hospital for treatment, my understanding is

Page 113

1   that a lot of the initial actions on this case happened
2   immediately and his subsequent, for lack of a better term,
3   disappearance on whether or not those actions were ongoing
4   there, I can't answer, but it is always a concern, we are
5   looking to relieve of the powers.
6   BY MR. PROVENZALE:
7       Q.  In terms of any aspect of the IAD investigation,
8   whether it was the admin end or the criminal end, did you
9   ever direct any investigation of these allegations of
10  Mr. Abbate's efforts to either intimidate witnesses or
11  threaten witnesses in connection with efforts to try to
12  obtain the videotape?
13      A.  You have to understand that the administrative
14  investigation was being conducted by OPS, so I am not
15  certain if the threat and the allegation information was
16  being actively investigated by IAD at that time, because
17  that information was being developed as the ongoing progress
18  of the OPS investigation.  It seemed somewhat convoluted to
19  outside people that, you know, I had three issues with.  I
20  had an OPS administration investigation separate and
21  distinct from my authority and jurisdiction of IAD.  We were
22  there to support that.  I had the investigation going to
23  find Mr. Abbate to relieve him of powers, and then I had the
24  criminal investigation into the battery.  Now, the fact that

Page 114

1   there is some leakage over here on OPS into the battery, I'm
2   not sure when my people knew about it, and I'm not sure when
3   it leaked.
4       Q.  So is the answer that you are not aware of any
5   investigation that IAD -- any of your people did in either
6   assisting OPS or on their own to investigate the allegation
7   of Mr. Abbate engaging in either witness intimidation or
8   threats in order to obtain the videotape?
9       MS. RUBENS:  Objection; form and mischaracterizes
10  completely.
11      THE WITNESS:  Yeah, and I am not sure when and how
12  those interviews were shared, so I can't answer specifically
13  at what level, but I do know that the IAD investigation was
14  focused specifically on the battery.  The identification and
15  evolution of information on witness intimidation I believe
16  came out of the OPS investigation.  When that fed back into
17  the subsequent final charging by the state, I am not sure if
18  that was fed through IAD or OPS.
19  BY MR. PROVENZALE:
20      Q.  Well, I am going to ask you to assume within two
21  days after the incident happened, so in the time frame of
22  when IAD became involved in the investigation, OPS was given
23  an audiotape of a woman who had worked in the bar at some
24  point in time relating conversations that she had with

Page 115

1   Mr. Abbate where these threats of false arrests and planting
2   drugs were recorded on the audiotape.  Do you ever remember
3   hearing that audiotape or listening to it at any time in
4   connection with this investigation?
5       A.  You know, I don't know if I heard the entire
6   audiotape, but I did hear parts of it.
7       Q.  Do you remember at what point in time you heard
8   it?
9       A.  I really don't.
10      Q.  Let's put it in the time frame of when Mr. Abbate
11  was arrested first on the misdemeanor, was it before then?
12      A.  I don't know.
13      Q.  Do you know whether any efforts were made to
14  contact any of Mr. Abbate's family members to determine the
15  location of whatever facility he had checked himself into?
16      A.  For the facility?  I'm not certain about that.
17      Q.  Do you know whether or not any fellow officers
18  with whom he had worked were contacted to identify what
19  facility Mr. Abbate had allegedly checked himself into?
20      A.  Like I said, both parties were checked to try to
21  identify the locations.  Whether or not it was specific to a
22  facility, I don't know.
23      Q.  I mean, other than officers going out to his house
24  and knocking on the door, are you aware of any other efforts

Page 116

1   that were made, or going out to the 20th District to ask his
2   supervisor whether he showed up to work on a certain day,
3   are you aware of any other efforts that were made to
4   identify Abbate's location, and specifically what treatment
5   facility he had allegedly checked himself into?
6       MS. RUBENS:  It calls for speculation.
7       You can answer.
8       THE WITNESS:  It's my understanding, and, again, I
9   would have to look at the investigative file, but,
10  generally, when we are -- they don't just knock on his door.
11  We reach out to family, they run vehicles, they attempt to
12  identify and locate the vehicle.  So there is a variety of
13  things that IAD does once an officer is not immediately
14  available.
15  BY MR. PROVENZALE:
16      Q.  And this officer, two of his family members were
17  either current or former Chicago police officers, so I
18  assume it would be easy to obtain contact information for
19  either of those individuals to communicate with them and
20  find out if they had information as to his whereabouts?
21      A.  It is not always easy to get information, but
22  clearly I would assume, and I don't know, I didn't see the
23  step by step of what general -- but generally they would
24  reach out to employees to see whether or not this officer is

Page 117

1   around.
2       Q.  You would agree that it would be an appropriate
3   investigative step to, through whatever source you do it, to
4   at least -- and legal source, to at least identify or make
5   attempts to identify the location of an officer who had
6   checked himself into a treatment facility, if not for his
7   own safety -- especially one whose police powers you were
8   going to take away, if not for his own safety, the safety of
9   others.  Would you agree with that?
10          MS. RUBENS:  Objection.  Compound and incomplete
11  hypothetical.
12          THE WITNESS:  I would agree that it is appropriate
13  to try to find an officer.  If I am expecting a parent to
14  tell me where a person has been checked into for mental
15  health, I don't know that I can demand that of a parent, but
16  clearly we would try to find that information out.
17  BY MR. PROVENZALE:
18      Q.  Given the circumstances in this case where it was
19  reported to you by Officer Naleway that Mr. Abbate couldn't
20  be located and that he was at an unknown treatment facility,
21  was there ever any discussion of getting a warrant?
22      A.  We briefly discussed it, but understand that at
23  the time that we were discussing it, that we were looking
24  for misdemeanor charges, so the idea of letting the

Page 118

1   investigation and getting the investigation full scale
2   versus trying to get a misdemeanor warrant for an unknown
3   location at that point did not become, I guess, critical is
4   the term that I would use.
5           You know, we were still getting some of our ducks
6   in a row, so to speak.  So at that point we were his
7   employer, we knew he would surface, it just becomes a
8   question of whether or not we would have to go and, you
9   know, pull him out of a treatment facility or not.
10      Q.  So it's your testimony as of the time -- as you
11  sit here today, your only recollection is that, as of the
12  time that you were having the discussion about whether to
13  get a warrant, there was no concern in your mind as to any
14  other criminal charges that were being investigated or
15  pursued against Mr. Abbate other than the misdemeanor
16  battery?
17      A.  At the time that I, you know, believed him to
18  be -- and I am not even sure that he was in a treatment
19  facility today as I sit here.  That we believed him to be in
20  a treatment facility, we were, to my recollection, only
21  looking at him under the misdemeanor battery.
22      Q.  And there was no suggestion of felony charges that
23  could be pursued in connection with the allegation that he
24  had through a third party communicated threats of false

Page 119

1   arrest or planting drugs, things like that?
2       A.  Again, I don't know if that was part of the
3   knowledge at the time that we were trying to locate Abbate.
4       Q.  That's the point I'm making.  As you sit here
5   today, you do not recall that that was something that was a
6   consideration in your mind in making the determination of
7   whether or not to get a warrant --
8       A.  Right.
9       Q.  -- for an officer whom you had no idea where he
10  was, location wise?
11      A.  You are saying an arrest warrant?
12      Q.  Yes.  An arrest warrant, correct.
13      A.  That's correct.
14      Q.  At some point in time were you ever involved in
15  the initiation of a CR file regarding the four officers who
16  had responded to the bar that evening?
17      A.  I don't know if I was involved in an initiation.
18  I would have had knowledge of it.
19      Q.  Were you ever involved in the assignment of that
20  investigation, or did OPS handle that, to your knowledge?
21      A.  That's a good question.
22          Generally, that would have been assigned to the
23  Internal Affairs Division.  I don't know if OPS retained
24  that investigation because they had the initial

Page 120

1   investigation.
2           MS. RUBENS:  If you don't know, you don't know.
3           THE WITNESS:  I don't know.
4   BY MR. PROVENZALE:
5       Q.  Were you ever involved in the initiation of a CR
6   file in connection with three police officers who were
7   apparently friends of Mr. Abbate's whom he had called either
8   the night of the incident or very shortly in the following
9   morning?
10      A.  Again, I have knowledge of the CR, but I don't
11  know whether or not IAD or OPS investigated it.
12      Q.  My question is whether or not you had anything to
13  do with the initiation of it?
14      A.  I don't believe I did.
15      Q.  Did you ever have anything to do with the
16  assignment of that investigation of that CR?
17      A.  I don't recall.
18      Q.  Are you aware of what the findings were in
19  connection with the CR related to the four officers that had
20  responded to the bar that evening?
21      A.  No, I am not.
22      Q.  Were you part, to your recollection, of the
23  command channel review process in connection with that CR?
24      A.  I don't recall.

Page 121

1    Q. How many cases have you testified in as the ADS of
2    IAD?
3        MR. YAMIN: Deposition?
4        MR. PROVENZALE: No, trial.
5        THE WITNESS: Trial?
6        MR. PROVENZALE: Yes.
7        THE WITNESS: None.
8        MR. PROVENZALE: I think I'm done. I'm sure I
9    will have questions when you are done.
10       MR. YAMIN: Actually, I don't have too many. I
11   just want to take a brief break.
12       MR. PROVENZALE: Sure.
13           (WHEREUPON, a short recess was had.)
14       MR. YAMIN: Just a couple questions from me and
15   then Barrett has a couple of questions.
16   C R O S S - E X A M I N A T I O N
17       By Mr. Yamin
18       Q. Ms. Kirby, you were head of IAD for how many
19   years?
20       A. About three and a half years.
21       Q. And as head of IAD and subsequently, have you been
22   and are you familiar with what guidelines or rules or
23   criteria sort of governed how investigations are conducted
24   by the Internal Affairs Division of the police department?

Page 122

1        MR. PROVENZALE: Just for the record, and just to
2    save everything, I am just going to make an objection and
3    have a standing objection for the line of questioning, to
4    the extent that you elicit any opinions from the witness on
5    foundation grounds. It calls for speculation and in
6    violation of 26(a)(2). Just a standing objection, so I
7    don't interrupt you.
8        MR. YAMIN: Do you need that repeated?
9        THE WITNESS: Yes, I am aware of them.
10   BY MR. YAMIN:
11       Q. Is there any general orders that apply to the
12   investigation of complaints of misconduct and subsequent
13   discipline of officers who are found to have violated the
14   rules and regulations of a police department?
15       A. You have General Order 93-3(a), which is the
16   complaint and disciplinary order. We have the SOP from IAD
17   which is not a general order, but stands as a directive, and
18   then we also have the collective bargaining agreements not
19   only for FOP, for PBA, and the various civilian unions that
20   we have within the Chicago Police Department.
21       Q. Let's back up to the first one. You said it was
22   General Order 93-3?
23       A. Correct.
24       Q. And that sets out guidelines for investigating

Page 123

1    complaints and disciplinary procedures for police officers?
2        A. Yes, it does.
3        Q. Is that correct? Okay.
4            And that governs investigations conducted both by
5    IAD and OPS and now IPRA; is that correct?
6        A. Correct.
7        Q. And you refer to an SOP. What are you referring
8    to there?
9        A. The Internal Affairs Division SOP.
10       Q. And, just generally, what kind of information, so
11   to speak, would be contained in the IAD SOP?
12       A. Just general operational matters specific to IAD
13   process, reference to where the general orders apply, but
14   various, day to day, I guess, operational issues within the
15   Internal Affairs Division are covered under the SOP.
16       Q. So the SOP has particular application to how
17   investigations are conducted by IAD; is that true?
18       A. Yes.
19       Q. General Order 93-3, I want to ask you about that.
20   If the SOP in large part is directed towards how
21   investigations are conducted, how would you compare that to
22   what 93-3 -- its impact on what IAD does?
23       MR. PROVENZALE: I am going to just object on
24   grounds of foundation. The general order speaks for itself,

Page 124

1    it calls for the witness to draw conclusions and make
2    interpretations that constitute conclusions of law. Or
3    opinions about conclusions of law.
4        MR. YAMIN: Do you need the question --
5        THE WITNESS: No. 93-3 is the, I guess, the
6    guiding directive. The IAD SOP extrapolates to the extent
7    that it deals with issues specifically faced by IAD. For
8    example, the general order calls for a closure of an
9    investigation within 30 days, but because of the complexity
10   of the investigations within IAD, those investigations
11   usually go beyond 30 days, and so the SOP deals with those
12   types of issues.
13   BY MR. YAMIN:
14       Q. And General Order 93-3 you said is more the --
15   what would you say, provides the overall framework for how
16   the department deems investigations are to be conducted and
17   disciplined to be dealt with?
18       A. That's correct. It also applies to the field
19   investigations not retained by IAD, so it is the -- it is
20   the framework under which all discipline investigations are
21   conducted.
22       Q. You also mentioned, Ms. Kirby, I don't know if you
23   used the phrase collective bargaining agreement or contract,
24   but that was yet a third document, I guess, that needs to be

Page 125

1    taken into account when IAD conducts investigations; is that
2    correct?
3        A.  That is correct.
4        Q.  What do you want to call it, contract?
5        A.  Frankly, we call it both.  I think that within the
6    legal arena it is called the collective bargaining
7    agreement, within the IAD investigation mode it is called
8    the contract.
9        Q.  Okay.  Well, regardless of how we want to refer to
10   it, contract or collective bargaining agreement, what role
11   does it play in terms of how it has an impact on IAD
12   investigations?
13       MR. PROVENZALE:  Same prior objection that I made
14   regarding foundation.  It calls for a conclusion.
15       THE WITNESS:  Well, the general order is 93-3,
16   which means that it originated in 1993.  We've had, I
17   believe, three collective bargaining agreements signed since
18   then, and so any modifications around administrative
19   discipline that was negotiated for under the agreements
20   would then supersede any existing provision within 93-3.
21   An example used earlier in this deposition was the content
22   of the affidavit.  Affidavit was state law, and it was
23   negotiated with the unions as to how it would be utilized
24   within the City of Chicago, and so for that distinct

Page 126

1    purpose, the contract has control over what the process is
2    for affidavits.
3
4    BY MR. YAMIN:
5        Q.  Now, your last answer was focused on how
6    provisions in the contract may have an effect on operative
7    guidelines that are, for example, codified in general order.
8    Generally, does the contract govern how IAD deals with
9    investigations and discipline on all matters that it
10   addresses?  In other words, you know, the contract covers
11   many issues, not all of which are -- not all of which have
12   a, you know, a direct link to something that's in general
13   order 93-3?
14       MR. PROVENZALE:  Same prior objection; foundation,
15   calls for a legal conclusion.
16       MR. YAMIN:  Do you follow what I am --
17       THE WITNESS:  Right.  The collective bargaining
18   agreements cover a variety of issues.  Where the collective
19   bargaining agreement has, I guess, authority to those
20   matters that relate to the conduct of discipline
21   investigations, discipline is a mandatory subject of
22   bargaining.  And so, you know, for grievance process
23   adjudication, conduct of the, in terms of interviews, those
24   are all mandated through the collective bargaining

Page 127

1    agreement, and they would supersede the general order within
2    the context of those specific issues.  But complimentary,
3    they're not -- they don't stand alone in either matter, 93-3
4    and collective bargaining agreement.
5        MR. YAMIN:  Thank you.
6    BY MR. YAMIN:
7        Q.  Is there anything else, besides what you've just
8    testified to, that has a bearing on IAD's investigative
9    function?
10       MR. PROVENZALE:  Objection; lacks foundation,
11   calls for a legal conclusion.
12       THE WITNESS:  In terms of the conduct of
13   investigations or the implementation of discipline, it's a
14   subset of the collective bargaining agreement, but any
15   arbitration decisions relative to the interpretation of past
16   disciplinary matters within the CPD, and clearly there is
17   always state and constitutional law, but for the purposes of
18   directives, we had to follow 93-3, the IAD-SOP collective
19   bargaining agreement, and then any arbitration decisions
20   that interpret the collective bargaining agreement.
21       MR. YAMIN:  No further questions from this half of
22   the City.
23
24

Page 128

1        MS. RUBENS:  I just have a couple.
2              C R O S S - E X A M I N A T I O N
3              By Ms. Rubens:
4        Q.  Ms. Kirby, is there an investigative rationale
5    behind having someone sign a misdemeanor complaint even if
6    felony charges are being sought?
7        MR. PROVENZALE:  Objection; lacks relevance,
8    incomplete hypothetical.
9        MS. RUBENS:  You can answer.
10       THE WITNESS:  Frankly, it's from the perspective
11   of assisting, I guess, the victim.  Some detectives follow
12   that practice when they are going for felony charges in case
13   felony charges are not approved, the victim doesn't need to
14   be located again to sign the misdemeanor complaint.  So it
15   is not a mutually exclusive issue, it's just a question of
16   making it easier on the victim.
17   BY MS. RUBENS:
18       Q.  What would the misdemeanor complaint allow the
19   officers to do?
20       MR. PROVENZALE:  Objection; lacks foundation,
21   relevance, calls for speculation.
22       THE WITNESS:  A signed misdemeanor complaint in
23   and of itself doesn't do anything, but allows the officer to
24   enter misdemeanor charge upon the rejection of a felony

Page 129

1　charge.
2　BY MS. RUBENS:
3　　Q.　The signing of misdemeanor complaint precludes
4　charging someone with a felony in any way?
5　　　MR. PROVENZALE:　Objection.　It calls for a legal
6　conclusion.
7　　　THE WITNESS:　Not in the practice of the Chicago
8　Police Department, no.
9　BY MS. RUBENS:
10　　Q.　After your conversation with Scott Cassidy in
11　which he informed you that they were going to approve felony
12　charges, what, if any, action did IAD take?
13　　A.　IAD made the arrest in the felony and put
14　Mr. Abbate into custody.
15　　　MS. RUBENS:　That's all the questions I have.
16　Thank you.
17　　　MR. APICELLA:　Ms. Kirby, I have just a couple
18　follow-ups, and they deal with mainly the upgrade of the
19　charge to a felony.　Okay.
20　　　C R O S S - E X A M I N A T I O N
21　　　By Mr. Apicella
22　　Q.　Earlier you testified that over the course of
23　your career, other than this case, you had never seen this
24　specific provision of a criminal code used to upgrade a

Page 130

1　simple battery up to a felony battery; is that correct?
2　　A.　Correct.
3　　Q.　And the code provision, basically, just deals with
4　the location of the battery, correct?
5　　A.　As I recall, that's correct.　I don't have it in
6　front of me, but I will take your word at face value.
7　　Q.　Is it your understanding that the code provision
8　that was relied upon makes it a felony to commit a simple
9　battery in a tavern?
10　　A.　Correct.
11　　Q.　Over the course of your career, how many batteries
12　have you seen?
13　　　MR. PROVENZALE:　Seen or -- like in person?
14　　　THE WITNESS:　Seen enough of those.
15　　　MR. YAMIN:　Keep going.
16　　　MR. APICELLA:　I will withdraw the prior question.
17　BY MR. APICELLA
18　　Q.　Over the course of your career, how many incidents
19　of battery have you been involved in as a police officer?
20　　A.　I believe you have the same challenge on that one,
21　but I've been -- I've investigated and I have recorded
22　numerous battery reports in my career as a police officer.
23　　Q.　Can you characterize as numerous; is it more than
24　a thousand?

Page 131

1　　A.　I couldn't, but in 22 years, I mean, the simple
2　battery charge or even aggravated battery charge is a fairly
3　common charge, and while the commander of the vice control
4　section, we received all reports on batteries occurring on
5　liquor premises, so I would say numerous.
6　　Q.　And you've never seen this provision of the code
7　used to charge anyone?
8　　A.　In my experience, no.
9　　Q.　Are you aware of any attempt by anyone outside the
10　State's Attorney's Office to influence the decision to
11　charge Mr. Abbate with a felony?
12　　A.　Aside from the CPD.
13　　Q.　Aside from the CPD.
14　　A.　No, I am not.
15　　Q.　Are you aware of Ms. Obrycka or anyone on her
16　behalf making any attempt to influence the decision to
17　upgrade the charge to a battery?
18　　　MR. PROVENZALE:　You mean aggravated battery?
19　　　MR. APICELLA:　Yes.
20　　　THE WITNESS:　I'm not aware of any conversations
21　Ms. Obrycka had with the State's Attorney's Office.
22　BY MR. APICELLA:
23　　Q.　Are you aware of any conversations that any
24　attorney -- any conversation that an attorney may have had

Page 132

1　on Ms. Obrycka's behalf with the State's Attorney's Office
2　to persuade them to upgrade the charge to a felony?
3　　A.　No, I'm not.
4　　Q.　Earlier you also talked about the normal procedure
5　when a charge is upgraded to a felony, and I believe you
6　said that the charge would be upgraded in court.　Do you
7　recall that?
8　　A.　I didn't reference that as a normal, but I stated,
9　I think, at some point that the charge could have been
10　upgraded in court, correct.
11　　Q.　Well, what is your understanding of what the norm
12　is?
13　　A.　In pursuing felony charges?
14　　　MR. PROVENZALE:　I am going to object.　It lacks
15　foundation.
16　BY MR. APICELLA:
17　　Q.　What is your understanding of -- let me back up.
18　　　Over the course of your career, you have had cases
19　that started as misdemeanors and ended up as felonies,
20　correct?
21　　A.　That they were arrested as a misdemeanor?
22　　Q.　Yes.
23　　A.　It has happened, but it's rare.
24　　Q.　And when it does happen, is it your experience

Page 133

1   that a separate arrest warrant is issued, or would the
2   charges just be upgraded at court?
3       A.   I have, on the same issue, where there is already
4   an arrest, I don't recall any separate arrest occurring.
5       Q.   Do you know what happened in this case?
6       A.   In regards to?
7       Q.   To Mr. Abbate.
8       A.   Referencing the arrest?
9       Q.   Yes.
10      A.   He was arrested twice.
11      Q.   Do you know why that was?
12      A.   Because the state's attorney decided that they
13  would charge -- or they would approve the aggravated battery
14  charge.
15      Q.   Did you have any input into a second arrest?
16           MR. PROVENZALE:   Objection; vague.
17  BY MR. APICELLA:
18      Q.   Did you have any input into the decision to arrest
19  Mr. Abbate the second time?
20      A.   Well, when it was decided that he would be
21  arrested, I said the CPD would do the arrest, correct.
22      Q.   Who made the decision to arrest the second time?
23           MR. PROVENZALE:   Objection; lacks foundation.
24           MS. RUBENS:   And vague.

Page 134

1            THE WITNESS:   Once it was established that there
2   was probable cause, the arrest was completed by my sergeant
3   but I had stated that CPD would support the arrest if there
4   was probable cause.
5
6   BY MR. APICELLA:
7       Q.   Who made the determination of probable cause
8   existed?
9       A.   Frankly, the state's attorney did when they
10  approved the felony charges.
11      Q.   Did anyone at the State's Attorney's Office ask
12  that Mr. Abbate be arrested again?
13      A.   I think -- you know, I don't recall if it was a
14  specific question, but there was only one of two ways of
15  having it done, it would either be a direct indictment or
16  physical arrest.   Whether or not they asked or we
17  volunteered, I'm not sure, but there was a mutual agreement
18  that he would be arrested for the battery.
19      Q.   Who agreed to that?
20      A.   It was in a conversation that I had with
21  Mr. Cassidy.
22      Q.   Was that in person?
23      A.   No, it was on the phone.
24      Q.   Was anyone else present for that conversation?

Page 135

1       A.   I don't recall anybody being present on my end.
2            MR. APICELLA:   That's all I have.
3            MR. PROVENZALE:   Just a few follow-up.
4            R E D I R E C T   E X A M I N A T I O N
5            By Mr. Provenzale:
6       Q.   Are you aware that Mr. Abbate's CR file is closed
7   with charges pending recommending termination?
8       A.   Yes, I am.
9       Q.   Do you know how the closure of his CR file was
10  coded in terms of the identification of the primary or
11  subcategories of misconduct?
12      A.   No, I do not.
13      Q.   Where does that show up, if anywhere, in the CR
14  file?
15      A.   I'm not sure if it's on the face sheet.   You got
16  to understand, OPS, IPRA, has a different procedure than IAD
17  does, and so I don't know if OPS information is sent to us
18  through, like, what they call the half sheet that then
19  allows for that data entry, or if they actually enter the
20  correct information -- the final information, not the
21  correct.   The final information on the first page, what's
22  known as the face sheet.
23      Q.   Does it all get routed through IAD for ultimate
24  data entry?

Page 136

1       A.   It used to, but now, as they are rolling out with
2   the auto complaint system, some of it is done solely by
3   IPRA, and so I am not sure at what juncture we are right now
4   because I have not been at IAD for a year.
5       Q.   Let's assume that this was IPRA at the time that
6   the investigation was closed and then the command channel
7   review process was completed and then termination complaint
8   was presented to the police board, where would that final
9   coding of the allegations of misconduct be found?
10      A.   In the file?
11      Q.   In the CR file.   If it would be found in there.
12      A.   To my understanding, and, again, it's been a while
13  since I looked at a face sheet, it would be on the face
14  sheet of the investigation.   You have to understand that now
15  there is electronic format, although I believe this case was
16  in before they were fully electronic, so some back data
17  entry that's being done into another system.   So, as far as
18  coding, you know, I honestly don't know if the data entry
19  people code it based on the rule violation and actually
20  contained on the face sheet now.
21      Q.   If the data entry people code it based upon the
22  rule violation, is there any way to back -- well, is there
23  any way to figure out how they coded it that you are aware
24  of?

Page 137

1     MS. RUBENS: Objection; foundation, calls for
2   speculation.
3     THE WITNESS: I'm not sure how it is done, but the
4   code itself, to my understanding, is on the face sheet.
5   BY MR. PROVENZALE:
6     Q.   And if it's not on the face sheet, do you know
7   where it would be recorded elsewhere?
8     A.   I don't know.
9     MS. RUBENS: Objection.
10     THE WITNESS: I would go to my sergeants for that.
11   BY MR. PROVENZALE:
12     Q.   You mentioned that your office handled the arrest
13   of Mr. Abbate on the second arrest, the felony arrest,
14   correct?
15     A.   That's correct.
16     Q.   Was it Detective Boyd and Sergeant Stehlik who had
17   handled that, to your knowledge?
18     A.   I don't believe it was.  On the second arrest?
19     Q.   On the felony.
20     A.   I thought it was Sergeant Skala, but I would have
21   to look at the --
22     Q.   Okay.  Well, Sergeant Stehlik and Sergeant Skala?
23     A.   I don't know who the partners were, but I do know
24   that Sergeant Skala was there, I do believe.

Page 138

1     Q.   Let me just -- whoever it was, do you remember
2   seeing anything on TV where media had recorded the
3   circumstances under which they took Mr. Abbate into custody
4   on that felony?
5     A.   Yes, I do.
6     Q.   Do you remember seeing circumstances essentially
7   to the effect that he was not handcuffed or padded down and
8   searched prior to the time he was placed into the squad car?
9     MS. RUBENS: Objection to relevance.
10     THE WITNESS: I saw him being placed into the
11   squad car, I don't know what happened prior.
12   BY MR. PROVENZALE:
13     Q.   You never saw any footage showing him being led
14   out of his alley, across the apron of a short driveway, into
15   an alley garage, and then being placed into the squad car
16   without handcuffs or without being padded down?
17     MS. RUBENS: Object to form, compound.
18     THE WITNESS: I didn't see that.  Like I said, I
19   saw him being put into the squad car.
20   BY MR. PROVENZALE:
21     Q.   And what you saw, do you remember whether he was
22   handcuffed?
23     A.   As I recall, he was not.
24     Q.   Was there ever any CR file initiated in connection

Page 139

1   with the manner in which whatever IAD officers they were who
2   took Mr. Abbate into custody on the felony for the violation
3   of breach of any department general order, rule, or safety
4   precaution related to taking felony suspects into custody --
5     A.   I don't recall that -- I don't recall if a CR was
6   initiated.
7     Q.   And did you ever initiate one, to your
8   recollection?
9     A.   I did not.
10     Q.   A circumstance like that would be an IAD
11   investigation, correct?  That would not be an OPS
12   investigation unless that was something that the
13   superintendent had told OPS to handle?
14     A.   Correct.
15     Q.   Categorically, that's otherwise an IAD
16   investigation?
17     A.   Correct.
18     MR. PROVENZALE: That's all.
19     MR. YAMIN: Thank you.
20     MS. RUBENS: Do you want to reserve?
21     MR. YAMIN: We reserve.
22     MR. PROVENZALE: Okay.
23     AND FURTHER DEPONENT SAITH NOT . . .
24

Page 140

1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2          EASTERN DIVISION
3   KAROLINA OBRYCKA, MARTIN        )
4   KOLODZIEJ, and EVA CEPIASZUK,   )
5     Plaintiffs,      )
                       )  No. 07 C 2372
6   -vs-               )  Judge
                       )  Amy J. St. Eve
7   CITY OF CHICAGO, a Municipal    )  Magistrate Judge
    Corporation, et al.,   )  Nan R. Nolan
8                        )
      Defendants.        )
9
10     I, DEBRA KIRBY, being first duly sworn, on oath,
11   say that I am the deponent in the aforesaid deposition,
12   taken on March 12, 2009, that I have read the foregoing
13   transcript of my deposition, consisting of Pages 1 through
14   140, inclusive, taken at the aforesaid time and place, and
15   that the foregoing is a true and correct transcript of my
16   testimony so given.
17
18          DEBRA KIRBY, Deponent
19   SUBSCRIBED AND SWORN TO
20   before me this      day
     of      , A.D. 2009.
21
22
      Notary Public
23
24

Page 141

1  UNITED STATES OF AMERICA      )
2  NORTHERN DISTRICT OF ILLINOIS ) SS:
3  EASTERN DIVISION              )
4  STATE OF ILLINOIS             )
5  COUNTY OF DU PAGE             )
6
7       I, MARIE WALSH FITZGERALD, a Notary Public within
8  and for the County of DuPage, State of Illinois, and a
9  Certified Shorthand Reporter of said state, do hereby
10 certify:
11      That previous to the commencement of the
12 examination of the witness, the witness was duly sworn to
13 testify the whole truth concerning the matters herein;
14      That the foregoing deposition transcript was
15 reported stenographically by me, was thereafter reduced to
16 typewriting under my personal direction and constitutes a
17 true record of the testimony given and the proceedings had;
18      That the said deposition was taken before me at
19 the time and place specified;
20      That the reading and signing by the witness of the
21 deposition was agreed upon as stated herein;
22      That I am not a relative or employee or attorney
23 or counsel, nor a relative or employee of such attorney or
24 counsel for any of the parties hereto, nor interested

Page 142

1  directly or indirectly in the outcome of this action.
2       IN WITNESS WHEREOF, I do hereunto set my hand and
3  affix my seal of office at DuPage County, Illinois, this
4  28th day of April, 2009.
5
6
7       Notary Public, DuPage County, Illinois
8       C.S.R. Certificate Number 084-002307
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24