**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAROLINA OBRYCKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  07 C 2372 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO and ANTHONY | ) | |
| ABBATE, JR., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On April 30, 2007, Plaintiff Karolina Obrycka brought the instant five-count Complaint

alleging that Defendants City of Chicago and former Chicago police officer Anthony Abbate, Jr.

violated her constitutional rights in relation to an incident on February 19, 2007 at Jesse's

Shortstop Inn in Chicago, Illinois and the subsequent investigation into the incident.[1]  In Count I,

Obrycka alleges that the City violated her First and Fourteenth Amendment rights based on the

City's *de facto* policy of concealing or suppressing investigations into police officer misconduct,

along with a code of silence within the Chicago Police Department.  *See Monell v. Department*

*of Soc. Servs. of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  In Counts II,

III, and IV, Obrycka alleges conspiracy claims against Abbate, the former Defendants to this

---

[1]  On April 30, 2009, the parties stipulated to dismiss all claims of Plaintiffs Martin Kolodziej and Eva Cepiaszuk against all Defendants.  (R. 197.)  Likewise, the parties stipulated to dismiss Defendants Patti Chiriboga and Gary Ortiz from this lawsuit on September 20, 2010 and December 2, 2009, respectively.  (R. 262, 241.)  Also, although Plaintiffs originally brought a claim against a John Doe Defendant, they did not identify this Defendant within the statute of limitations period, and thus there is no longer a John Doe Defendant in this lawsuit.  *See Hall v. Norfolk So. Ry. Co.,* 469 F.3d 590, 596 (7th Cir. 2006) ("It is the plaintiff's responsibility to determine the proper party to sue and to do so before the statute of limitations expires.").

lawsuit, and other alleged co-conspirators pursuant to 42 U.S.C. §§ 1983, 1985(2).  Count V is

an indemnification claim against the City pursuant to 735 ILCS 10/9-102.

Before the Court is the City's motion for partial summary judgment as to Counts I and V

of the Complaint pursuant to Federal Rule of Civil Procedure 56(a), to which Defendant Abbate

joined.  For the following reasons, the Court grants in part and denies in part the City's motion.

Specifically, the Court grants the City's motion for summary judgment as to its obligation to

indemnify Obrycka for Abbate's conduct in relation to Count I of the Complaint.  The Court

denies the remainder of the City's motion for summary judgment.

## BACKGROUND

### I.      Northern District of Illinois Local Rule 56.1

Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed

facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with

admissible evidence."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir.

2000).  "The Rule is designed, in part, to aid the district court, 'which does not have the

advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether a trial is

necessary."  *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted).  Local

Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which

the moving party contends there is no genuine issue."  *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625,

632 (7th Cir. 2009).  "The opposing party is required to file 'a response to each numbered

paragraph in the moving party's statement, including, in the case of any disagreement, specific

references to the affidavits, parts of the record, and other supporting materials relied upon.'  *Id.*

(citing N.D. Ill. R. 56.1(b)(3)(B)).  Also, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008).

The purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments.  *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture").  Therefore, the Court will not address the parties' legal and factual arguments made in their Rule 56.1 statements and responses.  *See System Dev. Integration, LLC v. Computer Sci. Corp.,* 739 F.Supp.2d 1063, 1068 (N.D. Ill. 2010).  Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."  *Bordelon,* 233 F.3d at 528.  The Court may also disregard statements and responses that do not properly cite to the record.  *See Cady,* 467 F.3d at 1060; *Cichon v. Exelon Generation Co., LLC,* 401 F.3d 803, 809-10 (7th Cir. 2005).

In many of the City's responses to Obrycka's Rule 56.1(b)(3)(C) Statement of Additional Facts, the City fails to cite to the record when disputing the facts.  Thus, the Court disregards the City's responses that do not properly cite to the record.  *See Cady,* 467 F.3d at 1060.  With these standards in mind, the Court turns to the relevant facts of the case.

## II.    Relevant Facts

On February 19, 2007, Obrycka was working as a bartender at Jesse's Shortstop Inn, a neighborhood bar in Chicago.  (R. 372, Def.'s Rule 56.1 Stmt. Facts ¶¶ 9-10.)  Obrycka's shift started at 6:00 p.m. and ended at 2:00 a.m.  (*Id.* ¶ 11.)  Abbate, who was a patron at Jesse's

Shortstop Inn on February 19, 2007, was a Chicago police officer, although he was not on duty that day. (*Id.* ¶¶ 7, 8; R. 381, Pl.'s Rule 56.1 Stmt. Facts ¶ 1.) A physical altercation between Abbate and Obrycka occurred at approximately 9:30 p.m. that evening at Jesse's Shortstop Inn in which Abbate repeatedly punched and kicked Obrycka. (Def.'s Stmt. Facts ¶¶ 12, 22.) Earlier that day, Abbate had started a fight with a patron of Jesse's Shortstop Inn around 3:00 p.m. (Pl.'s Stmt. Facts ¶ 1.) The bartender at that time, Patti Chiriboga, who is Abbate's friend, told him she would not serve him any more alcohol and he left the bar. (*Id.*) Later that day, Abbate returned to Jesse's Shortstop Inn at approximately 8:00 p.m. at which time he consumed some mixed drinks and shots of brandy. (Pl.'s Stmt. Facts ¶ 2; Def.'s Stmt. Facts ¶¶ 13, 15.) Also, prior to the altercation with Obrycka, Abbate went behind the bar, after which Obrycka asked him to leave the bar area. (Pl.'s Stmt. Facts ¶ 3; Def.'s Stmt. Facts ¶¶ 17, 18.) Abbate complied. (Pl.'s Stmt. Facts ¶ 3.) Evidence in the record reveals, however, that as the night progressed, Abbate became more physically and verbally abusive. (Pl.'s Stmt. Facts ¶ 2; Pl.'s Ex. C.) Despite Obrycka telling Abbate not to come behind the bar, Abbate went behind the bar a second time and began punching and kicking Obrycka telling her that "nobody tells me what to do." (Pl.'s Stmt. Facts ¶ 3; Def.'s Stmt. Facts ¶¶ 21, 22.) Before the altercation, Abbate repeatedly yelled "Chicago Police Department" while flexing his biceps. (Pl.'s Stmt. Facts ¶¶ 2, 3.)

After punching and kicking Obrycka, Abbate left Jesse's Shortstop Inn and Obrycka immediately called 911. (*Id.* ¶ 4; Def.'s Stmt. Facts ¶¶ 23, 24.) At that time, Obrycka did not know that Abbate was a police officer, but then a patron of the bar told her that Abbate was a Chicago police officer and Obrycka relayed this information to the 911 operator. (Pl.'s Stmt. Facts ¶ 4; Def.'s Stmt. Facts ¶ 25.) Thereafter, Officers Peter Masheimer and Jerry Knickrehm,

4

veteran 25th District patrolmen, arrived at Jesse's Shortstop Inn. (Pl.'s Stmt. Facts ¶ 5; Def.'s Stmt. Facts ¶¶ 26, 27.) When Officers Masheimer and Knickrehm spoke to Obrycka, she told them that the offender was a Chicago police officer and that the incident was caught on the bar's video cameras. (Pl.'s Stmt. Facts ¶¶ 5, 6.) At some point, Obrycka also informed the officers that the perpetrator was named Tony. (Id. ¶ 6.) In addition, the manager of Jesse's Shortstop Inn, Martin Kolodziej, informed Officers Masheimer and Knickrehm that the entire incident was on videotape. (Id. ¶ 7.)

Some of the information that Obrycka and Kolodziej reported to Officers Masheimer and Knickrehm was not contained in their final police report of the February 19, 2007 incident, including that the perpetrator was a Chicago police officer and that the incident was taped by the bar's video cameras. (Id. ¶ 7.) Moreover, the Sergeant in charge did not sign off on the final police report until four days after the incident. (Id. ¶ 8.) Later, when the Chicago Police Department's Office of Professional Standards ("OPS") was investigating the incident, Officers Masheimer and Knickrehm stated that no one told them that the perpetrator was a Chicago police officer.[2] (Id. ¶ 9.)

Later on February 19, 2007, Chiriboga, Abbate's friend and a bartender at Jesse's Shortstop Inn, viewed the videotape of the incident with the bar's manager Kolodziej. (Id. ¶ 18.) After Chiriboga viewed the videotape, she told Abbate's girlfriend, Linda Burnickas, how bad

---

[2] At the time of the February 19, 2007 incident underlying this lawsuit, the Chicago Police Department's Office of Professional Standards ("OPS") was responsible for investigating misconduct complaints against Chicago police officers. In September 2007, the City removed OPS from the Chicago Police Department and reorganized it as a separate department – the Independent Police Review Authority ("IPRA") – which reports directly to the Mayor of the City of Chicago.

the attack appeared on the videotape. (*Id*. ¶ 19.) Burnickas, Abbate, and Chiriboga had been communicating with each other off and on during the hours immediately following the February 19, 2007 incident. (*Id*. ¶¶ 13-19.) After the incident, Abbate made numerous telephone calls to other Chicago police officers, including to his partner at the 20th District. (*Id*. ¶¶ 21, 24.) In turn, Abbate's partner called other Chicago police officers, including detectives. (*Id*. ¶¶ 23-25.)

That same evening, Chiriboga also talked to Gary Ortiz, another City employee and Abbate's friend, after which Ortiz went to Jesse's Shortstop Inn and asked Obrycka if she would agree to not press charges against Abbate. (Def.'s Stmt. Facts ¶ 31.) In particular, Ortiz told Obrycka that Abbate had offered to pay for her medical bills and time off if she did not register a complaint or file a lawsuit against Abbate. (Pl.'s Stmt. Facts ¶ 20.) Obrycka said no. (Def.'s Stmt. Facts ¶ 31.) The City concedes that Ortiz's action was an attempted "bribe." (R. 370, Def.'s Mem., at 11.)

Also after the incident, Abbate's girlfriend Burnickas called Jesse's Shortstop Inn asking Obrycka for her last name. (*Id*. ¶ 22.) Obrycka testified that she was too scared to give her last name to Burnickas after she found out that Abbate was a Chicago police officer. (*Id*.) Later, Chiriboga told Obrycka that she had met with Abbate and that Abbate told Chiriboga that she had to get the surveillance tape or there would be problems for the bar and its employees. (Def.'s Stmt. Facts ¶ 34.) There is also evidence in the record that Abbate tried to intimidate and threaten Obrycka and Kolodziej from disclosing the videotape of the incident because Abbate acknowledged that without the tape, there would be no case against him. (Pl.'s Stmt. Facts ¶¶ 27, 28.) Approximately a week after Obrycka learned about Abbate's threats, she quit working at Jesse's Shortstop Inn because she did not feel safe. (*Id*. ¶ 29.)

6

On February 21, 2007, Obrycka, Kolodziej, and Chiriboga met with investigators at OPS to discuss the February 19, 2007 incident, although Chiriboga refused to talk about Abbate's threats. (*Id.* ¶¶ 28, 30.) At that time, Kolodziej and Obrycka told the OPS investigators about the details of the incident and that it was captured on the bar's video surveillance. (*Id.* ¶ 32.) In a later meeting with OPS on February 26, 2007, it is undisputed that Chiriboga lied to OPS investigators about the fact that Abbate tried to intimidate people at the bar and that he wanted to obtain the videotape of the attack. (*Id.* ¶ 30.)

On February 22, 2007, OPS's Chief Administrator and Chief Investigator, as well as other OPS personnel, viewed the videotape of the incident. (*Id.* ¶ 35.) After OPS contacted the Office of the Superintendent of the Chicago Police Department, certain officials met and also viewed the videotape. (*Id.*) Superintendent Phil Cline was at the meeting either in person or by telephone. (*Id.*) Superintendent Cline directed OPS to handle the investigation, told OPS to contact the Cook County's State's Attorney's Office for review, and further directed the Chicago Police Department's Internal Affairs Division ("IAD") to provide additional support. (*Id.* ¶ 36.)

A meeting was scheduled for the following day for IAD, OPS, and State's Attorney personnel to review the video and evaluate charging options, but prior to the meeting, the Assistant Deputy Superintendent in charge of IAD called the Deputy Chief of the State's Attorney's Professional Standards Unit explaining that Abbate was in a "bar fight" and that he took some swings at Obrycka, but it appeared to be a misdemeanor battery. (*Id.* ¶ 38.) The parties dispute whether anyone at the State's Attorney Office officially reviewed the case for charging before the police officers interviewed Obrycka on February 22, 2007 and handed her a pre-typed complaint form for a misdemeanor battery. (*Id.* ¶ 40.) After Obrycka signed the

misdemeanor complaint, it appears that IAD, OPS, and the State's Attorney took no action until March 14, 2007, when Abbate was charged. (*Id*. ¶ 41.) Abbate surrendered three weeks after the incident on the misdemeanor battery charge. (*Id*. ¶ 44.) Obrycka maintains that based on the Chicago Police Department's inaction, she released the February 19, 2007 videotape to the media in mid-March 2007. After she released the videotape and it was publically aired, the State's Attorney approved felony charges for aggravated battery on March 20, 2007. (*Id*. ¶ 40.) After a bench trial, a Circuit Court of Cook County judge found Abbate guilty of aggravated battery on June 2, 2009. On June 23, 2009, the trial judge sentenced Abbate to two years of probation.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "[D]istrict courts presiding over

8

summary judgment proceedings may not weigh conflicting evidence or make credibility

determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth*

*Grp., Inc.,* 629 F.3d 697, 704-05 (7th Cir. 2011) (internal citations omitted).

## ANALYSIS

I.    **Count I – *Monell* Claim**

In Count I of the Complaint, Obrycka alleges that the City violated her Fourteenth

Amendment substantive due process liberty interest in bodily integrity.[3]  *See Washington v.*

*Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Rochin v. California,*

342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).  In particular, Obrycka maintains that the

*de facto* policies of the City of Chicago – through the conduct of members of the Chicago Police

Department, OPS, and IAD in impeding and interfering with the investigation of police

misconduct, including police brutality – deprived her of her liberty interest in bodily integrity.

In its motion for summary judgment, the City contends that it did not violate Obrycka's

substantive due process rights arising from Abbate's beating of Obrycka because Abbate was not

acting under the color of state law when he attacked her, and thus the beating was an act of

---

[3]  Obrycka also bases her *Monell* claim on the free speech clause of the First Amendment and other Fourteenth Amendment rights, in addition to her Fourteenth Amendment substantive due process claim.  Although the City briefly discusses Obrycka's conspiracy claims against Abbate pursuant to the First Amendment and Equal Protection Clause as alleged in Counts II and III of the Complaint, the City does not specifically address Obrycka's allegations in the context of her *Monell* claim until its reply brief – including Obrycka's Fourteenth Amendment access to courts claim and First Amendment free speech claim.  Moreover, the City's arguments in reply are cursory and undeveloped.  Therefore, these aspects of Obrycka's *Monell* claim remain part of this lawsuit.  *See Palka v. City of Chicago,* 662 F.3d 428, 438 (7th Cir. 2011) (arguments made for first time in reply brief are waived); *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (undeveloped arguments are waived).

private violence.[4]  In other words, the City argues that it had no constitutional duty to protect

Obrycka from Abbate.  *See DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S.

189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("nothing in the language of the Due Process

Clause itself requires the State to protect the life, liberty, and property of its citizens against

invasion by private actors"); *Wragg v. Village of Thornton,* 604 F.3d 464, 467 (7th Cir. 2010)

("A state usually need not protect its citizens from 'private actors.'").  The City, however,

misconstrues Obrycka's substantive due process claim.

Specifically, Obrycka argues that the City's *de facto* policy was the moving force behind

the deprivation of her substantive due process rights, namely, her liberty interest in bodily

integrity.  *See Board of County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 400,

117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[I]n enacting § 1983, Congress did not intend to

impose liability on a municipality unless *deliberate* action attributable to the municipality itself

is the 'moving force' behind the plaintiff's deprivation of federal rights.") (citing *Monell*, 436

U.S. at 694) (emphasis in original).  As the Seventh Circuit teaches, "*Monell* recognized that the

premise behind a § 1983 action against a government body is 'the allegation that official policy

is *responsible* for the deprivation of rights.'"  *Thomas v. Cook County Sheriff's Dep't,* 604 F.3d

293, 306 (7th Cir. 2010) (citation omitted) (emphasis in original); *see also Milestone v. City of

Monroe, Wis.,* 665 F.3d 774, 780 (7th Cir. 2011) ("There is no respondeat superior liability

under § 1983; the Supreme Court 'distinguish [es] acts of the *municipality* from acts of

*employees* of the municipality.'") (citation omitted) (emphasis in original).  Indeed, in regard to

---

[4]  Throughout its legal memoranda, the City refers to Abbate's attack of Obrycka on the evening of February 19, 2007 as a "beating."

"a municipal liability claim, the City policy itself must cause the constitutional deprivation," and therefore, the "municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the 'color of law' requirement under § 1983." *See Gibson v. City of Chicago*, 910 F.2d 1510, 1519-20 (7th Cir. 1990). Accordingly, the Court examines Obrycka's substantive due process claim against the City under the *Monell* framework and not *DeShaney* because Obrycka argues that the City's *de facto* policy was the moving force behind the deprivation of her constitutional rights.

To establish liability against the City under *Monell*, Obrycka must show that: (1) she suffered a deprivation of a constitutional right, (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policymaking authority, that (3) proximately caused her constitutional injuries. *See Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005). The Court first turns to the second requirement in regard to the City's policy or custom.

### A.     Widespread Custom, Policy, or Policy

Under the second requirement, Obrycka must establish that her constitutional injury was caused by (1) the enforcement of an express policy; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or usage with the force of law; or (3) a person with final policymaking authority. *See Palka*, 662 F.3d at 434; *see also Connick v. Thompson*, ___ U.S. ___, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ("These are 'action[s] for which the municipality is actually responsible'") (citation omitted). Here, Obrycka seeks to establish her *Monell* claim by presenting evidence that the City has a well-settled, widespread practice or custom of impeding and interfering with police misconduct investigations.

Moreover, Obrycka contends that there is an attendant "code of silence" that exists within the Chicago Police Department whereby officers conceal each other's misconduct in contravention of their sworn duties. She maintains that this *de facto* policy and the code of silence are evidenced and caused by the Chicago Police Department's failure to: (1) sufficiently investigate allegations of police misconduct; (2) accept citizen complaints against police officers; (3) promptly interview suspected officers or take witness statements and preserve evidence; (4) properly and sufficiently discipline officers; and (5) maintain accurate and complete records of complaints and investigations of misconduct. Obrycka also asserts that the Chicago Police Department fabricates exculpatory evidence or destroys evidence when investigating citizen complaints against its police officers. Obrycka maintains that this *de facto* policy and the code of silence encourage Chicago police officers to engage in misconduct with impunity and without the fear of official consequences.

For purposes of this motion, the City assumes that evidence in the record shows that there are genuine disputes as to the material facts supporting the existence of a *de facto* custom or policy of impeding and interfering with police misconduct investigations. (*See* R. 370, Opening Mem., at 14-15.) The City, however, argues that there is no evidence supporting Obrycka's allegations that there is a code of silence within the Chicago Police Department.

In support of her allegations, Obrycka presents expert opinion testimony that withstood the City's challenges pursuant Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[5] First, Obrycka

---

[5] The Court conducted *Daubert* hearings as to Obrycka's experts on May 26, 2011 and June 10, 2011, and issued *Daubert* rulings on June 2, 2011, June 16, 2011, June 29, 2011, and July 5, 2011. (R. 317, 324, 341, 344, 351.)

offers the expert opinion of Lou Reiter, Obrycka's law enforcement administrative, organizational, and management procedures expert. (Pl.'s Stmt. Facts ¶ 45.) Reiter opined on the existence and impact of the code of silence within the Chicago Police Department. (*Id.*) He stated that based upon his knowledge of the Chicago Police Department in particular and police organizational structures in general, during the time frame of February 2007 and for a substantial period of time prior to February 2007, the Chicago Police Department had an organizational environment where a code of silence and deficient administrative investigations and disciplinary procedures were present allowing police officers to engage in misconduct with little fear of sanctions. (*Id.*) Reiter further opined:

> The failure of the Chicago Police Department to acknowledge its potential and take affirmative steps to eliminate or minimize the influence of the Code of Silence, in my opinion, is a conscious choice various Chicago Police managers and executive officers have taken and, in my opinion, represents a position of deliberate indifference by the Chicago Police Department to this disruptive issue within the agency. Any reasonable officer in the Chicago Police Department would be aware of the systemic deficiencies in the administrative investigative process and the discipline deliberative system coupled with the entrenched affect of the Code of Silence. Those officers who engage in misconduct and violate citizens' Constitutional rights would do so with the perception that their misconduct would go undiscovered or investigated in such a deficient manner or subjected to prolonged delay in adjudication that they would not be held accountable or sanctioned.

(R. 272, Ex. B, Reiter Op., ¶ 35.)

In further support of her code of silence theory, Obrycka presents the expert testimony of Dr. Steven Whitman, who is her expert statistician. (*Id.* ¶ 46.) Dr. Whitman opined that based upon his statistical analysis of the rates of sustained findings in force-related complaints for Chicago police officers from 1999 through 2004, as well as specific data rates for the 25th District – where the incident at issue occurred – and the 11th and 20th Districts – in which

13

Abbate had worked in the five years prior to 2007, the sustained rates for force-related complaints against Chicago police officers over the eight years prior to 2007 were statistically significantly lower than the national average sustained rates reported in the Bureau of Justice Statistics 2006 Citizens Complaints About Police Use of Force Report for the national average for all departments (8%) or the national average for larger departments like Chicago (6%). (*Id*.) Specifically, the average sustained rate within the Chicago Police Department was as low as 0.5% in 2004. (*Id.*) Dr. Whitman also observed that in the 25th District from January 2005 through February 2007, not one of the 147 excessive force complaints was sustained, and in the 11th and 20th Districts, the sustained rate was only 1.2%. (*Id.*)

Viewing these facts and all reasonable inferences in Obrycka's favor – as the Court is required to do at this procedural posture – Reiter's opinion that a code of silence exists within the Chicago Police Department allowing police officers to engage in misconduct with little fear of reprisal, coupled with Dr. Whitman's analysis showing that the Chicago Police Department has statistically significantly lower rates than the national average of sustained rates for police misconduct complaints, Obrycka has presented evidence creating a genuine dispute as to the material fact that a code of silence exists within the Chicago Police Department. Moreover, other evidence in the record supports Obrycka's code of silence theory, including the fact that after Abbate punched and kicked Obrycka and realized that his conduct was videotaped, Abbate and his partner made dozens of telephone calls to each other and other Chicago police officers, including police detectives. Other evidence that supports the existence of a code of silence includes Officers Masheimer's and Knickrehm's failure to include in the final police report that Abbate was a police officer and that the attack was videotaped. A reasonable jury could infer

that these numerous telephone calls and Officers Masheimer's and Knickrehm's conduct constituted an effort to protect Abbate from police brutality allegations or to cover-up Abbate's misconduct.

Nonetheless, the City argues that there are no genuine factual disputes as to the existence of a code of silence and that the City is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a). The City specifically takes issue with Reiter's opinion arguing that he only identified six indicators of the code of silence as it applies to this case. The City, however, made this argument in its *Daubert* motion and the Court rejected it. (R. 272, Def.'s Mot. to Bar, at 7.) Moreover, the City's argument that these indicators are not reliable because they occurred after Abbate hit and kicked Obrycka is unavailing because Reiter based his opinion on more than these indicators, including his vast experience and knowledge of law enforcement in general and the Chicago Police Department in particular. Indeed, these specific indicators – such as Officers Knickrehm's and Masheimer's failure to report that Abbate was a police officer and that the incident was caught on videotape in their final police report – serve as illustrations of the code of silence in the context of the February 19, 2007 incident and the subsequent investigation. In sum, the City's attempt to re-litigate this issue is unavailing and does not establish that there are no genuine disputes as to the material fact that a code of silence did not exist and that the City is entitled to judgment as a matter of law. Meanwhile, as the Court explained in its earlier *Daubert* order, the City will have the opportunity to cross-examine Reiter regarding the basis of his conclusions at trial. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir. 2000) ("question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after

15

opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.").

### B.    Causation

Next, the City argues that Obrycka cannot fulfill the causation requirement, namely, that the City's *de facto* policy – with the attendant code of silence – was the "moving force" behind her constitutional injury. *See Bryan County,* 520 U.S. at 407-08. In other words, Obrycka must set forth evidence demonstrating a direct causal link between the *de facto* policy and code of silence and the deprivation of her substantive due process liberty interest in bodily integrity. *See id.* at 404; *Thomas,* 604 F.3d at 306. Construing the facts and all reasonable inferences in Obrycka's favor, she has presented evidence raising a genuine dispute as to the material fact that the City's *de facto* policy and code of silence caused her constitutional deprivation. More specifically, while Abbate was at Jesse's Shortstop Inn on February 19, 2007, he was physically and verbally abusive with several patrons of the bar and Obrycka. He yelled out "Chicago Police Department" while flexing his biceps on several occasions that evening. While kicking and punching Obrycka, he stated "nobody tells me what to do." A reasonable jury could conclude that based on Abbate's conduct, he was acting with impunity and in a manner in which he thought he was impervious to the consequences of his misconduct. In addition, after he attacked Obrycka, Abbate and his partner made numerous telephone calls to other Chicago police officers. A reasonable jury could infer that Abbate and his partner made these telephone calls to trigger the code of silence, namely, to initiate a cover-up of his misconduct.

Also, viewing the facts and all reasonable inferences in Obrycka's favor, there is evidence in the record that Abbate's conduct triggered the code of silence – such as Officers

Knickrehm and Masheimer not including the facts that Abbate was a police officer and that there was a videotape of the incident in their final police report of the February 19, 2007 incident. Further evidence of the code of silence – construed in Obrycka's favor – includes police officers interviewing Obrycka and handing her a pre-typed complaint form for a misdemeanor battery before the State's Attorney's Office had the opportunity to properly review the incident for charges. Accordingly, Obrycka has made a sufficient showing at summary judgment that the City's *de facto* policy and the code of silence caused her constitutional injury.

### C. Culpability

The City further argues that Obrycka must show that the municipal action was taken with deliberate indifference as to the known or obvious consequences based on the Supreme Court's decision in *Bryan County*. *See id.* at 405-07. The *Monell* claim in *Bryan County*, however, was based on a facially lawful policy, namely, a sheriff's lawful hiring decision. *See id.* at 405-07; *see also Rasche v. Village of Beecher,* 336 F.3d 588, 599 (7th Cir. 2003) (First Amendment *Monell* claim based on village's lawful zoning ordinances). To clarify, "a plaintiff seeking to establish municipal liability on the theory that a *facially lawful* municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bryan County,* 520 U.S. at 407 (emphasis added).[6]

_____

[6] Despite the fact that Obrycka's theory under *Monell* involves a *de facto* policy, the City, relying on *Vodak v. City of Chicago,* 639 F.3d 738 (7th Cir. 2011), maintains that Obrycka must establish that the City – through its final policymaker – was deliberately indifferent. The City's argument does not apply under Obrycka's theory of liability. To clarify, the plaintiffs' theory of liability in *Vodak* did not concern a *de facto*, widespread policy in which the City's policy was the moving force behind the constitutional violation. Instead, the policy at issue in *Vodak* was a Chicago Police Department General Order concerning mass demonstrations in

Here, Obrycka does not attack a facially lawful policy or municipal action.  Instead, she alleges that there is an unlawful, *de facto* policy of impeding and interfering with police misconduct investigations and that this policy, along with the code of silence, directly caused her constitutional injury.  As the *Bryan* Court explains, when "a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."  *Id*. at 404 (emphasis in original).  The *Bryan* Court further articulated, "Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right."  *Id.* at 405 (quoting *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).  In "any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation."  *Id.*; *see also Dye v. Wargo,* 253 F.3d 296, 298-99 (7th Cir. 2001).

Obrycka's *Monell* claim is based on the substantive component of the Fourteenth Amendment's Due Process Clause "that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (quoting *Daniels,* 474 U.S. at 331).  In particular, Obrycka relies upon her fundamental liberty interest in bodily integrity.  *See Rochin,* 342 U.S. at 172.  For Obrycka to recover on substantive due process grounds, she must show that the City "exercised its power without reasonable justification in a manner that 'shocks the conscience.'" *Bettendorf v. St. Croix County,* 631 F.3d 421, 426 (7th Cir. 2011).  "[C]onscience-shocking behavior is likely to be found where the

---

which the Superintendent of Police was the final policymaker and authorized the police to arrest demonstrators.  *See id.* at 747-48 ("the superintendent *was* the City, so far as the demonstration and arrests were concerned") (emphasis in original).

'conduct [is] intended to injure in some way unjustifiable by any government interest.'" *Steen v. Myers,* 486 F.3d 1017, 1023 (7th Cir. 2007) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed. 2d 1043 (1998)).[7]

In response to Defendant's summary judgment motion, Obrycka presents evidence of a widespread policy and code of silence that allow for police misconduct and brutality without the fear of repercussions, thus affording "brutality the cloak of law." *See Rochin,* 342 U.S. at 173. As the *Rochin* Court explained, "[n]othing would be more calculated to discredit law and thereby brutalize the temper of society." *Id.* at 174. Thus, viewing the evidence and all reasonable inferences in Obrycka's favor, she has raised a genuine issue of material fact as to the culpability requirement, namely, the City's *de facto* policy and the code of silence "shock the conscience" because the alleged policies allow for police brutality and misconduct unjustifiable by any governmental interest. *See Lewis,* 523 U.S. at 849.

**D.     *Heller* Argument**

In its opening brief, the City mentions that because Abbate did not violate Obrycka's rights under the First Amendment and Equal Protection Clause, the City cannot be held liable. The City, however, did not develop this argument or cite to any legal authority, namely, *Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), until its reply brief. Even if the City had properly developed its argument based on *Heller* in its opening brief, this argument fails because Obrycka's theory of municipal liability based on the alleged

---

[7] Although the *Lewis* Court differentiated between three levels of fault, namely, negligence, deliberate indifference, and conscious-shocking, the Seventh Circuit cautions against reading these classifications too rigidly. *See Bublitz v. Cottey,* 327 F.3d 485, 490 (7th Cir. 2003); *see, e.g., Carter v. Simpson,* 328 F.3d 948, 952 (7th Cir. 2003) ("conduct that is 'deliberately indifferent' may in certain circumstances 'shock the conscience'").

widespread practice of concealing or suppressing investigations into police officer misconduct is not dependent on Abbate violating her constitutional rights, especially because Abbate was not involved in any such investigations. *See Thomas,* 604 F.3d at 304-05 (city's polices can harm plaintiff even if officer not individually culpable). In other words, under the circumstances, it would not be an inconsistent verdict if the jury found the City liable based on its *de facto* policy, but not Abbate for his own conduct. *See id.* at 305 ("a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict") (emphasis in original).[8]

Similarly, for the first time in its reply brief, the City argues that Obrycka should have brought her constitutional claims pursuant to the Fourth Amendment based on *Graham v. Connor,* 490 U.S. 386, 395, 104 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Because the City raised this argument for the first time in its reply brief, the City has waived this argument. *See Palka,* 662 F.3d at 438; *Gross v. Town of Cicero, Ill.,* 619 F.3d 697, 704-05 (7th Cir. 2010).

## II.    Count V – Indemnification

Last, the City contends that it does not have any indemnification obligations in relation to Abbate's alleged misconduct because he was not acting within the scope of his employment. *See* 745 ILCS 10/9-102. In response to the City's summary judgment motion, Obrycka concedes that the City does not have an obligation to indemnify her for Abbate's alleged misconduct under

---

[8] In support of its *Heller* argument, the majority of the City's legal argument is in a footnote in its reply brief. *See Long v. Teachers' Retirement Sys. of Ill.,* 585 F.3d 344, 349 (7th Cir. 2009) (arguments made in footnotes are waived). In that footnote, the City attempts to distinguish the Seventh Circuit's *Thomas* holding by relying on *Thomas v. Cook County Sheriff's Dep't,* 588 F.3d 445 (7th Cir. 2009) – an opinion that was amended and superseded on the denial of rehearing by *Thomas v. Cook County Sheriff's Dept.,* 604 F.3d 293, 306 (7th Cir. 2010). Hence, the City's arguments based on the 2009 *Thomas* decision are unavailing.

Count I, acknowledging that Abbate was not acting within the scope of his employment when he attacked her. Obrycka, however, contends that the City has the duty to indemnify her for Abbate's alleged misconduct after he attacked her and in relation to her conspiracy claims in Counts II, III, and IV. The City does not sufficiently address why Abbate was not acting within the scope of his employment in the context of Obrycka's allegations in Counts II, III, and IV. *See Clarett,* 657 F.3d at 674 ("undeveloped arguments are considered waived"); *see also Coles v. City of Chicago,* 361 F.Supp.2d 740, 750 (N.D. Ill. 2005) ("Facts related to the subjective intent of the employee are highly relevant to the scope of employment issue.").[9] Therefore, the City has failed in its burden of establishing that there are no genuine disputes as to any material fact that Abbate was not acting within the scope of his employment. *See Celotex*, 477 U.S. at 323. As such, the Court grants the City's summary judgment motion as to its obligation to indemnify Obrycka on Count I, but denies the City's motion as to Counts II, III, and IV.

---

[9] The parties did not take Abbate's deposition due to Abbate's criminal prosecution and his assertion of his Fifth Amendment privilege against self-incrimination.

## CONCLUSION

For the these reasons, the Court grants in part and denies in part the City's motion for partial summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a). Because the Court addressed Obrycka's objections to Defendant's Local Rule 56.1(a)(3)(A) Statement of Facts in the context of each fact, the Court denies Obrycka's motion to strike as moot. Also, the Court strikes Defendant's motion to strike Obycka's Local Rule 56.1(b)(3)(C) Statement of Additional Facts as untimely because the Court granted the City two extensions of time to file its Reply Brief and Response to Obrycka's Statement of Additional Facts, yet the City did not file its motion to strike until after the final January 31, 2012 deadline.

**Date:** February 23, 2012

**ENTERED**

_____

**AMY J. ST EVE**
**United States District Court Judge**