## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KAROLINA OBRYCKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 C 2372 |
| | ) | |
| CITY OF CHICAGO and ANTHONY ABBATE, JR., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiff Karolina Obrycka's motion in limine in which she seeks to bar the expert testimony of Richard McCleary, Ph.D., pursuant to Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993). As explained in detail below, the Court grants in part and denies in part Plaintiff's *Daubert* motion as to Dr. McCleary.[1]

### BACKGROUND

On April 30, 2007, Plaintiff brought a five-count Complaint alleging that Defendants City of Chicago and former Chicago police officer Anthony Abbate, Jr. violated her constitutional rights in relation to an incident on February 19, 2007 at Jesse's Shortstop Inn in Chicago, Illinois and the subsequent investigation into that incident. Specifically, Plaintiff

---

[1] Plaintiff filed this *Daubert* motion late. Specifically, she filed it on July 20, 2012, even though all *Daubert* motions were due on or before November 9, 2010. (R. 269.) For the sake of completeness, however, the Court will address Plaintiff's late-filed *Daubert* motion. *See Dotson v. Bravo,* 321 F.3d 663, 667 (7th Cir. 2003) (federal courts have inherent authority to control their own dockets).

maintains that the *de facto* policies of the City of Chicago – through the conduct of members of the Chicago Police Department's ("CPD") Office of Professional Standards ("OPS") and the Department's Internal Affairs Division ("IAD") in impeding and interfering with the investigation of police misconduct, including police brutality – deprived her of her Fourteenth Amendment substantive due process liberty interest in bodily integrity.  *See Monell v. Department of Soc. Servs. of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Plaintiff seeks to establish her *Monell* claim by presenting evidence that the City has a well-settled, widespread practice or custom of impeding and interfering with police misconduct investigations.  Moreover, Plaintiff argues that there is an attendant "code of silence" that exists within the CPD, whereby officers conceal each other's misconduct in contravention of their sworn duties.  Plaintiff asserts that this *de facto* policy and the code of silence are evidenced and caused by the CPD's failure to: (1) sufficiently investigate allegations of police misconduct; (2) accept citizen complaints against police officers; (3) promptly interview suspected officers or take witness statements and preserve evidence; (4) properly and sufficiently discipline officers; and (5) maintain accurate and complete records of complaints and investigations of misconduct. Plaintiff also contends that the CPD fabricates exculpatory evidence or destroys evidence when investigating citizen complaints against its police officers.  Further, Plaintiff maintains that this *de facto* policy and the code of silence encourage Chicago police officers to engage in misconduct with impunity and without the fear of official consequences.

In order to counter Plaintiff's *Monell* claim, the City has identified Dr. Richard McCleary as an expert.  Plaintiff challenges Dr. McCleary's opinions under Rule 702 and *Daubert*.

**LEGAL STANDARD**

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in Daubert[.]" *Lewis v. CITGO Petroleum Corp*., 561 F.3d 698, 705 (7th Cir. 2009). "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)); *see also Lapsley v. Xtek, Inc*., ___ F.3d ___, 2012 WL 3055865, at *1 (7th Cir. July 27, 2012) ("The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be "based on sufficient facts or data," use "reliable principles and methods," and "reliably appl[y] the principles and methods to the facts of the case.") (quoting Fed. R. Evid. 702)). Whether to admit expert testimony rests within the discretion of the district court. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); *Lapsley*, 2012 WL 3055865, at *6 ("we 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable'") (quoting *Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705.

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid.

702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011).

District courts employ a three-part analysis before admitting expert testimony: (1) the

expert must be qualified as an expert by knowledge, skill, experience, training, or education;

(2) the expert's reasoning or methodology underlying his testimony must be scientifically

reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence

or to determine a factual issue.  *See Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir.

2010).  "The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony

to determine if it has "the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field" so as to be deemed reliable enough to present to a jury." *Lapsley*,

2012 WL 3055865, at *1 (quoting *Kumho Tire Co.*, 526 U.S. at 152).

## ANALYSIS

### I.    Dr. McCleary's Qualifications

Defendants properly designated Richard McCleary, Ph.D. as an expert criminologist and

statistician pursuant to Federal Rule of Civil Procedure 26(a)(2).  Specifically, Dr. McCleary is a

criminologist with a special emphasis in statistical analysis as it relates to public policy.  He has

a Ph.D. from Northwestern University in sociology with a concentration in criminology and

statistics.  Prior to his doctoral studies, Dr. McCleary studied mathematics and social studies in

graduate school at Northwestern University, where he received a Masters degree.  As an

undergraduate student at the University of Wisconsin, Dr. McCleary studied mathematics.  Since

receiving his doctorate, Dr. McCleary has been a sociology and criminal justice professor at the University of California-Irvine, the University of New Mexico, the State University of New York-Albany, Arizona State University, and the University of Illinois. Presently, Dr. McCleary is a professor of criminology at the University of California-Irvine, where he teaches graduate level statistics courses, crime measurement, and spatial distribution crime. Dr. McCleary has also served on federal and state government task forces, and editorial boards of national peer review journals.

In the past thirty-five years, Dr. McCleary has authored or co-authored numerous books, chapters of books, articles, and reviews in the area of statistical modeling, including, but not limited to (1) "Applied Time Series Analysis for the Social Sciences," (2) "Interrupted Time Series Analysis," (3) "Evolution of Time Series Experiment," (4) "Philosophical and Statistical Foundations of Time Series Experiments," (5) "The Impact of a Crime Wave: Perceptions, Fear, and Confidence in the Police," (6) "Uniform Crime Reports as Organizational Outcomes: Three Time Series Experiments," (7) "Interrupted Time Series Analysis of Crime Statistics: the Case of Organizational Reforms," (8) "How Parole Officers Use Records," and (9) "The Mathematics of Behavioral Change." Dr. McCleary has conducted extensive research in the areas of statistical forecasting, including the forecasting of prison populations and crime rates. In addition, Dr. McCleary has been an expert witness in numerous state and federal lawsuits, especially in cases involving the secondary effects of sexually oriented business, including crime-related hazards. *See, e.g., Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla*., 630 F.3d 1346, 1351 (11th Cir. 2011); *Abilene Retail No. 30, Inc. v. Board of Comm'rs of Dickinson County, Kan.*, 492 F.3d 1164, 1170 (10th Cir. 2007).

Moreover, Dr. McCleary, as a criminologist, has had experience working with police departments. Dr. McCleary, for example, has lectured at police training academies, including the FBI National Academy. In addition, Dr McCleary has worked with police departments on several of his research projects, including: (1) training police on uniform coding of crimes and excessive force complaints through a grant from the U.S. Bureau of Justice Statistics to the New Mexico Criminal Justice Statistical Analysis Center; (2) studying crime rates in a native village in Alaska pursuant to grants from the United States Department of the Interior and Alaska Department of Public Safety, resulting in a published article entitled "Social Indicators in Native Village Alaska;" (3) conducting time series analysis relative to a policing program in Phoenix, Arizona which resulted in two published articles, "The Impact of a Crime Wave: Perceptions, Fear and Confidence in Police" and "Uniform Crime Reports as Organized Outcomes: Three Time Series Experiments;" (4) training police officers to work with crime victims with developmental disabilities as reported in: "Crime Victims with Developmental Disabilities: Report of a Workshop;" and (5) evaluating the effects of drinking and driving laws in numerous jurisdictions.

## II.     Dr. McCleary's Opinions

Dr. McCleary's May 24, 2010 expert report sets forth his opinions, the data and information upon which he relied, and the exhibits he expects to use at trial. His conclusions are as follows:

- Controlling for size of the population served, the number of sworn officers, and the volume of calls for service, the Chicago Police Department (CPD) has a lower than expected number of excessive force complaints.

- The lower than expected number of excessive force complaints filed

6

against CPD officers can be attributed to policies aimed at minimizing excessive force complaints either directly or indirectly.

1.      The first set of policies concerns recruitment and training of applicants for sworn officer positions.  Compared to other U.S. police departments,

   (a)      Applicants for sworn positions in the CPD have higher educational credentials.

   (b)      Applicants for sworn positions in the CPD receive more hours of training both in and out of the academy.

2.      A second set of polices relates to the CPD's integration of new sworn officers into the force and its retention of experienced officers.  Compared to other U.S. police departments,

   (a)      New recruits constitute a smaller than average proportion of the CPD's force of sworn officers.

   (b)      CPD's retention rate for sworn officers is higher than average.

3.      A third set of policies relates to the use of explicit protocols to govern the interactions between sworn officers and members of the community.  Compared to other U.S. police departments, the CPD has a higher proportion of explicit protocols covering interactions in areas identified by researchers as crucial to community relations.

4.      A fourth set of policies relates to the level of resources provided for meeting the community's demand for police services.  Compared to other U.S. police departments, the CPD's rate of calls and dispatchers per sworn officer is lower than average.

5.      A fifth set of policies relates to the diversity of the CPD's force of sworn officers.  Compared to other U.S. police departments, the CPD's force of sworn officers includes higher proportions of women and minorities.

6.      A sixth set of policies relates to the CPD's community outreach programs and initiatives.  Compared to other U. S. police departments, the CPD operates a higher proportion of the types of programs that researchers have identified as crucial to maintaining strong community relations.

7.      Finally, a seventh set of polices relates to the procedures used by the CPD to adjudicate excessive force complaints, the CPD has adopted state-of-

the-art procedures for adjudicating excessive force complaints against officers.

- Controlling for the number of officer-citizen interactions, the CPD has a lower than expected number of excessive force complaints. The CPD's lower than expected rate of complaints is consistent with the CPD's policies and procedures, that, based on research, could be expected to reduce the risk of excessive force incidents.

(R. 475-1, Ex. A, McCleary Expert Report, at 1-2.)

## III.    Dr. McCleary Lacks Foundation for His Qualitative Conclusions

"'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citation omitted). In performing its gatekeeping function, the Court must determine not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Id.* at 617 (internal quotation and citation omitted). Assuredly, "experts commonly extrapolate from existing data." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.2d 416, 419-20 (7th Cir. 2005) (quotation omitted). "Reliable inferences," however, "depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert." *Id.* (citation omitted). "The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (internal citations omitted)).

In support of her *Daubert* motion, Plaintiff argues that while Dr. McCleary is a qualified statistician and criminologist in a general sense, he does not have the academic, professional, or practical expertise in the field of policing, police organizations, and police occupational culture to render his qualitative opinions. Dr. McCleary's past expert trial testimony, for example, has

8

focused on time series analyses[2] and the study of crime rates involving the secondary effects of sexually oriented businesses. Moreover, Dr. McCleary testified at his deposition that he has never conducted an audit, statistical study, or field study of a police department for any relevant organizational issues outside of budgeting. (R. 475, Ex. C., McCleary Dep., at 15-19, 57.) According to Dr. McCleary, his May 24, 2010 expert report is the first time that he has conducted any such study. (*Id.*) In addition, although Dr. McCleary has worked with police departments collecting crime data, not one of Dr McCleary's publications addresses the organizational or occupational culture of police organizations, let alone police officer misconduct. Instead, Dr. McCleary has published statistical analyses on natural disasters, homicides and suicide, drunk driving, politics, and religion. As such, Dr. McCleary lacks foundation for his qualitative conclusions.

Dr. McCleary, for example, opines that "[t]he lower than expected number of excessive force complaints filed against CPD officers can be attributed to policies aimed at minimizing excessive force complaints either directly or indirectly," such as "state-of-the-art procedures for adjudicating excessive force complaints against officers." Dr. McCleary is not qualified to give this specific opinion – not only because he does not have the academic, practical, or professional experience to do so – but also because he failed to conduct a field investigation of the CPD, review Complaint Registers,[3] rely upon the Collective Bargaining Agreement that speaks to the

---

[2] "In statistics, signal processing, econometrics and mathematical finance, a time series is a sequence of data points, measured typically at successive time instants spaced at uniform time intervals.... Time series analysis comprises methods for analyzing time series data in order to extract meaningful statistics and other characteristics of the data." *See* "Time Series," Wikipedia, http://en.wikipedia.org/wiki/Time_series (visited September 6, 2012).

[3] A Complaint Register ("CR") file is a compilation of documents related to the City of Chicago's internal investigation of allegations of misconduct against its police officers. *See*

progressive disciplinary structure involving police officer misconduct, or review the IAD

Standard Operating Procedures and the OPS Standard Operating Procedures Manual, among

other CPD-specific materials. *See Obrycka v. City of Chicago,* 792 F.Supp.2d 1013, 1024 (N.D.

Ill. 2011). And, although Dr. McCleary maintains that he reviewed the City's policies regarding

the manner of investigating allegations of police officer misconduct, including Chicago Police

General Orders 5-02 and 5-04, General Orders 5-02 and 5-04 concern the special response plans

for large scale emergencies and haz-mat incidents, respectively. Also, Dr. McCleary relied upon

Chicago Police General Orders 97-10 and 97-11, which discussed the CPD's Behavioral

Intervention System and Personnel Concerns Program, yet General Order 97-10 was rescinded in

May 2005 and General Order 97-11 was rescinded in March 2005 – well before the February

2007 incident underlying this lawsuit. Furthermore, Dr. McCleary testified at his deposition that

he could not recall the exact content of these general orders, although he did testify that he

believed these policies involved excessive force complaints and police pursuits. (*See* McCleary

Dep., at 26-27, 64-65, 148-52.) Dr. McCleary's deposition testimony reveals, however, that the

police pursuit policies upon which he relied were rescinded in 2003. (*Id*. at 152.) In addition,

Dr. McCleary's opinions regarding the policies that attributed to the lower rate of excessive

force complaints go far beyond mere statistical work as the City claims.

   In summary, Dr. McCleary's lack of professional, practical, or academic expertise in

assessing police organizations and police culture, along with his failure to review CPD-specific

materials, supports the conclusion that he lacks foundation for his qualitative conclusions in

which he opines that the certain CPD's policies caused a lower than expected number of

_____

*Obrycka v. City of Chicago,* No. 07 C 2372,  2011 WL 2633783, at *2 (N.D. Ill. July 5, 2011).

excessive force complaints as compared to other police departments. Accordingly, these

conclusions are not sufficiently reliable under *Daubert* and Rule 702. *See Daubert,* 509 U.S. at

590 ("'knowledge' connotes more than subjective belief or unsupported speculation");

*Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir. 2010) (expert "cannot

simply assert 'bottom line'" . . . "[n]or may the testimony be based on subjective belief or

speculation"); *Wendler & Ezra, P.C. v. American Int'l Group, Inc.,* 521 F.3d 790, 791-92 (7th

Cir. 2008) ("An expert who supplies nothing but a bottom line supplies nothing of value to the

judicial process.") (citation omitted); *Ammons v. Aramark Unif. Servs.,* 368 F.3d 809, 816 (7th

Cir. 2004) ("a court is expected to reject 'any subjective belief or speculation.'") (citation

omitted). The Court therefore grants Plaintiff's *Daubert* motion in regard to Dr. McCleary's

conclusions as to the reasons why the CPD has a lower than expected number of excessive force

complaints as compared to other police departments.[4]

### III.    Dr. McCleary's Quantitative Analysis

Plaintiff also challenges Dr. McCleary's methodology concerning his underlying

quantitative conclusion that the CPD has a lower than expected number of excessive force

complaints compared to other police departments. To clarify, Dr. McCleary's expert report

explains:

---

[4] In its response brief, the City states that "[t]o the extent that Dr. McCleary's remarks
that the City of Chicago's policies were "state of the art" and that the City of Chicago has a
"model police agency" are deemed qualitative in nature, the City agrees to withdraw them." (R.
498, Resp. Brief, at 9.) The City, however, did not agree to withdraw Dr. McCleary's other
qualitative opinions in which he concluded that certain CPD policies caused the lower than
expected number of excessive force complaints.

11

## 3.1 Expected (vs. Observed) Excessive Force Complaints

**Table 3.1** reports statistics on excessive force complaints in 2002 reported by the 522 municipal police departments that responded to these items on the 2003 LEMAS survey.[5]  In subsequent sections of this report, these 522 departments will be used to compare the CPD's standing with respect to policies and procedures aimed at reducing citizens' excessive force complaints.

The CPD reported 2,890 excessive force complaints; 915 of these complaints were unfounded or resulted in exoneration, leaving a total of 1,975.  Although this number is large in absolute terms, taken in the context, the number is approximately 8.1 percent lower than the number of expected of comparable departments.

....

To determine the number of complaints that the CPD *should* have had statistically, the number of complaints that were unfounded or that resulted in an exoneration was subtracted from the total of each of the 522 municipal police departments that responded to these items on the LEMAS survey.  The net number of complaints was then statistically adjusted to control the effects of (1) differences in populations, (2) differences in sworn officers, (3) differences in calls for service, and (4) differences in states that might affect the number of complaints.  Controlling for population, sworn officers, calls for service, and state, the CPD was statistically expected to have 2,137 excessive force complaints in 2002.  Since the observed number was 1,975, the CPD had 162 fewer complaints than what would be statistically expected of a department with the same number of citizen-officer interactions located in the same state (Illinois).

---

[5]  In 2003, the United States Department of Justice, Bureau of Justice Statistics ("BJS"), published a nationwide Law Enforcement Management and Administrative Statistics ("LEMAS") survey.  According to the Department of Justice, Bureau of Statistics website:

Conducted every 3 to 4 years, LEMAS collects data from over 3,000 state and local law enforcement agencies, including all those that employ 100 or more sworn officers and a nationally representative sample of smaller agencies.  Data are obtained on the organization and administration of police and sheriffs' departments, including agency responsibilities, operating expenditures, job functions of sworn and civilian employees, officer salaries and special pay, demographic characteristics of officers, weapons and armor policies, education and training requirements, computers and information systems, vehicles, special units, and community policing activities.

http://bjs.ojp.usdoj.gov.  The latest data available is from the 2003 LEMAS survey.  *See id.*

(McCleary Expert Report, at 3-4.) (emphasis in original).

In her *Daubert* motion, Plaintiff argues that Dr. McCleary improperly manipulated the statistics because he developed his expected complaint rate by controlling for four variables, yet the study's author, Dr. Matthew J. Hickman, who is Defendant's other expert statistician and criminologist, proscribed that only three variables should be controlled, namely, agency type, size, and population served. (R. 475-1, Ex. E, "Citizens Complaints About Police Use of Force," Matthew J. Hickman, Ph.D., at 7.) Therefore, by controlling for the number of sworn officers, Plaintiff argues that Dr. McCleary's statistical method to generate the expected number contradicts Dr. Hickman's proscriptions, and thus Dr. McCleary's entire methodology and results are unreliable.

In response, the City argues that the Bureau of Justice Statistics via Dr. Hickman did not prescribe any control variables for statistical analysis and that it was proper for Dr. McCleary to use control variables that he deemed statistically relevant. The City further contends that Plaintiff's disagreement with Dr. McCleary's choice of control variables does not invalidate the entire study. Instead, the City maintains that Plaintiff may challenge Dr. McCleary's choices on cross-examination. The Court agrees. As the Seventh Circuit recently explained, a "*Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 2012 WL 3055865, at *1 (citing *Daubert,* 509 U.S. at 596).

Plaintiff also challenges Dr. McCleary's methodology based on Dr. Hickman's 2006 article in which he cautions:

> Citizen complaints data must be interpreted with caution.  Differences in how agencies receive, process, and record complaints can account for differences in the volume and rate of complaints across agencies.  Likewise, the citizen's decision whether to file a complaint may be influenced by both citizen and agency characteristics, and other factors.
>
> ....
>
> Finally, the meaning of the complaint rate is not entirely clear: a low force complaint rate could mean that police are performing well or that the complaint process is inaccessible; likewise, a high force complaint rate could mean that the officers use force often or that the complaint process is more accessible.

(Ex. E, "Citizens Complaints About Police Use of Force," Matthew J. Hickman, Ph.D., at 4.)

Again, Plaintiff's counsel may address this information when cross-examining Dr. McCleary, or for that matter, when cross-examining Dr. Hickman.  But, to argue that Dr. Hickman's cautionary advice undermines Dr. McCleary's methodology to the point that it is unreliable under *Daubert* is unavailing and would supplant the adversarial process.  *See Gayton,* 593 F.3d at 616 ("Determination on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

Accordingly, the Court denies Plaintiff's Daubert motion as to Dr. McCleary's quantitative opinions.

## IV.    Relevancy

Next, Plaintiff argues that Dr. McCleary's expert opinion testimony is not relevant to her *Monell* claim.  "Rule 702 allows testimony by a qualified expert if such testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue."  *United States v.*

14

*Gallardo,* 497 F.3d 727, 733 (7th Cir. 2007) (quoting Fed.R.Evid. 702). As the *Daubert* Court explains, Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance." *Id.* at 591. Specifically, *"Daubert* instructs that expert testimony must be relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement." *Gallardo,* 497 F.3d at 733. In other words, there has to be a connection between Dr. McCleary's expert opinions and the claims in this lawsuit for his opinions to fulfill the helpfulness standard under Rule 702 because "[e]xpert testimony which does not relate to an issue in the case is not relevant, and ergo, not helpful." *Daubert,* 509 U.S. at 591 (citation omitted).

In her motion, Plaintiff maintains that Dr. McCleary's statistical analysis renders no opinions about what the expected versus observed complaint rate is for the City of Chicago for any year other than 2002. Plaintiff's argument concerns Dr. McCleary's reliance on the 2003 LEMAS survey in which the last data available is from 2002. Plaintiff's expert witness, Dr. Steven Whitman, also relied upon this survey, which the Court found relevant to Dr. Whitman's analysis and reasonable for Dr. Whitman to rely upon. (*See* R. 347, 6/29/11, Whitman *Daubert*, Mem., Op., and Order, at R. 16-17.) In reply, Plaintiff nevertheless argues that the LEMAS data is relevant only because there is more recent data that has been measured against it. Not only are arguments made for the first time in reply briefs waived, *see Wachovia Sec., LLC v. Banco Panamericano, Inc.,* 674 F.3d 743, 758-59 (7th Cir. 2012), Plaintiff's counsel may cross-examine Dr. McCleary about his use of the LEMAS data and its date restrictions.

In addition, Plaintiff contends that the LEMAS data was not the best data available because "Dr. McCleary had reams of other data available to him to evaluate whether his opinions

15

about the expected rate versus the actual rate differences held up over time after 2002." (R. 540,

Pl.'s Reply, at 6.) Plaintiff, however, fails to identify these "reams of other data," and thus

Plaintiff's incomplete argument does not establish that Dr. McCleary's opinion is not relevant

under the circumstances. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)

(underdeveloped, conclusory, and unsupported arguments are waived). As with Dr. Whitman's

expert opinions, the 2003 LEMAS survey is relevant to Dr. McCleary's analysis and reasonable

for Dr. McCleary to rely upon.

## CONCLUSION

For the these reasons, the Court grants in part and denies in part Plaintiff's *Daubert*

motion to bar the expert testimony of Richard McCleary, Ph.D.

**Date:** September 17, 2012

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**