**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAROLINA OBRYCKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-cv-2372 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Amy St. Eve |
| | ) | |
| Defendants. | ) | |

**AMICUS BRIEF OF THE POLICE ACCOUNTABILTY
PROJECT AND THE MACARTHUR JUSTICE CENTER IN
OPPOSITION TO THE PARTIES' MOTION TO VACATE THE JUDGMENT**

The Police Accountability Project of the University of Chicago's Mandel Legal Aid

Clinic and the Roderick and Solange MacArthur Justice Center at Northwestern University

School of Law, by their undersigned counsel, submit this amicus brief to address the public

policy considerations that require denial of the parties' joint motion to vacate the judgment.

**INTRODUCTION**

After years of litigation, this case was tried to a jury verdict, and judgment on that verdict

has been entered in favor of Karolina Obrycka. A review of the docket in this case reveals that an

extraordinary amount of sweat, skill, and time, on the part of the lawyers, the Court, and the

parties went into that accomplishment. It would take an exceptional showing under Rule 60(b)(6)

to justify wiping away that hard-won verdict. The parties would have to show that their private

interest in eliminating the judgment somehow outweighs the public interest in keeping the

judgment intact.

The balancing of interests in this case is not complicated. Initially, the Amici (and the

Court, apparently) believed that the parties' motion required a balancing of Ms. Obrycka's very

important interest in receiving payment of her judgment against weighty public interests that
normally preclude vacating a judgment that has been made of record in a case—*i.e.*, that the
parties' settlement (and Ms. Obrycka's payment) was contingent upon the Court's willingness to
grant the motion to vacate. The parties' counsel informed the Court last Friday, however, that
this is not the case. Instead, Ms. Obrycka will receive the full amount of the jury's award, plus
fees and costs, no matter what the Court decides with regard to the request to vacate the
judgment.

Because justice will be accomplished for Ms. Obrycka in any event, *there is no
remaining equitable consideration to balance against the strong interests that favor keeping the
judgment intact.* The City's argument is that the judgment should be vacated simply and solely
because it would prefer not to have to litigate the collateral estoppel implications of the judgment
in future cases. That contention finds no support in any case of which the Amici are aware. To
the contrary, it flies directly in the face of the established principle that the possible use of a
judgment in future cases is actually an important reason to keep judgments on the books and to
reject motions like the one filed here. This Court should firmly reject the City's position and
deny the joint motion to vacate.

## ARGUMENT

Setting aside a judgment under Rule 60(b) is an "extraordinary remedy" that is granted
only in "exceptional circumstances." *McCormick v. City of Chicago*, 230 F.3d 319, 327 (7th Cir.
2000); *see also*, *e.g.*, *Aearo Corp. v. Chartis Specialty Ins. Co.*, No. 08 CV 0604 DFH-DML,
2010 WL 2925020, at *1 (S.D. Ind. July 19, 2010) ("[T]he Supreme Court has separately
admonished district courts that they, too, must find 'extraordinary circumstances' before they

1

may vacate their decisions under Rule 60(b)(6)" (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863-64 (1988), quoting *Ackermann v. United States*, 340 U.S. 193 (1950)).[1]

In addition, before vacating a judgment, the Court must carefully consider the public interest at stake. *See, e.g.*, *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 26 (1994); *Matter of Mem. Hosp. of Iowa County, Inc.*, 862 F.2d 1299, 1302 (7th Cir. 1988). In doing so, the Court must consider that there is a public interest in the judgment itself. Indeed, the Court "must have at heart the interests of other litigants in future cases, and hold them equal in weight with the interests of today's." *Memorial Hospital*, 862 F.2d at 1302.

Vacatur is an extraordinary remedy, even when parties to the judgment request vacatur by agreement. *Id.* at 1302; *see also Bonner Mall*, 513 U.S. at 26 ("Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." (internal quotes and citation omitted)); *see also id.* ("[P]recedent, a public act of a public official, is not the parties' property…To the extent an opinion permits the invocation of [collateral estoppel], it may have great value to strangers—a value that one or another party to today's case may try to appropriate in the settlement, but which is not theirs to sell."). Judge Easterbrook has explained, "History cannot be rewritten. There is no common law writ of erasure. . . [T]he judicial system ought not to allow the social value of that precedent, created at a cost to the public and other litigants, to be a bargaining chip in the process of settlement. . .  The interests of litigants, in general . . . lie with the orderly operation of a system

---

[1] A copy of this decision, along with a copy of all the other unpublished decisions cited in this brief, is attached hereto as Group Exhibit A.

of justice, one in which conclusions of litigation are recorded and thus preserved for the future."
*Id.* at 1300, 1302, 1303. Moreover, "[t]he independence of the judiciary would be compromised
if courts routinely struck their own decisions because the parties involved were displeased with
the final outcome." *Evans v. Mullins*, 130 F. Supp. 2d 774, 777 (W.D. Va. 2001).

### A. IMPORTANT PUBLIC INTERESTS FAVOR KEEPING THE JUDGMENT INTACT.

There is no doubt that this case implicates critical public interests: it has been one of the
most talked about and written about cases involving police misconduct in recent years. From the
day that the videotape of Officer Abbate's beating of Karolina Obrycka was released to the
public, the community has closely followed what has transpired. This is in part because of the
horrific video footage, but it is also in part because of the specific claims against the City.
Indeed, well before this case, it has been a matter of public concern (and often outcry) that a
"code of silence" has permeated the Chicago Police Department ("the Department") and—in part
because of that code—the City routinely fails to investigate allegations of police misconduct and
to discipline officers who repeatedly engage in police misconduct.

### 1. The Judgment Entered on the Jury Verdict In this Case May Prompt Reform of Corrupt City of Chicago Policies.

The jury verdict in this case has done something of great import: it affirmed the reality of
the code of silence and the role of that code in Abbate's misconduct. After hearing twelve days
of testimony and deliberating for two days, the jury confirmed that the City of Chicago "had a
widespread custom or practice of failing to investigate and/or discipline its officers and/or of a
police code of silence." Dkt. 681 (jury instructions), at 26. The jury further found that either or
both of these practices constituted an exercise of power by the City of Chicago that "shocks the

3

conscience" and was the "moving force" behind Abbate's conduct toward Ms. Obrycka. *Id.* The jury found that the City's practices were the direct cause of the horrific beating of Ms. Obrycka.

There is a larger context to the jury's verdict. The cover-up of Officer Abbate's beating is an unfortunate example of City practices that allow police officers to abuse their authority with impunity. The code of silence and the absence of effective officer discipline have time and again undermined the community's trust in the Department.  Since at least the 1980s,[2] these practices have been, and continue to be, the subject of numerous Section 1983 *Monell* claims. The Burge torture scandal is perhaps the best known example of how the Department's practices facilitated a pattern of sordid misconduct.[3] The more recent Special Operations Section scandal is another example. The very recent, widely reported developments in the re-investigation of the David Koschman homicide suggest that investigative corruption in that matter was covered up for over eight years. Many believe that official cover-ups are a daily fact of life in countless "routine" cases. Against this backdrop, the verdict in this case was profound. The judgment upon that verdict holds out the possibility that the Department—to avoid similar outcomes in future cases—may feel compelled to take action to reform the disciplinary system and to eradicate the code of silence.

For this reason, the potential use of the judgment in this case for collateral estoppel purposes is a public interest factor that weighs heavily against the City's request to vacate. *See*

---

[2] *See Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). In *Jones*, an Area 2 detective, Frank Laverty broke the code of silence in order to exonerate an innocent defendant and was punished by the Department as a result.
[3] *See, e.g.*, *Tillman v. Burge*, 813 F. Supp. 2d 946, 958, 978-79 (N.D. Ill); *Patterson v. Burge*, 328 F. Supp. 2d 878, 898-99 (N.D. Ill. 2004); *Hobley v. Burge*, No. 03 C 3678, 2007 U.S. Dist. LEXIS 12159 (N.D. Ill. Feb. 22, 2007).

*Memorial Hospital*, 862 F.2d at 1302; *see also Pivot Point Int'l, Inc. v. Charlene Products, Inc.*, No. 90 C 6933, 2002 WL 1484488 (N.D. Ill. July 10, 2002). Using the judgment in this case, future litigants in cases whose facts and circumstances are not known to this Court may argue that the judgment here collaterally estops the City from contesting the existence of the municipal policies that were litigated in this case.[4] If the City has to face the prospect of such outcomes, it will have a strong incentive to change the practices that led to Officer Abbate's abuse of Ms. Obrycka. Take away the judgment—and thereby reduce or eliminate the City's risk of having to face collateral estoppel—and the City's incentive to reform will be lowered.

This fact, of course, is not lost upon the public. Both of Chicago's papers have editorialized in favor of allowing the judgment to stand because it serves as a wake-up call to the Chicago Police Department to reform the unfortunate policies that have caused so much harm in this case and in many others. *See* Editorial, *Whitewashing Code of Silence*, CHI. SUN-TIMES (Dec. 4, 2012) ("The city of Chicago has a choice: End the Police Department's code of silence or pretend there is no such thing. The only right choice, of course, is to end the pernicious code of silence, the existence of which a federal jury recently agreed there is no doubt. But the city, for reasons of legal convenience, is asking a judge to set the jury's judgment aside—a bad move for the police, the city and every Chicagoan."); *See* Editorial, *Let the Abbate Judgment Stand*, CHI. TRIB. (Dec. 7, 2012) ("The judgment—and yes, that damning precedent—should stay on the

---

[4] Short of that, litigants may seek to use the verdict and judgment as evidence of a continuing code of silence at a particular point in time, or have a police practices expert rely upon that finding, similar to the way in which the 2003 *Monell* verdict against the City in *Garcia* v. *City of Chicago* has been relied upon. *See, e.g.*, *Arias v. Allegretti*, No. 05 C 5940, 2008 WL 191185, at *4 (N.D. Ill. Jan 22, 2008) (discussing *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 22175618 (N.D. Ill. Sept. 19, 2003)).

books. It is what it is. It should hasten reforms that would spare taxpayers from liability by eliminating police misconduct instead of hiding it.")

### 2. The Judgment Entered on the Jury Verdict in This Case May Serve the Interests of Judicial Economy.

The Seventh Circuit and other courts have recognized that judgments in decided cases benefit the system by enabling future litigants to employ the doctrine of collateral estoppel to avoid re-litigation of facts that have already been decided. *See*, *e.g.*, *Memorial Hospital*, 862 F.2d at 1302-03; *Allen-Bradley Co., LLC v. Kollmorgen Corp.*, 199 F.R.D. 316, 318 (E.D. Wis. 2001) (refusing to vacate substantive order to facilitate settlement and noting that "in the Seventh Circuit, great weight has been accorded the countervailing interest in judicial economy and the effect of the decision upon third parties"); *Evans*, 130 F. Supp. 2d 774 (refusing to vacate jury verdict in Section 1983 excessive force case).

In this case, there can be no legitimate dispute that keeping the judgment intact (and thereby enabling the possible application of issue preclusion against the City in future *Monell* cases raising the same City policies) would be far more economical than forcing the re-litigation of the *Monell* issues that were determined by the jury in this case.

This point should not be lost on the City. In almost every police misconduct case that involves a *Monell* claim, the City asks the court to bifurcate, bar, or otherwise excuse the City from having to litigate *Monell*. *See* Craig B. Futterman *et al.*, 1 DePaul J. for Soc. Just. 251, 258 (2008) (describing the City's legal strategy). In support of such requests, the City typically argues that it is too burdensome for the City to participate in *Monell* discovery and that litigating *Monell* is a waste of judicial resources. In ruling on these motions, Courts in this district that

have recognized the resource burden of *Monell* litigation. *See, e.g.*, *Cruz v. City of Chicago*, No. 08 CV 2087, 2008 WL 5244616, at *1-2 (N.D. Ill. Dec. 16, 2008) ("Motions to bifurcate *Monell* claims are now commonplace . . . . The spate of bifurcation motions and the willingness of many judges to grant them stems in large part from the recognition that, in many (perhaps most) instances, claims of municipal liability require an extensive amount of work on the part of plaintiff's attorneys and experts, and an extraordinary amount of money must be spent in order to prepare and prove them.") (internal quotations and citations omitted).

This case is a rare exception to the pattern. The *Monell* claim against the City was fully litigated all the way to a jury verdict. The docket reflects considerable investment of resources by the Court and the parties to that end. The *Monell* claim was the subject of numerous discovery motions, *Daubert* motions and hearings (the parties retained at least six experts on the subject), extensive summary judgment briefing, and multiple motions *in limine*. *See, e.g.*, Dkt Nos.80, 99, 113, 121, 174, 264, 266, 270, 272, 287, 280-84, 301, 303, 308, 310, 313, 317, 341, 342, 368-424.

If there are cases in which issue preclusion is appropriate, the *Obrycka* judgment will allow plaintiffs to pursue *Monell* claims without imposing similar burdens on the court or the parties—burdens about which the City so often complains. On the other hand, if the *Obrycka* judgment is vacated, all of the resources invested in this case will be of diminished use to future parties who will be deprived of any opportunity to contend that the factual predicate for the *Monell* claims in their cases was already resolved by the jury here.

7

### 3. The Judgment Entered on the Jury Verdict in this Case is the Culmination of the Parties' Litigation and Must Stand.

The judiciary has a strong interest in allowing the judgment in this case to stand because it reflects the culmination of the parties' litigation. If this judgment were vacated, that would incentivize future litigants to engage in wasteful litigation strategies.

The docket in this case reflects repeated efforts by the Court to encourage settlement, including but not limited to two separate referrals to a magistrate for settlement purposes. *See, e.g.*, Dkt. Nos. 83, 341, 436, 442, 447, 619. Apparently neither the damning facts of this case nor the Court's efforts to foster settlement could move the City to make a pre-trial settlement offer of any kind. *See*, *e.g.*, Annie Sweeney & Jason Meisner, *Police Cover-Up Found in Bartender Beating*, CHI. TRIB. (Nov. 14, 2012) (noting the City's refusal to settle on "principle").

The City took a gamble when it decided not to settle Ms. Obrycka's *Monell* claim before trial, and a high-stakes one at that. The City's lawyers were aware that a *Monell* judgment comes with significant collateral consequences, just as they were aware of the likelihood that the jury would find against the City on the *Monell* claim. Nevertheless, the City adamantly refused to settle, forcing the Court, jurors, Ms. Obrycka, her counsel, and City taxpayers (who paid for the City's defense and will pay at least $2 million more in damages and attorneys' fees) to expend enormous resources litigating the case to a jury verdict. Having chosen such a path, the City must live with the consequences of the jury's verdict.

Allowing the City—or any other litigant—to go back and erase this judgment will reward its poor decision-making, and encourage the City (and possibly other litigants) to take unreasonable pre-trial settlement positions. *See Bonner Mall*, 513 U.S. at 28 (observing that

vacatur might discourage settlement because some litigants "may think it worthwhile to roll the dice rather than settle . . . if, but only if, an unfavorable outcome can be washed away by a settlement-related vacatur."); *Evans*, 130 F. Supp. 2d at 775 ("[I]f post-judgment vacatur were a readily available option, parties would be less likely to settle at earlier stages of the controversy."). To put it another way, the City has no incentive to settle future cases if it can buy its way out of estoppel when it loses. This public interest consideration weighs heavily against the Rule 60(b)(6) motion.

## B. THE CITY'S INTEREST IN AVOIDING FUTURE LITIGATION REGARDING ISSUE PRECLUSION DOES NOT OUTWEIGH THE PUBLIC INTERESTS DESCRIBED ABOVE.

The City's position is simple—and deeply flawed. It contends that taxpayer dollars will be wasted if it could be put to the burden of contesting the collateral estoppel effects of the judgment here. On the one hand, the City suggests that the burden of such possible future litigation is a very costly one to impose on Chicago taxpayers—sufficient to offset the weighty public interests discussed in the preceding section. But, on the other hand, the City contends that any argument for the collateral estoppel effect of this judgment would be frivolous—deflating the interests in favor of the judgment. Not surprisingly the City does not cite any authority for its internally inconsistent and extreme position, nor are the Amici aware of any.

The City's reliance on *Mayes v. City of Hammond*, 631 F. Supp. 2d 1082 (N.D. Ind. 2008) is completely misplaced. In *Mayes*, the court found that under the facts of that case, a 25-year old wrongful conviction, the potential preclusive effect of the judgment in future cases was non-existent and therefore the public interest in the judgment was limited. The court's implication was that the larger the class of cases in which the judgment might potentially have

9

preclusive effect, the greater the public interest. Here, the jury's verdict could have preclusive effect in scores (even hundreds) of current and future Section 1983 cases in this courthouse which may now or in the future include similar allegations of *Monell* liability. Indeed, there is every reason to believe that that reality is what lies behind the City's strenuous efforts to convince this Court to vacate the present judgment.

But, more important still, *Mayes* presented a situation with plausible parallels to the situation that the Amici and the Court initially believed was at stake in this case. In *Mayes,* the $9,000,000 judgment posed an unbearable hardship for the municipality, requiring issuance of a bond just to pay a structured settlement; and the private interest of the plaintiff was compelling because he and his family were living in "extreme poverty" and were financially desperate. *Id.* at 1096-98. A settlement deal *that was contingent upon vacation of the judgment as one of its terms* would accomplish justice for the plaintiff and end the case. Thus, the interest in the settlement outweighed the public importance that the judgment might have.

This case stands in stark contrast. The settlement with Ms. Obrycka is secure no matter the ruling on the present motion. And here, unlike *Mayes,* it can hardly be said with any assurance that the judgment could never have preclusive effect in other cases.

To be sure, this Court need not (nor should it) decide whether this judgment should be given preclusive effect in other cases. That question—which necessarily depends on the facts and circumstances of future litigation as to which this Court can only speculate—must be left to future courts to decide on the basis of the issues presented in those cases. *See Independent Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 531 (7th Cir. 1997) (application of collateral estoppel "depends upon a case by case analysis"). What is clear at this juncture is that

10

the City has offered no legitimate reason for this Court to unilaterally deprive future litigants of whatever benefit this judgment might have in cases that are not before this Court. *Cf. Pivot Point*, 2002 WL 1484488 ("I do not know what preclusive effect this judgment legitimately carries for the other pending suit—that is a subject for another judge in another court—but it is an effect that Pivot Point must live with.")

Contrary to the City's presentation, the collateral estoppel effect of this judgment is not a simple issue and another court might well conclude that this judgment has preclusive effect. Certainly, *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905-07 (7th Cir. 1990), on which the City places sole reliance, does not foreclose that result. *La Preferida* dealt with a very specific issue (not present here) of whether a consent judgment should be given preclusive effect. The court observed that consent judgments generally are not afforded such effect except where they clearly evince the parties' intent to foreclose a particular issue. *Id.* at 906. Analyzing the particular consent judgment at issue, the *La Preferida* court found it "ambiguous" in the sense that it could not glean the parties' intent definitively and therefore declined to give it preclusive effect. *Id.* at 906-07. Thus, the applicability of *LaPreferida* to this case is at best debatable.

Nor is there unassailable merit to the City's contention that this judgment is "ambiguous" and therefore unusable in any future case. The jury found that the City had either (1) a widespread custom or practice of failing to investigate and/or discipline its officers; (2) a widespread custom or practice of a police code of silence; or (3) both. Although it might not be possible to know which of these three options the jury chose, this does not mean that the verdict cannot be given preclusive effect. *See, e.g.*, *Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332,

11

344-45 (4th Cir. 1992) (preclusion appropriate where a prior jury finding that the defendants had violated federal securities law necessarily rested on one of four findings because any one of the four findings would establish the necessary scienter in second suit), *opinion vacated on agreed motion by parties*, 1993 WL 524680; *Brown v. R. D. Werner Co.*, 428 F.2d 375, 376 (1st. Cir. 1970) ("As long as each 'of the possible grounds for the former decision is legally sufficient to bring him the result he wants', a party seeking the benefit of collateral estoppel is entitled to it despite a general verdict," citing F. James, Civil Procedure § 11.20, at 580 (1965)); *Haddad v. Border Express, Inc.*, 300 F.2d 885, 886 (1st Cir. 1962) (although it was not clear whether a prior verdict rested on non-negligence of the defendant or negligence of the plaintiff, either ground was sufficient to preclude a second action that would be defeated by either ground alone); *Cf. Schellong v. INS*, 805 F.2d 655, 658 (7th Cir. 1986) ("[A] judgment which is based on alternative grounds is an effective adjudication as to both and is collaterally conclusive as to both."); *United States v. Hans*, 548 F. Supp. 1119, 1125-26 (S.D. Ohio 1982) (applying collateral estoppel even though prior jury finding could be interpreted three ways).

But, in any event, the effect of this judgment in another case is a matter best addressed by the judge before whom that case is pending. *Cf. Rozema v. Marshfield Clinic*, No. 96 C 592-C, 1997 WL 416292, at *16 (W.D. Wis. Mar. 10, 1997) (declining to determine whether a prior judgment is "ambiguous" until there is an opportunity to consider the facts of the case in which preclusion is sought).

The City may certainly prefer not to have to litigate whether this judgment has preclusive effect. But that desire is not a legitimate justification for vacating this judgment.

12

### C.  IT WOULD BE A GRAVE AFFRONT TO THE CITIZENS OF CHICAGO AND THE RULE OF LAW TO VACATE THE JUDGMENT IN THIS CASE.

The City's efforts to vacate this judgment have been deeply offensive to the public. For example, one of the jurors who gave up more than two weeks from his work and life to this case was "appalled" when he learned of the City's motion, and in a call to the *Chicago Tribune* stated:

> By changing [the jury's verdict], it's going to cost the city respect. As a result of this decision of the mayor, the public will lose the respect of the judicial process. And if you lose that, where are you?

John Kass, *Juror Bristles Over Emanuel's Move to Erase 'Code of Silence' Verdict*, CHI. TRIB. (Dec. 6, 2012). The media has taken a similar view. *See* Editorial, *Let the Abbate Judgment Stand*, CHI. TRIB. (Dec. 7, 2012) ("To find for Obrycka, the jury had to determine that the code of silence exists. By seeking to vacate the judgment, the city hopes to erase that finding. That would be an affront to the jury and to the justice system."). These views highlight the skepticism with which the public may view judicial proceedings if parties are allowed to "erase" jury verdicts at will.[5]

In a likely attempt to save face, the City asserted in Court last week that it does respect the jury's verdict, which it does not seek to disturb. The City proceeded to make the specious argument that it wants only to vacate the judgment (as if it were possible to do so without effectively nullifying the jury verdict upon which it is based). This position is disingenuous. What the City truly cares about, and what is ultimately at stake in this motion, is whether other

---

[5] It would be particularly troubling to vacate the finding in this case that the City's Police Department had a code of silence that caused violence to a citizen. The code of silence involves the sort of cover-up that the City has long denied. The City should not be permitted to escape a finding that it covered-up the misconduct of its officers by allowing it to simply erase that adjudication as if it never occurred, and then go on denying a code of silence.

13

litigants will be able to use this judgment for collateral estoppel purposes in other cases. If the judgment is vacated, other courts will never have the opportunity to consider the question. *Korczak v. Sedeman*, 427 F.3d 419, 422 (7th Cir. 2005) (Posner, J.) ("A vacated judgment is not a permissible basis for collateral estoppel."). Of course, that is exactly what the City hopes to accomplish here.

More importantly, if the City is allowed to sweep verdicts such as this one under the rug, it will have no incentive to change. If the judgment stands, however, the City will have the incentive to change its practices in order to avoid estoppel. The City will have to convince future courts that estoppel no longer applies because the Department has made real changes, thereby rendering this verdict inapplicable. That is the way to save taxpayer money—the goal that the City's lawyers so earnestly claim they wish to advance. The present motion—misguided and without legal support—should be firmly rejected.

**CONCLUSION**

For the reasons above, this Court should deny the parties' joint motion to vacate the

judgment.

Respectfully submitted,

**THE POLICE ACCOUNTABILITY
PROJECT OF THE UNIVERSITY OF
CHICAGO'S MANDEL LEGAL AID
CLINIC**

**THE RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER**

By: ___ /s/  Locke E. Bowman
          One of their attorneys

Locke E. Bowman
Roderick and Solange MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-0844

Craig B. Futterman
Edwin F. Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University
Chicago, IL 60637
(773) 702-9611

**OF COUNSEL:**

G. Flint Taylor
People's Law Office
1180 N. Milwaukee Avenue
Chicago, IL 60642
(773) 235-0070

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that a copy of the foregoing document was transmitted to all counsel of record in this matter on December 11, 2012 before the hour of midnight by means of the Court's electronic filing system.

_____/s/ Locke E. Bowman_____